DONALD SPECTER (SBN 83925)
dspecter@prisonlaw.com
SARA NORMAN (SBN 189536)
snorman@prisonlaw.com
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704

SHAWN HANSON (SBN 109321)
shanson@akingump.com
AMIT KURLEKAR (SBN 244230)
akurlekar@akingump.com
ANYA FREEDMAN (SBN 275213)
afreedman@akingump.com
AKIN GUMP STRAUSS HAUER
& FELD LLP
580 California Street, Suite 1500
San Francisco, CA 94104-1036
Telephone: (415) 765-9500
Fax: (415) 765-9501

Attorneys for Plaintiffs Quinton Gray,
Angela Patterson, and Stanley Kujansky

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUINTON GRAY, ANGELA PATTERSON, and STANLEY KUJANSKY, on behalf of themselves and all others similarly situated, | Case No. EDCV13-0444 VAP(OPx) |
| Plaintiffs, | **CLASS ACTION** |
| v. | **CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| COUNTY OF RIVERSIDE, | |
| Defendant. | |

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

**NATURE OF THE ACTION**

1.     Riverside County has one of the largest jail systems in California, with nearly 4,000 men and women held in five detention facilities ("Riverside jails"). This population consists of both pretrial detainees and people serving sentences in local custody (collectively referred to herein as "prisoners").

2.     The thousands of men and women locked up in Riverside's jails face cruel and inhumane deficits in medical and mental health care.  Defendant has known for years that its inadequate health care delivery system places prisoners entering the jails at a serious risk of harm but has failed to take the necessary steps to mitigate the risk.  As a result, prisoners in the Riverside jails are subjected to policies and practices that systematically deprive them of their constitutional right to basic life-saving care.

**JURISDICTION**

3.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.  Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202; and 42 U.S.C. § 1983.

**VENUE**

4.     Venue is proper in the Central District of California under 28 U.S.C. § 1391(b) because Plaintiffs' claims for relief arose in this district and Defendant is located in the district.

**PARTIES**

**Plaintiffs**

5.     Plaintiff Quinton Gray is a prisoner in the Riverside jails in custody of Defendant Riverside County.  He has multiple chronic medical and mental health conditions, including seizures, high blood pressure, severe arthritis, and visual and auditory hallucinations and depression.  He has experienced and continues to experience repeated treatment failures, including delays in adjusting medication

1

1    regimens, lack of appropriate laboratory monitoring and frequent missed doses. His

2    initial intake form, similar to other Riverside files, documented "no" to all questions

3    (including history of seizures and high blood pressure)—demonstrating inadequate

4    intake procedures. Even when Mr. Gray has been seen, he has not received adequate

5    basic primary care: for example, he was not screened for high cholesterol or

6    diabetes, despite his chronic high blood pressure.

7        **6.**      Further, Mr. Gray was placed on potent psychotropic medication

8    without appropriate evaluation by a mental health professional with an utter failure

9    to monitor serious and possibly life-threatening side effects. Medications were

10    either suddenly discontinued or multiple doses missed, placing him at serious risk of

11    serious side effects and psychiatric decompensation. He in fact experienced and

12    continues to experience significant, injurious side effects from his medication

13    mismanagement and treatment failures. Mr. Gray has exhausted his administrative

14    remedies.

15        **7.**      Plaintiff Angela Patterson is a prisoner in the Riverside jails in custody

16    of Defendant Riverside County. After sustaining severe injuries in a car accident in

17    June 2009, Ms. Patterson had a temporary filter placed in her inferior vena cava

18    (IVC), the blood vessel supplying the heart, to prevent blood clots. She was booked

19    into the Riverside jails shortly thereafter, where she was subjected to multiple

20    delays, cancellations, appointment mix-ups, and failures to provide appropriate

21    follow-up regarding safe removal of the temporary filter. Nearly a year later, when

22    she was finally taken for surgery, it was found that the filter could not be removed

23    due to the build-up of scar tissue. As a result, Ms. Patterson is now condemned to a

24    lifetime of daily anticoagulation medications and frequent laboratory monitoring,

25    with significant risk of fatal bleeds and other complications. She is 26 years old. If

26    physicians had appropriately obtained and reviewed her records, and made efforts to

27

28

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

refer her for IVC filter removal in a timely fashion, it is likely that the filter could have been removed and Ms. Patterson would need no further treatment.

8.    In addition, she has experienced multiple delays in follow-up with the orthopedic and vascular surgery clinics as well as in the work-up of a scalp mass. She has also not had timely and effective medication monitoring and administration, resulting in frequent stretches of time where her anticoagulation levels are too low or too high, placing her at risk for further complications. Ms. Patterson has exhausted her administrative remedies.

9.    Plaintiff Stanley Kujansky[1] is a prisoner in the Riverside jails in custody of Defendant Riverside County. He has been subjected to substandard care while in Defendant's custody, with inadequate medication administration and treatment of his blood pressure and multiple delays in the work-up and diagnosis of his chronic neck pain. As a result, he has suffered and continues to suffer unnecessary pain and Defendant's treatment has endangered his cardiovascular health. Mr. Kujansky has exhausted his administrative remedies.

**Defendant**

10.    Defendant County of Riverside operates five jails -- the Robert Presley Detention Facility, the Smith Correctional Facility, the Indio Jail, the Southwest Detention Center, and the Blythe Jail – that incarcerate nearly 4,000 prisoners. The County is responsible for providing a constitutional level of health care for those in its custody, including the funding, oversight, and corrective action to ensure adequate conditions.

---

[1] Due to a clerical error, Mr. Kujansky is referred to as Stanley Kwawsky or Kujawsky in the Riverside jail records.

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

# FACTUAL ALLEGATIONS

**I.      Riverside County exhibits systemic failures in the provision of basic health care to prisoners in its jails.**

11.      Defendant, by policy and practice, maintains and runs a health care system that lacks basic elements necessary to provide constitutional care: it systematically fails to identify and diagnose serious conditions, to provide timely care, to administer appropriate medications, to employ adequate staff to meet prisoners' basic needs, to maintain records that allow informed treatment decisions, to establish legally required confidentiality, and to identify and correct its own failings.

12.      Prisoners' access to health care is so inadequate at all the Riverside jails as to constitute deliberate indifference to their serious medical and mental health needs.  Further, Defendant is deliberately indifferent to the fact that these systemic failures result in significant injury and a substantial risk of serious harm.

**A.      Delays in and denial of access to care**

13.      Defendant has a policy and practice of failing to provide timely access to necessary health care and is deliberately indifferent to the risk of harm and injury to prisoners that results from this systemic failure.  Care is often delayed or denied entirely, causing unnecessary pain and suffering as well as physical injury to the patients.  The two basic mechanisms to alert health care staff to prisoners' needs -- intake screening and sick call – are inadequate in both policy and practice.

**1.      Intake screening**

14.      Riverside's jail screening and intake process fails to adequately identify and treat the medical and mental health care problems of newly arriving prisoners.

15.      Insufficient numbers of nursing staff are available to identify and evaluate medical conditions on intake, resulting in dangerous delays in treatment. Prisoners are rarely assessed for communicable diseases when they arrive at the

4

1  jails, and medically high-risk prisoners do not have histories taken, physical
2  assessments, or treatment plans.

3      **16.**    Plaintiff Quinton Gray arrived at the Riverside jails with a chronic
4  seizure disorder and high blood pressure.  His initial intake form nonetheless has
5  "no" marked for every question about health care needs, including those that should
6  clearly be marked "yes."  Numerous other prisoners with longstanding chronic
7  conditions have intake forms with the same deficiencies, demonstrating an
8  inadequate intake screening process.

9      **17.**    As a result, prisoners are placed at serious risk of harm.  For example,
10 one woman who regularly takes medication for her chronic severe high blood
11 pressure entered the Riverside jails on September 9, 2011.  She received no
12 medication or, indeed, any recorded medical screening or attention until she suffered
13 chest pain and hypertensive emergency nearly three weeks later.  At that time, she
14 was sent to the emergency room at Riverside County Regional Medical Center
15 (RCRMC) and found to have blood pressure of 230/140 -- high enough to cause a
16 stroke, vision loss, or a heart attack.

17     **18.**    Another woman with multiple serious medical conditions, including
18 hypothyroidism, diabetes, and a recent history of gastric bypass surgery, had no
19 record of any of these crucial health factors on her booking form, in which every
20 question regarding the presence of health care needs was marked "no."  Treatment
21 for her serious chronic conditions was delayed, resulting in significant health risks.

22     **19.**    Another patient who arrived in the Riverside jails with multiple
23 longstanding chronic conditions -- a seizure disorder, asthma, psoriasis, and
24 Hepatitis C -- had "no" marked for every question on his booking form regarding
25 medical history.  As a result, he did not receive all of his necessary medications for
26 several weeks.

