**AKIN GUMP STRAUSS HAUER & FELD LLP**
SHAWN HANSON (SBN 109321)
DANIELLE CROCKETT (SBN 261809)
NICHOLAS GREGORY (SBN 275582)
KELSEY MORRIS (SBN 277859)
SAURISH BHATTACHARJEE (SBN 286264)
580 California Street, Suite 1500
San Francisco, CA 94104
Telephone: (415) 765-9500
Facsimile: (415) 765-9510
Email: shanson@akingump.com, dcrockett@akingump.com
ngregory@akingump.com, kmorris@akingump.com
sbhattacharjee@akingump.com

**PRISON LAW OFFICE**
DONALD SPECTER (SBN 83925)
SARA NORMAN (SBN 189536)
WARREN GEORGE (SBN 53588)
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704
Email: dspecter@prisonlaw.com, snorman@prisonlaw.com
wgeorge@prisonlaw.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION - RIVERSIDE

| | |
|---|---|
| QUINTON GRAY, et al.<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF RIVERSIDE,<br><br>Defendants. | Case No. EDCV 13-0444 VAP (OPx)<br><br>**DECLARATION OF PABLO STEWART, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date: July 21, 2014<br>Time: 2:00 p.m. |

I, Pablo Stewart, declare,

1. I am a board-certified psychiatrist and Clinical Professor in the Department of Psychiatry of the University of California, San Francisco. My curriculum vitae is attached hereto as Appendix A. Throughout my professional career, I have had extensive clinical, research, and academic experience in the diagnosis, treatment, and prevention of mental illnesses in correctional and other institutional contexts. I have designed and taught courses in correctional psychiatry at the University of California, San Francisco. I have also designed and taught courses on the protocols for identifying and treating psychiatric patients with various disorders and have supervised psychiatric residents in teaching hospitals. I have worked closely with local, state, and federal governmental bodies to design and present educational programs about psychiatry, substance abuse, and preventative medicine.

2. I have extensive experience managing, monitoring, and reforming correctional mental health systems. For example, between August 1988 and December 1989, I served as the Director of Forensic Psychiatric Services for the City and County of San Francisco. In that capacity, I had administrative and clinical oversight responsibility for the psychiatric care provided to the inmate population in San Francisco at both the county jails and in the locked inpatient treatment unit at the San Francisco General Hospital.

3. I have also served as a psychiatric expert or consultant to various federal courts and other organizations implementing remedial decrees or inspecting facilities regarding the provision of mental health care in correctional institutions, including the United States Department of Justice, the State of New Mexico, and the federal district courts for the Eastern District of California in *Gates v. Deukmejian* and the Northern District of California in *Madrid v. Gomez*.

4. I have been asked to render an opinion as to the policies and practices of Riverside County as they relate to the provision of mental health care to prisoners in its

jails and on the mental health treatment for named plaintiffs Quinton Gray and John Rosson, III, as well as possible named plaintiffs Brandy McClellan and Julie Miller.

5. To form my opinions in this case and to prepare this Declaration, I have reviewed dozens of health care records from current and former Riverside prisoners, Riverside jail health care policies, the prisoner declarations and grievances cited herein, death reports, coroner/autopsy reports, safety cell and restraint chair logs, audits and reports regarding health care delivery in the Riverside jails, and budget and staffing information. I have provided specific citations in my report to illustrate and support my conclusions.

6. The litigation is in an early stage, and my opinions are limited by the information I had to review. I have not yet visited the jails or spoken to staff or prisoners, although I have reviewed numerous health care records and grievances and important documents from the County that describe and assess the provision of mental health care.

7. I am confident, however, in the preliminary opinions I express in this report. The data I reviewed is ample to support these conclusions, based on my extensive experience in analyzing care delivery processes in detention systems. As more information becomes available, I plan to supplement and modify these opinions as appropriate.

8. It is very clear to me that Riverside County fails to deliver adequate and appropriate mental health care to patients in its jails. These failures are unmistakable and they are systemic. As I describe in more detail below, my review of the reports, policies, County records, and health care charts showed me that the substandard mental health care occurs not in isolated incidents, but instead constitutes the sort of systematic deficiencies that are typical of correctional systems that lack adequate staffing and oversight.

9. I begin by discussing the nature of the system – a single, unified mental health care system spread across five jails. I then discuss the systemic problems that have been identified over the years by various entities, including County and State watchdogs. Finally, I review the current treatment deficits, which demonstrate the same chronic systemic deficiencies and the County's failure to institute the reforms necessary to bring its mental health delivery system up to community standards of care.

**1. Riverside is a unified system with systemic problems**

10. Riverside County operates its jails not as five separate entities but as a single, unified system. Health care at all the jails operates according to generally applicable policies and procedures. See, for example, Exh. 12 to the Declaration of Danielle Crockett in Support of Plaintiffs' Motion for Class Certification (Crockett Decl.) at COR012276-12397 (system-wide mental health policies). Mental health care has top-down leadership and executive decision-making through the County's Department of Mental Health Detention Services (MHDS) and the Sheriff. The Memorandum of Agreement among the Sheriff, the MHDS, and the jail's medical services (Detention Health Services) clearly calls for systemic decision-making and a unified approach to health care treatment across the jails. See Exh. 13.[1]

11. One characteristic of a unified system is a distinction between levels of mental health care, with specific facilities identified for higher acuity and lower acuity patients. Patients are transferred to specific places to receive the appropriate level of care. In Riverside, higher-acuity mental health patients are kept at the Robert Presley Detention Center (Presley), which is near the Riverside County Regional Medical Center (RCRMC), where I understand patients are sent for higher levels of care. See Exh. 13 at COR030712, Exh. 14 at COR010101, COR010103.

[1] All future references to Exhibits in this Declaration are to the Crockett Decl.

12. The County clearly intends the Riverside jails to operate according to system-wide policies, but that does not mean those policies are adequate: a preliminary review points out several deficiencies. One significant policy flaw is that an initial mental health screening and/or assessment is completed only for referred patients. See Exh. 12 at COR012324: "All referred inmates will receive a mental health initial screening and/or assessment by qualified mental health professional." This is insufficient: every person entering the jail must be properly and thoroughly screened for mental health needs. Otherwise, the system will miss mentally ill people who are, often by virtue of their mental illness, not able to seek help themselves. I discuss this concern in more detail in Section 3.b, below.

13. One characteristic of a functional mental health delivery system able to provide community standard of care is a set of policies that distinguish among various patient levels of care and minimum treatment service requirements for those levels, such as frequency of contact with primary clinician or with psychiatrist. In my review of the Inmate Care and Treatment policies (Exh. 12 at COR012322-COR012340), which set out core patient treatment processes, I saw no such policies. This gap leaves clinicians without guidance as to frequency of contact with patients. Not unexpectedly, I saw haphazard and inadequate attention to patients' mental health needs in many of the charts I reviewed, with a dangerously passive approach taken by the clinicians: many seem to only see patients in response to some external prompt, such as patient request or outside advocacy. This is a fundamentally flawed way to run a mental health delivery system, since patients by the very nature of their conditions are not always capable of self-referral when treatment is inadequate or medications need adjustment. Responsible clinicians maintain regular oversight over their patients, and Riverside's policies do not encompass such a duty.

14. Indeed, many of the patient charts showed a marked passivity – to the point of indifference – on the part of Riverside's mental health clinicians towards all aspects

of patient care. The clinicians do not appear to monitor many patients' responses to treatment, side effects, and possibly dangerous interactions with underlying medical conditions. These findings are set out in more detail in the following sections on deficits in treatment planning (3.c), access to care (3.d), and treatment monitoring (3.e). The practice in the jails is thus entirely consistent with the policy omission in this area, although the lack of adequate policies does not excuse departures from community standards of care, something I found all too often in my review of the patient records.

15. Another system-wide concern I have is that Riverside, by policy, appears to limit treatment to only certain conditions. See Exh. 12 at COR012323 (listing diagnoses that allow a clinician to "open a case": Schizophrenia, Schizoaffective Disorder, Psychotic Disorders, Bipolar Disorders, Major Depressive Disorders, and Substance Induced Psychotic/Mood Disorders). This is problematic for several reasons. First, it assumes that mental health clinicians are competent in assessing and diagnosing mentally ill inmates. My review of the medical records calls this competency into question, as is discussed in more detail in the following sections. Second, the list of diagnoses in COR012323 is extremely limited: it misses a large number of Axis 1 disorders, including such common ones as Anxiety Disorders and Posttraumatic Stress Disorder as well as many Mood Disorders.[2] In my experience, mental health care delivery systems that limit treatment to certain diagnoses set up an incentive for clinicians to diagnose patients with conditions outside the scope of treatment. It becomes far too easy to recast a disorder and avoid treatment responsibility.

16. Third, it is not appropriate to limit treatment to only Axis 1 disorders. What if a patient has Borderline Personality Disorder, which is Axis 2, and is suicidal and cutting himself? Would that patient qualify for treatment under Riverside's

[2] I note that elsewhere the policies state that if there is an Axis I diagnosis, "client will be opened for treatment." Exh. 12 at COR012325. I am not sure how to resolve this contradiction in the policies. The contradiction is itself a concern, since it leaves clinicians with inadequate guidance.

policies? The answer, on paper at least, appears to be no, which would be a grave policy error. I am told that there has been testimony to the effect that Axis 2 diagnoses would be treated in the jails, which would certainly be appropriate. If that is the case, the policies are sadly outdated and fail to provide the sort of guidance needed for a well-functioning mental health delivery system.

**2. Riverside has long demonstrated systemic mental health care deficiencies**

17. In addition to my concerns about the policies, I found systemic deficiencies in the actual practices in the Riverside jails. These are clearly long-standing: in 2010-2012, a series of audits from the County's own Grand Jury, the State agency (then called the Corrections Standards Authority) that monitors jail operations, and an independent agency (Institute for Medical Quality, or IMQ) hired by the Sheriff describe serious deficiencies in Riverside's system-wide jail health care processes, including substandard screening mechanisms, dangerously inadequate staffing, malfunctioning medication delivery systems, insufficient oversight of suicidal or self-harming prisoners, and inadequate record-keeping. See, e.g., Exhs. 15, 16, 17, 18, and 14.

18. It is worth noting these findings in some detail, since they provide an important context for the review of current practices. For example, the Grand Jury reported that at the time of their initial booking into county jails, detainees are screened by correctional officers. The Grand Jury expressed concern that "correctional officers may not recognize hidden medical and/or mental health problems that could best be observed by a medical/mental health expert. This could result in delaying needed treatment," and recommended that "[m]ental health personnel should be assigned at each jail and used at the time of initial booking to screen for possible mental illness." Exh. 15 at PLTFS00422, 426. The Sheriff agreed, acknowledging that the absence of mental health professionals at intake could result in delayed mental health treatment. Exh. 16 at PLTFS00453. This problem remains: the initial booking screening of all detainees for mental health issues is still being done by jail deputies. Exh. 13 at

COR030709. This system-wide policy places new detainees at serious risk of delayed access to needed mental health care.[3] I discuss the ongoing problems with the Riverside's intake policies and practices in more detail in Section 3.b.

19. Further, as the IMQ report recognizes, "the time period immediately following admission to a jail is the most dangerous time for an inmate, and over half of in-custody deaths occurred within one month of admissions, with 24% of deaths occurring within two days of admission." Exh. 19 at PLTFS00419. This danger is still all too present in the Riverside jails. See Sections 3.b and 3.g, below.

20. The State's Corrections Standards Authority also reported that after the their initial booking, prisoners identified with mental health problems had to wait as long as three weeks before they were evaluated by mental health specialists and provided needed medication. Exh. 18 at COR010089. The Sheriff agreed that there were delays that could impact prisoners' mental stability. Exh. 16 at PLTFS00454; see also Exh. 14 (IMQ report) at COR010105. As I discuss in Sections 3.d and 3.f, I saw persuasive evidence that these problems continue, with delayed access to care and woefully inadequate medication administration, and fragile prisoners with serious mental health conditions are suffering as a result.