27

28

5

1      **20.**    Initial mental health screening at the jails is faulty because it is
2  performed by untrained custody staff, a practice that Riverside Sheriff Stanley Sniff
3  knows is inadequate and dangerous because, as he states, "correctional officers may
4  not recognize hidden medical and/or mental health problems that could be best
5  observed by a medical/mental health expert.  This could result in delaying needed
6  treatment."  Appropriate screening is particularly important since, according to the
7  Sheriff, "the time period immediately following admission to a jail is the most
8  dangerous time for an inmate, and over half of in-custody deaths occurred within
9  one month of admissions, with 24% of deaths occurring within two days of
10  admission."

11     **21.**    One man admitted to the Smith Jail had no recorded intake or screening
12  at all.  He was eventually placed in a suicide watch "safety cell" and given
13  psychotropic medications (Zoloft and Trazodone).  His medical records contain no
14  diagnosis, medical administration records, review of symptoms, psychiatric history,
15  social history, review of current medications, allergies, mental status examinations,
16  vital signs, risk assessments or treatment goals.

17     **22.**    Another prisoner's intake note is extremely brief and illegible.  It does
18  not contain an adequate diagnosis, review of symptoms, social and psychiatric
19  history, allergies, mental status examination, vital signs, risk assessment, or
20  treatment goals.  The patient was given multiple psychotropic medications,
21  including antipsychotics, with no subsequent recorded clinical notes describing
22  symptoms, ongoing examinations, or diagnoses.  The inadequate screening and
23  diagnostic process placed him at risk for dangerous unmonitored side effects,
24  contraindicated medications, and untreated mental illness.

25     **23.**    Another patient was prescribed Trazodone, Risperdal and Zoloft
26  without any associated documentation indicating he was first assessed by a mental
27  health professional and provided a treatment plan outlining a rationale for these

28

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

medications. There was no documentation of informed consent, which in his case is particularly important since he had a pre-existing seizure disorder and type-II diabetes.  Risperdal lowers the seizure threshold and can worsen type-II diabetes. On the day he was prescribed Risperdal, Trazodone and Zoloft, he submitted a health needs request stating he had a seizure in his cell. Risperdal should be attempted to be lowered or discontinued if patients are having uncontrolled seizures prior to starting or on the medication. There is no documentation of screening for active seizures prior to initiating Risperdal and no documentation addressing co-management of his seizure disorder and use of Risperdal with a neurology specialist.

### 2.    Sick call and access to care

24.    Even if their serious medical concerns are flagged at intake, patients are often unable to obtain care because the sick call system is inadequate.  Outside monitors have repeatedly found the Riverside jails incapable of providing the daily sick call that state law requires.  These conditions harm prisoners, who experience extreme difficulty in obtaining necessary medical and mental health appointments. In the absence of a functioning sick call system they must either obtain a court order from the criminal court or file repeated blue slips (health needs requests, or HNRs) and grievances.   Plaintiff Quinton Gray has never seen a Riverside jail doctor without an order from the Superior Court for care.  He has received three orders: in late 2011, in June 2012, and in September 2012.  Plaintiff Stanley Kujansky similarly has had to obtain court orders to see a doctor in the Riverside jails.

25.    Court orders, blue slips, and grievances regarding health care are routinely ignored.  The County maintains an extensive computerized list of court-ordered appointments that notes how long the prisoners have been waiting; delays of one, two, or three months are common.  One prisoner obtained a court order on November 21, 2011, that orders her "to see medical doctor within 48 hours to be evaluated for severe pain due to hernia on back.  Court recommends medication

7

treatment to control pain." After waiting several weeks, the prisoner filed a grievance asking that the order be honored. The response, dated December 23, 2011, acknowledged the court order and the month-long delay and stated that "nurses confirmed they are waiting for the doctor to show up to see the court orders." Plaintiff Stanley Kujansky was prescribed pain medication without ever seeing a doctor in the jails; he received a court order on November 22, 2011, to see a doctor for his pain, but was not actually seen until January 25, 2012.

26.     Some prisoners who request medical attention are told that doctors are only seeing patients with court orders for care.

27.     Prisoners also file repeated blue slips without any result except a $3 charge exacted for each request. As a result, they are placed at serious risk of harm. For example, one patient filed numerous blue slips complaining of serious stomach pain but was never seen by a doctor. After three months of such complaints, he submitted a blue slip stating that he was vomiting blood, a symptom that can indicate an emergency leading to death and which is at minimum is concerning for gastric disease such as peptic ulcers or cancer. The patient should have seen a physician immediately, had his vital signs and blood counts checked, and possibly even have been referred to an emergency room or gastroenterologist for further evaluation. None of this was done. He was not even referred to see a doctor for another month.

28.     Compounding the problem, prisoners often have extreme difficulty grieving inadequate access to care since they must request grievance forms from sheriffs' deputies, who often refuse to provide them. Plaintiff Quinton Gray filed a grievance in September 2012 noting serious ongoing problems with access to medical and mental health care, and stating that he had to get a grievance form from "an outside agency" because of custody staff's refusal to provide him with a form and their interference with access to adequate health care.

29.     As a result of these policies and procedures, prisoners experience dangerous delays in access to both primary and specialty care.

30.     One woman entered the Presley jail with Stage Four colon cancer in late July 2011.  In early August, she was seen for abdominal pain, nausea and vomiting, similar to the colon cancer symptoms she had experienced on first diagnosis.  Her outside medical records, obtained at that time by the County, documented chemotherapy in 2009 for colon and ovarian cancer and a recent CT scan showing possible recurrence.  With these strong indicators that her cancer had returned, she should have received a colonoscopy and referral to an oncologist within a very few weeks.  Although both referrals were made on August 3, neither was completed by the time she was released from custody in December 2011.  For more than four months, County medical providers demonstrated gross incompetence and negligence, with unexplained delays, apparently lost referrals, and a botched attempt at a colonoscopy, for which she was not given a basic bowel preparatory procedure – an elementary mistake.   Throughout this time, the patient repeatedly complained of abdominal pain and rectal and vaginal pressure.  The lack of care for her malignancy possibly allowed it to progress to a point where she was no longer a candidate for further treatment, shortening her life expectancy.  The inadequate treatment for her symptoms forced her to endure unnecessary pain and suffering.

31.     Another woman with a breast tumor suffered significant delays in care: she was denied timely appointments with a physician; multiple specialty appointments were not scheduled or were skipped, despite physician referrals; and she was frequently not notified of important test results such as biopsies, when standard practice is to notify patients of results within one to two weeks.  Nearly every time her complaints were addressed by medical staff was in response to a court order.  Her tumor was found to be benign; had it been malignant, these cumulative delays could have been life-threatening.  Although she received some

9

1  medications to treat her ovarian cyst-related pain, she continued to have pain and
2  physicians failed to order a repeat vaginal ultrasound or refer her to gynecology for
3  further evaluation and management, as the standard of care requires.

4       **32.**     Plaintiff Angela Patterson arrived at the Riverside jails following
5  surgery to place a temporary filter in a major blood vessel supplying her heart. She
6  was discharged directly from the RCRMC hospital to the jail. Despite the fact that
7  such filters should be removed within three months, there was no acknowledgment
8  of the existence of the filter in her jail medical records for over a month. Ms.
9  Patterson then endured many months of delays, cancellations, and scheduling mix-
10  ups in specialty care, as well as repeated medication administration failures. For
11  nearly six months, medical staff documented confusion over whether the IVC filter
12  was temporary or permanent; they did not resolve the matter until March 2010, nine
13  months after the filter was placed in her body. She was not seen in surgery until
14  June 25, 2010, at which point it was discovered that the filter could not be safely
15  removed because of the accumulation of scar tissue.

16       **33.**     Following the surgery, a Riverside jail doctor discontinued Ms.
17  Patterson's anticoagulation medication because of "filter removal," despite the fact
18  that it was still in her body and there was a note in her medical records from two
19  days earlier reporting that the filter had not been removed. In August 2010, she was
20  placed on life-long anticoagulation therapy. Anticoagulation therapy has significant
21  risks, including the risk of fatal bleeds, and requires daily medication and frequent
22  laboratory monitoring -- a weighty burden, particularly for Ms. Patterson, who is 26
23  years old. If physicians had appropriately obtained and reviewed her records and
24  made efforts to refer her for IVC filter removal in a timely fashion (within a few
25  months of placement), it is likely that the filter could have been removed and Ms.
26  Patterson would need no further anticoagulant therapy, with all the risks that entails.

27

28

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

34.    A patient with chronic high blood pressure was inadequately screened on intake, as described above, which resulted in an emergency room visit and dangerously high blood pressure.  Subsequent months in custody saw no improvement in her care, as Riverside County medical staff failed utterly to monitor her chronic condition.  Her care was repeatedly delayed, prescribed medications repeatedly not offered, and the sub-par care led to multiple episodes of uncontrolled hypertension and preventable emergency room visits.