21. The Grand Jury found that prisoners assessed with moderate mental health problems such as neuroses, phobias, or panic disorders were not always offered appropriate medication and counseling by qualified staff to get and maintain them in a stable condition. Exh. 15 at PLTFS00422. The policy omission I discussed in the previous section suggests that this problem has not been fixed either.

---

[3] I note that the policies now state that a registered nurse will do a follow-up health screening. Exh. 13 at COR030709. However, the policies do not specify that the nurse must have any mental health training, and it does not give a time frame for the screening except that it be done prior to the inmate being housed in the jail population. In my experience, jail inmates sometimes spend long periods of time – even overnight – in holding cells or the like before being placed in housing. This policy does not correct the systemic problems identified by the Grand Jury.

22. Deficiencies in treatment are similarly long-standing. IMQ found in 2011 that prisoners were "staying in safety cells longer that clinically appropriate," were "infrequently evaluated," and were "removed from safety cells and transported to hospitals for mental health treatment because there are no staff personnel to treat them." Exh. 14 at COR010094. I saw evidence that these problems continue: in Section 3.h, I discuss the plight of prisoners with chronic mental health conditions who are deprived of effective treatment. Instead, they repeatedly decompensate, are placed in safety cells for excessive amounts of time, and are then transported to outside hospitals for treatment and stabilization. When this happens dozens of times to multiple prisoners, it points out serious and systemic failures in the planning and implementation of effective treatment.

23. In his 2011-2012 report to Jail administrators, the DHS Medical Director acknowledged that under California's Realignment Plan (AB 109), the population of the Riverside County jails was changing from a transitional population to a more permanent one, with "[t]reatment of acute, episodic conditions. . . changing to treatment of chronic conditions." Exh. 20 at COR009755. As seen in the widespread lack of patient care oversight and treatment planning as well as the fact that many patients are sent repeatedly to safety cells for stabilization, the Riverside jails are still mired in a crisis management mode rather than providing effective treatment to patients with chronic mental health conditions.

24. Medication administration deficiencies were well documented in the IMQ report: the independent agency found that nurses often fail to pass medications timely and evaluate side effects in their patients. Exh. 14 at COR010094. Patients were not given medications when they went to court. *Id.* The medication delays were dangerous to patients. *Id.* at COR010105. The State's Corrections Standards Authority reported in January 2011 that because of a lack of adequate staffing, nurses were administering night-time psychotropic medications to County jail patients between 2:00 p.m. and 4:00

p.m. -- far earlier than the community standard of care requires. Exh. 18 at COR010088-10089. The administration of psychotropic medications far in advance of the normal sleep cycle forces patients to make a painful choice between falling asleep in the middle of the afternoon and then staying up all night as the drug's effects wear off, or refusing their medications, only to stay up all night and wait for morning pill call. As I discuss in Section 3.f, patients continue to suffer from these substandard medication administration practices.

25. The IMQ report found in 2011 that the "[h]ealth authority is unable to assure health assessment current information is filed in medical records . . . ." Exh.14 at COR010104. All of the medical records I reviewed were disorganized and chaotic, making it difficult if not impossible to assess continuity of care and medication administration. See Section 3.i. IMQ also found that "[c]onfidentiality of the medical conditions inmates write on kites and delivered to medical staff by custody staff is in question." *Id.* I found ongoing privacy concerns as well. See Section 3.j.

26. My review of patient charts and declarations, staffing reports, safety cell and restraint chair logs, and other County documentation of current jail policies and practices demonstrates to me that these systemic deficiencies continue, and continue to harm patients and place them at serious risk of harm. These findings are described in more detail in the following sections.

**3. Mentally ill people in Riverside jails face a serious risk of harm from inadequate care**

27. I found ample evidence of systemic violations in the following basic constituent elements of a correctional mental health system.

**(a) Staffing**

No system can function without adequate staff. For example, a mental health system must have enough clinicians to see patients, diagnose them, review their care at regular intervals, and attend to any crises; registered nurses (RNs) and licensed

vocational nurses (LVNs) must be available in sufficient numbers to provide treatment triage and regularly distribute patient medications.

28. It is abundantly clear to me from reviewing patient charts that mental health staffing is inadequate. The problems I describe in this declaration – including treatment planning deficiencies that fail to account for dangerous medication interactions with underlying medical conditions; medication mismanagement; failure to properly assess, monitor, and adjust mental health treatment; dangerously inadequate suicide prevention mechanisms – are classic indicators of poor mental health staffing. It is not clear to me from the documents I was provided, however, whether it is the simple number of staff that is insufficient or the way that they are used and the direction they are given.

29. Riverside's mental health staffing shortages are well documented in 2011 and 2012 in the audits and reports. See Exh. 17 at COR010066-10067, 10079, 10081-10082; 18 at COR010087-10088, 10091; Exh. 14 at COR010103-10107. The more recent documents I have seen from the County appear to place them currently at or near their own desired staffing levels, however. See Exhs. 21-25 and 26-42. Without actually touring the facility and questioning staff regarding their processes, it is difficult for me to tell whether these staffing numbers are adequate. What is clear from the documents I reviewed is that not enough treatment is being provided to mental health patients, whether due to staffing shortages or other reasons. It is also clear that severe and chronic staffing shortages continue in the LVN and RN categories that directly impact mental health treatment, since it appears that these are the staff who deliver medications, document refusals, and provide front-line triage and observations of the efficacy of psychotropic medications and any side effects. As of October 2013, only 26 out of 42 licensed vocational nurse positions in the jails (adult facilities and RCRMC) were filled. Exh. 43. With only 62% of the staff the County deems necessary in this position, deficiencies in medication administration are to be expected. Also in October

2013, only 44 out of 72 institutional nurse positions (including senior nurses and supervisors) in the jails were filled, or 63%. *Id.* These serious vacancy levels appear to explain, at least in part, the major deficits in medication administration I discuss in Section 3.f.

**(b) Intake and screening**

30. A well-run intake process is essential to flag urgent concerns and to identify mental health patients so that interruptions to care are minimized. Intake deficiencies were mentioned specifically in the Grand Jury and other audits from only a few years ago, and I saw clear evidence that the policy and practice of providing deficient intake and screening to patients in the jails remains.

31. I saw several cases in which Riverside's process fell short of what is needed with tragic results. , a war veteran with Posttraumatic Stress Disorder and Bipolar Disorder, tried to harm himself during the intake process in January 2012. The following day he was placed alone in a cell with a telephone cord that he used to strangle himself. Exh. 44; Exh. 45 at COR040833-834, COR040843. , who also had Bipolar Disorder, also expressed suicidal ideation during intake in July 2012. He was later that day placed in a general population cell, alone, where he hanged himself with a bed sheet. Exh. 46 at COR040690-691, COR040693. Both prisoners were sent to "safety cells" immediately following intake, presumably to be better monitored (see Section 3.h), but were quickly removed and placed in settings with the ready means to kill themselves. See also , Exh. 62 (patient with long history of Schizophrenia, paranoia, manic symptoms, and disorganized thought with no documentation of meaningful mental health intake or assessment until hospitalization for medical conditions several days later; committed suicide six weeks later).

32. The warning signs were unmistakeable during the intake process for these men, and the failure of Riverside's mental health system to act appropriately on that

information was disastrous. In the first two cases, a functional health care delivery system with the necessary treatment components available would have placed them on suicide observation status in a safe and clean environment until they could be properly assessed by a psychiatrist. The psychiatric assessment would include appropriate mental health interventions and a treatment plan that encompassed appropriate custodial settings for the patient's risk and needs. None of this was done for either patient, raising the clear implication that these necessary components simply do not exist in Riverside.

33. was screened for intake on March 30, 2013. His lengthy history of multiple suicide attempts, past psychiatric treatment, and medications was not noted and he was not referred for mental health treatment until April 6, 2013. He attempted suicide the following day, after which he was finally assessed by a psychiatrist. Sadly, this is not the first time experienced inadequate intake procedures in the Riverside jails. He was earlier arrested on August 31, 2012, and reported his psychiatric history and medications when assessed by a clinician on September 4, 2012. Despite the clinician noting his past history of past suicide attempts and documentation of depression and agitation, he was not assessed by a psychiatrist until October 16, 2012, six weeks after intake. Further, he was only seen by a psychiatrist after endorsing suicidal ideations.

34. Mentally ill patients who are not suicidal also experience harm from the inadequate intake and screening process. a patient at high risk for depression due to multiple chronic medical problems including recent kidney and pancreas transplants, had no relevant notation on his intake medical and mental health assessment forms from February 2012 regarding these conditions. I saw many other patient charts whose intake forms were marked with "no" for all conditions and medications, despite the clear presence of chronic conditions and/or long-term medications. See, e.g., (May 2013), (March 2013), (February 2013).

35. Patients sometimes wait weeks or months to receive psychotropic medications they were taking prior to entering the jail, a serious risk to patients' well-being which an adequate intake/assessment process should be designed to avoid. Declaration of Julie Miller in Support of Plaintiffs' Motion for Class Certification (Miller Decl.), attached as Exh. 3 to Crockett Decl., at ¶¶ 5, 14. filed a grievance on July 5, 2013, stating that he had asked to see mental health on June 19, 2013, on the first day he arrived in jail, in order to obtain the psychotropic medications he had been taking since he was young. He stated that in the more than two weeks since that time, he had been experiencing auditory hallucinations, sleeplessness, and paranoia. Exh. 47 at PLTFS00323. See also (patient with history of multiple suicide attempts and long-term psychiatric medications screened at intake March 30, 2013, but did not receive psychotropic medications until April 10, several days after he attempted suicide).

36. Mentally ill patients who have not received care in the community must also be properly identified and care initiated. Brandy McClellan is an example of a patient who was not receiving mental health treatment outside of jail, instead resorting to self-medication through substance abuse. Declaration of Brandy McClellan in Support of Plaintiffs' Motion for Class Certification (McClellan Decl.), attached as Exh. 2 to Crockett Decl., at ¶ 3. Once sentenced to a long jail term with extremely limited opportunities for movement and programming, her anxiety escalated until she asked for treatment in late 2013. *Id.* A well-functioning system would have identified her unmet treatment needs on intake, saving her weeks of pain for untreated mental illness.

37. These cases demonstrate serious, chronic, systemic gaps in Riverside's intake and screening processes.

**(c) Assessment and treatment planning**

38. Once mental health patients have been identified, they must be assessed in a timely manner and have their treatment formulated in a treatment plan.

39. An essential element of treatment planning is the determination of whether the prescribed psychotropic medications are contraindicated or require special measures to monitor physical health due to underlying medical conditions. I saw evidence of systemic failures to address potentially dangerous drug interactions, placing patients at serious risk of harm. The utter lack of attention to this elementary concern indicates that psychiatric medications are prescribed in haphazard fashion, without the necessary communication between medical and mental health staff and careful patient consultation and chart reviews necessary for patients with complex medical and mental health care profiles.

40. Two of the plaintiffs experienced this problem. John Rosson has a history of hyperlipidemia, non-insulin-dependent diabetes, hypertension, deep vein thrombosis treated with Coumadin, and recurrent lower extremity cellulitis. He was prescribed Zyprexa, Abilify, and Risperdal at various times. Except for several acute medical or psychiatric hospitalizations, he had no lab assessments monitored by his psychiatrists to determine baseline and ongoing markers for diabetes, elevated lipids, renal function or cardiac effects (electrocardiogram), despite being maintained on atypical antipsychotic medications which should have triggered such attention. I saw no indication anywhere that psychiatrists were involved in any of the psychiatric medical decisions about his treatment. This is a serious concern because these medicines (atypical antipsychotics) are well known to cause dyslipidemia, diabetes, and elevated blood triglycerides. These failures are extremely disturbing and placed him at grave risk of harm. (I did note normal lipid panels in Mr. Rosson's chart, which was a relief – he is fortunate. But I saw no evidence that any Riverside mental health staff noted the risk or tracked the lab results in their care decisions.)

41. Quinton Gray, another plaintiff, is a hypertensive patient with bradycardia (an abnormally low heart rate) and a history of seizures. He was given Geodon and Trilafon while in the Riverside jails but very few electrocardiograms or laboratory tests

to monitor cardiac and metabolic health. Riverside's monitoring failure exposed him to a serious risk of harm because his medical conditions are potentially life-threatening. Simply put, it is dangerous to prescribe medications that risk cardiac complications to a patient with a pre-existing cardiac abnormality, particularly with no follow-up or monitoring.