35.    A patient experiencing uncontrolled seizures and multiple emergency room visits was not given a neurology referral for more than three months after his arrival in the Riverside jails.  After the referral was made, he waited for two more months to actually see a neurologist, although he was having seizures two to three times per week, often sustaining head trauma and other injuries, and although managing his condition was clearly beyond the scope of a general medicine practitioner.  The neurologist recommended an EEG, which was never performed. The patient continued to have uncontrolled seizures and emergency room visits; he had another neurologist appointment two months later, at which point the EEG was re-ordered.  The patient was never referred to an epilepsy specialist, despite the clear indication that his medication regime was ineffective and such a consultation was needed.  Continued, untreated generalized seizures place patients at high risk for immediate injury (such as he repeatedly sustained) as well as worsening long-term cognitive impairment, decreased function, and diminished quality of life.

36.    Another patient arrived in jail with a lap-band that had been surgically inserted into his stomach for weight loss.  He soon began to demonstrate symptoms of a esophageal obstruction (a known complication of such surgery), including significant weight loss, nausea, vomiting, and extreme hunger.  Despite numerous requests for help, he experienced unnecessary delays in diagnosis and treatment and failure to respond to his multiple health complaints.  For example, after two

11

1   episodes of loss of consciousness, a documented 17-pound weight loss in 30 days,

2   complaints of inability to tolerate any food or liquid intake, and a blood pressure of

3   90/60, he was merely referred for a medical appointment more than a week in the

4   future.  The delays in diagnosis of his obstruction put him at risk for serious health

5   complications due to rapid weight loss and deprivation of essential nutrients.

6       **37.**    Access to mental health care is no better.  Defendant's deficient system

7   forces mentally ill prisoners to wait weeks or months for mental health assessment

8   and evaluation by clinical staff, during which time they are denied essential

9   psychotropic medications and other treatment.  The Sheriff admitted this problem in

10  July 2011, acknowledging that "such delays may impact an inmate's mental

11  stability."  As with medical care, many mental health patients must file repeated

12  blue slips or grievances to get seen; others are only seen by clinicians after the

13  judges in their criminal cases have ordered care.  Patients experience a range of

14  symptoms, from auditory hallucinations to severe depression, while enduring these

15  lengthy delays.

16      **38.**    Patients with serious dental care needs suffer from the same pattern and

17  practice of injurious delays.  Patients in severe pain wait for months to see a dentist

18  and face significant pain and suffering as a result.   For example, one patient with

19  only two functioning teeth lost more than 20 pounds in the six months he has been

20  incarcerated because he is unable to eat much of the food he is served and he cannot

21  afford to buy his own.  He has submitted blue slips to see a dentist to get dentures

22  without success.

23      **39.**    Another patient experienced serious delays in care: her complaints of

24  tooth pain were first documented in her health records in December 2011.  On

25  March 17, 2012, a  progress note in her file simply reads "Back upper Rt tooth broke

26  and gum swollen."  This one-line progress note, with no medical history, duration of

27  symptoms, or full exam, is inconsistent with accepted medical standards of care.  In

28

12

addition, the patient was prescribed penicillin and motrin for her symptoms without any mention of a dental referral or evaluation.

40.     Another patient filed a request complaining of a broken tooth and requesting a dental referral on September 21, 2011.  He submitted a repeat request a month later also requesting a dental referral.  He was not seen for these complaints until November 1, 2011, at which time medical staff noted that he had decayed teeth and referred him to dental staff without any mention of his ability to eat or whether the tooth looked infected.  In the many months he has been waiting, he has experienced intermittent severe pain in his teeth that makes him unable to eat several times a week.

### 3.     Specialty referrals

41.     The Riverside jails lack adequate policies and procedures to provide patients with needed referrals for specialty medical consultations and procedures.  For example, a patient with colon cancer was referred for a colonoscopy and to an oncologist on August 3, 2011, but neither was completed by the time she was released from custody in December 2011.  Given that her cancer was Stage IV, she should have been seen in a very few weeks.

42.     As discussed above, Plaintiff Angela Patterson experienced numerous delays and cancellations in specialty referrals, which likely led to build-up of scar tissue on a temporary filter in a blood vessel near her heart.  As a result, she will live the rest of her life with this filter in her chest and suffer a lifetime of serious anticoagulation medication with related health risks and the burden of frequent monitoring.

43.     Another man with uncontrolled seizures and multiple emergency room visits was not given a neurology referral for more than three months after his arrival in the Riverside jails.  After the referral was made, he waited for two more months

1 | to actually see a neurologist, although he was having seizures two to three times per
2 | week.

3 |     **44.**    A man who had experienced severe recent head injuries was ordered an
4 | ENT consultation by a Riverside jail doctor but it did not take place and had to be
5 | re-ordered one month later.  When the ENT consultation finally took place, he was
6 | not sent with his crucial records and the appointment was of limited use.  He was
7 | referred for surgery on September 30, 2011, but did not receive it, and despite
8 | repeated complaints of pain and two more court orders for care, he was not seen
9 | again until November 8, 2011, when the surgery was re-ordered "ASAP."

10 |     **45.**    A patient with multiple chronic conditions -- a seizure disorder, asthma,
11 | psoriasis, and Hepatitis C -- experienced multiple delays in obtaining timely
12 | referrals, even after ordered by physicians, as well as follow-up, resulting in sub-
13 | standard care.

14 |     **4.**    **Denials of care**

15 |     **46.**    Some prisoners face outright denials of basic and necessary medical
16 | care.  Plaintiff Quinton Gray was prescribed Dilantin on his arrival at the jail, but
17 | even after two emergency room readings taken over the next few days showed that
18 | the Dilantin level in his blood was far below the therapeutic level, jail medical staff
19 | did nothing for well over a year.

20 |     **47.**    A prisoner with thyroid disease was denied medication for nearly three
21 | months.  Although her initial screening form missed the condition, it was noted
22 | repeatedly on her charts for several months by medical staff before she was finally
23 | prescribed medication.  Missed doses of thyroid medication for a prolonged period
24 | put patients at risk for severe fatigue, slow heart rates, weight gain, constipation,
25 | hair loss, edema, and eventually coma.  The same patient also has a history of
26 | gastric bypass surgery; the jail doctor refused her any dietary supplements to ensure
27 | proper nutrition throughout her jail stay, despite repeated requests.  Patients are at
28 |

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1  risk for malnutrition following bypass surgery and require life-long vitamin

2  supplementation.  In addition, no tests were ordered to assess any nutritional

3  deficiencies, another violation of the standard of care.

4      **48.**    Another prisoner fell and hurt his back at Presley in November 2010

5  and again in March 2011.  He was provided inadequate neurologic exams after his

6  falls, several-month delays for scheduling of x-rays and consultations (even when

7  ordered "as soon as possible"), and inadequate trial of physical therapy; his back

8  pain went essentially untreated.  Two clinic appointments were cancelled due to

9  "too many ad-segs" and one was cancelled because a wheelchair van was not

10  available.

11      **B. Substandard medication management and administration**

12      **49.**    Reliable and systematic medication delivery is an essential element to a

13  constitutional health care system.  Defendant has a policy and practice of failing to

14  prescribe, provide, and properly manage medication, and of providing incorrect,

15  interrupted, or incomplete dosages.  As a result, prisoners with serious health care

16  conditions are placed at substantial risk of harm and are in fact harmed.

17      **50.**    Many patients are provided substandard care because there is

18  inadequate staff to distribute medications.  (Staffing deficiencies are described in

19  more detail in the following section.)  Medication deliveries are often skipped

20  entirely, leaving patients without essential treatment.  Plaintiffs Quinton Gray,

21  Angela Patterson, and Stanley Kujansky have experienced numerous skipped

22  medication dosages at various Riverside jail facilities, placing Mr. Gray at serious

23  risk for heart attack, stroke, and seizures; exposing Ms. Patterson to an increased

24  risk of recurrent thrombus; and endangering Mr. Kujansky's cardiovascular health.

25      **51.**    Other prisoners face the same problems.  One patient who is prescribed

26  medications for his chronic high blood pressure has experienced a dangerous

27  number of missed doses: for example, in April 2011 he was not given nine doses of

28

15

1   both of his medications, and in September 2011 staff did not administer 14 doses of
2   one and eight doses of the other medication.  Another patient who has been
3   prescribed medications for his diabetes has experienced numerous missed
4   medication doses – 21 missed doses in one month alone.

5       52.    In practice, medication distribution in the jails takes place only once or
6   at most twice daily, leaving patients who require multiple daily dosages, or bedtime
7   delivery, unserved.  Since the Smith facility is so large, nurses start evening pill call
8   at approximately 2 p.m. to allow them to deliver medications throughout the
9   institution.  This includes sleep medications: some patients receive their pills in the
10  middle of the afternoon and fall asleep within a few hours.  Pill call is erratic for
11  many prisoners, and evening pills might arrive any time from 3 to 10 p.m., if at all,
12  which is particularly dangerous for diabetics, many of whom must receive
13  medications at regular intervals, coordinated with meal times.  Plaintiff Angela
14  Patterson has had her medications switched by jail staff from morning to evening,
15  despite the fact that the medication should be taken at the same time daily, likely
16  affecting her treatment stability.