42. Moreover, contrary to the standard of care Mr. Gray had no assessment of his tardive dyskinesia (uncontrollable tremors, twitching, and muscle stiffness) being worsened by the prescription of two antipsychotics at once and no assessment of how two antipsychotic drugs might lower his seizure threshold. In fact, Mr. Gray did appear to experience serious side effects from this medication interaction while in the Riverside jails: he describes his chronic experience of involuntary muscle contractions in his tongue, neck, legs, and feet, extremely painful and distressing side effects that not only caused him to suffer directly but which incited other prisoners to attack him verbally and physically out of apparent fear and disgust. Declaration of Quinton Gray in Support of Plaintiffs' Motion for Class Certification (Gray Decl.), attached as Exh. 1 to Crockett Decl., at ¶¶ 17, 18, 20. He also described frequent seizures: mild ones approximately once a week and several grand mal seizures during his approximately two-year jail stay. *Id.* at ¶ 19. In one of the grand mal episodes, he describes falling on the stairs and hitting his teeth; in others, he notes that he urinated and defecated on himself, a humiliating outcome that can place incarcerated patients at risk from other prisoners. *Id.* at ¶¶ 11, 20. These outcomes are entirely predictable results of the failure to monitor his physical condition and reactions to his medications.

43. I saw many other examples of dangerous deficiencies in this area.

was receiving several medications in June 2012: Celexa (used for anxiety and depression), Vistaril (used for sleep) and Trileptal (used for seizures, and off-label for Bipolar Disorder). There are many major drug interaction concerns with Trileptal. This medication inhibits the metabolism of many psychotropic medications, increasing the

blood levels of medications to potentially toxic levels. With the use of Celexa and Trileptal together, blood levels of Celexa could increase to toxic levels and place the patient at high risk of cardiac arrhythmias (specifically QT interval prolongation). The Federal Drug Administration in 2011 released a warning about Celexa's potential for cardiac toxicity, with an update in March 2012. The prescribing physician should have been aware of this warning for cardiac toxicity, particularly for a drug that slows down the metabolism, but there is no indication in file of any such awareness or attention to the risk.

44. has Bipolar Disorder. He was prescribed two antidepressant class medications (Remeron and Celexa) at the same time, in May 2012. Although this can be done, there should be careful documentation as to why these two antidepressant medications are being used, because they carry a class D drug-drug interaction (meaning that the prescriber should consider changing therapy due to risk of serotonin syndrome). Serotonin syndrome is a potentially fatal and emergent medical condition caused by elevated serotonin levels in the body. I did not see documentation to justify this treatment. While the medications were shown as being renewed once monthly, there is no documentation that the patient was ever physically seen or assessed by a medical doctor. Also, taking these two antidepressant medications at the same time increased the patient's risk of cycling into a manic episode.

45. In April 2013, was prescribed Celexa for at least one month in addition to Risperdal and Benadryl. Celexa and Risperdal can increase the chance of cardiac arrhythmias, notably prolonged QT intervals. Given documented history of multiple cardiac arrhythmias, which includes super ventricular tachycardia and atrial fibrillation, placing him on both of these medications at the same time increased his chance of developing lethal arrhythmias. There is no documentation indicating was aware these medications could worsen his cardiac conditions (that is, no informed consent signature). These medications were ultimately

discontinued, and was placed on Thorazine. However, Thorazine can also cause cardiac arrhythmias in patients with a prior history, placing patients like at higher risk of cardiac events.

46. Julie Miller is an HIV patient with major Depression and suspected Bipolar Disorder. She is given Norvir for her HIV in the jails. In February 2013, Ms. Miller was prescribed Paxil and Trazodone. Norvir inhibits the metabolism of both of these drugs and as a result, can increase blood levels of the drugs to dangerous levels. Increased blood levels of Trazodone and Paxil can be associated with more side effects, including dry mouth, sedation, dizziness, and weight gain. Ms. Miller complains of significant weight gain. Miller Decl. at ¶ 7. Also, both drugs increase serotonin blood levels, placing Ms. Miller at higher risk of serotonin syndrome -- a potentially life-threatening condition consisting of altered mental status, muscle contractions, fever and autonomic instability. There is no notation in her medical file to indicate that she was regularly assessed for possible side effects from these medications, nor is there documentation that those medications were given at lower doses while she was on Norvir. She reports that she has never been told about possible side effects of new medications or monitored to determine their effects. Miller Decl. at ¶ 6. Further, in September 2012, Ms. Miller was given the medications Elavil and Effexor at the same time. Taking Effexor and Elavil at the same time can also increase the risk of serotonin syndrome. There is no documentation in Ms. Miller's file indicating that she was regularly assessed for serotonin syndrome or other medication-related side effects.

47. has a seizure disorder and type 2 diabetes. In April, 2012, was prescribed Trazodone, Risperdal, and Zoloft. Risperdal lowers the seizure threshold and can worsen type 2 diabetes. Risperdal should be discontinued, or its strength lowered, for patients who are having uncontrolled seizures prior to starting on the medication. On the day he was prescribed Risperdal, submitted a health care request stating that he had had a seizure in his cell two days prior. There is

no documentation in file that he was screened for active seizures prior to initiation of Risperdal.

48. See also (prescribed Risperidone in August 2013 with no documentation that a psychiatrist reviewed and assessed his history of poorly controlled diabetes or current lab values indicating present poor diabetes control; no documentation he was warned that Risperidone is known to increase blood sugars and worsen diabetes); (history of high blood pressure treated with Norvasc; started on Olanzapine without baseline labs which were necessary to monitor weight gain, hyperlipidemia, and metabolic syndrome associated with this medication that could have put him at risk for cardiac and metabolic complications); (initiated on Paroxetine and Thioridazine, which require clear documented psychiatric necessity for concomitant use and special monitoring because of dangerous potential interactions and side effects, with no documented monitoring for the known risk).

49. The failure to properly assess medication interactions with underlying medical conditions was the most widespread and dangerous deficiency in this area. I had additional concerns, however, that some patients had trouble even obtaining any appropriate assessments for mental health care. , mentioned just above, requested mental health care in August 23, 2013, from medical staff, but there is no documentation of any referrals to mental health staff or any psychiatric assessment before he was started on psychotropic medications on October 4, 2013 (there is documentation that he was given these medications for four days in September 2013, and then none administered until October 4, 2013.) This is of serious concern because of his poorly controlled diabetes and the potentially dangerous interactions with Risperidone, one of the medications he was prescribed.

50. The appropriate categories of medications must also be prescribed. I was extremely disturbed to see the repeated prescription of Thorazine for Riverside patients: Brandy McClellan, , , , Julie Miller,

and all have been given that medication during the course of their jail stays. Thorazine is an outdated antipsychotic medication. It is far from the standard of care in a modern mental health delivery system. There are several reasons that responsible psychiatrists no longer use it: first, because it produces extremely debilitating side effects; second, because it lacks efficacy as an antipsychotic; and third, because it presents an unacceptable risk of sudden death due to cardiac arrhythmia.

**(d) Access to care**

51. It is axiomatic that timely access to care is essential for any correctional mental health care system. By policy and practice, Riverside does not have a reliable system for patients to obtain necessary mental health treatment. This systemic failure was well documented in the 2010-2012 reports. Exh. 17 at COR010070 and 10084; Exh. 18 at COR010089; Exh. 14 at COR010105. It has clearly not been corrected: the significant delays I saw patients suffer before they could obtain mental health treatment, with no indication that these delays were anything out of the ordinary, painted a picture of a system that simply cannot support regular and appropriate access to care.

52. For example, , a Bipolar patient with a history of multiple suicide attempts, has multiple documented self-harm incidents in the Riverside jails starting a few days after his arrival, in April 2013, through July 2013 (the end date of the records I reviewed). Nonetheless, repeated referrals to mental health staff were ignored: I saw referrals to mental health on April 6 (after intake), April 7 (after a suicide attempt), June 14 (after another suicide attempt), June 20, June 24 (another suicide attempt), July 6, and July 8. He was seen by a psychiatrist April 8 and 19. As far as I could see, all the other referrals were unanswered. There is no indication this extremely fragile patient was followed by psychiatry on a regular basis. In my experience, systems that cannot follow through on referrals for their most at-risk patients generally lack the capacity to plan and oversee care for less obviously needy patients.

53. Patients relate similar stories in their declarations. Quinton Gray, whose serious mental illness and underlying medical conditions require careful monitoring, was not regularly or consistently seen until friends complained to jail officials. Gray Decl. at ¶ 8. He describes constant struggles to be seen by mental health staff. *Id.* at ¶¶ 6-9. John Rosson, who has frequently been placed in safety cells and sent to RCRMC for inpatient psychiatric care, relates that he nonetheless had difficulty obtaining access to mental health treatment, and indeed had no therapy at all, until counsel in this case wrote to County officials about his care deficits. Declaration of John Rosson, III, in Support of Plaintiffs' Motion for Class Certification (Rosson Decl.), attached as Exh. 4 to Crockett Decl., at ¶¶ 11-12.

54. Brandy McClellan experienced a dangerous and entirely predictable side effect of the medications she was prescribed, resulting in her hospitalization after she nearly collapsed and had serious cardiac complications. McClellan Decl. at ¶¶ 7-8 (see more detailed discussion below, in Section 3.e). Nonetheless, in order to get any attention from mental health staff after returning from the hospital she had to file a health care request form ("blue slip") and wait several weeks to be seen by a psychiatrist. *Id.* at ¶ 9. During this time, the medications she had been misprescribed and which caused her hospitalization continued to be presented to her at pill call. *Id.* If she had not had the presence of mind to refuse them, she could have been in serious danger. I was very disturbed to read in her declaration that the treating psychiatrist had not even been made aware of her hospitalization until she told him. *Id* That speaks to serious gaps in Riverside's practices on oversight of and access to basic care.

55. Grievances filed by prisoners describe similar delays. In a June 2013 grievance, wrote that he had been waiting three months to see a mental health professional, despite putting in blue slip requests for treatment. Exh. 48 at PLTFS00240. filed a grievance in July 2013 documenting his unanswered request to see mental health in June, on the first day he arrived in jail, because he had

been taking medication since he was young and he was currently hearing voices. Exh. 47 at PLTFS00323. On June 12, 2013, filed a grievance a week after he was told by staff that he was eleventh in line to see a mental health provider. After several days passed, he wrote staff told him he was still in line with a "long line" ahead of him. Exh. 49 at PLTFS00349. There is no evidence these requests were triaged.

56. Access to care includes access to medications. Grievances submitted to staff describe delays in medication start-up. In May 2013, (suffering from Bipolar Disorder) submitted a grievance noting that he had seen a mental health professional two to three weeks prior but had yet to receive medication to help him sleep, despite submitting two additional requests following his initial appointment. Exh. 49 at PLTFS00345. In a grievance from August 2013, wrote that he saw mental health for his depression, anxiety and insomnia, and he was told that he would have to wait four to six weeks to start medication treatment. Exh. 50 at PLTFS00320.

57. Many prisoners believe they must obtain a court order from the judge in their criminal case to get treatment in the jails; this practice is so common that Riverside even has a policy of how to respond to court orders for care and a database to track such orders and the County's response. Exh. 51 (policy on court orders); Exh. 52 at PLTFS00263-270 (printout of database tracking court-ordered care); Exh. 19 at PLTFS00419; Gray Dec at ¶ 10 (had to get court orders for access to care); Miller Decl. at ¶ 14 (had to get court order to get chronic care medications started five months after arrival in jails). In response to a grievance filed by in July 2012 asking to see a doctor after waiting three months, staff wrote "inmate stated he knows a court order is the only way to see a doctor." Exh. 53 at PLTFS00328. wrote in an April 2013 grievance that staff told him to get a court order to see a doctor to discuss changes to his medication regimen. The staff's response was that he would be permitted to see a nurse—medical personnel who by law cannot write or modify prescriptions. Exh. 54 at PLTFS00326.