17      53.    Defendant's policy and practice is to require patients to alert staff when
18  their medications run out.  As a result, some prisoners' prescriptions are not
19  renewed until they file multiple health care requests or grievances, resulting in
20  significant treatment interruptions with resulting, predictable harm to the patients.
21  For example, a patient at Southwest Detention Center has experienced several one-
22  month gaps between refills of his psychiatric medications, including Paxil.  Paxil
23  has a well-documented discontinuation syndrome: the lengthy lapses in medication
24  delivery place him at serious risk for severe discontinuation symptoms including
25  flu-like symptoms, nausea, vomiting, and headaches.  A Presley patient prescribed
26  pain medications for his severe back pain is frequently deprived of the medications
27
28

16

when the prescriptions run out and refills are not provided; doctors also renew his medications without assessing their efficacy.

54.     Another man held in the Presley facility experienced significant lapses, without explanation, in receiving medication for his bipolar disorder: his Zoloft was not renewed for nearly one month, and his Topomax was not renewed for nearly three months.  Further, neither medication was appropriately titrated on being restarted.  Sudden discontinuation of these medications can cause manic episodes and seizures as well as physical symptoms such as nausea, vomiting, and headaches; sudden resumption after a significant gap in time can also cause damaging side effects.  The patient in fact experienced depression and severe mood swings due to the medication mismanagement.

55.     Plaintiff Stanley Kujansky has been denied medications on the days he goes to court for hearings in his criminal case as well as on the days he goes to see outside specialists for medical care.  These deprivations are pursuant to policy and practice: numerous other prisoners are denied medications altogether when they attend court hearings or are transported to outside appointments.  Some prisoners regularly miss medications in the morning because they are asleep and staff routinely fail to announce medication delivery effectively.

56.     Riverside also has a policy and practice of failing to monitor the effects of medication to determine whether dosages are correct or medications should be changed.   Plaintiffs Quinton Gray, Angela Patterson, and Stanley Kujansky have suffered from inadequately monitored medication regimens which have serious endangered their health and forced them to endure unnecessary pain and suffering. Their problems are typical of those experienced by medical and mental health patients in the Riverside jails.  For example, one man with high blood pressure has been given two medications to treat his condition, but on occasion, without explanation, he has been abruptly discontinued from one of the medications.  No

17

monitoring of his condition is documented in his medical records, suggesting that either such documentation is missing or it was never charted -- either way, lack of proper documentation can be dangerous for patient care and signifies a concerning level of disorganization within the medical department.

57.     The same patient's file lacks any progress notes documenting any blood pressure, history, physical exam or lab tests during the duration of treatment. In general, when starting or changing blood pressure regimens, patients' blood pressures should be checked to ensure that they are not over-medicated or given low blood pressure, which can be dangerous.  In addition, without monitoring blood pressure, there is no way to know if the patient was actually adequately controlled -- high blood pressure could put him at risk for strokes, brain bleeds and heart attacks. Further, because one of his medications can be associated with electrolyte abnormalities, the standard of care requires physicians to check basic blood tests for sodium, potassium and kidney function levels either prior to or shortly after starting such agents.  None of this was done.

58.     A diabetic man who entered the Riverside jails with an elevated blood sugar count was prescribed medications and ordered glucose checks twice daily for two weeks and then weekly thereafter, as well as various blood work.  These orders were apparently ignored, however, along with two subsequent orders for weekly blood sugar checks: his health records show only two glucose checks over the next several months and no evidence that he ever had the blood work performed.  This failure to monitor his condition placed him at serious risk of harm, particularly since one of the medications he was prescribed, Glipizide, can make patients hypoglycemic.

59.     Psychotropic medications also are not monitored to determine whether they are effective or whether they cause severe side effects.

18

60.     Patients face serious consequences from the denial of appropriate medications.  For example, one man experienced uncontrolled seizures resulting in serious injuries.  His medication regimen was clearly ineffective, but he was merely prescribed increases in his existing medication, contrary to the standard of care.  He continued to suffer from frequent seizures and resulting physical injuries.

61.     Another patient fell in his cell and hurt his hand (he uses a cane due to leg injuries, but is only allowed it to ambulate longer distances).  He was sent to the emergency room one day later with increasing pain in his hand.  He was found to have suffered a fracture and prescribed Vicodin and Ibuprofen for the pain.  He was never given these medications on his return to the jail, and suffered unnecessary pain as a result.

62.     Medication lapses can be particularly devastating in the mental health realm.  According to Sheriff Sniff, "continuity in delivery of mental health medications may affect the stability of an inmate's mental health and is critical to inmate care."  More specifically, delays in administering psychotropic medications to mental health patients can result in serious harm.  Such harm is occurring in the Riverside jails: prisoners experience frequent gaps in medication delivery, as the Sheriff has admitted.  Sometimes psychotropic medications are not distributed at all in entire housing units, since nurses are simply overwhelmed.  At other times, patients' medications are abruptly changed with no examination and no explanation.  These interruptions harm prisoners.  Over many months in the Indio, Presley, and Smith jails, Plaintiff Quinton Gray had his powerful psychotropic medications either suddenly discontinued or multiple doses missed.  Similarly, a patient at Smith had his psychotropic medications and dosages changed repeatedly over two years, including the abrupt and unexplained cessation of his antipsychotic medications.  A Presley patient also had psychotropic medications abruptly started, stopped, and renewed over several years with little or no evaluation or assessment.  This pattern

19

1 and practice of medication mismanagement places these patients at serious risk for
2 decompensation, untreated mental illness, and severe side effects.

3    **C.    Severe staffing deficits**

4        **63.**    Many of the deficits described herein stem from the inadequate health
5 care staffing levels maintained by Defendant in the jails.  There are simply not
6 enough doctors, nurses, mental health providers, pharmacists, or medical records
7 staff to meet the needs of the population.

8        **64.**  ` Defendant's policy and practice of severely understaffing health care
9 positions in the jails is long standing and has been repeatedly censured by the county
10 Grand Jury.  In 2010, the Grand Jury found that "[m]ental health staff is not
11 available in any county jail facility in sufficient numbers to identify and treat in an
12 individualized manner those treatable inmates suffering from serious mental
13 disorders."  The Grand Jury Report released on June 14, 2012, states the problem in
14 clear terms:

15        In July, 2011, DMH was advised. . . .that the medical/mental health
16        staffing levels in county jails needed to be restored to 2007 levels, in
17        order to be in compliance with [state law].  As of this writing, the
18        Grand Jury learned through sworn testimony that during the eight
19        months following the 2010-2011 Grand Jury report, DMH staffing
20        levels were allowed to decrease even further.

21        **65.**    Medical care is no better: according to the independent Inmate Medical
22 Quality evaluators, invited by Sheriff Sniff to identify deficiencies in jail health
23 care, "[t]he request for medical care exceeds the capability of the staff to meet the
24 demands."  The Detention Health Services administrator agreed, admitting that "the
25 demand exceeds the resources available to provide the requested services."

26        **66.**    Long-term medical vacancies are endemic, particularly given the
27 competition with the higher salaries offered by the state prison system.  For

28
**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

example, at the beginning of 2011, there were only three physicians for well over 3,000 prisoners in the five jails.   Two doctors subsequently resigned and for at least several months, there was not a single physician, physician assistant, or nurse practitioner working in the Riverside jails – only a "Chief of Medical Specialty" who rarely saw patients.  Only two of the five full-time physician positions in the jails were filled as of May 31, 2012.

67.     Other medical staffing is also deficient.  As of May 2012, the county had multiple vacancies for nurses and nurse supervisors, and only 65 of 101 total Detention Health Services positions were filled.  Further, according to the CSA, "there is no budget for overtime and no staff available to provide services in the event of illness, injury, or vacation."

68.     Defendant lacks the staff necessary to provide minimally adequate dental care.  By the County's own assessment, two full-time dentists and two full-time dental assistants are required to offer basic dental care to the nearly 4,000 prisoners.  As of May 2011, only one dentist and one dental assistant were working in the jails.

69.     A patient at the Smith Jail with chronic high blood pressure filed a grievance complaining that although the doctor had ordered blood pressure checks every three days, he had only received them twice in the preceding 23 days.  The grievance response from Senior Corporal Diaz confirms that the patient "is still not having his blood pressure checked.  When he asked the nursing staff they stated they do not have the time."

**D.     Violations of patients' confidentiality rights**

70.     According to the Grand Jury, Riverside "has no confidential self-referral system by which inmates can request mental health care without revealing the nature of their request to correctional officers," as required by federal and state law.  *See* 45 C.F.R. §§ 164.500 *et seq.*; Cal. Civil Code §§ 56.10 *et seq.*  Requests

for medical care are also not confidential, since they too are delivered to medical staff by custody staff.   Prisoners are directed to give blue slips requesting health care directly to custody staff; many believe that they must provide as much detail as possible about their health care needs in order to increase their chances to be seen. Many prisoners, including Plaintiffs Gray and Kujansky, also must file grievances in order to be seen by clinicians.   To get grievance forms, they must persuade custody staff that their concerns are significant.  The grievances are then heard by custody staff, who make the determination whether to involve health care staff.

71.     Examination space at Southwest Detention Center is not confidential: patients can overhear other patients' examinations through an open door, as they wait in the hallway for their own treatment.