58. Although I have not yet performed my more detailed review of mental health care in the Riverside jails, these preliminary indications of a pattern and practice of depriving patients access to timely care are a significant concern. Of course, even in a well-run health care delivery system, some patients will experience delays in seeing psychiatrists and psychologists. But what I see in the Riverside patient charts is different in scope from what I have seen in systems that have adequate access to care provisions. There is simply no evidence of an organized system to ensure that all patients are seen in a timely and regularized fashion. Without such a system, too many patients will experience harm from untreated or poorly treated mental illness.

**(e) Treatment monitoring**

59. Any effective mental health delivery system must include regular, systematic monitoring to ensure treatment efficacy, check on patient compliance, and review potentially harmful side effects. I saw dangerously inadequate treatment monitoring in many of the Riverside patient charts I reviewed. This sort of treatment failure is a classic marker of a disorganized, systemically incoherent system. A few examples illustrate the dangers of such a blind spot in a mental health delivery system.

60. Brandy McClellan[4] is a patient who suffered from anxiety and nightmares before coming to jail. McClellan Decl. at ¶ 4. When she entered the Riverside Jails in December 2013, she was under lockdown almost all of the time, in a small cell. *Id.* at ¶ 5. She had heightened anxiety in jail, with pronounced mood swings. *Id.* Women in jail have an extremely high rate of Posttraumatic Stress Disorder (PTSD), but no meaningful mental health assessment was done on intake, and she was not referred for psychiatric assessment. *Id.* at ¶¶ 3-5. She later asked for psychiatric treatment and was given Vistaril and Trazodone. *Id.* at ¶ 5. She continued to feel substantial anxiety and

[4] I did not have an opportunity to review Ms. McClellan's health care records, although I have been told that they have been requested. My account is derived solely from her Declaration. I welcome the opportunity to review the records, when available.

was having trouble sleeping so she put in a blue slip to request different medications. *Id.* at ¶ 6. Her medications were changed to Vistaril and Thorazine. *Id.* This change of medications was indefensible for the following reasons. First, Thorazine is an outdated antipsychotic medication that is not clinically indicated from what I have read from Ms. McClellan. Second, Thorazine can lower a person's blood pressure substantially and cause serious cardiac problems. This is made worse by the overtly sedating effects of Vistaril, which may impair a patient's ability to realize there is a problem; any such prescription must be carefully monitored.

61. In fact, after a short time taking these medications, Ms. McClellan collapsed, and was sent to the emergency room with a racing heart rate. *Id.* at ¶¶ 7-8. This serious condition, as described, was clearly a result of the drug side effects. After she returned from her hospital stay, her prescription remained unchanged, and she was daily presented with Thorazine and Vistaril at pill call. *Id.* at ¶ 9. Fortunately, she refused and sought further assessment. *Id.* When she finally saw a psychiatrist, he had no idea that she had been in the hospital. *Id.* She has never received any information as to what happened to her that day. *Id.* at ¶ 8. That this life-threatening and well known adverse drug interaction could have happened at the end of 2013, and continued into 2014, is inexcusable. Prescription of these two medications together to a patient like Ms. McClellan indicates to me that health care staff are dangerously indifferent to the serious mental health needs of their patients. Ms. McClellan is fortunate to have survived this indifference.

62. I was also concerned by the failure to monitor , a Bipolar patient with multiple documented suicide attempts. I saw no documentation of any meaningful or effective psychiatric intervention, assessment or change in medications from his booking on March 30, 2013, through July 2013 (the last date of the records I reviewed), even though he had repeated access to means for self-harm and in fact harmed himself several times during this period. He was repeatedly simply sent

back to general population, where he soon found the means to harm himself again. Nor was there documentation of the baseline and regular maintenance labs that are the standard of care for patients on Lithium.

63. The one interaction received that approaches an appropriate intervention is the development of a safety plan with a clinician to help eliminate suicide attempts in April 2013. However, this plan was clearly ineffective, since there are multiple documented self-harming incidents in June 2013. Other than scattered appointments with mental health clinicians, I saw no apparent attempt to assess his condition and modify his treatment and harm prevention program. The acuity and severity of his symptoms requires careful psychiatric oversight and monitoring of his condition, which he did not receive.

64. Plaintiff Quinton Gray has documented tardive dyskinesia and extrapyramidal side effects and seizures that were likely worsened due to inconsistent use and administration of Geodon and other medications. He describes in his declaration the significant pain and danger to which these conditions exposed him, including involuntary spasms in his legs and feet, uncontrolled jerking of his tongue, a fall with resulting head injury, and incontinence. Gray Decl. at ¶¶ 11, 17, 20. This is classic presentation of these conditions and based on his description and my review of his records, I believe that it is likely that the medication failures in his case were directly responsible for the severity of his symptoms and the suffering he experienced as a result. A well-functioning mental health delivery system would have monitored his experience and side effects and made appropriate adjustments and corrections to his treatment. I saw no evidence of such efforts in his records.

65. I did see evidence that some patients experienced psychiatrist oversight and monitoring of their conditions. See, *e.g.,* health care records for ,

., (seen regularly, but also suffered an abrupt cessation of psychotropic medications in October 2012, discussed in the following section),

(seen regularly until refused treatment in May and June 2013, but psychotropic medications continued to be prescribed, which is inappropriate; also, never given lab tests to monitor use of Lithium, as standard of care requires). This does not change my opinion that there are systemic problems. In even extremely poorly functioning systems, I expect to see some patients receive acceptable care, and Riverside, on paper at least, claims to be adequately staffed. However, the cases I have discussed throughout this Declaration show consistent and dangerous inattention to patients' needs over the last several years, and the serious deficits experienced by these patients point out ongoing serious gaps in Riverside's mental health delivery system.

**(f) Medication administration**

66. Medication administration is central to patient treatment. Psychotropic medications, if given irregularly, interrupted, or abruptly discontinued, are clinically ineffective and can make mental disorders more difficult to treat in the future. Even worse, such interruptions can lead to serious side effects and suicidality. I saw inconsistent medication administration – sometimes dangerously inconsistent – in the patient charts I reviewed. Such widespread problems are indicative at the very least of severe short-staffing in this area and possibly of incompetence or malpractice. Given the chronic nature of this problem, as well documented in the 2010 and 2011 reports (see Exh. 18 at COR010088-10089; Exh. 14 at COR010105; Exh. 15 at PLTFS00422), I am extremely disturbed by the County's failure to fix it.

67. The serious injury that can result from such failures is well illustrated in the experience of plaintiff John Rosson. A review of Mr. Rosson's chart shows multiple episodes in 2012 and 2013 of interrupted administration of psychotropic medications followed by hospitalization for self-injurious behavior and suicidal ideation. Mr. Rosson is a very fragile patient with a history of self-harm as well as Mood Disorder NOS, possible Bipolar Disorder, and possible Obsessive-Compulsive Disorder. He has all the markers of a patient who must be carefully monitored. The fact that the County

cannot provide medications regularly to such a fragile patient, with multiple documented episodes of self-harm, indicates serious deficiencies on its medication delivery process -- deficiencies that have subjected Mr. Rosson to intolerable risk.

is another extremely at-risk patient. For the most part, he received his medications regularly until he experienced a sudden discontinuation of Thorazine in October 2012 and a sudden resumption of the medication at the end of November at much lower dose. He attempted suicide within a few weeks, a sad but predictable response to such a serious episode of medication mismanagement.

68. Quinton Gray also experienced dangerous medication mismanagement. Despite his hypertension and cardiac condition, he was prescribed mental health medications – Geodon and Trilafon -- that can cause severe cardiac events. He describes inconsistent and unreliable medication delivery, including a failure to coordinate his Geodon with meals to allow him to take it on a full stomach. Gray Dec at ¶ 14. His records bear out these medical administration problems, with numerous inadequately explained lapses in delivery which appear to result from some combination of cancelled or nonexistent pill calls, failure to reorder or refill prescriptions, and patient refusals with no documented counseling or monitoring of painful side effects.

69. I saw numerous other patient charts that document medication interruptions or discontinuations that place them at risk of harm. (not given many doses of Lithium in April 2013); (between July and October 2013, not given between 3 and 8 doses of Thorazine nearly every month; in April 2013, not given 7 doses of Celexa and 9 doses of Risperdal); (frequent missed doses of Risperdal and Benadryl in June to October 2012 before these medications were suddenly discontinued in November 2012); (between August 2011 and March 2012, not given at least 18 doses of Paroxetine, 36 doses of Hydroxyzine, at least 28 doses of Mellaril, and at least 27 doses of Lamotrigine); (multiple missed doses of Remeron, Celexa, Lithium, Risperdal in 2012); (no Zoloft

for nearly a month in late 2011, then restarted at 100 mg; should have been titrated to avoid possible sedation, gastrointestinal upset, and anxiety).

70. Patients spoke about these problems in their declarations. See Rosson Decl. at ¶ 6; Gray Decl. at ¶¶ 12-16.

71. I saw several grievances that also allude to these problems. In August 2011, Hansen filed a grievance noting that the cancellation of evening pill call was happening frequently, resulting in missed psychiatric medication delivery. Exh. 55 at PLTFS00308. Custody incidents also appear to interrupt the distribution of medication. In March 2012, a grievance filed by and the corresponding response from staff documented that a security incident prevented pill delivery that day. Exh. 56 at PLTFS00337.

72. Timing is also important. Many psychotropic medications must be given at regular times to avoid wildly fluctuating blood levels. For treatment efficacy, these medications must maintain a constant dosage in the patient's bloodstream. Giving the dosages at different times of day can have much the same effect as abrupt discontinuation or missed dosages. Further, many psychotropic medications cause sedation and should be given shortly before normal sleep occurs.

73. This has been a chronic problem in the Riverside jails (see Exh. 15 at PLTFS00422), and it clearly has not been fixed. Patients repeatedly describe irregular medication delivery times, ranging from as early as 2:30 or 3 p.m. to 11 p.m. for evening medications. Miller Decl. at ¶ 8; McClellan Decl. at ¶ 10; Rosson Decl. at ¶ 10. (Apparently the evening pill call has even been skipped entirely: in May 2012, grieved what he called a frequent occurrence where pill call was being conducted only once a day, in the morning. Exh. 56 at PLTFS00336.)

74. Further, when evening pill distribution occurs very early, it causes serious disruptions and difficulties for patients taking psychiatric medication. In a March 2012 memo responding to a grievance over the early administration of a patient's sleeping

pills, a lieutenant acknowledged that medication administration was taking place between 2:30 and 4:00 p.m. and that nursing staff was trying to implement a schedule to administer medication after 6 p.m. Exh. 57 at PLTFS00351. This change does not appear to have taken place. Mental Health Staff Meeting Minutes of October 22, 2013, discuss the ongoing problem of evening pill call "so early in the evening." Exh. 58 at COR041658. The minutes add with apparently unwarranted hope: "DHS is almost fully staffed and will soon be adding a later pill call for night time [psych] meds." *Id.* As the declarations of Ms. Miller, Ms. McClellan, and Mr. Rosson make clear, as of 2014 this later pill call has not been put into effect, and patients continue to be harmed. Miller Decl. at ¶¶ 8-9; McClellan Decl. at ¶ 10; Rosson Decl. at ¶ 10.

75. There does not appear to be a consistent policy to provide automatic refills for patients on psychotropic medications; instead, Riverside appears often to rely on patient advocacy. Miller Decl. at ¶ 10; Rosson Decl. at ¶ 6. This is a dangerous practice in mental health treatment, given that these patients are not always able to self-advocate for their necessary medications. I saw extensive evidence in the patient records of failure to timely renew psychotropic medications: John Rosson (medication renewal failures, particularly after discharge from acute medical or psychiatric hospitalization); (medications not renewed for a month; no assessment for withdrawal syndrome); (multiple significant failures to renew medications created risk of withdrawal syndrome); (24-day gap for renewal of Zoloft and Topomax; sudden discontinuation of Topomax can lead to decompensation including acute manic episodes and sudden discontinuation of Zoloft can lead to side effects such as nausea, vomiting, and headaches as well as re-emergence of depressive symptoms, including suicidality); (one nearly two-week gap and one apparent two-month gap without renewal of medications, placing him at risk for discontinuation syndrome and decompensation of mental illness); (Fluoxetine renewed one week late, a delay that could cause re-emergence of mental illness).