**E.     Poor records administration**

72.     Adequate health care cannot be provided in the absence of adequate health records: clinicians must know their patients' medical histories, past diagnoses and treatment, and for psychiatric patients, a history of suicidal thinking or attempts.

73.     Riverside's medical records system is profoundly disorganized and incomplete.  Some psychiatric patients have no diagnosis recorded, despite the prescription of psychotropic medications.  Some patients are prescribed medications but lack any record of medication administration in their file, or any record that the effects of the medication were tracked and reviewed.   All three Plaintiffs' health care records demonstrate Riverside's failures in this area.

74.     It is not surprising that record-keeping is inadequate: as of December 6, 2011, the entire medical records staff for five jails and well over three thousand prisoners was three medical records technicians and no medical clerks.

75.     The record-keeping gaps impact patient care.  One psychiatric patient had no legible diagnosis, review of symptoms, psychiatric history, mental status examination, or risk assessment.  He was nonetheless prescribed antipsychotics with

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

no reference to any ongoing mental status exams or data on symptoms, even when doses or medications are changed, as was done repeatedly over a two-year period. At one point, the patient's antipsychotics were stopped abruptly with no explanation in the records.

76.     Another patient was placed in a safety cell on suicide watch with no recorded reason.  The order to discontinue the watch is similarly bereft of any explanation as to why he is no longer a danger to himself, or any risk assessment.

### F.     Inadequate quality assurance

77.     Not surprisingly, given the paucity or records and severe staffing shortages, Riverside officials lack the ability to identify and correct the problems described herein.  Health care staff do not systematically correct identified deficiencies, and there is inadequate staff for oversight and review of care.

## II.     Even If Prisoners See Health Care Providers, They Do Not Receive Constitutionally Adequate Medical or Mental Health Care

78.     As detailed in the previous section, Riverside's lack of the basic elements of a health care delivery system -- policies and procedures to ensure timely access to appropriate care, medication management, adequate staffing, patient confidentiality, medical records, and quality assurance – harms Plaintiffs and members of the plaintiff class.  Even when they are able to see health care providers, prisoners are by policy and practice denied adequate medical and mental health care in the Riverside jails: they experience gross treatment failures, inadequate examinations, and the failure to provide necessary specialty appointments and diagnostic tests.

### A.     Substandard medical care

79.     Plaintiffs Gray, Patterson, and Kujansky, on behalf of themselves, the plaintiff class, and the medical subclass, assert the following.

23

80. Prisoners – even those with serious medical conditions -- rarely see physicians, and health care records demonstrate a paucity of appropriate follow-up, monitoring, and specialty referrals, as well as improper care.

81. Plaintiff Quinton Gray has chronic high blood pressure that has been inadequately monitored and controlled by Riverside jail medical staff. He has experienced multiple elevated blood pressure measurements without any assessment of the efficacy of his medications and dosages. He has twice gone without blood pressure check for more than four months, despite his history of elevated readings and despite the fact that regular readings had been ordered by physicians. In addition, he is frequently not provided his medications at all, thus increasing his risk of poorly controlled blood pressure. Uncontrolled blood pressure can cause heart attacks, heart failure and strokes.

82. Mr. Gray's seizure disorder has also been inadequately treated. He was prescribed Dilantin on his arrival at the jail, but two emergency room readings taken over the next few days showed that the Dilantin level in his blood was far below the therapeutic level. Jail medical staff did nothing for well over a year, at which point a Dilantin level check was ordered, then re-ordered after it was not performed. Moreover, Mr. Gray is frequently not provided his Dilantin at all, placing him at serious risk for seizures, which he has experienced in the jails.

83. Plaintiff Angela Patterson has experienced significant and damaging sub-standard health care, as described above, which has likely caused her permanent injury.

84. Plaintiff Stanley Kujansky has chronic high blood pressure. Sub-standard care in the Riverside jails has endangered his cardiovascular health. First, multiple dosages of his blood pressure medication have not been administered as prescribed. In particular, he is denied medications on the days he appears in court as well as the days he has specialty care appointments in the Riverside county hospital,

24

1  in part because there are no medical staff on duty at the Presley jail who could

2  deliver the medications on his return, after 6 p.m.  As a result of these missed

3  dosages of blood pressure medication, Mr. Kujansky has suffered from abrupt and

4  repeated fluctuation in blood pressure.

5      **85.**    Mr. Kujansky has filed repeated grievances on this denial of

6  medications, notably on June 15, 2012; July 15, 2012; and August 15, 2012.  These

7  grievances have either been granted or ignored, but the problem has not been solved.

8      **86.**    Further, the blood pressure medication Mr. Kujansky has been

9  prescribed in the jails -- Clonidine -- is usually a last-resort drug to control blood

10  pressure since it can cause severe dizziness and low blood pressure and in particular

11  can cause rebound tachycardia (an elevated heart rate) if doses are missed.  It should

12  not be prescribed unless a patient can take it consistently and reliably, which is

13  clearly not the case in the Riverside jails, as medical staff should well know and as

14  is amply demonstrated by the medication administration record showing repeated

15  missed doses of his medications.   Moreover, the frequent use of Ibuprofen, as

16  prescribed to Mr. Kujansky, can also elevate blood pressure, which likely

17  contributed to some of his high readings.

18      **87.**    Other patients experience similarly inadequate and at times life-

19  threatening medical care.  For example, one patient arrived in the Riverside jails

20  after having been assaulted with a crowbar just three weeks earlier.  He had spent

21  two of those weeks in the hospital and had undergone surgery to repair his jaw and

22  implant hardware.  Despite obvious facial injuries and blood noted in his ear on his

23  arrival at the jail, he was not seen by a doctor for three weeks, and not until he

24  received a court order for treatment.  At that time, his severe recent head trauma was

25  noted and the doctor ordered an ENT consultation.  However, it did not take place,

26  and the consultation had to be re-ordered one month later.  Following a second

27  court-ordered doctor's appointment, the patient's implanted hardware was found to

28

be coming out of his jaw. He was diagnosed in the emergency room with a fractured dental plate. He was again referred for an ENT consultation, which finally took place a week later. Because he was not sent with his crucial records, however, the appointment was of limited use. He was referred for surgery on September 30, 2011, but did not receive it; despite repeated complaints of pain and two more court orders for care, he was not seen again until November 8, when the surgery was re-ordered "ASAP." Throughout, the patient was never seen except in response to a court order. Repeated warning signs – complaints of incontinence, evidence of memory loss and confusion – were ignored, and there are no documented attempts to determine whether he was experiencing brain trauma symptoms or displaying underlying dementia, psychiatric disease, or cognitive deficits. Had the patient been evaluated when he was first noted to have his injuries at the time of booking, with records requested sooner and a more timely evaluation and appointment in both the ENT clinic and the oral and maxillofacial surgery clinic, his serious complications could have been minimized and they certainly would have been treated earlier, likely reducing the unnecessary pain and suffering that he endured.

88.    A patient at the Smith jail was seen by a nurse for ear pain on August 2, 2011. The doctor did not examine him, but prescribed medication over the telephone. Five days later he was seen again by a nurse for worsening pain and redness of the ear; the doctor, again over the telephone, referred him to the emergency room at RCRMC. Following that visit, the same doctor prescribed antibiotics over the telephone, which he never received. Two weeks later, he had another emergency room visit and was again prescribed the same antibiotic by the same doctor by telephone. Three weeks after that, on September 15, the patient underwent tympanoplasty and mastoidectomy at RCRMC. On his return to the jail after the surgery, he was prescribed Vicodin and antibiotics over the telephone but never received them. On September 22, he reported blood coming from the ear but

was only seen by the nurse and not a doctor; the doctor ordered medications over the telephone.  He again reported bleeding on October 1 to the nurse but was not seen by a doctor.  He was finally seen on October 5, 2011, by a specialist at RCRMC and was noted to have pus in his ear.  Throughout the entire ordeal, he never once saw a doctor at the jail.

89.  Another patient with a long history of seizures endured many months during which he was denied all seizure medications.  Jail medical staff were aware of his seizure disorder on November 8, 2011, but despite multiple blue slips requesting care, he was not prescribed seizure medications until April 9, 2012.  He suffered several seizures in custody which would likely have been prevented if he had been evaluated by a physician sooner and continued on his stable, home anti-seizure medication regimen.

90.  Another patient was seen, pursuant to court order, for ovarian cyst-related pain.  She was given some medication but continued to have pain.  Jail physicians failed to order a repeat vaginal ultrasound or refer her to gynecology for further evaluation and management, as the standard of care requires.

91.  Even when prisoners get to see the doctor, the examinations are often ludicrously inadequate.  Patients at Presley are "examined" in the non-contact attorney visiting booth.  However, instead of sitting on the well-lighted attorney side of the booth facing the patient behind glass, the doctor places himself outside of the booth, where the deputies ordinarily sit, visible only through a slot for passing documents.  No meaningful physical examination is possible under such conditions.  Without meaningful physical examinations, the standard of care cannot be met.