76. Diligence and self-advocacy skills are no guarantee of timely medication renewals in this broken medication delivery process, as several grievances indicate. In 2011, filed multiple blue slips and grievances requesting medication renewal over the course of several months, culminating in a citizen's complaint over the Jail's failure to renew his prescriptions. Exh. 55 at PLTFS00295-316. Sheriff Stanley Sniff, in a written response, responded to the complaint by telling that his concerns "would be addressed," without elaboration. *Id.*

77. In grievances filed in 2012 and 2013, documented missed doses because his prescriptions were cancelled or not renewed. Exh. 59 at PLTFS00329-332. filed a grievance in April 2011 requesting his prescription be refilled. By the time he received a response to his grievance—that custody staff would speak to medical staff to expedite his request—he had been off of his medication for two weeks. Exh. 60 at PLTFS00283.

**(g) Suicidal and self-harming behavior**

78. One of the most critical functions of the jail mental health system is the prevention of suicide and self-harming behavior. There are deficiencies in the Riverside jails' suicide prevention policies and practices, and I believe that these deficiencies pose a substantial risk of serious harm to Riverside Jail prisoners.

79. A close examination of the most recent suicides in the Riverside jails shows glaring failures to provide standard preventive measures. In order to reduce suicide risk, correctional systems typically adopt several simple, basic practices which have become standard of care, particularly for high-risk patients. These include careful medication management and monitoring, regular housing unit security checks, and, in some cases, reducing the isolation of high-risk patients by double-celling them. These measures are particularly important in segregation and intake units. It is also well established that extra attention must be given at intake to patients who present a high risk of suicide,

including those with histories of self-harm, suicide attempts, or suicidal ideation; those with significant mental health histories; and people charged with sexual assaults.

80. Riverside has systematically failed to make use of these fundamental practices, as the tragic example of several recent suicides demonstrates.[5] See, generally, Exhs. 61, 62, 44, 63, 64, 65, 46, 66, 45, and 67.

81. For example, was a 24-year-old veteran of the war in Afghanistan who suffered from Posttraumatic Stress Disorder and Bipolar Disorder. Exh. 44 at COR17001. During his booking process at the Larry Smith Detention Center on January 28, 2012, he attempted to stab himself with a pen. *Id.* at COR17000. He was subdued and placed in a safety cell (see discussion below of these placements). *Id.* Upon placement in the safety cell he admitted that in 2011 he had tried to kill himself by hanging. Exh. 45 at COR40833. The next day he was removed from the safety cell and placed by himself in a holding cell that contained a phone with a cord. *Id.* at COR40843. An hour later, he was found unresponsive with the phone cord wrapped around his neck. *Id.* He later died. This was an entirely preventable suicide for several reasons. First, as a veteran with both Posttraumatic Stress Disorder and Bipolar Disorder, presented a profile of someone at high risk for self-harm. Second, his prior suicide attempt and his attempt to stab himself during booking indicated a heightened risk for suicidal behavior. He should not have been celled alone, he certainly should not have had the ready means he needed to harm himself, and he should have been watched closely. died an entirely preventable death after experiencing an utter breakdown in adequate mental health assessment and monitoring.

82. was arrested on July 2, 2012. Exh. 64 at COR017100. He was 30 years old and suffered from Bipolar Disorder. *Id.* at COR017103. While

[5] The information I have about these suicides comes from Coroner's investigation reports and incident reports produced by Defendant and the mental health records of the patients. I have not seen any suicide "autopsies," an assessment that should be done for every in-jail suicide, because I have been told they have not yet been produced.

being processed through intake at Presley, he stated he had suicidal thoughts. *Id.* at COR017100. As a result, he was placed in a safety cell. *Id.* Six hours later he was cleared from the safety cell and moved to a general population cell. *Id.* He was housed alone. *Id.* at COR017101. His statement about suicidal thoughts and his mental health history necessitated close observation, but none was documented in the coroner's investigation. On July 3, 2012, fashioned a noose from a bed sheet, attached it to the top shelf of a bookcase in his cell, and hanged himself. *Id.* at COR017100-102. Despite clear risk indicators, he was inadequately monitored and allowed the means to take his own life. This was likely a preventable suicide.

83. entered Presley on October 31, 2012, accused of sexual acts with an under-age child. Exh. 63 at COR17064.. was initially double-celled, but his cell-mate was released. *Id.* Isolated in his cell, he attached a bed sheet to the top bunk and committed suicide by hanging, during a 90-minute period where he apparently went unobserved. *Id.* As with the others, risk for self-harming behavior was clear, due to the nature of his alleged crime. He should not have been left in a cell by himself without close observation.

84. died in custody at Presley on October 29, 2012. Exh. 62 at COR16864. had a history of drug abuse and diagnoses of Bipolar Disorder and Schizophrenia. *Id.* at COR16867, 16869. He was in the mental health housing unit and placed in Administrative Segregation, where he was housed alone. *Id.* at 16864-865. Custody staff reported finding him nonresponsive and "shaking a lot" in his cell on September 18, 2012. *Id.* at 16867. On October 28, 2012, staff observed him "acting wild" and very agitated, and reported yelling and screaming throughout the night. *Id.* at 16864-865. He was known at times to be non-compliant with his medications, including Cogentin, Risperdal, and Depakote. *Id.* at 16865. The Coroner's investigation report about his death indicated there was a video clip of in his cell beginning at 1330 hours showing him lying nude on the floor of his cell, rocking

back and forth. *Id.* at 16867. At around 1419 hours, according to the report, he was shown on the video clip repeatedly hitting the back of his head on the metal ladder of his bunk bed; ten minutes later, his movements suggested "seizure-like" activity. *Id.* He continued to move for several more minutes until 1433 hours when he stopped moving altogether. *Id.* He remained in a prone position completely motionless for fully an hour, until corrections staff entered his cell and found him dead. *Id.*

85. It is inconceivable to me that this seriously ill man with dangerous conditions and a history of noncompliance with psychotropic medication, who was observed to be in sustained agitation and distress, was left alone in his cell, unobserved and allowed to engage in behavior that likely triggered a seizure-type episode that led to his death. He should have been closely monitored; his observed behavior clearly warranted immediate intervention. The head-banging described in the report could well have provoked a seizure and suggests to me a very serious attempt to harm himself.

86. There were also three suicides reported during 2011: two at Presley (Exhs. 64 and 68) and one at the Southwest Detention Center (Exh. 69). The two Presley suicides involved prisoners who were celled alone, one of whom had expressed suicide ideation in the past and was housed on a security floor because he was in the process of testifying against his former gang associates. Exh. 61. I believe this stressful situation and his history of suicide ideation put him at risk for suicide and he should not have been celled alone.

**(h) Use of safety cells and restraint chairs**

87. Another basic aspect of care for mental health patients is the use of crisis or observation beds in order to better treat and monitor troubled patients who express suicidal or self-harming ideation or who are behaving in a manner that makes them a danger to themselves or others. Typically, patients are either stabilized in these settings and returned to the general jail population, where they must be followed closely for a period of time, or transferred to a higher level of care. Such placements are extremely

short-term and are not meant to be used as substitutes for needed mental health treatment, nor are they to be used as punitive measures to discipline prisoners. Instead, they are an opportunity for enhanced observation and clinical engagement.

88. In Riverside jails, these placements are called "safety cells." The information I have reviewed about the use of safety cells -- including hundreds of logs kept by staff with basic information about the patient, reason for the placement, records of basic services and health care monitoring, and the time of placement and release -- demonstrates that the County is systematically misusing this tool. In the Riverside jails, the safety cells appear to be used more as a means to harm mental health patients than to treat them: conditions are described as filthy and dehumanizing, with feces smeared on the walls and terrible odors pervading the area. Plaintiff John Rosson, who has been repeatedly placed in safety cells when he exhibits self-harming behavior or intentions, graphically describes the blood and urine stains -- "sometimes still wet" -- in these cells and, in a recent stay, "a huge pile of feces" left by another patient on top of the grate he must use as toilet. Rosson Dec at ¶7. Plaintiff Quinton Gray, who experienced numerous safety cell placements, describes lasting effects of the foul conditions: he relates that even many months later, he still smells the feces that were smeared on the floors, walls, and food port of the safety cells and scrubs his hands raw to try to remove the imagined stench and stain. Gray Dec at¶¶ 28-30. He demonstrates the trauma of the experience when he relates that for many months following his safety cell placements, he would not eat the food on the edges of his food tray because of the psychologically scarring effect of receiving food through a feces-smeared foot port. *Id.* at¶ 29.

89. The filthy conditions that prisoners describe are both damaging to those who experience them in the immediate term but also tend to compromise mental health treatment. Patients are far less likely to share suicidal or self-harming thoughts with clinical or custody staff if they know the consequences are likely to be placement under such punitive conditions. Mr. Gray speaks to this harmful outcome. Gray Dec at ¶ 32.

90. The cells do not seem to be used as treatment or monitoring mechanisms because patients are not assessed or monitored while in them. See (placed in safety cell with no documentation of meaningful mental health assessment, suicide risk evaluation or appropriate safety planning); (placed in safety cell on June 14, 2013, after attempting to hang himself; on June 18, 2013, after cutting himself; and June 24, 2013; all without documented meaningful psychiatric assessment or medication review); Exh. 70 at COR017859-60 (no mental health staff response documented for over three hours after placement for suicidal statements); Rosson Decl. at ¶¶ 8-9. I was very concerned to hear that safety cell clearance interview was conducted through a food port and that is a standard practice in the Presley jail. I do not believe that a clinician can meaningfully communicate with an at-risk patient while stooping to speak through a small slot in a locked cell door. That environment is certainly not confidential and it is not conducive to the sort of credibility assessment and careful questioning that are called for in such a situation.

91. Between February 18, 2013, and August 22, 2013, was placed in a safety cell 28 different times. Exh. 71[6] at 495, 498, 502, 505, 509, 510, 512-13, 522, 523, 528, 530, 538, 546, 552, 562, 566, 568, 570, 572, 576, 580, 584, 592, 599, 602, 626, 627, and 633. She was sent repeatedly (10 different times) to outside facilities for evaluations under California Penal Code section 4011.6 (which permits a person in charge of a county jail to send an inmate who appears to be "mentally disordered" to a facility for 72 hours of treatment and evaluation). *Id.* at 512, 525, 529, 539, 548-549, 573-574, 603, 622, 635, 647. This revolving door shipment of a troubled prisoner for stabilization and treatment suggests an inability to provide meaningful mental health therapy in the Riverside County jails. also was placed in a restraint chair

---

[6] For convenience, all citations for this exhibit are to internal page numbers.

numerous times, a further indication of a startling indifference to her unstable mental health and need for therapy and medication. Exhs. 72, 73, and 74.

92. was by no means the only patient for whom safety cells were repeatedly used, to a degree that questions the efficacy of any actual treatment in the jails. For example, between December 28, 2012, and September 4, 2013, was placed in a safety cell 21 different times and sent to outside facilities four different times for Section 4011.6 evaluations. Exh. 71 at 475, 476, 481, 487, 490, 497, 499, 500, 506, 525, 528, 531, 536, 546, 563, 566, 587, 595, 613, 617, and 629 (safety cell placements); 548, 567, 588, and 615 (outside facilities). She was also forced to endure placement in a restraint chair. See, e.g., Exhs. 75, 76. The mistreatment of these two mental health patients is an abdication of responsibility for providing mental health treatment to mental health patients. Many others were similarly bounced between jail and higher levels of care at outside facilities because the County's failure to provide necessary mental health therapy: Rosson Decl. at ¶ 9; (Exhs. 77, 78, 79, 80, 81); (Exhs. 82, 83, 84); (Exhs. 85, 86, 87).