**B.    Substandard mental health care**

**92.** Plaintiff Gray, on behalf of himself, the plaintiff class, and the mental health subclass, asserts the following.

**93.** Riverside County lacks an adequate system to provide a basic level of constitutional mental health care. In the absence of such a system, the County fails utterly to provide appropriate, informed diagnoses and treatment plans, ensure continuity of psychotropic medication, monitor prisoners prescribed such medication, make available medications that are effective in treating serious mental disorders, or provide necessary therapeutic treatment.

**94.** Many prisoners do not get the right medications, the right dosages, or appropriate ongoing care: the Grand Jury found that "[i]nmates with assessed moderate mental health problems such as neuroses, phobias, panic disorders, etc., are not always offered appropriate mediation and counseling by qualified staff to get and maintain them in a stable condition." As a result, they suffer severe side effects and decompensation.

**95.** Mentally ill prisoners are regularly started on powerful psychotropic medications with no record of any evaluation, diagnosis, or treatment plan. This practice is dangerous because it does not allow subsequent monitoring or review, and places patients at serious risk of harm through lack of treatment or inappropriate treatment for their mental illness.

**96.** Even prisoners prescribed appropriate medications face frequent disruptions in medication delivery, including abrupt cessation and missed pill deliveries, which cause serious suffering for these mentally ill patients, as described in more detail in the prior section on medication administration.

**97.** No tracking is done of patients' symptoms and any reaction they might have to the medication, except for a cursory, non-confidential questioning at their cell doors. The monitoring of vital signs such as weight, cholesterol, and glucose

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

levels, which is essential to ensure the patients are not suffering adverse effects from psychotropic drugs, is absent.  Dosages are changed abruptly, with no explanation.

98.    On arrival in the Riverside jails, Plaintiff Quinton Gray was prescribed several powerful psychotropic medications with no evaluation, diagnosis, or assessment by a mental health professional, and no baseline laboratory test to monitor known risky side effects of the medications.

99.    One of his medications, Geodon, must be taken with food or much of it is not absorbed.  Mr. Gray was not ordered to be given his Geodon with food, which placed him at risk for varying blood levels and varying side effects and efficacy.  He was also started on the maximum dose, which increases the risk of severe side effects such as acute muscle stiffness and tremors.  Several months later, Mr. Gray's medications were discontinued suddenly without appropriate taper of maximum dose of Geodon, which placed him at risk for rebound tardive dyskinesia, seizures, discontinuation syndrome (flu-like illness) and decompensation of psychiatric symptoms (paranoia, hallucinations, and thought disorganization).

100.    Months later, Mr. Gray was started on a second antipsychotic while also on Geodon, despite the lack of clinical evidence that treating schizophrenic patients with two antipsychotics provides better efficacy or treatment outcomes, and despite the increased risk of side effects and drug-drug interactions.  When prescribed together, Mr. Gray's two medications increase the risk of tardive dyskinesia (such as tongue-biting), acute muscle stiffness and tremors, and cardiac events (arrhythmias).  Both medications also lower the seizure threshold and when given together in a patient with a history of seizure disorder, could cause increased seizure events.

101.    In July 2012, Mr. Gray was started on Benadryl and Cogentin at the same time, with no documented explanation in his health care records.  There is

29

1   never a need to treat a patient with both of these medications at the same time, and
2   they have multiple side effects including constipation and delirium.

3       **102.**   Multiple doses of Mr. Grey's medications have not been administered
4   to him during his stay in the jails.  Missed doses can alter blood levels in a way that
5   increases side effects (including worsening of tardive dyskinesia), variably changes
6   seizure thresholds and can cause decompensation of psychiatric symptoms.

7       **103.**   As a result of Defendant's failed mental health delivery system, Mr.
8   Gray has in fact experienced twitching, tongue-biting, increased seizures and tongue
9   swelling, all predictable side effects from taking near maximum dose of these two
10  antipsychotic medications.  He lives with racing thoughts, disorientation,
11  depression, and chronic sleep loss.  He has not been appropriately monitored or
12  treated for these damaging side effects and signs of the inefficacy of his medication
13  regimen.

14      **104.**   These failures are typical of the policies and practices that produce
15  substandard mental health care generally for patients in the Riverside jails.  For
16  example, one Southwest Detention Center patient  has no noted psychiatric/mental
17  health progress notes in his chart to indicate he was ever evaluated by a medical
18  doctor regarding his psychiatric condition, treatment plan or consent to medication
19  changes. He was maintained on Paxil, an antidepressant with an extremely short-
20  half life that can lead to a severe discontinuation syndrome if the dose is missed
21  even for 24 hours.   He has experienced multiple incidences of missing days of
22  medications as well as not having his medications renewed for one month periods,
23  placing him at risk for severe discontinuation symptoms as well as decompensation.
24  There are no medication monitoring standards set in place, particularly to monitor
25  for weight gain on Paxil.  His medications were repeatedly renewed without
26  evidence of evaluation.

27

28

**CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**105.**   Another patient housed in Presley was started on multiple antipsychotic, anti-depressant, and bipolar disorder medications without any record of an appropriate assessment of her mental illness, the indications for the medications, or informed consent.  Most notes by the clinician in her file are illegible and they contain no assessment or plan regarding her treatment.  Multiple times her medications were renewed, stopped, started or changed without any documentation or assessment: in particular, her medications were renewed repeatedly for more than two years without any indication of ever being evaluated by a medical doctor; during this period two new medications were started without a medical evaluation or documentation of informed consent; and once her medications were not renewed for an entire month.  Sudden discontinuation of medications puts patients at risk for severe side effects and decompensation of psychiatric illnesses.  She was also started on multiple medications at high doses without appropriate titration, resulting in severe side effects, and subjected to the abrupt discontinuation of medications that might have been helpful for her symptoms.  Further, she was placed on safety-cell observation but was never evaluated by a medical doctor despite this being a psychiatric emergency.

**106.**   Another Presley patient was prescribed multiple psychotropic medications with no documentation of ever being evaluated by a mental health professional for ongoing psychiatric care.   This is of particular concern in her case, since two of her medications are relatively contraindicated and should have had clear documented psychiatric necessity for concomitant use including special monitoring for side effects.

**107.**   Further, the patient was started and stopped on multiple medications and had doses changed without any documentation of evaluation for efficacy, side effects or informed consent.  Such reviews were essential for this patient, since she was placed on Thioridazine, a drug used to treat psychosis, anxiety and insomnia,

31

1    that with long-term use can cause tardive dyskinesia, a highly distressing and
2    uncomfortable phenomenon consisting of involuntary movements.  There is no
3    documentation she was ever evaluated for such side effects.

4        **108.**   In addition, she had significant periods of not receiving her medications
5    as well as frequent missed delivery of individual doses, placing her at risk for
6    discontinuation syndrome including intense anxiety, flu-like symptoms, headache,
7    nausea/vomiting, and parasthesias as well as rapid decompensation of mental illness.
8    Moreover, despite missing significant periods of medications, the medications were
9    suddenly restarted or given again at their regular doses rather than appropriately re-
10   titrated.  One of her medications, Lamotrigine, can result in a life-threatening rash if
11   it is suddenly started  after stopping it for several days, as happened in her case.
12   Sudden starting of Paroxetine, another of her medications, can lead to severe gastro-
13   intestinal upset, sedation and anxiety.

14       **109.**   A patient at Smith was started on numerous psychotropic medications
15   without any documentation he was evaluated by a mental health professional, given
16   informed consent prior to initiation, or monitored for efficacy or side effects.  He
17   experienced significant lapses in medication administration, placing him at risk for
18   discontinuation syndrome associated with his medications, including severe
19   headache, nausea, vomiting, flu-like symptoms, agitation and anxiety.

20       **110.**   One reason for this inadequate care might be the abysmally poor
21   communication with clinical staff that some prisoners experience.  For example, one
22   Smith prisoner described his interview as taking place in a non-contact attorney
23   visiting booth, with glass separating doctor from patient.  He answered some
24   questions from the psychiatrist, who then held up a piece of paper on which he
25   wrote words such as "mood swings" and "voices."  The patient nodded in response.
26   No history was taken – he is a disabled veteran with severe anxiety and PTSD – and
27   there was no discussion of medication side effects.  The entire session lasted 15-20

28

minutes.  The psychiatrist then briefly held up a piece of paper with information about medications, but the patient did not have a chance to read it.  The psychiatrist handed the paper to a deputy, who gave it to the patient and rushed him to sign it.  When the patient asked, "can I read it?" the deputy responded: "just sign it."  The patient did not find out the names of the medications he was prescribed for three days after he started taking them.  For the first two days, when he asked the nurses the names of the pills, they would respond but he could not understand.  When he requested clarification, they would say "next person" and rush him through.