93. I saw evidence that many patients are deprived of basic needs, going for ten or twenty hours or more without any offers of food or water from staff. See, for example, Exh. 88 at COR022501-22503 (no water from placement at 1:16 p.m. to 9:00 a.m. the following day, which is nearly 20 hours; no meals from placement until 10:50 a.m. the next morning, which is nearly 22 hours, in March 2013); Exh. 89 at COR023978-23982 (in August 2013 placement, no meals offered for 13 hours, from placement at 2:40 p.m. to breakfast at 3:40 a.m., and then 11 hours, until dinner at 2:59 p.m.; no water for gaps of three, five, and seven hours); Exh. 90 at COR019472 (not fed for 18 hours after placement in February 2013); Exh. 91 at COR019480-19481 (not fed for more than 10-hour safety cell placement in February 2013); Exh. 92 at COR023647-23651 (no water offered from 4:05 p.m. placement to 3:50 a.m. breakfast and then from 6:25 p.m. to 6:03 a.m., gaps of nearly 12 hours and 11 ½ hours, in July 2013); Exh. 93

at COR017795-17796 (no water offered for nearly 10 hours in January 2012). The deprivation of food and water is a serious concern for all patients, but particularly harmful for patients with medical or mental illness.

94. Prisoners are routinely placed in safety cells for disciplinary reasons. I saw placements for such things as being “combative with others” (Exh. 94 at COR017824, Exh. 95 at COR023950); “refused to lockdown/threatened to fight” (Exh. 96 at COR017813); "bizarre behavior - refused to lockdown, stated he wanted to fight" (Exh. 97 at COR018071); “combative to staff” (Exh. 98 at COR023816, Exh. 99 at COR018696); simply “combative” (Exh. 100 at COR24106, Exh. 101 at COR024024); and being “ag[g]ressive to staff” (Exh. 102 at COR-18895). Even more concerning, I saw safety cell placements for property destruction (Exh. 103 at COR023858, Exh. 104 at COR022867) and even “to prevent damaging jail property” (Exh. 105 at COR022608). A serious risk of using such placements for disciplinary purposes is that staff develop the tendency to think of all patients in safety cells as disciplinary problems, ignoring the very real treatment needs that many of them present.

95. I noted minimal medical and mental health contact during safety cell placements. Patients often go many hours without a face-to-face encounter, and then it is appears to be usually with nurses and not clinicians (it is very hard to tell from the records, since the entries from mental health staff are often nearly illegible, which is itself a problem, since contacts cannot be meaningfully monitored for quality assurance purposes if they are not legibly recorded). This is the case even for those patients who are placed in safety cells for medical monitoring, such as following being placed in a chokehold by custody staff (for example, Exh. 106 at COR017830; Exh. 107 at COR017959) or because they are “gravely disabled.” See, e.g., Exh. 81 at COR023852; Exh. 92 at COR023647; Exh. 108 at COR019531-36 (“unable to care for self per FMH”). The “gravely disabled” patients typically spent a few days in safety cells before being transferred to RCRMC, presumably for a higher level of care. Both of

these placements demonstrate inappropriate use of safety cells. People who have been placed in a chokehold need medical evaluations; people who are "gravely disabled" require psychiatric and/or medical evaluations; both need proper placements for the level of care required. Warehousing in a filthy barren room will not do anything to provide treatment or monitoring for these patients.

96. I also saw multiple placements in restraint chairs. This is an extreme measure in which a patient is strapped down into a chair without the ability to move about, eat or drink, use a toilet, or even scratch his or her nose. It is extremely restrictive and often painful, both physically and mentally. If it is used at all, it should be used in an inpatient setting where patients get careful oversight and attention from medical and mental health clinicians who work to bring them out of the chair quickly and safely. By contrast, in the Riverside documentation I saw utterly inappropriate use of this drastic form of restraint on prisoners who were simply disciplinary problems for staff: restraint chair placements due to "destruction of jail property" (Exh. 109 at COR24724); "attempting to break camera" (Exh. 110 at COR017923); "uncooperative with staff, refused to walk, stiffened up" (Exh. 111 at COR018525); "assault on staff, combative" with no mental health response (Exh. 112 at COR24621); "damaged cell window in transpo" and "hitting cell window w/ his head" (Exh. 113 at COR018019); "combative with staff" (Exh. 114 at COR018586-87, Exh. 115 at COR018621, Exh. 116 at COR023730, Exh. 117 at COR023634, Exh. 118 at COR018829).

97. Staff are supposed to provide water and range of motion checks every 30 minutes to prisoners in the restraint chairs, based on the policy set forth on the log forms. I saw frequent failures to comply with these policies. For example, one prisoner was kept in the restraint chair for four hours without being given water. Exh. 113 at COR018019. One was kept for three hours" with no range of motion check. Exh. 111 at COR018525. Another spent over three hours in the chair with only two range-of-motion checks. Exh. 119 at COR018541-42.

98. My conclusion from reviewing safety cell and restraint chair logs as well as health care records and declarations from prisoners who have experienced these placements is that they are used to punish and to contain but not to treat, and that they injure rather than protect the patients subjected to their use.

**(i) Health care records**

99. Well-kept health records are essential to patient care. Mental health (as well as medical) practitioners must be able to trace patient diagnoses, response to treatment, other possibly interactive conditions, and historical symptoms and presentation of health care problems. This need is particularly pressing when, as I saw in the Riverside charts, patients are seen by multiple providers.

100. Riverside does not appear to have a functional system to ensure appropriate record-keeping: it was very challenging to follow a patient's course of treatment from the health care records I reviewed. Generally, I was unable to locate the assessments and the subsequent medication orders and then the follow-up visits. I simply couldn't tell the progression of care from the chart. Their treating clinicians would likewise have a very difficult time approaching patient care with an adequate understanding of response to treatment, even if the patients were being adequately monitored. The disordered and incomplete charting cannot but act as a barrier to patient care.

101. I was not surprised to see a June 2013 grievance from a patient who said he went without medication for seven days because his prescription was not written in his chart. Exh. 120 at PLTFS00358.

**(j) Privacy**

102. As discussed above, many prisoners must file health care request forms or grievances in order to receive treatment or even prescription refills. The policy and practice has been that both documents must be given to sheriff's deputies and may not be given directly to health care staff. I am very concerned about this practice because it requires patients to divulge the details of their mental health needs to custody staff. In

the jail environment, where many consider mental illness to be a sign of weakness and therefore a dangerous vulnerability, this practice will inevitably inhibit prisoners' likelihood of asking for help. It is an inherent obstruction to patient access to care.

103. I have been told that this policy has recently been changed, and health care request forms may now be given directly to health care staff. I welcome this correction and very much hope that it improves patient access to care. However, from my long experience in working with and evaluating correctional systems around the country, I know that such change comes slowly, if at all. When I tour the facilities, I look forward to learning whether the forms are indeed made available to prisoners without having to justify their use to custody staff and whether health care staff are equipped to process the forms without undue delay.

104. The privacy concerns run deeper than the written forms. Quinton Gray describes numerous mental health encounters held in the presence of custody staff, even though he was shackled. Gray Dec at ¶ 7. Even more disturbing, he describes mental health encounters in which two other patients were seated nearby, within hearing range. *Id.* at ¶ 8. Julie Miller similarly describes the presence of custody staff at mental health appointments, and also mental health encounters at cell-front, where other prisoners can overhear. Miller Decl. at ¶¶ 12-13. John Rosson relates that the Presley psychiatrist also interviewed him cell-front, where their conversation could be overheard by others. Rosson Decl. at ¶ 13. These privacy violations are not only insupportable in and of themselves, they do not allow for the kind of patient confidences that are necessary for adequate treatment. I look forward to obtaining more information about the conditions under which mental health patients are seen and evaluated for treatment purposes; this preliminary information is indicative of serious concerns.

///

///

///

**4. Conclusion**

105. Based upon the information summarized above, it is my opinion that systemic deficiencies in the Riverside jail mental health delivery system place the health and sometimes the lives of its patients at risk.

106. I have reviewed the declarations and health care records of the plaintiffs who have raised mental health claims in this case: John Rosson and Quinton Gray. The problems I saw in their charts and read about in their declarations are entirely typical and predictable outcomes of the systemic deficiencies described above: for Mr. Rosson, dangerously inadequate assessment and treatment planning, poor access to care, faulty medication administration, substandard treatment for suicidal and self-harming acts, and privacy violations; for Mr. Gray, inadequate intake procedures, dangerously deficient assessment/treatment planning, poor access to care, faulty medication administration, substandard treatment for suicidal and self-harming behavior, and privacy violations.

107. I am told by counsel that they anticipate adding Julie Miller and Brandy McClellan as plaintiffs. Their records and declarations also constitute typical examples of the sort of systemic deficiencies I found generally in the Riverside mental health delivery system: for Ms. Miller, inadequate intake procedures, dangerously inadequate assessment and treatment planning, poor access to care, faulty medication administration, and privacy violations; for Ms. McClellan, inadequate intake procedures, dangerously inadequate assessment and treatment planning, poor access to care, inadequate treatment monitoring, and faulty medication administration.

108. As I have said, this is a preliminary review. But the evidence I saw was ample to demonstrate to me that many of the serious deficiencies that were reported in the audits in 2010-2012 and acknowledged by the Sheriff in 2011 are very much in evidence in the Riverside jails today. The County appears to have increased its mental health staff in response to these documented problems, a measure I welcome -- but it has not come close to fixing the profound underlying problems.

109. The theme that emerged very clearly and consistently from the evidence I reviewed is that Riverside County systematically and severely limits the mental health treatment for patients in its jails, depriving them of necessary services and placing them at serious risk of harm. The County's written policies allow practitioners to evade treatment responsibilities; its practices consistently rely on patients to drive their own care, with inadequate oversight, monitoring, or management by trained practitioners.

110. The indifference to patient care comes through in the passivity I saw from psychiatrists and clinicians. They simply do not know many of their patients or follow their progress. Intake was sketchy at best; medications are prescribed without any attention to whether they are dangerous to the individual patient based on underlying medical conditions; there is no follow-up to determine treatment efficacy or track potentially debilitating side effects; medication administration is uneven and no follow-up is done to ensure patients are not harmed – as they are likely to be – by the frequent stops and starts in delivery; and the approach to suicidality or self-harming behavior is damaging rather than helpful to these most vulnerable patients.

111. Of course not all Riverside prisoners will be harmed by these deficiencies in the same way – some will die, some will suffer injury short of death, and some will be lucky enough to escape permanent injury altogether. But the problems described above are systemic in nature, and require systemic solutions. Riverside's mental health care system is highly centralized, governed by uniform policies. In my experience as a court expert in other class action lawsuits challenging correctional mental health systems, court orders directed at administrators who oversee the entire system can bring about the needed changes to provide relief to the class as a whole, by reducing the risk of harm faced by all prisoners.

///

///

///

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on the 10TH day of April 2014 in SAN FRANCISCO.