111.   Another prisoner arrived at the Smith jail with a list of her prescribed psychotropic medications, which was placed in her property.  She waited two weeks to see a psychiatrist, but could not recall for him which medications she had taken and did not have the list to consult.  He told her he would prescribe medications and when she asked for her diagnosis, and he responded "That is not important right now, just go ahead and take your medications."  A week later, the pills arrived and she took them without knowing what they were.  Within three days, she experienced a severe reduction in her ability to function and could not walk unassisted.  She stopped taking the pills.  A week later, her mother spoke to a sergeant and told him that the medication list should be retrieved from her property.  He assured her it would be done and the proper pills would be dispensed.  The following day, new pills arrived, which again made her feel "woozy" and "dizzy."  She again stopped taking them.

112.   A crucial element of an adequate mental health care delivery system is an appropriate means to assess and monitor patients who exhibit or contemplate self-harming behavior.  Here, too, Riverside's practices fall far short of acceptable mental health care procedures.  Prisoners believed to be suicidal or self-harming are placed in a barren cell with only a rough smock to wear and a hole in the ground to relieve themselves.  The so-called "safety cells" are often filthy and stink of the

urine and feces that is visible on the walls and floor.  Patients are left in the cells for many days, with inadequate monitoring or supervision, under lights that are never turned off.  Plaintiff Quinton Gray was forced to endure these conditions for 48 hours simply because he told custody staff on entering the jail that he needed psychiatric medications.  Another man was placed in a safety cell and removed more than a day later with no risk assessment, explanation, or criteria for removal – a gross departure from the standard of care.

### III.   Defendant has known for years of the significant risk of harm from its inadequate jail health care system and has failed to take reasonable steps to mitigate the risk to prisoners

113.   Defendant Riverside County has for many years woefully underfunded detention health care.  The lack of infrastructure and staff to deliver life-saving care has resulted, as Sheriff Stanley Sniff has told the Board of Supervisors, in a "crisis in the jail system."

114.   The County's own Grand Jury as well as several independent auditors have come to the same conclusion: dangerous deficits in health care services at the jails threaten the lives and health of the thousands of men and women they hold.

115.   The severe deficiencies in health care services in Riverside's jails are thus well established by admissions from Sheriff Sniff and reports from state and county watchdogs and independent auditors.  Defendant has long been aware of the harm its deficient system causes to patients with serious health care needs through these reports as well as numerous grievances and health needs requests from prisoners.  Defendant's failure to take action to ameliorate the conditions constitutes deliberate indifference to Plaintiffs' serious health care needs.

116.   Several 2011 reports documented extensive health care violations in the jails.  The 2010-11 Grand Jury Report: Riverside County Detention Health Care Administration found systemic failures in treatment, medication management,

record-keeping, and administration of forced medications, among other areas.  On July 5, 2011, the Sheriff responded that he "generally concurs with the findings of the Grand Jury and has been outspoken on the need to remedy these issues over the last two years."

117.   The Grand Jury's report on mental health care deficiencies, 2010-11 Grand Jury Report: Mental Health Detention Services, noted serious health care staffing deficiencies.  Again, the Sheriff agreed with this assessment.  The Grand Jury released an updated report in June 2012, noting that mental health staffing has in fact decreased since its prior year's report.

118.   The Sheriff invited the state's Corrections Standards Authority (CSA), a body with statutory duty to regularly inspect county facilities, to perform an additional inspection in January 2011.  The CSA found numerous violations of state law, including a widespread failure to provide daily sick call and insufficient oversight of prisoners on suicide watch.  They also found serious deficits in medication administration: missed pill calls, night-time medications administered between 4 and 6 p.m., and prisoners going to court denied medications entirely.

119.   At the CSA's recommendation, Sheriff Sniff contracted with the independent Inmate Medical Quality (IMQ) to identify deficits and make recommendations.  IMQ performed their evaluation May 2-5, 2011, and reported significant and potentially harmful systemic deficiencies in staffing, screening, sick call, quality assurance, medical records, management of communicable diseases, medication management, and use of restraints and safety cells for suicidal or self-harming prisoners.  As with both of the Grand Jury reports, the Sheriff accepted these findings as requiring immediate and drastic attention.

120.   The health care deficiencies in the Riverside jails, and Defendant's awareness of them, predate the 2011 reports and stem in part from years of drastic cost-cutting measures.  As Sheriff Sniff has explained, the County made "deep cuts

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

to medical personnel staffing levels" in fiscal year 2008-09, which "unacceptably impacted the delivery of medical services. . . and other jail operations." Instead of correcting the problem, the County made another 20% reduction in medical and mental health care staff as of July 1, 2010.

121.   On January 12, 2012, Plaintiffs' counsel sent Defendant officials a sixteen-page letter detailing the systemic problems set forth in this Complaint. Defendant did not make any substantive response to the specific concerns described in the letter.

122.   The County's systemic failures, as outlined in this Complaint, in Plaintiffs' January 2012 letter, and in the numerous reports of independent auditors, result in significant injury and the unnecessary and wanton infliction of pain in violation of the Eighth and Fourteenth Amendments. The injuries, as described above, include drastically inadequate cancer treatment that may have significantly decreased one patient's life expectancy; severe and unnecessary pain; unconstitutional conditions on suicide watch; exacerbated mental illness from failure to provide appropriate screening and medications; and severe reactions from inadequate and frequently interrupted medication delivery.

## CLASS ACTION ALLEGATIONS

**Plaintiff class**

123.   Plaintiffs bring this action on their own behalf and, pursuant to Rule 23(a), b(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of all adult men and women who are now, or will be in the future, in the custody of Riverside County and who are now, or will be in the future, subject to an unreasonable risk of harm due to Defendant's policies and practices of denying prisoners minimally adequate medical care and minimally adequate mental health care.

124.   The class is so numerous that joinder of all members is impracticable. There are currently nearly 4,000 people incarcerated in the five Riverside jails, all of

36

whom are entirely dependent on Defendant for medical and mental health care.  All prisoners are at risk of developing serious medical and mental health conditions while in the Riverside jails.  Due to Defendant's policies and practices, all Riverside jail prisoners receive or are at risk of receiving inadequate health care while in the Riverside jails.

125.   There are questions of law and fact common to the class including whether the failure to provide minimally adequate medical and mental health care violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution and whether Defendant has been deliberately indifferent to the serious health care needs of class members.  Defendant is expected to raise common defenses to these claims.

126.   Since there are several thousand class members, separate actions by individuals would in all likelihood result in inconsistent and varying decisions, which in turn would result in conflicting and incompatible standards of conduct for the defendants.

127.   Defendant has acted and failed to act on grounds that apply generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.

128.   The claims of the named Plaintiffs are typical of the claims of the class and subclasses, since their claims arise from the same policies, practices, and courses of conduct and their claims are based on the same theory of law as the class's claims.

129.   The named Plaintiffs, through counsel, will fairly and adequately protect the interests of the class.  Plaintiffs do not have any interests antagonistic to the plaintiff class.  Plaintiffs, as well as the Plaintiff class members, seek to enjoin the unlawful acts and omissions of Defendant.  Further, Plaintiffs are represented by

counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

**Medical Subclass**

130.   Plaintiffs Gray, Patterson, and Kujansky bring this action on their own behalf and, pursuant to Rule 23(a), b(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of a subclass of prisoners (hereinafter "Medical Subclass") who are now, or will in the future be, subjected to the medical care policies and practices of the Riverside jails.

131.   The Medical Subclass is so numerous that joinder of all members is impracticable.  There are currently nearly 4,000 people incarcerated in the five Riverside jails.  All prisoners are at risk of developing serious medical conditions while in the Riverside jails.  Due to Defendant's policies and practices, all Riverside jail prisoners receive or are at risk of receiving inadequate medical care while in the Riverside jails.

132.   There are questions of law and fact common to the Medical Subclass including whether the failure to provide minimally adequate medical care violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution and whether Defendant has been deliberately indifferent to the serious health care needs of Medical Subclass members.  Defendant is expected to raise common defenses to these claims.

133.   Since there are several thousand Medical Subclass members, separate actions by individuals would in all likelihood result in inconsistent and varying decisions, which in turn would result in conflicting and incompatible standards of conduct for the Defendant.

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

134.   Defendant has acted and failed to act on grounds that apply generally to the Medical Subclass, so that final injunctive or corresponding declaratory relief is appropriate respecting the Medical Subclass as a whole.

135.   The claims of the named Plaintiffs are typical of the claims of the Medical Subclass, since their claims arise from the same policies, practices, and courses of conduct and their claims are based on the same theory of law as the Medical Subclass's claims.

136.   The named Plaintiffs, through counsel, will fairly and adequately protect the interests of the Medical Subclass.  Plaintiffs do not have any interests antagonistic to the Medical Subclass.  Plaintiffs, as well as the Plaintiff class members, seek to enjoin the unlawful acts and omissions of Defendant.  Further, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

**Mental Health Subclass**

137.   Plaintiff Gray brings this action on his own behalf and, pursuant to Rule 23(a), b(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of a subclass of prisoners (hereinafter "Mental Health Subclass") who are now, or will in the future be, subjected to the mental health care policies and practices of the Riverside jails.

138.   The Mental Health Subclass is so numerous that joinder of all members is impracticable.  There are currently nearly 4,000 people incarcerated in the five Riverside jails.  All prisoners are at risk of developing serious mental health conditions while in the Riverside jails.  Due to Defendant's policies and practices, all Riverside jail prisoners receive or are at risk of receiving inadequate mental health care while in the Riverside jails.