PABLO STEWART



Apr 10 2014 8:26AM Pablo Stewart, M.D. 415-753-5479 p.2

# APPENDIX A

# CURRICULUM VITAE

***PABLO STEWART, M.D.***
**824 Ashbury Street**
**San Francisco, California 94117**
**(415) 753-0321; fax (415) 753-5479; e-mail: pab4emi@aol.com**
**(Updated November 2013)**

| | |
|---|---|
| EDUCATION: | University of California School of Medicine, San Francisco, California, M.D., 1982<br><br>United States Naval Academy, Annapolis, MD, B.S. 1973, Major: Chemistry |
| LICENSURE: | California Medical License #GO50899<br>Hawai'i Medical License #MD-11784<br>Federal Drug Enforcement Administration #BS0546981<br>Diplomate in Psychiatry, American Board of Psychiatry and Neurology, Certificate #32564 |

## ACADEMIC APPOINTMENTS:

| | |
|---|---|
| September 2006-Present | Academic Appointment: Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| July 1995 - August 2006 | Academic Appointment: Associate Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1989 - June 1995 | Academic Appointment: Assistant Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1986 - July 1989 | Academic Appointment: Clinical Instructor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |

## EMPLOYMENT:

| | |
|---|---|
| December 1996-Present | Psychiatric Consultant<br>Provide consultation to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues; extensive experience in all phases of capital litigation and correctional psychiatry. |

| | |
|---|---|
| January 1997-<br>September 1998 | Director of Clinical Services, San Francisco Target Cities Project. Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court Also responsible for providing clinical in-service trainings for the staff of the Project and community agencies that requested technical assistance. |
| February 1996 -<br>November 1996 | Medical Director, Comprehensive Homeless Center, Department of Veterans Affairs Medical Center, San Francisco. Overall responsibility for the medical and psychiatric services at the Homeless Center. |
| March 1995 -<br>January 1996 | Chief, Intensive Psychiatric Community Care Program, (IPCC) Department of Veterans Affairs Medical Center, San Francisco. Overall clinical/administrative responsibility for the IPCC, a community based case management program. Duties also include medical/psychiatric consultation to Veteran Comprehensive Homeless Center. This is a social work managed program that provides comprehensive social services to homeless veterans. |
| April 1991 -<br>February 1995 | Chief, Substance Abuse Inpatient Unit, (SAIU), Department of Veterans Affairs Medical Center, San Francisco. Overall clinical/administrative responsibility for SAIU. |
| September 1990 -<br>March 1991 | Psychiatrist, Substance Abuse Inpatient Unit, Veterans Affairs Medical Center, San Francisco. Clinical responsibility for patients admitted to SAIU. Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues. |
| August 1988 -<br>December 1989 | Director, Forensic Psychiatric Services, City and County of San Francisco. Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco. Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. |
| July 1986 -<br>August 1990 | Senior Attending Psychiatrist, Forensic Unit, University of California, San Francisco General Hospital. Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward. Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward. Liaison with Jail Psychiatric Services, City and County of San Francisco. Advise San Francisco City Attorney on issues pertaining to forensic psychiatry. |

| | |
|---|---|
| July 1985<br>June 1986 | Chief Resident, Department of Psychiatry, University of California San Francisco General Hospital. Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatry course for UCSF second-year medical students. |
| July 1984 -<br>March 1987 | Physician Specialist, Westside Crisis Center, San Francisco, CA. Responsibility for Crisis Center operations during assigned shifts; admitting privileges at Mount Zion Hospital. Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested. |
| April 1984 -<br>July 1985 | Psychiatric Consultant, Marin Alternative Treatment, (ACT). Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues. |
| August 1983 -<br>November 1984 | Physician Specialist, Mission Mental Health Crisis Center, San Francisco, CA. Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
| July 1982-<br>July 1985 | Psychiatric Resident, University of California, San Francisco. Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 -<br>July 1978 | Infantry Officer - United States Marine Corps. Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Commander of a Vietnamese Refugee Camp. Received an Honorable Discharge. Highest rank attained was Captain. |

HONORS AND AWARDS:

| | |
|---|---|
| June 1995 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995. |
| June 1993 | Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993. |
| May 1993 | Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine. |
| May 1991 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991. |
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students of the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award For Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship. One of sixteen nationwide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry. Made presentation at Annual Hospital and Community Psychiatry Meeting in Montreal, Canada, in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome." |

MEMBERSHIPS:

| | |
|---|---|
| June 2000-<br>May 2008 | California Association of Drug Court Professionals. |
| July 1997-<br>June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 -<br>June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 -<br>April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |
| July 1992 -<br>June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1990 -<br>June 1992 | Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine |

PUBLIC SERVICE:

| | |
|---|---|
| June 1992 | Examiner, American Board of Psychiatry and Neurology, Inc. |
| November 1992 -<br>January 1994 | California Tuberculosis Elimination Task Force, Institutional Control Subcommittee. |
| September 2000-<br>April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health Report.* |
| May 2001-<br>Present | Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association. |
| January 2002-<br>June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program. |
| February 2003-<br>April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco. |
| December 2003-<br>January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team. |
| February 2004-<br>June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004-<br>January 2006 | Member of Human Services Commission, City and County of San Francisco. |

| | |
|---|---|
| February 2006-<br>January 2007;<br>April 2013-<br>present | Vice President, Human Services Commission, City and County of San Francisco. |
| February 2007-<br>March 2013 | President, Human Services Commission, City and County of San Francisco. |

UNIVERSITY SERVICE:

| | |
|---|---|
| October 1999-<br>October 2001 | Lecturer, University of California, San Francisco, School of Medicine Post Baccalaureate Reapplicant Program. |
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On Medicine. |
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of Nursing, Department of Family Health Care Nursing. Lecture to the Advanced Practice Nurse Practitioner Students on Alcohol, Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco, School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the Department of Medicine. Also, provide crisis intervention and psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify, treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions Committee, University of California, San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract and retain minority students and faculty. |
| October 1986 -<br>September 1987 | Member Steering Committee for the Hispanic Medical Education Resource Committee.<br>Plan and present educational programs to increase awareness of the special health needs of Hispanics in the United States. |
| September 1983 -<br>June 1989 | Admissions Committee, University of California, School of Medicine. Duties included screening applications and interviewing candidates for medical school. |

| | |
|---|---|
| October 1978 - December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic. Provided free instruction to the public on proper methods of exercise and preventative health measures. |

TEACHING RESPONSIBILITIES:

| | |
|---|---|
| July 2003- Present | Facilitate weekly psychotherapy training group for residents in the Department of Psychiatry. |
| January 2002- January 2004 | Course Coordinator of Elective Course University of California, San Francisco, School of Medicine, "Prisoner Health." This is a 1-unit course, which covers the unique health needs of prisoners. |
| September 2001- June 2003 | Supervisor, San Mateo County Psychiatric Residency Program. |
| April 1999- April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug Awareness Community Outreach Project. |
| February 1998- June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 - November 1996 | Supervisor, Psychiatry 110 students, Veterans Comprehensive Homeless Center. |
| March 1995- Present | Supervisor, UCSF School of Medicine, Department of Psychiatry, Substance Abuse Fellowship Program. |
| September 1994 - June 1999 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse." This is a 1-unit course, which covers the major aspects of drug and alcohol abuse. |
| August 1994 - February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Supervise 4th Year medical students in the care of dual diagnostic patients. |
| February 1994 - February 2006 | Consultant, Napa State Hospital Chemical Dependency Program Monthly Conference. |
| July 1992 - June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric Aspects of Medicine," University of California, San Francisco, School of Medicine. |
| July 1991- Present | Group and individual psychotherapy supervisor, Outpatient Clinic, Department of Psychiatry, University of California, San Francisco, School of Medicine. |

| | |
|---|---|
| January 1991 | Lecturer, University of California, San Francisco, School of Pharmacy course, "Addictionology and Substance Abuse Prevention." |
| September 1990 - February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric residents, Substance Abuse Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - November 1996 | Off ward supervisor, PGY II psychiatric residents, Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU), San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans Affairs Medical Center. |
| September 1989 - November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 - June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 - Present | Tavistock Organizational Consultant. Extensive experience as a consultant in numerous Tavistock conferences. |
| September 1987 - December 1993 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Alcoholism". This is a 1-unit course offered to medical students, which covers alcoholism with special emphasis on the health professional. This course is offered fall quarter each academic year. |
| July 1987- June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco General Hospital and Veterans Affairs Medical Center. |
| July 1986 - June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |
| July 1986 - August 1990 | Clinical supervisor, Psychology interns/fellows, San Francisco General Hospital. |
| July 1986 - August 1990 | Clinical supervisor PGY I psychiatric residents, San Francisco General Hospital |
| July 1986 - August 1990 | Coordinator of Medical Student Education, University of California, San Francisco General Hospital, Department of Psychiatry. Teach seminars and supervise clerkships to medical students including: Psychological Core of Medicine 100 A/B; Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric Clerkship 110 and Advanced Clinical Clerkship in Psychiatry 141.01. |

| | |
|---|---|
| July 1985 – August 1990 | Psychiatric Consultant to the General Medical Clinic, University of California, San Francisco General Hospital. Teach and supervise medical residents in interviewing and communication skills. Provide instruction to the clinic on the psychiatric aspects of ambulatory medical care. |

COMMUNITY SERVICE AND PRISON CONDITIONS EXPERT WORK:

| | |
|---|---|
| October 2007 -Present | Plaintiffs' expert in 2007-2010 overcrowding litigation and in opposing current efforts by defendants to terminate the injunctive relief in *Coleman v. Brown,* United States District Court, Eastern District of California, Case No. 2:90-cv-00520-LKK-JFM. The litigation involves plaintiffs' claim that overcrowding is causing unconstitutional medical and mental health care in the California state prison system. Plaintiffs won an order requiring the state to reduce its population by approximately 45,000 state prisoners. My expert opinion was cited several times in the landmark United States Supreme Court decision upholding the prison population reduction order. *See Brown v. Plata,* __ U.S. ___, 131 S. Ct. 1910, 1933 n.6, 1935, 179 L.Ed.2d 969, 992 n.6, 994 (2011). |
| July/August 2008 | Plaintiff psychiatric expert in the case of Fred Graves, et al., plaintiffs v. Joseph Arpaio, et al., defendants (District Court, Phoenix, Arizona.) This case involved Federal oversight of the mental health treatment provided to pre-trial detainees in the Maricopa County Jails. |
| February 2006- December 2009 | Board of Directors, Physician Foundation at California Pacific Medical Center. |
| June 2004- September 2012 | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003- June 2008 | Organizational/Psychiatric Consultant, State of Hawaii, Department of Human Services. |
| June 2003- December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement," New Mexico Corrections Department (NMCD). This is a settlement arrived at between plaintiffs and the NMCD regarding the provision of constitutionally mandated psychiatric services for inmates placed within the Department's "Supermax" unit. |
| October 2002- August 2006 | Juvenile Mental Health and Medical Consultant, United States Department of Justice, Civil Rights Division, Special Litigation Section. |

| | |
|---|---|
| July 1998-<br>June 2000 | Psychiatric Consultant to the Pacific Research and Training Alliance's Alcohol and Drug Disability Technical Assistance Project. This Project provides assistance to programs and communities that will have long lasting impact and permanently improve the quality of alcohol and other drug services available to individuals with disabilities. |
| July 1998-<br>February 2004 | Psychiatric Consultant to the National Council on Crime and Delinquency (NCCD) in its monitoring of the State of Georgia's secure juvenile detention and treatment facilities. NCCD is acting as the monitor of the agreement between the United States and Georgia to improve the quality of the juvenile justice facilities, critical mental health, medical and educational services, and treatment programs. NCCD ceased to be the monitoring agency for this project in June 1999. At that time, the Institute of Crime, Justice and Corrections at the George Washington University became the monitoring agency. The work remained unchanged. |
| July 1998-<br>July 2001 | Psychiatric Consultant to the San Francisco Campaign Against Drug Abuse (SF CADA). |
| March 1997-<br>Present | Technical Assistance Consultant, Center for Substance Abuse Treatment, Substance Abuse and Mental Health Services Administration, Department of Health and Human Services. |
| January 1996-<br>June 2003 | Psychiatric Consultant to the San Francisco Drug Court. |
| November 1993-<br>June 2001 | Executive Committee, Addiction Technology Transfer Center (ATTC), University of California, San Diego. |
| December 1992 -<br>December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc. Review all research protocols for the clinic per Department of Health and Human Services guidelines. |
| June 1991-<br>February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic. Overall responsibility for psychiatric services at the clinic. |
| December 1990 -<br>June 1991 | Medical Director, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Responsible for directing all medical and psychiatric care at the clinic. |
| October 1996-July 1997 | Psychiatric Expert for the U.S. District Court, Northern District of California, in the case of Madrid v. Gomez, No. C90-3094-TEH. Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison. |
| April 1990 –January 2000 | Psychiatric Expert for the U.S. District Court, Eastern District of California, in the case of Gates v. Deukmejian, No. C1V S-87-1636 LKK-JFM. Report directly to the court regarding implementation and monitoring of the consent decree in this case. (This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville). |

| | |
|---|---|
| January 1984 - December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues. Special emphasis on dual diagnostic patients. |
| July 1981- December 1981 | Medical/Psychiatric Consultant, Youth Services, Hospitality House, San Francisco, CA. Advised youth services staff on client management. Provided training on various topics related to adolescents. Facilitated weekly client support groups. |

SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| | |
|---|---|
| January 1996 - June 2002 | Baseball, Basketball and Volleyball Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| September 1994 - Present | Soccer Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| June 1991- June 1994 | Board of Directors, Pacific Primary School, San Francisco, CA. |
| April 1989 - July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 - May 1995 | Numerous presentations on Mental Health/Substance Abuse issues to the student body, Hidden Valley Elementary School and Santa Rosa Jr. High School, Santa Rosa, CA. |

PRESENTATIONS:

1. San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1. (10/12/1990). "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2. Grand Rounds. Department of Psychiatry, University of California, San Francisco, School of Medicine. (12/5/1990). "Advances in the Field of Dual Diagnosis."

3. Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference, Napa, California. (3/3/1991). "Planning a Satisfying Life in Medicine."

4. 24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California, San Mateo, California. (9/11/1991). "The Chronically Ill Substance Abuser."

5. Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics. (11/26/91). "Mentoring as an Art."

6. Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine. (4/25/1992). "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7. First International Conference of Mental Health and Leisure. University of Utah. (7/9/1992). "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8. American Group Psychotherapy Association Annual Meeting, San Francisco, California. (2/20/1993). "Inpatient Groups in Initial-Stage Addiction Treatment."

9. Grand Rounds. Department of Child Psychiatry, Stanford University School of Medicine. (3/17/93, 9/11/96). "Issues in Adolescent Substance Abuse."

10. University of California, Extension. Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97). "Dual Diagnosis."

11. American Psychiatric Association Annual Meeting. (5/26/1993). "Issues in the Treatment of the Dual Diagnosis Patient."

12. Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis. (6/23/1993). "Dual Diagnosis Treatment Issues."

13. Utah Medical Association Annual Meeting, Salt Lake City, Utah. (10/7/93). "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14. Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993). "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

15. Haight Ashbury Free Clinic's 27th Anniversary Conference. (6/10/94). "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16. University of California, San Diego. Addiction Technology Transfer Center Annual Summer Clinical Institute: (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98). "Treating Multiple Disorders."

17. National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists. (9/10/94). "Psychiatry, Homelessness, and Serious Mental Illness."

18. Value Behavioral Health/American Psychiatry Management Seminar. (12/1/1994). "Substance Abuse/Dual Diagnosis in the Work Setting."

19. Grand Rounds. Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry. (1/24/1995). "Models of Addiction."

20. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project. (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01). "Demystifying Dual Diagnosis."

21. First Annual Conference on the Dually Disordered. (3/10/1995). "Assessment of Substance Abuse." Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22. Delta Memorial Hospital, Antioch, California, Medical Staff Conference. (3/28/1995). "Dealing with the Alcohol and Drug Dependent Patient." Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23. Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada. (11/23/95). "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24. The Labor and Employment Section of the State Bar of California. (1/19/96). "Understanding Alcoholism and its Impact on the Legal Profession." MCCE Conference, San Francisco, CA.

25. American Group Psychotherapy Association, Annual Training Institute. (2/13-2/14/96), National Instructor - Designate training group.

26. American Group Psychotherapy Association, Annual Meeting. (2/10/96). "The Process Group at Work."

27. Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28. International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29. Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client". (11/14/96)

30. Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery". (11/22/96)

31. Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32. Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33. DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California. (7/31/97)

34. The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender". Wilsonville, Oregon. (8/1/97)

35. The California Council of Community Mental Health Agencies Winter Conference, Key Note Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction

treatment for parents with mental health services to severely emotionally disturbed children." Newport Beach, California. (2/12/98)

36. American Group Psychotherapy Association, Annual Training Institute, Chicago, Illinois. (2/16-2/28/1998), Intermediate Level Process Group Leader.

37. "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience." The Haight Ashbury Free Clinics Inc., sponsored this seminar in conjunction with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis. San Francisco, California. (3/6-3/8/1998)

38. "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection." The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference. (6/4/1998)

39. Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women." (6/11/1998)

40. Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient." (6/17/1998)

41. Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems." (6/19/1998)

42. "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer." The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference. San Rafael, California. (6/20/1998)

43. "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44. Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse." (7/15/1998)

45. "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii. (9/2/98)

46. 9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco. "Care Issues and Pain Management for Chemically Dependent Patients." San Francisco, CA. (9/10/98)

47. Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000." "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA. (9/18/98)

48. Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder." Napa, CA. (9/23/98)

49. "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA. (9/30/98)

50. "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA. (10/13/98)

51. California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient." Concord, CA. (10/15/98)

52. California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel. (10/15/98)

53. Northwest GTA Health Corporation, Peel Memorial Hospital, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada. (10/23/98)

54. 1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders." Sacramento, CA. (12/11/98)

55. "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA. (1/7/99)

56. Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder." (1/19/99)

57. "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA. (1/22/99 & 2/5/99)

58. Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High Risk Offender." (2/17/99)

59. American Group Psychotherapy Association, Annual Training Institute, Houston, Texas. (2/22-2/24/1999). Entry Level Process Group Leader.

60. "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii. (3/5 & 3/6/99)

61. "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA. (3/10/99)

62. "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA. (3/11/99)

63. "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA. (3/17/99)

64. Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i. Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis &

Addressing the Needs of the Patient with Multiple Substance Dependencies. Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility. (4/2-4/9/99)

65. "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA. (4/14/99)

66. "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA. (4/21/99)

67. California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California. (4/29/99)

68. "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i. (4/30/99)

69. State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital." Honolulu, Hawai'i. (4/30/99)

70. "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i. (4/30/99)

71. 11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Concord, California. (5/6/99)

72. The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Escondido, California. (5/7/99)

73. "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California. (5/13/99)

74. "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", third annual conference presented by the Southern California Mental Health Directors Association. Anaheim, California. (5/21/99)

75. 15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder." Boise State University, Boise, Idaho. (5/25/99)

76. "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California. (6/3/99)

77. "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan. (6/14/99)

78. "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan. (6/17/99)

79. "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan. (6/22/99)

80. "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan. (6/26/99)

81. "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California. (7/13/99)

82. "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California. (7/15/99)

83. "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California. (7/22/99)

84. 1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry. Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness. What's Really Happening to your Patient?" "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering." La Jolla, California. (8/3/99)

85. "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center. Kahului, Maui. (8/23/99)

86. "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California. (9/13/99)

87. "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California. (9/14/99)

88. "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California. (9/16/99)

89. "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California. (9/23/99)

90. "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona. (9/28/99)

91. "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i. (10/8-10/10/99)

92. "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California. (10/12/99)

93. "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California. (10/14/99)

94. "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California. (10/21/99)

95. "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California. (1/27/00)

96. "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California. (3/6/00)

97. "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California. (3/16/00)

98. "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California. (3/17/00)

99. "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California. (4/3/00)

100. "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California. (4/4-4/5/00)

101. "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California. (5/15/00)

102. National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California. "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103. "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California. (6/9/00)

104. "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunder Road Adolescent Treatment Centers, Inc., Oakland, California. (6/29 & 7/27/00)

105. "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California. (9/8/00)

106. "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California. (9/9/00)

107. Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey. "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108. "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (11/1/00, 3/13/01)

109. "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California. (11/12-11/17/00)

110. "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California. (12/5/00)

111. "Wasn't One Problem Enough?" Mental Health and Substance Abuse Issues. 2001 California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California. (3/2/01)

112. "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process." County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California. (3/8 & 4/5/01)

113. "Assessment of the Patient with Substance Abuse and Mental Health Issues." San Mateo County General Hospital Grand Rounds. San Mateo, California. (3/13/01)

114. "Dual Diagnosis-Assessment and Treatment Issues." Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California. (5/8/01)

115. Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California. (5/10/01)

116. National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice." I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol. New Orleans, LA. (6/1-6/2/01)

117. Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders." San Jose, California. (6/15/01)

118. Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser." Olympia, Washington. (11/15/01)

119. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (1/14/02)

120. First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas." El Centro, California. (1/28/02)

121. The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California. (4/25/02)

122. Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

123. 3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System." (6/5/02)

124. New Mexico Department of Corrections, "Group Psychotherapy Training." Santa Fe, New Mexico. (8/5/02)

125. Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002." Berkeley, California. (8/15/02)

126. California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis." Sacramento, California. (8/22/02)

127. Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128. Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129. "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (10/1/03), (12/3/03)

130. "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California. (10/18/03)

131. "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Pasadena, California. (4/2/04)

132. Lecture tour of Japan (4/8-4/18/04). "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (9/9/04)

134. "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Sacramento, California. (4/8/05)

135. "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University. San Francisco, California. (8/13/05)

136. Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse." San Francisco, California. (10/24/05)

137. Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse." Woodland, California. (1/25/06), (6/23/06)

138. "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139. Lecture tour of Japan (4/13-4/23/06). "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness." Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140. "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference. Sacramento, California. (4/25/06)

141. "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142. "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference. Sacramento, California. (4/27/07)

143. "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network. Medford, Oregon. (5/10/07)

144. "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar. San Francisco, California. (8/2/07)

145. "Capital Punishment," Human Writes 2007 Conference. London, England. (10/6/07)

146. "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California. (10/30/07)

147. "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference. San Diego, California. (12/13/07)

148. "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada. (4/10/08)

149. "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program. Chelan, Washington. (6/3/08)

150. "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference. Burlingame, California. (6/19/08)

151. Mental Health and Substance Abuse Training, Wyoming Department of Health, "Diagnosis and Treatment of Co-occurring Mental Health and Substance Abuse." Buffalo, Wyoming. (10/6/09)

152. 2010 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th & 5th, 2010)

153. Facilitating Offender Re-entry to Reduce Recidivism: A Workshop for Teams, Menlo Park, CA. This conference was designed to assist Federal Courts to reduce recidivism. "The Mentally-Ill Offender in Reentry Courts," (9/15/2010)

154. Juvenile Delinquency Orientation, "Adolescent Substance Abuse." This was part of the "Primary Assignment Orientations" for newly appointed Juvenile Court Judges presented by The Center for Judicial Education and Research of the Administrative Office of the Court. San Francisco, California. (1/12/2011, 1/25/12, 2/27/13 & 1/8/14)

155. 2011 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th, 2011)

156. 2012 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 2nd, 2012)

157. Mexican Capital Legal Assistance Program Meeting, "Issues Related to Mental Illness in Mexican Nationals." Santa Fe, New Mexico (10/12/12); Houston, Texas (4/23/13)

158. Los Angeles County Public Defender's Capital Case Seminar, "Mental Illness and Substance Abuse." Los Angeles, California. (9/27/13)

PUBLICATIONS:


1) Kanas, N., Stewart, P. and Haney, K. (1988). *Content and Outcome in a Short-Term Therapy Group for Schizophrenic Outpatients*. Hospital and Community Psychiatry, 39, 437-439.

2) Kanas, N., Stewart, P. (1989*). Group Process in Short-Term Outpatient Therapy Groups for Schizophrenics.* Group, Volume 13, Number 2, Summer 1989, 67-73.

3) Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues.* Journal of Psychoactive Drugs, Vol. 23(4), Oct.-Dec. 1991, 387-395.

4) Banys, P., Clark, H.W., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal*. Journal of Substance Abuse Treatment, Vol. 11(1), 9-15.

5) Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, H.W., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers.* The Journal of Nervous and Mental Disease, Vol. 182(10), 570-575.

6) Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W.O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trial Of Tyrosine for Cocaine Dependence.* Journal of Psychoactive Drugs, Vol. 28(3), pages 305-309, July-September 1996.

7) Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* Prevention, (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999.

8) Stewart, P. (1999). *New Approaches and Future Strategies Toward Understanding Substance Abuse.* Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9) Stewart, P. (2002). *Treatment Is A Right, Not A Privilege.* Chapter in the book, *Understanding Addictions-From Illness to Recovery and Rebirth,* ed. by Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10) Stewart, P., Inaba, D.S., and Cohen, W.E. (2004). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Fifth Edition*, CNS Publications, Inc., Ashland, Oregon.

11) James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices.* National Institute of Corrections, Accession Number 019468.

12) Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as AMICUS CURIAE in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*

13) Stewart, P., Inaba, D.S., and Cohen, W.E. (2007). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Sixth Edition*, CNS Publications, Inc., Ashland, Oregon.

14) Stewart, P., Inaba, D.S. and Cohen, W.E. (2011). *Mental Health & Drugs.* Chapter 10 in the book, *Uppers, Downers, All Arounders, Seventh Edition,* CNS Publications, Inc., Ashland, Oregon.