139.   There are questions of law and fact common to the Mental Health Subclass including whether the failure to provide minimally adequate mental health

39

care violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution and whether Defendant has been deliberately indifferent to the serious health care needs of Mental Health Subclass members. Defendant is expected to raise common defenses to these claims.

140.   Since there are several thousand Mental Health Subclass members, separate actions by individuals would in all likelihood result in inconsistent and varying decisions, which in turn would result in conflicting and incompatible standards of conduct for the Defendant.

141.   Defendant has acted and failed to act on grounds that apply generally to the Mental Health Subclass, so that final injunctive or corresponding declaratory relief is appropriate respecting the Mental Health Subclass as a whole.

142.   The claims of Plaintiff Gray are typical of the claims of the Mental Health Subclass, since his claims arise from the same policies, practices, and courses of conduct and his claims are based on the same theory of law as the Mental Health Subclass's claims.

143.   Plaintiff Gray, through counsel, will fairly and adequately protect the interests of the Mental Health Subclass. Plaintiff does not have any interests antagonistic to the Mental Health Subclass. Plaintiff Gray, as well as the Mental Health Subclass members, seeks to enjoin the unlawful acts and omissions of Defendant. Further, Plaintiff is represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

## CLAIMS FOR RELIEF

### First Cause of Action
### (Plaintiffs Gray, Patterson, and Kujansky and the plaintiff class
### v. Defendant County of Riverside)
### (Eighth Amendment; 42 U.S.C. § 1983)

40

144.   By its policies and practices described in paragraphs 1 through 143, Defendant subjects Plaintiffs and the Plaintiff class to an unreasonable risk of harm and injury from inadequate health care.  These policies and practices have been and continue to be implemented by Defendant and its agents or employees in their official capacities, and are the proximate cause of Plaintiffs' and the Plaintiff class's ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

145.   Defendant has been and is aware of all of the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.

## Second Cause of Action
### (Plaintiffs Gray, Patterson, and Kujansky and the plaintiff class
### v. Defendant County of Riverside)
### (Fourteenth Amendment; 42 U.S.C. § 1983)

146.   By its policies and practices described in paragraphs 1 through 143, Defendant subjects Plaintiffs and the Plaintiff class to an unreasonable risk of harm and injury from inadequate health care.  These policies and practices have been and continue to be implemented by Defendant and its agents or employees in their official capacities,  and are the proximate cause of Plaintiffs' and the Plaintiff class's ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment.

147.   Defendant has been and is aware of all of the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.

## Third Cause of Action
### (Plaintiffs Gray, Patterson, and Kujansky and the Medical Subclass
### v. Defendant County of Riverside)
### (Eighth Amendment; 42 U.S.C. § 1983)

CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

148.  By its policies and practices described in paragraphs 1 through 143 Defendant subjects Plaintiffs and the Medical Subclass to an unreasonable risk of harm and injury from inadequate medical care.  These policies and practices have been and continue to be implemented by Defendant and its agents or employees in their official capacities,  and are the proximate cause of Plaintiffs' and the Plaintiff class's ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

149.  Defendant has been and is aware of all of the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.

### Fourth Cause of Action
### (Plaintiffs Gray, Patterson, and Kujansky and the Medical Subclass v. Defendant County of Riverside)
### (Fourteenth Amendment; 42 U.S.C. § 1983)

150.  By its policies and practices described in paragraphs 1 through 143, Defendant subjects Plaintiffs and the Medical Subclass to an unreasonable risk of harm and injury from inadequate medical care.  These policies and practices have been and continue to be implemented by Defendant and its agents or employees in their official capacities,  and are the proximate cause of Plaintiffs' and the Plaintiff class's ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment.

151.  Defendant has been and is aware of all of the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.

### Fifth Cause of Action
### (Plaintiff Gray and the Mental Health Subclass v. Defendant County of Riverside)
### (Eighth Amendment; 42 U.S.C. § 1983)

152.   By its policies and practices described in paragraphs 1 through 143, Defendant subjects Plaintiffs and the Mental Health Subclass to an unreasonable risk of harm and injury from inadequate mental health care.  These policies and practices have been and continue to be implemented by Defendant and its agents or employees in their official capacities,  and are the proximate cause of Plaintiff's and the Plaintiff class's ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

153.   Defendant has been and is aware of all of the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.

### Sixth Cause of Action

**(Plaintiff Gray and the Mental Health Subclass v. Defendant County of Riverside)**

**(Fourteenth Amendment; 42 U.S. C. § 1983)**

154.   By its policies and practices described in paragraphs 1 through 143, Defendant subjects Plaintiffs and the Mental Health Subclass to an unreasonable risk of harm and injury from inadequate mental health care.  These policies and practices have been and continue to be implemented by Defendant and its agents or employees in their official capacities,  and are the proximate cause of Plaintiff's and the Plaintiff class's ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment.

155.   Defendant has been and is aware of all of the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.

### PRAYER FOR RELIEF

156.   Plaintiffs and the class they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint.  Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the Defendant as alleged herein, unless

Plaintiffs are granted the relief they request. The need for relief is critical because the rights at issue are paramount under the Constitution of the United States.

**157.** WHEREFORE, Plaintiffs, on behalf of themselves and the class they represent, request that this Court grant them the following relief:

A. Declare the suit is maintainable as a class action pursuant to Federal Rule of Civil procedure 23(a) and 23(b)(1) and (2);

B. Adjudge and declare that the conditions, acts, omissions, policies, and practices of Defendant and its agents, officials, and employees are in violation of the rights of Plaintiffs and the class they represent under the Eighth and Fourteenth Amendments to the U.S. Constitution;

C. Order Defendant, its agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, to develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm that Plaintiffs and members of the Plaintiff class suffer due to Defendant's inadequate medical and mental health care. Defendant's plan shall include at a minimum the following:

1. Staffing: Staffing shall be sufficient to provide Plaintiffs and the Plaintiff class with timely access to qualified and competent clinicians who can provide routine, urgent, emergent, and specialty health care;

2. Access: Policies and practices that provide timely access to health care;

3. Screening: Policies and practices that reliably screen for medical and mental health conditions that need treatment;

4. Emergency response: Timely and competent responses to health care emergencies;

5. Medication and supplies: Timely prescription and distribution of medications and supplies necessary for medically adequate care;

44

6.  Chronic care: Timely access to competent care for chronic illnesses;

7.  Mental health treatment: Timely access to necessary treatment for serious mental illness, including medication, therapy, inpatient treatment, suicide prevention, and suicide watch; and

8.  Quality assurance: A regular assessment of health care staff, services, procedures, and activities designed to improve outcomes, and to identify and correct errors or systemic deficiencies.

D.  Enjoin Defendant, its agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, from continuing the unlawful acts, conditions, and practices described in this Complaint and from failing to provide minimally adequate health care;

E.  Award Plaintiffs, pursuant to 42 U.S.C. § 1988, the costs of this suit and reasonable attorneys' fees and litigation expenses;

F.  Retain jurisdiction of this case until Defendant has fully complied with the orders of this Court, and there is a reasonable assurance that Defendant will continue to comply in the future absent continuing jurisdiction; and

G.  Award such other and further relief as the Court deems just and proper.

1    Dated:                    March 8, 2013

2                              PRISON LAW OFFICE

3

4                              By: *Donald Specter*

5                              DONALD SPECTER
                               SARA NORMAN
6                              Attorneys for Plaintiffs

7

8                              AKIN GUMP STRAUSS HAUER
                               & FELD LLP
9

10

11                             By:

12                             SHAWN HANSON
                               AMIT KURLEKAR
13                             ANYA FREEDMAN
                               Attorneys for Plaintiffs
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                   46
─────────────────────────────────────────────────────
          CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

Quinton Gray, Angela Patterson, and Stanley Kujansky, individuals

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

County of Riverside

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Donald Specter & Sara Norman
Prison Law Office
1917 Fifth St. Berkeley, CA 94710
Tel: (510) 280-2621

Shawn Hanson, Amit Kurlekar, & Anya Freedman
Akin Gump Strauss Hauer & Feld LLP
580 California St., Ste 1500
San Francisco, CA 94104 Tel: (415) 765-9500

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☒ Yes ☐ No ☐ **MONEY DEMANDED IN COMPLAINT: $** declaratory/injunctive

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Deprivation of rights under (1) Eighth Amendment of the U.S. Constitution; (2) Fourteenth Amendment of the U.S. Constitution; and (3) 42 U.S.C. § 1983

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☒ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY: Case Number:** EDCV13-0444

**AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.**

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s):

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s):

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Riverside County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Riverside County | |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Riverside County | |

*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** Donald Spector   DATE: March 8, 2013

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge Virginia A. Phillips and the assigned discovery Magistrate Judge is Oswald Parada.

The case number on all documents filed with the Court should read as follows:

## EDCV13- 444 VAP (OPx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

======================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)    NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY