UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUINTON GRAY, ANGELA PATTERSON, AND STANLEY KUJANSKY, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED, | Case No. EDCV 13-00444-VAP (OPx) |
| Plaintiffs, | **ORDER GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; DENYING DEFENDANT'S MOTION TO DISMISS** |
| v. | **Motions filed on April 14, 2014 and August 4, 2014** |
| COUNTY OF RIVERSIDE, | |
| Defendant. | |

Before the Court is Plaintiffs' Motion for Class Certification ("Mot." or "Motion") (Doc. No. 28) and Defendant's Motion to Dismiss Portions of the Second Amended Complaint (Doc. No. 126).  The Motion for Class Certification came before the Court for hearing on July 21, 2014.  The Motion to Dismiss is appropriate for resolution without a hearing and the Court VACATES the hearing set for this matter on September 8, 2014, at 2:00 p.m.  See Fed. R. Civ. P. 78; L.R. 7-15.

After consideration of the papers filed in support of, and in opposition to, the Motions, the Court GRANTS Plaintiffs' Motion for Class Certification and DENIES Defendant's Motion to Dismiss.

## I.   BACKGROUND

The County of Riverside ("Defendant" or "County") operates five county jails: the Robert Presley Detention Facility ("Presley"), the Smith Correctional Facility ("Smith"), the Indio Jail ("Indio"), the Southwest Detention Center ("Southwest"), and the Blythe Jail ("Blythe") (collectively, "Riverside Jails").  (SAC ¶ 15.)  In total, the Riverside Jails incarcerate approximately 3,500 prisoners.  (Id.)  Three departments within the County share responsibility for providing medical and mental health care to inmates within the Riverside Jails: the Riverside County Sheriff's Department ("Sheriff's Department"); Riverside County Regional Medical Center - Detention Health Services ("Detention Health Services"); and the Riverside County Regional Medical Center - Detention Mental Health Services ("Detention Mental Health Services").  (Ex. 13 to Crockett Decl., Riverside County Interagency Adult Detention Healthcare Memorandum of Agreement ("MOU") (Doc. No. 32).)

Quinton Gray, Angela Patterson, Stanley Kujawsky, John Rosson III, Brandy McClellan, Julie Miller, and Michael Wohlfeil (collectively, "Plaintiffs") are current and former inmates in the Riverside Jails.  On March 8, 2013, Plaintiffs filed this action on behalf of all current and future inmates who are in the custody of the County.  Plaintiffs allege systemic inadequacies in the County's provision of medical and mental health care expose inmates in the Riverside Jails to a substantial risk of serious harm.  Plaintiffs allege that the County has acted with deliberate indifference in the provision of medical and mental health care and that the County's failure to provide adequate medical and mental health care to inmates in their custody violates the Eighth and Fourteenth Amendments.  Plaintiffs seek declaratory and injunctive relief.

On April 14, 2014, Plaintiffs filed this Motion to certify the Class and two Subclasses.  On June 9, 2014, after the Class Certification Motion was filed, Plaintiffs filed a Motion to file a Second Amended Complaint ("SAC") and on July 18, 2014, the Court granted Plaintiffs' Motion.  (See Order Granting Motion to File a Second Amended Complaint (Doc. No. 118).)  Accordingly, the Court addresses certification based on the factual allegations and named Plaintiffs in the SAC.

Defendant filed its Opposition to the Motion for
Class Certification on June 16, 2014 ("Opp'n.") (Doc. No.
52), and Plaintiffs filed their Reply on June 30, 2014
("Reply") (Doc. No. 75).  Defendant filed a Response to
Plaintiffs' Reply on July 11, 2014 ("Def.'s Response")
(Doc. No. 115).

Plaintiffs seek certification of a Class and two
Subclasses.  The proposed Class definition is, "all adult
men and women who are now, or will be in the future, in
the custody of Riverside County and who are now, or will
be in the future, subject to an unreasonable risk of harm
due to Defendant's policies and practices of denying
prisoners minimally adequate medical care and minimally
adequate mental health care." (SAC ¶ 157.)  The proposed
"Medical Subclass" definition is "prisoners who are now,
or will in the future be, subjected to the medical care
policies and practices of the Riverside jails." (<u>Id.</u> ¶
164.)  The proposed Medical Subclass representatives are
Gray, Patterson, Kujawsky, and Wohlfeil.  (<u>Id.</u>)  The
proposed "Mental Health Subclass" definition is
"prisoners who are now, or will in the future be,
subjected to the mental health care policies and
practices of the Riverside jails."  (<u>Id.</u> ¶ 171.)  The
proposed Mental Health Subclass representatives are Gray,
Rosson, McClellan, and Miller.  (<u>Id.</u>)

The motion for class certification came before the Court for hearing on July 21, 2014.  On August 4, 2014, Defendant filed a Motion to Dismiss Portions of the Second Amended Complaint ("MTD") (Doc. No. 126).  Plaintiffs filed an Opposition to the Motion to Dismiss on August 18, 2014 ("MTD Opp'n") (Doc. No. 128) and Defendant filed its Reply on August 22, 2014 ("MTD Reply") (Doc. No. 130).

## II.   FACTUAL ALLEGATIONS

Plaintiffs allege that Defendant maintains and runs a health care system that "lacks basic elements necessary to provide constitutional care" and fails to identify and diagnose serious conditions, provide timely care, administer appropriate medications, employ adequate staff, maintain records, maintain inmate confidentiality, and identify and correct its own failings.  (SAC ¶ 16.) Plaintiffs allege that, as a system, the Defendant's policies and prisoners' access to health care are so inadequate they constitute deliberate indifference to serious medical and mental health needs.  (Id. ¶ 17.) Plaintiffs identify several inadequate policies and procedures related to delays in access to care and the provision of inadequate care at the Riverside Jails.

To begin, Plaintiffs allege that Defendant has a policy and practice of severely understaffing health care

positions in the jails. (Id. ¶ 90.) As a result, there are not enough doctors, dentists, nurses, mental health providers, pharmacists, or medical records staff to serve the needs of the population. (Id.) As of September of 2013, only 63 percent of medical staff positions in the jails were filled. (Id. ¶ 95.)

Plaintiffs also allege the intake process and procedures are inadequate and result in delayed or denied medical care. (SAC ¶ 18.) The intake procedures are not sufficiently staffed with nurses who can identify and evaluate medical and mental health conditions. (Id. ¶ 20.) Furthermore, the intake procedures do not adequately identify medical and mental health conditions because they are performed by custody staff without medical or mental health training. (Id. ¶ 27.) As a result of this policy, inmates may receive delayed or inappropriate treatment of medical and mental health conditions. For example, Plaintiff Gray entered the Riverside Jails with a chronic seizure disorder and high blood pressure. His intake form has "no" marked for every question about health care needs, including those that should be marked "yes." (Id. ¶ 21.)

Plaintiffs allege that the Defendant maintains a non-functioning sick call system that is incapable of providing daily sick call. (SAC ¶ 32.) The lack of a

functioning sick call system puts prisoners at a risk of serious harm because they must rely on other means to obtain care.  Prisoners may either obtain a court order from the criminal court, file repeated health care request forms ("blue slips"), or file grievances in order to receive access to primary and specialty care.  (Id. ¶¶ 32, 37.)  In addition, the County maintains a policy that makes it difficult for prisoners to file a grievance about inadequate access to medical care.  As a result, the prisoners experience dangerous delays in accessing medical care, creating a serious risk of additional harm and suffering from untreated medical conditions.  (Id. ¶ 38.)

For example, Plaintiff Gray alleges he has only seen Riverside Jail doctors when required by court order. (Id. ¶ 32.)  Other named Plaintiffs also received court orders to see doctors in the Riverside Jails.  (Id.) Furthermore, court orders are often not honored.  (Id. ¶ 33.)  For example, in November 2011, the Superior Court ordered an inmate to be seen by a medical doctor within 48 hours.  A few weeks later, despite this directive, the inmate filed a grievance because he still had not received treatment.  (Id.)

Delays in access to care result in serious harm.  For example, Plaintiff Patterson arrived at the Riverside

Jails following heart surgery that placed a temporary filter in a major blood vessel supplying her heart. (SAC ¶ 40.) The filter was supposed to have been removed within three months, but this was not reflected in the jail medical records. (Id.) As a result, there was delay and confusion as to whether the filter was temporary or permanent. Nine months later she went in for surgery, but by that time the filter could no longer be removed safely because of the accumulation of scar tissue. (Id.) As a result, Patterson will require life-long anticoagulation therapy, which carries significant risks of fatal blood clotting and requires daily medication and monitoring. (Id. ¶ 41.)

Plaintiffs allege that Defendant lacks adequate policies and procedures to provide inmates with referrals for specialists. (SAC ¶¶ 53-61.) For example, Plaintiff Wohlfeil spent more than two years waiting for speciality care to diagnose and develop a treatment plan for his chronic diarrhea and dozens of tumors. (Id. ¶ 55.)

As a result of inadequate access to care, many inmates are completely denied care while in Riverside Jails. For example, an inmate with high blood pressure and a history of coronary artery disease complained of an irregular heartbeat and chest pain. He was not evaluated or given any treatment, and only instructed to let staff

know if he experienced those symptoms again.  Five weeks later he was found unresponsive, pale, and sweaty with high blood pressure and a heart flutter.  (Id. ¶ 65.)

Plaintiffs allege that Defendant has a policy and practice of failing to prescribe, provide, and properly manage medication.  In addition, Defendant provides incorrect, interrupted, or incomplete dosages, which puts prisoners at a serious risk of harm.  (Id. ¶ 67.) Defendant maintains a policy of inadequate staffing to distribute medications.  (Id. ¶ 68.)  As a result, prisoners are often forced to skip doses of medication; placing them at risk of harm.  In addition, as a result of understaffing, the delivery of medication is erratic and the time of delivery fluctuates greatly.  (SAC ¶ 71.) A prisoner who requires multiple daily dosages may receive his or her evening dose in the middle of the day. Plaintiffs Gray, Patterson, Kujawsky, and Rosson have each experienced skipped medication dosages and fluctuating medication delivery times.  (Id. ¶¶ 68, 71.)

Defendant's policies require inmates to alert staff when a medication refill is required.  (Id. ¶ 72.)  As a result of this policy, there are often significant interruptions in treatment because a prescription may not be renewed until the prisoners file multiple health care requests or grievances.  (Id.)  In addition, the

Defendant maintains a policy of denying prisoners medications when they attend court hearings or are transported to outside appointments.  (Id. ¶ 73.)  Lapses in the delivery of psychotropic medications are particularly detrimental to the prisoners.  (Id. ¶ 83.)  For example, Plaintiff Gray has suffered harm from lapsed dosages of his psychotropic medications that treat him for bipolar disorder.  (Id. ¶ 84.)

Defendant also has a practice of failing to monitor the effects of medication to determine whether dosages are correct or whether medications should be changed. (SAC ¶ 74.)  Failure to monitor medication dosages exposes prisoners to serious risks to their health and unnecessary pain and suffering.  (Id.)  For example, a prisoner with a documented allergy to Dilantin was repeatedly prescribed the medication and offered it during pill call, placing him at serious risk of harm. (Id. ¶ 78.)

Plaintiffs allege that mental health "encounters" are often held in the presence of custody staff and other prisoners.  The lack of confidentiality reduces the likelihood that inmates will feel comfortable speaking candidly about their conditions, and thus may inhibit the provision of effective mental health care.  (Id. ¶ 100.) Plaintiffs Miller, Rosson, and Gray have all experienced

1  mental health encounters that were not confidential.

2  (Id.)

3

4      Plaintiffs allege that due to understaffing, the

5  Defendant's medical records system is disorganized and

6  incomplete, thus increasing the serious risk that

7  prisoners will receive inadequate healthcare.  (Id. ¶¶

8  102, 104.)

9

10     Finally, when inmates are treated by jail physicians,

11  the inmates often do not receive sufficient follow-up,

12  monitoring, specialty referrals, or proper care.  (SAC ¶

13  108.)  In regard to mental health, Plaintiffs allege

14  there are no appropriate means to assess and monitor

15  inmates who exhibit or contemplate self-harming behavior.

16  (Id. ¶ 144.)  Inmates who require mental health treatment

17  are often put into safety cells, where they are not

18  monitored and do not receive treatment.  (Id.)  Current

19  practices concerning the use of safety cells and safety

20  "restraint chairs" are ineffective and potentially

21  dangerous.  (Id. ¶ 145.)  The Riverside Jails' logs

22  reveal improper use and failure to monitor inmates in

23  safety cells and restraint chairs.  (Id. ¶ 146.)

24  Plaintiffs Gray and Rosson have experienced placement in

25  safety cells without proper monitoring or treatment.

26  (Id. ¶ 144.)

27

28

11

Plaintiffs allege that Riverside officials lack the ability to identify and correct the systemic problems in their policies and practices.  As a result, they do not remedy the deficiencies.  (SAC ¶ 105.)

Plaintiffs allege that inadequacies in Defendant's health policies are well-documented, including multiple Grand Jury reports, a report by the Corrections Standards Authority, and a report by Inmate Medical Quality.  These reports all document systemic deficiencies in staffing, screening, sick call, quality management, medical records, medication management, and the use of restraint chairs and safety cells.  (Id. ¶¶ 148-154.)  In 2011, the Sheriff accepted the findings of these reports as requiring immediate and drastic action, but has failed to take reasonable steps to mitigate the risk of serious harm to inmates.

### III.   LEGAL STANDARD

**A.   Motion to Dismiss**

Federal Rule of Civil Procedure 12(b)(6) allows a party to bring a motion to dismiss for failure to state a claim upon which relief can be granted.  Rule 12(b)(6) is read along with Rule 8(a), which requires a short, plain statement upon which a pleading shows entitlement to relief.  Fed. R. Civ. P. 8(a)(2); Conley v. Gibson, 355 U.S. 41, 47 (1957) (holding that the Federal Rules

require a plaintiff to provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." (quoting Fed. R. Civ. P. 8(a)(2))); Bell Atl. Corp. v Twombly, 550 U.S. 544, 555 (2007). When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint — as well as any reasonable inferences to be drawn from them — as true and construe them in the light most favorable to the non-moving party.  See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994).

     "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted).  Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level."  Id.

     To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570;

1  Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949
2  (2009).  "The plausibility standard is not akin to a
3  'probability requirement,' but it asks for more than a
4  sheer possibility that a defendant has acted unlawfully.
5  Where a complaint pleads facts that are 'merely
6  consistent with' a defendant's liability, it stops short
7  of the line between possibility and plausibility of
8  'entitlement to relief.'"  Iqbal, 129 S. Ct. at 1949
9  (quoting Twombly, 550 U.S. at 556).
10
11      The Ninth Circuit has clarified that (1) a complaint
12  must "contain sufficient allegations of underlying facts
13  to give fair notice and to enable the opposing party to
14  defend itself effectively" and (2) "the factual
15  allegations that are taken as true must plausibly suggest
16  an entitlement to relief, such that it is not unfair to
17  require the opposing party to be subjected to the expense
18  of discovery and continued litigation."  Starr v. Baca,
19  652 F. 3d 1202, 1216 (9th Cir. 2011).
20
21  **B.   Class Certification**
22      Federal Rule of Civil Procedure 23 governs class
23  actions.  Fed. R. Civ. P. 23.  Under Rule 23(a), a party
24  seeking class certification must demonstrate the
25  following prerequisites: (1) numerosity of plaintiffs;
26  (2) common questions of law or fact; (3) typicality of
27  named plaintiff's claims; and (4) ability of the named
28

plaintiff to protect the interests of the class adequately. <u>See</u> <u>Ellis v. Costco Wholesale Corp.</u>, 657 F.3d 970, 980 (9th Cir. 2011) (citing Fed. R. Civ. P. 23(a)). The party seeking certification bears the burden of demonstrating it has met each of the four requirements of Rule 23(a). <u>Id.</u> Although not mentioned in Rule 23(a), the moving party must also demonstrate that the class is ascertainable. <u>Keegan v. Am. Honda Motor Co., Inc.</u>, 284 F.R.D. 504, 521 (C.D. Cal. 2012); <u>Rodmakers, Inc. v. Newport Adhesives & Composites, Inc.</u>, 209 F.R.D. 159, 163 (C.D. Cal. 2002) ("Prior to class certification, plaintiffs must first define an ascertainable and identifiable class.").

After satisfying the five prerequisites of numerosity, commonality, typicality, adequacy, and ascertainability, a party must also demonstrate that it meets at least one of the prerequisites in Rule 23(b). Under 23(b), class certification is appropriate if (1) there is a risk that separate actions would create incompatible standards of conduct for the defendant or prejudice individual class members not parties to the action; or (2) the defendant has treated the members of the class as a class, making appropriate injunctive or declaratory relief with respect to the class as a whole; or (3) common questions of law or fact predominate over questions affecting individual members and that a class

1  action is a superior method for fairly and efficiently
2  adjudicating the action.   Fed. R. Civ. P. 23(b)(1-3).
3
4     The decision to grant or deny a motion for class
5  certification is committed to the trial court's broad
6  discretion.  Bateman v. American Multi-Cinema, Inc., 623
7  F.3d 708, 712 (9th Cir. 2010).   A party seeking class
8  certification must affirmatively demonstrate compliance
9  with Rule 23 — that is, the party must be prepared to
10  prove that there are in fact sufficiently numerous
11  parties and common questions of law or fact.  Wal-Mart
12  Stores, Inc. v. Dukes, —— U.S. ——, 131 S. Ct. 2541, 2550,
13  2551 (2011).   This requires a district court to conduct a
14  "rigorous analysis" that frequently "will entail some
15  overlap with the merits of the plaintiff's underlying
16  claim."  Id.
17
18  **C.  Denial of Adequate Medical and Mental Health Care**
19     Plaintiffs claim the policies and practices of the
20  Riverside Jails subject inmates to an unreasonable risk
21  of harm and injury from inadequate medical and mental
22  health care.  Plaintiffs bring their claims under the
23  Eighth and Fourteenth Amendments because the Riverside
24  Jails house both pre-conviction and post-conviction
25  inmates.  The Fourteenth Amendment applies before
26  conviction and the Eighth Amendment applies after
27  conviction, but the standards are equivalent in regard to
28

medical care.   See City of Revere v. Massachusetts Gen.
Hosp., 463 U.S. 239, 244 (1983) (In regard to medical
care "the due process rights of a person [before trial]
are at least as great as the Eighth Amendment protections
available to a convicted prisoner.").   Under the Eighth
Amendment, prison officials must provide for inmates'
basic human needs while in custody, including "food,
clothing, shelter, medical care, and reasonable safety."
Helling v. McKinney, 509 U.S. 25, 32 (1993).   Medical
care includes both mental and physical health.   See
Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982).

To prevail on their claims under the Eighth and
Fourteenth Amendments, Plaintiffs must show Defendant
acted with "deliberate indifference to serious medical
needs."   Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir.
2006) (citing Estelle v. Gamble, 429 U.S. 97, 104
(1976)).   There are two prongs to the deliberate
indifference analysis.   Id.   First, under an objective
analysis, the prisoner must show a "serious medical need
by demonstrating that failure to treat a prisoner's
condition could result in further significant injury or
the unnecessary and wanton infliction of pain."   Id.
(internal quotations and citations omitted).

Second, under a subjective analysis, the prisoner
must show that the defendant's response to that need was

deliberately indifferent.  Id.  The state of mind required for deliberate indifference is "subjective recklessness." Snow v. McDaniel, 681 F.3d 978, 985-86 (9th Cir. 2012) overruled on other grounds by Peralta v. Dillard, 744 F.3d 1076 (9th Cir. 2014).  The deliberate indifference standard is "less stringent in cases involving a prisoner's medical needs . . . because 'the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992) overruled on other grounds by WMX Technologies, Inc. v. Miller, 104 F.3d 1133 (9th Cir. 1997).

     The deliberate indifference prong is met if (1) there is a purposeful act or failure to respond; and (2) the plaintiff demonstrates there was harm caused by the indifference.  Id.  A prisoner may meet the harm requirement by demonstrating that the defendant's actions expose the prisoner to a "substantial risk for serious harm." Parsons v. Ryan, 754 F.3d 657, 677 (9th Cir. 2014) ("Parsons II").  It is not necessary for a prisoner to "await a tragic event" before seeking a remedy. Farmer, 511 U.S. at 828.  Deliberate indifference to serious medical needs may be established by showing that there are "systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate

population is effectively denied access to adequate
medical care."  <u>Madrid v. Gomez</u>, 889 F. Supp. 1146, 1256
(N.D. Cal. 1995) (citing <u>Wellman v. Faulkner</u>, 715 F.2d
269, 272 (7th Cir. 1983); <u>see also</u> <u>Wilson v. Seiter</u>, 501
U.S. 294, 304 (1991) (Approving <u>Wellman</u> and recognizing
that "[s]ome conditions of confinement may establish an
Eighth Amendment violation "in combination" when each
would not do so alone, but only when they have a mutually
enforcing effect that produces the deprivation of a
single, identifiable human need such as food, warmth, or
exercise—for example, a low cell temperature at night
combined with a failure to issue blankets.").

## IV.  MOTION TO DISMISS

Defendant moves to dismiss portions of Plaintiffs'
SAC related to intake procedures, privacy procedures, and
the use of safety cells and restraint chairs as a
disciplinary measures on the basis that allegations
related to these policies fail to state a claim upon
which relief may be granted.


In Opposition, Plaintiffs argue that each of these
alleged policies expose inmates in the Riverside Jails to
a substantial risk of serious harm in violation of the
Eighth and Fourteenth Amendments.  In addition,
Plaintiffs correctly assert that they have not alleged a
separate claim arising out of each specific policy;

rather, the factual allegations of the SAC support
Plaintiffs' six claims that the health care system in the
Riverside Jails subjects Plaintiffs in the Medical and
Mental Health subclasses to an unreasonable risk of harm
and injury from inadequate health care.  <u>See</u> <u>Wilson</u>, 501
U.S. at 304; <u>Madrid</u>, 889 F. Supp. at 1256 (N.D. Cal.
1995).

## A.    Intake Procedures

     Defendant moves to dismiss all allegations related to
intake procedures in the SAC.  (SAC ¶¶ 19-25, 27; Prayer
at 54:15-16.)  As explained above, Plaintiffs allege that
the intake procedures in the Riverside Jails are
inadequate because they are conducted by untrained
custody staff, and there are insufficient numbers of
nursing staff available to evaluate medical and mental
health conditions on intake.  As a result, the "inmates
are rarely assessed for communicable diseases when they
arrive at the jails and medically high-risk prisoners do
not have histories taken, physical assessments, or
treatment plans."  (SAC ¶ 20.)  Plaintiffs have
sufficiently alleged the intake procedures fail to screen
inmates adequately for medical and mental health
procedures.  For example, Plaintiff Gray's intake form
has "no" marked for every question about health care
needs, including those that should be marked "yes."  (<u>Id.</u>
¶ 21.)  The SAC also includes allegations of similar

1  deficiencies in the intake screening process for unnamed
2  plaintiffs.

3

4      Defendant moves to dismiss these allegations on the
5  basis that the intake policy alleged in the SAC is not
6  constitutionally inadequate.  In addition, Defendant
7  claims that the specific allegations related to Gray's
8  intake do not rise to the level of deliberate
9  indifference.  (MTD at 4-5.)

10

11     An adequate intake screening assessment is a
12  recognized component of a constitutionally adequate
13  health care delivery system.  See Madrid, 889 F. Supp. at
14  1258 (deficient intake screening method part of
15  constitutionally inadequate health care system which
16  failed to provide access to medical and mental health
17  care); Carty v. Farrelly, 957 F. Supp. 727, 738 (D.V.I.
18  1997) (Inadequate intake health evaluations also
19  contribute to constitutionally inadequate medical and
20  mental health care); see also Lareau v. Manson, 651 F.2d
21  96, 109 (2d Cir. 1981) (inadequate screening of
22  communicable diseases at intake is inadequate medical
23  practice that violates Eighth Amendment).  Defendant
24  argues the alleged intake policy is not constitutionally
25  deficient because inmates are not entitled to better
26  health care than members of the public, and that members
27  of the public are only treated for medical conditions
28

that they disclose and seek treatment for.  In addition, Defendant also argues that there is no requirement under federal law that medical or mental health staff, rather than officers, conduct intake screening and that there is no "federal Constitutional right to have information recorded on forms."  (MTD at 5.)  Plaintiffs do not allege that intake conducted by officers is per se constitutionally inadequate; rather, they claim that in Riverside Jails, intake is conducted by untrained custody staff who do not have specialized training to conduct mental health screenings and fail to identify health concerns or accurately record medical issues on booking forms.  Plaintiffs allege that this policy exposes inmates to a substantial risk of serious harm because medical and mental health conditions may not be recognized at intake.  The intake policy is one policy in an alleged system of delivering health care that is constitutionally deficient under the Eighth and Fourteenth Amendments.

   Next, the Court turns to Defendant's claim that the allegations related to Gray's intake experience are insufficient to state a claim for a constitutional violation.  Defendant would likely succeed on its Motion if Gray had filed a Complaint as an individual inmate, alleging that his individual intake experience amounted to constitutional violation.  See Boncher ex rel. Boncher

1  v. Brown Cnty., 272 F.3d 484, 487 (7th Cir. 2001)

2  (inadequacy of intake checklist form and training of the

3  intake officer insufficient to constitute constitutional

4  violation where intake officer believed suicidal inmate

5  was joking about committing suicide); McCaster v.

6  Clausen, 684 F.3d 740, 747 (8th Cir. 2012) (nurse who

7  conducted intake exam was not deliberately indifferent

8  when serious medical need was not obvious).  The SAC,

9  however, only includes Gray's experience as evidence of

10  the existence of an allegedly deficient intake policy

11  that exposes inmates to a substantial risk of serious

12  harm.  Moreover, Plaintiffs allege that the intake policy

13  combines with other policies to create a health care

14  system that is constitutionally inadequate and subjects

15  inmates to a substantial risk of serious harm.  Thus,

16  there is no "claim" that may be dismissed based on the

17  constitutional adequacy of Gray's individual intake

18  experience.  See Brown v. Plata, —— U.S. ——, 131 S.Ct.

19  1910, 1925 n.3 (2011)("Because plaintiffs do not base

20  their case on deficiencies in care provided on any one

21  occasion, this Court has no occasion to consider whether

22  these instances of delay - or any other particular

23  deficiency in medical care complained of by the

24  plaintiffs - would violate the Constitution"); Parsons

25  II, 754 F.3d at 678 ("Although a presently existing risk

26  may ultimately result in different future harm for

27  different inmates — ranging from no harm at all to death

28

1  — every inmate suffers exactly the same constitutional

2  injury when he is exposed to a single statewide ADC

3  policy or practice that creates a substantial risk of

4  serious harm.").   Whether Gray's individual exposure to

5  the policy amounts to a constitutional violation does not

6  alter the alleged injury suffered by the class, which is

7  a substantial <u>risk</u> of serious harm.   Thus, Plaintiffs'

8  allegations regarding the Riverside Jails' intake

9  policies are sufficient to survive a motion to dismiss

10

11 **B.   Privacy Allegations**

12      Defendant seeks to dismiss all allegations in the SAC

13 related to inmate privacy.   (<u>See</u> SAC ¶¶ 98-100.)

14 Plaintiffs allege that until recently the Riverside Jails

15 did not have a confidential self-referral system by which

16 inmates could request mental health care without

17 revealing the nature of their request to correctional

18 officers.   (SAC ¶ 98.)   Under the old policy inmates

19 would give blue slips requesting health care directly to

20 custody staff, who would then determine whether the

21 requests should be passed to medical staff.   (<u>Id.</u>)   This

22 policy was in violation of HIPAA and California state

23 law.   (<u>Id.</u>)   Currently, inmates give any blue slips

24 directly to medical staff.   The SAC alleges that, even

25 under the current policies, if an inmate would like a

26 grievance form in order to complain about delays or

27 inadequacies in receiving medical treatment that inmate

28

must persuade custody staff that their concerns are significant.  In addition, the SAC alleges that many mental health encounters are held in the presence of other custody staff and prisoners, which does not allow for effective treatment because the patients are not comfortable disclosing their mental health issues or needs in a non-confidential setting.  (SAC ¶ 100.) Plaintiffs Miller, Rosson, and Gray have all experienced non-confidential mental health encounters.  (Id. ¶ 100.)

Defendant moves to dismiss these allegations on the basis that inmates do not have a right to privacy or confidentiality of their medical records.  (Mot. at 13-16.)  Defendant is correct that an inmate does not have an absolute constitutional right to confidential medical records.  See Seaton v. Mayberg, 610 F.3d 530, 534 (9th Cir. 2010) (recognizing general principle that whatever right to privacy an inmate has may be "overridden for legitimate penological reasons").  Furthermore, violations of HIPPA or California state law regarding medical records do not necessarily rise to the level of a constitutional violation.  But, the factual allegations in the SAC regarding privacy are not alleged in support of a claim that the County violated inmates' right to privacy.  Rather, Plaintiffs allege that Defendant's practice of conducting mental health interviews in non-confidential environments and involving custody staff in the process of obtaining medical care exposes inmates to

a substantial risk of serious harm because the inmates are less likely to disclose mental health issues in a non-confidential setting.   These practices are one of several deficient practices that Plaintiffs allege form a healthcare system that fails to provide adequate access to medical and mental health care.   Thus, Defendant's arguments regarding the lack of a right to privacy are unavailing as that is not the right Plaintiffs allege is being violated.   Plaintiffs' allegations regarding privacy are sufficient to survive a motion to dismiss.

## C.   Use of Safety Cells and Restraint Chairs for Discipline

Lastly, Defendant moves to dismiss allegations related to the use of safety cells and restraint chairs for disciplinary purposes.   (See SAC ¶ 145.)   The SAC alleges that the County routinely places inmates in safety cells as a punitive measure for actions such as "destroying jail property" or "being combative with jail staff."   (Id.)   Plaintiffs allege that using the safety cells as a punitive measure exceeds the proper use of the placements, and exposes patients to a substantial risk of serious harm because it makes it less likely that patients will report serious emotional distress or suicidal ideation.   (Id.)

The County moves to dismiss these allegations on the basis that it is constitutional to use safety cells and

restraint chairs as a disciplinary measure.  Defendant is correct that the use of safety cells and restraint chairs "to control violent or self-destructive inmates" is not a per se constitutional violation.  <u>Anderson v. Cnty. of Kern</u>, 45 F.3d 1310, 1315 <u>opinion amended on denial of reh'g,</u> 75 F.3d 448 (9th Cir. 1995) (policy of using safety cells for suicidal and mentally disturbed inmates was not unconstitutional).  The use of safety cells for purely punitive purposes, however, may rise to the level of a constitutional violation.  <u>Id.</u>

Plaintiffs do not allege that *any* use of safety cells and restraint chairs to restrain suicidal or violent inmates is unconstitutional.  Rather, Plaintiffs allege that Riverside Jails' deficient practice of using safety cells for disciplinary and punitive purposes exposes inmates to a substantial risk of serious harm because the inmates are less likely to report serious emotional distress out of fear they will be placed in a safety cell.  Plaintiffs allege this practice is one of many allegedly deficient policies that creates a healthcare system that provides inadequate medical and mental health care.  Thus, Plaintiffs' allegations regarding the use of safety cells for disciplinary purposes survive Defendant's Motion.

## V.   STANDING

Defendant challenges Plaintiffs' standing in its Motion to Dismiss and its opposition to the Motion for Class Certification.  In the opposition to the Motion for Class Certification, Defendant argues that the named Plaintiffs do not have Article III standing to bring claims related to any injury they themselves did not suffer.  (Opp'n. at 10-13.)  Specifically, Defendant contends that no named Plaintiff suffered any injury as a result of inadequate intake procedures, inadequate dental or vision care[1], or inadequate suicide prevention policies[2], and thus claims related to these alleged policies may not proceed.  In addition, Defendant argues that the majority of people in the proposed Subclasses do not have standing.  In the Motion to Dismiss, Defendant

---

[1]It is unclear from the Motion and the Second Amended Complaint whether Plaintiffs claim Defendant's policies related to dental or vision care are inadequate. The allegations concerning dental care largely relate to the timeliness of such care, but Plaintiffs do not identify a specific policy or practice for which they seek certification.  Accordingly, the Court does not address the policies regarding the provision of dental or vision care in any detail.

[2]At the hearing Defendant argued that no named Plaintiff has suffered any injury as a result of inadequate suicide prevention policies because no named Plaintiff has committed suicide.  The Court rejects Defendant's suggestion that only an inmate who successfully commits suicide has standing to challenge inadequate suicide prevention policies.  See Helling v. McKinney, 509 U.S. 25, 33 (1993) (It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them.").

also submits that Plaintiffs lack standing to assert claims related to the use of safety cells as a disciplinary measure.

Defendant asserts lack of standing on three bases. First, many inmates are only in the Riverside Jails for a short period of time - a few hours or a few days - and thus never need any medical or mental health care. Second, inmates who receive medical or mental health care that meets community standards; _e.g._, the "large portion of the inmates [that] receive better care in jail than outside of jail," do not have standing.  (Opp'n. at 10.) Third, inmates who are satisfied with the medical and mental health care they receive have no standing.

Article III standing requires a plaintiff to demonstrate "an "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical."  D'Lil v. Best W. Encina Lodge & Suites, 538 F.3d 1031, 1036 (9th Cir. 2008) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)).  In the context of claims arising from prison conditions, an inmate who is claiming that the defendant fails to prevent harm must show that he is incarcerated under conditions "posing a substantial risk of serious harm."  Brown, 131 S.Ct. at 1926 n. 3 (no consideration of whether specific instances of care violate the Constitution, because Plaintiffs rely on

systemwide deficiencies that, taken as a whole, subject sick and mentally ill prisoners to a substantial risk of serious harm.) (citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 834 (1994)).  When seeking only injunctive relief, a plaintiff need not wait until he suffers an actual injury because the constitutional injury is the exposure to the risk of harm.  <u>Parsons II</u>,754 F.3d at 678; <u>Parsons v. Ryan</u>, 289 F.R.D. 513, 521 (D. Ariz. 2013) ("<u>Parsons</u> I"); <u>see also</u> <u>Chief Goes Out v. Missoula Cnty.</u>, 2013 WL 139938, at *5 (D. Mont. Jan. 10, 2013) (injury suffered is the "deprivation itself, not just the negative effects resulting from the deprivation."); <u>Rosas v. Baca</u>, 2012 WL 2061694, at *3 (C.D. Cal. June 7, 2012) (class certification appropriate where all inmates were at significant risk of excessive violence at the hands of deputies, even if they had not been personally subject to excessive force).  Indeed, the United States Supreme Court has commented that "it would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."  <u>Helling v. McKinney</u>, 509 U.S. 25, 33 (1993).

    Defendant argues that the named Plaintiffs lack standing to raise allegations related to the intake procedures.  The gravamen of the County's argument is that because Gray's individual intake experience does not amount to a constitutional violation, Plaintiffs may not

allege any facts related to the intake policies.  As
discussed above, whether an individual Plaintiff's
exposure to the policy amounts to a constitutional
violation does not affect whether the class as a whole,
or that specific individual, is subject to a substantial
risk of serious harm.  Gray has alleged direct exposure
to the intake procedures, one of the policies that forms
the basis for Plaintiffs' claim of unconstitutional
healthcare.  His exposure is sufficient to support
Plaintiffs standing to bring their claim that they suffer
a substantial risk of serious harm as a result of the
deficient intake policy.

    The County also asserts that Plaintiffs lack standing
to challenge the Riverside Jails' alleged practice of
improperly using safety cells and restraint chairs for
disciplinary purposes because no named Plaintiff was
exposed to this policy or asserts any specific injury.
The Court addresses this issue in relation to its
commonality analysis, and finds that Plaintiffs have
failed to submit sufficient evidence to support the
existence of an unofficial policy of using safety cells
for purely punitive or disciplinary purposes.
Accordingly, the Court does not reach the question of
Plaintiffs' standing as to this specific policy.

Thus, in regard to Defendant's argument regarding the named Plaintiffs,[3] the Court finds that the Plaintiffs have sufficiently alleged that a named Plaintiff has suffered a "serious risk of substantial harm" as a result of each of the alleged inadequate healthcare policies that are appropriate for certification.  Although support for these allegations is not necessarily provided in each named Plaintiff's declaration, other evidence submitted in support of certification describes inadequacies in the named Plaintiffs' intake forms and Mr. Rosson's treatment for self-harming behavior and suicidal ideation.

The unnamed members of the proposed Subclasses are "highly likely to require medical [or] mental health . . . care" and thus face a "substantial risk of serious harm resulting from exposure to the defendant's policies and practices governing healthcare."  See Parsons II, 754 F.3d at 686.  An inmate may require medical or mental health care regardless of the length of time he or she is in the Riverside Jails, indeed; the first 24 hours of

_____

[3]Both Gray and Patterson are no longer inmates in the Riverside Jails.  The Court determines standing based on "whether the elements of Article III standing . . . were satisfied at the time the complaint was filed."  Haro v. Sebelius, 747 F.3d 1099, 1108 (9th Cir. 2014) (citing Cnty. of Riverside v. McLaughlin, 500 U.S. 44, 51 (1991)).  Gray and Patterson were inmates at the time Plaintiffs' initial complaint was filed.  Accordingly, they maintain standing to bring this suit.

confinement may be the most dangerous.[4]   (Stewart Decl. (Doc. No. 29) ¶ 19.)   That an inmate is satisfied with his care, or may have received even worse care outside of jail, does not eliminate his exposure to a substantial risk of serious harm.   It is the exposure to a risk of serious harm, and not the actual medical or mental health care received, that constitutes the injury suffered by the inmates in this action.   Each member of the proposed Subclasses is alleged to be subject to a "substantial risk of serious harm" as a result of each of the alleged policies in the SAC.   These allegations are sufficient to confer Article III standing on the unnamed class members.

## VI.   CLASS CERTIFICATION

**A.   Rule 23(a)**

   **1.   Ascertainability**

Defendant contends that the proposed Class definition of "all adult men and women who are now, or will be in

---

[4]At the hearing, Defendant argued that Riverside Jails are distinguishable from <u>Parsons</u> because this action involves jails where as Parsons involved prisons, where inmates were likely to stay for much longer periods of time while serving their sentence.   The Court is not persuaded by this distinction.   Although the average stay within a Riverside County Jail may be shorter than in a prison, every inmate who enters a Riverside County Jail is allegedly exposed to a risk of serious harm as a result of inadequate healthcare policies.   This is true even if that risk does not materialize into physical harm due to the short period of detention.   <u>See</u> <u>Parsons II</u>, 754 F.3d at 678 ("any one of them [prisoners] could easily fall ill, be injured, need to fill a prescription, require emergency or specialist care, crack a tooth, or require mental health treatment").

the future, in the custody of Riverside County and who
are now, or will be in the future, subject to an
unreasonable risk of harm due to Defendant's policies and
practices of denying prisoners minimally adequate medical
care and minimally adequate mental health care" is a
"fail safe" class that is not ascertainable.  A proposed
class is ascertainable if it is "administratively
feasible for the court to determine whether a particular
individual is a member."  <u>Keegan</u>, 284 F.R.D. at 521
(quoting <u>O'Connor v. Boeing N. Am., Inc.</u>, 184 F.R.D. 311,
319 (C.D. Cal. 1998).)  Defendant argues it is not
administratively feasible to determine the members of the
proposed Class because it would require a specific
factual inquiry into whether each inmate was "subject to
an unreasonable risk of harm" or received "adequate"
medical care.  (Opp'n. at 4.)  A class is "fail safe" if
the definition of the class shields the class members
from adverse judgment.  <u>Randleman v. Fid. Nat. Title Ins.
Co.</u>, 646 F.3d 347, 352 (6th Cir. 2011) ("the class itself
is defined in a way that precludes membership unless the
liability of the defendant is established.").  Either
"the class members win or, by virtue of losing, they are
not in the class and, therefore, not bound by the
judgment."  <u>Id.</u>; <u>Kamar v. RadioShack Corp.</u>, 375 F. App'x
734, 736 (9th Cir. 2010) ("the class itself is defined in
a way that precludes membership unless the liability of
the defendant is established.").

In Reply, Plaintiffs propose a new Class definition:
"all prisoners who are now, or will be in the future,
subjected to the healthcare policies and practices of
Riverside County." (Reply at 21.)  This Class definition
is almost identical to the definition approved in
Parsons, and is similar to the definitions of the
Subclasses, which Defendant concedes are ascertainable.
(Opp'n. at 8.); see Parsons I, 289 F.R.D. at 525
(certifying class of "all prisoners who are now, or will
in the future be, subjected to the medical, mental
health, and dental care policies and practices of the
ADC").  In addition, this modification resolves
Defendant's contention that the original Class definition
is "fail safe."  Accordingly, the Court will proceed to
analyze the Rule 23(a) factors using the Plaintiffs'
revised Class definition, modified to use the term
"medical and mental health" rather than "healthcare"
policies.  See Wolph v. Acer Am. Corp., 272 F.R.D. 477,
483 (N.D. Cal. 2011) (the Court has broad discretion to
modify a class definition); Chief Goes Out, 2013 WL
139938, at *3 (modifying class definition in class
certification order); Morrow v. Washington, 277 F.R.D.
172, 189 (E.D. Tex. 2011) (modifying class definition in
certification order to ensure ascertainable class).

## 2. Numerosity

Rule 23(a)(1) requires the class be so numerous that
joinder of individual class members is impracticable.

35

See Fed. R. Civ. P. 23(a)(1).  There is no "precise threshold," but Courts have routinely found the numerosity requirement is met when a proposed class comprises "40 or more members."  Berry v. Baca, 226 F.R.D. 398, 403 (C.D. Cal. 2005).  Here, the Riverside Jails have custody over approximately 3,500 inmates, and approximately 50,000 inmates pass through the jails each year.  (See Ex. 153 to Crockett Decl., U.S. Dept. of Justice, Office of Justice Program, Bureau of Justice Statistics, "Jail Prisoners at Midyear 2010 - Statistical Tables (June 28, 2011), at 2170; Ex. 154 to Crockett Decl., Defendant's October 10, 2013 Response to Plaintiffs' Request for Production.)  Accordingly, the proposed Class and Subclasses meet the numerosity requirement.

### 3.  Commonality

Commonality requires Plaintiffs to demonstrate there are "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Plaintiffs must demonstrate "significant proof"[5] that members of the class have

_____

[5]In Parsons II the Ninth Circuit noted that courts have taken different views as to whether the "significant proof" standard articulated in Wal-Mart applies to claims outside of the employment discrimination context.  See 754 F.3d at 684 n.29.  It then declined to decide the issue because it found that Plaintiffs had met their burden under either a significant proof or lesser standard.  This Court assumes without deciding that the higher, "significant proof" standard applies in this action.  This approach is consistent with other district courts in the Ninth Circuit that have applied the
(continued...)

suffered the same injury, and not merely that they have
suffered violations of the same provision of law."
<u>Wal-Mart</u>, 131 S. Ct. at 2551.  Plaintiffs' claims must
depend on a "common contention" and "[t]hat common
contention . . . must be of such a nature that it is
capable of classwide resolution — which means that
determination of its truth or falsity will resolve an
issue that is central to the validity of each one of the
claims in one stroke."  <u>Id.</u>  "Plaintiffs need not show
that every question in the case, or even a preponderance
of questions, is capable of classwide resolution.  So
long as there is 'even a single common question' a
would-be class can satisfy the commonality requirement of
Rule 23(a)(2)."  <u>Wang v. Chinese Daily News, Inc.</u>, 737
F.3d 538, 544 (9th Cir. 2013) (quoting <u>Wal-Mart</u>, 131 S.
Ct. at 2556.)  Thus, commonality exists even "[w]here the
circumstances of each particular class member vary but
retain a common core of factual or legal issues with the
rest of the class."  <u>Evon v. Law Offices of Sidney
Mickell</u>, 688 F.3d 1015, 1029 (9th Cir. 2012) (quoting
<u>Parra v. Bashas', Inc.</u>, 536 F.3d 975, 978-79 (9th Cir.
2008).)  In a civil rights class action, "commonality is
satisfied where the lawsuit challenges a system-wide
practice or policy that affects all of the putative class

---

[5](...continued)
"significant proof" standard to classes of prisoners
seeking injunctive relief.  <u>See</u> <u>Parsons I</u>, 289 F.R.D. at
522; <u>Amador v. Baca</u>, 2014 WL 1679013, at *3 (C.D. Cal.
Mar. 12, 2014).

members."  <u>Armstrong v. Davis</u>, 275 F.3d 849, 868 (9th
Cir. 2001).

    In this action, the crucial question is whether the
Plaintiffs have submitted "sufficient evidence of
systemic and centralized policies or practices in a
prison system that allegedly expose all inmates in that
system to a substantial risk of serious future harm."
<u>Parsons II</u>, 754 F.3d at 684.  Plaintiffs must provide
more than conclusory or "threadbare" allegations that
systemic policies and practices exist.  <u>Id.</u> at 48.
Rather, proof that there are "in fact . . . common
questions of law or fact" is required.  <u>Wal-Mart</u>, 131 S.
Ct. at 2551.  In this analysis, "a district court must
consider the merits if they overlap with the Rule 23(a)
requirements."  <u>Ellis</u>, 657 F.3d at 981.  Thus, it may be
necessary for the Court to "probe behind the pleadings"
in evaluating proof of systemic policies and practices.
<u>Comcast Corp. v. Behrend</u>, 133 S. Ct. 1426, 1432 (2013).
The Court, however, may examine the underlying claims of
the Plaintiff only for the purposes of determining
whether common questions exist; it may not conduct a
"mini-trial on the merits" prior to certification.
<u>Ellis</u>, 657 F.3d at 983 (citing <u>Wal-Mart</u>, 131 S. Ct. at
2552 n. 6); <u>see also</u> <u>Amgen Inc. v. Connecticut Ret. Plans
& Trust Funds</u>, –– U.S. ––, 133 S. Ct. 1184, 1194-95
(2013) ("Rule 23 grants courts no license to engage in
free-ranging merits inquiries at the certification stage.

Merits questions may be considered to the extent - but only to the extent - that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."); <u>Messner v. Northshore Univ. HealthSystem</u>, 669 F.3d 802, 811 (7th Cir. 2012) ("the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits.").

### i. Evidence Submitted in Support of and in Opposition to the Existence of Commonality

In support of their Motion, Plaintiffs submitted extensive evidence, including: (1) declarations of the named Plaintiffs; (2) expert opinions of Dr. Wilcox and Dr. Stewart; (3) Riverside County jail records, such as autopsy reports of inmates who have died, safety cell logs, and inmate grievances; (4) official County documents related to mental health staffing at the jails, standards and policies for medical and mental health care at the jails, and depositions of county employees; and (5) the 2010-2011 and 2011-2012 Grand Jury Reports and related documents.[6]  In their Reply, Plaintiffs submitted the County's records of court orders issued from Riverside County Superior Courts to Riverside Jails from

---

[6]Both parties filed all documents related to the medical and jail records of all inmates who are not named Plaintiffs in this action under seal pursuant to the protective order issued in this action.  (<u>See</u> Doc. No. 19.)  To the extent possible, the parties filed redacted versions of the evidence submitted to the Court.

2011-2014 ("court orders"), statistical analysis of those court orders, and the supplemental declarations of Dr. Wilcox and Dr. Stewart.[7]

_____

[7]Defendant objects to the court orders, Lynch's analysis of the court orders, and the supplemental declarations of Dr. Wilcox and Dr. Stewart on the basis that it is improper to submit new factual or legal arguments for the first time in reply. (See Def.'s Response.)  Generally, "reply briefs are limited in scope to matters either raised by the opposition or unforeseen at the time of the original motion." Burnham v. City of Rohnert Park, 1992 WL 672965, at *1 n. 2 (N.D. Cal. May 18, 1992) (citing Lujan v. National Wildlife Federation, 497 U.S. 871 (1990).)  "New evidence submitted as part of a reply is improper" because it does not allow the Defendant an adequate opportunity to respond. Morris v. Guetta, 2013 WL 440127, *8 (C.D. Cal. Feb. 4, 2013).  For this reason, the district court may decline to consider new evidence or arguments raised in reply, and generally "should not consider the new evidence without giving the non-movant an opportunity to respond." Provenz v. Miller, 102 F.3d 1478, 1483 (9th Cir. 1996); Deirmenjian v. Deutsche Bank, A.G., 2006 WL 4749756, at *6 n.52 (C.D. Cal. Sept. 25, 2006).  The opportunity for rebuttal, however, need not be in writing; an opportunity for oral rebuttal may be sufficient.  See Smith v. Microsoft Corp., 2013 WL 6497073, at *2 (S.D. Cal. Dec. 10, 2013) (considering new evidence in a reply for a motion for class certification; Jones v. ConAgra Foods, Inc., 2014 WL 2702726, at *22 (N.D. Cal. June 13, 2014) (considering new evidence in reply brief in support of class certification).  Here, the court orders were referred to in Plaintiffs' Motion and the actual records of the court orders were supplied by the Defendant to Plaintiffs in discovery. (See Mot. at 8.)  Thus, it is debatable whether this evidence raises "new matters." See Gambra v. Int'l Lease Fin. Corp., 377 F. Supp. 2d 810, 827 (C.D. Cal. 2005) ("The Court finds that defendants' reply brief and supporting materials do not raise new matters and should not be stricken.").  Assuming the court orders and the accompanying analysis are new evidence, the Defendant has submitted substantial written objections to all of the "new" material. (See Def.'s Objs. to Pls.'s Ex. A-E (Doc. No. 116); Wilcox Reply Evid. Objs. (Doc. No. 113); Stewart Reply Evid. Objs. (Doc. No. 114).)  Thus, the Court will consider the evidence Plaintiffs' submitted in Reply, as well as Defendant's written objections and any oral arguments at the hearing.  See Provenz, 102 F.3d at 1483 (suggesting the district court erred in considering the moving party's new evidence submitted in reply and

(continued...)

In opposition to the Motion, Defendant submitted the declarations of 14 County employees; the declaration of the Chief Executive Officer for Inland Empire Health Plan; the expert opinions of four physicians; and hundreds of pages of Riverside County jail records, inmate mental health and medical records, and transcripts of deposition testimony.  In addition, the Defendant submitted over 1,000 evidentiary objections to Plaintiffs' evidence.  As the Court details below, the majority of these objections are challenges to the credibility of the named Plaintiffs and proposed class members, catalogued disagreements with the opinions of Plaintiffs' experts, disputes over the interpretation of facts and evidence, and repetitive objections that are often obviously inapplicable.  Defendant's misguided objections are largely inappropriate at the class certification stage as the Court is limited in its ability to resolve factual disputes and may not hold a mini-trial on the merits.

### ii. Commonality Evidentiary Standard

"At the class certification stage, the Court makes no findings of fact, nor any ultimate conclusions on Plaintiffs' claims." <u>Velazquez v. Costco Wholesale Corp.</u>, 2011 WL 4891027, at *2 (C.D. Cal. Oct. 11, 2011).

---

[7](...continued)
not considering the non-moving party's supplemental declaration in response).

Accordingly, "evidentiary rules unrelated to expert testimony are not applied with rigor in deciding motions for class certification." <u>Cholakyan v. Mercedes-Benz, USA, LLC</u>, 281 F.R.D. 534, 550 (C.D. Cal. 2012); <u>Velazquez</u>, 2011 WL 4891027, at *2 (("[T]o the extent the Court relies on evidence to which the parties object, the Court overrules the objections.  This is because at the class certification stage, the Court makes no findings of fact, nor any ultimate conclusions on Plaintiffs' claims, and the Court may consider inadmissible evidence."); <u>Keilholtz v. Lennox Hearth Prods.</u>, 268 F.R.D. 330, 337 n. 3 (N.D. Cal. 2010) ("On a motion for class certification . . . the Federal Rules of Evidence take on a substantially reduced significance, as compared to a typical evidentiary hearing or trial"); <u>Parkinson v. Hyundai Motor Am.</u>, 258 F.R.D. 580, 599 (C.D. Cal. 2008) ("[A] motion for class certification ... need not be supported by admissible evidence.").

The Court applies a more rigorous evidentiary standard in regard to expert testimony, even at the class certification stage.  <u>See Wal-Mart</u>, 131 S.Ct. at 2554 (expressing "doubt" that expert testimony is admissible in evaluating a class action without a <u>Daubert</u> analysis); <u>Ellis</u>, 657 F.3d at 982 (in a class certification motion "the district court correctly applied the evidentiary standard set forth in <u>Daubert</u>"); <u>Cholakyan</u>, 281 F.R.D. at 541-42 (applying <u>Daubert</u> analysis to expert testimony in

class certification motion).  Rule 702 of the Federal
Rules of Evidence permits admission of "scientific,
technical or other specialized knowledge" by a qualified
expert if it will "assist the trier of fact to understand
the evidence or to determine a fact in issue."  Fed. R.
Evid. 702.  A trial judge has a "gatekeeping" obligation
with respect to opinion testimony of experts.  Daubert v.
Merrell Dow Pharmaceuticals, 509 U.S. 579, 589 (1993).
"[T]he trial judge must "ensure that any and all
scientific testimony or evidence admitted is not only
relevant, but reliable."  Id.  All forms of expert
testimony, not just scientific testimony, are subject to
the trial court's gatekeeping role.  Kumho Tire Co. v.
Carmichael, 526 U.S. 137, 147-149 (1999); White v. Ford
Motor Co., 312 F.3d 990, 1007 (9th Cir. 2002) (finding
that the trial judge is required to "apply his
gatekeeping role . . . to all forms of expert testimony,
not just scientific testimony.").  Under Daubert, the
court must make "a preliminary assessment of whether the
reasoning or methodology underlying the testimony is
scientifically valid and of whether that reasoning or
methodology properly can be applied to the facts in
issue."  Daubert, 509 U.S. at 543.

     The Court has reviewed all of evidence submitted in
support, and in opposition to, the existence of
commonality for the Class and the Subclasses, and
summarizes the evidence presented below.

### iii.   Declarations

In support of their Motion, Plaintiffs filed
declarations from nearly all named Plaintiffs.[8]  (See Ex.
1 to Crockett Decl. (Doc. No. 32) ("Gray Decl.); Ex. 2 to
Crockett Decl. ("McClellan Decl."); Ex. 3 to Crockett
Decl. ("Miller Decl."); Ex. 4 to Crockett Decl. ("Rosson
Decl."); Ex. 155 to Crockett Decl. ("Wohlfeil Decl.");
Ex. 157 to Crockett Decl. ("Patterson Decl.").)
Defendant filed evidentiary objections to all of the
named Plaintiffs' Declarations.  ("Evid. Objs. to Pls.'
Decl. (Doc. No. 85).)  Plaintiffs responded to all of
Defendant's objections.  (See Doc. Nos. 95, 98, 106, 107,
108, 109.)

Defendant submitted lengthy evidentiary objections to
all named Plaintiffs' declarations.  Most commonly,
Defendant objects that a statement in the Plaintiff's
declaration "misstates the evidence."  These objections
are supported by citations to jail medical records, which
Defendant argues contradict Plaintiffs' statement either
because there is no evidence in the jail medical record
supporting the statement, or, the record appears to
contradict the statement.[9]  All of the Plaintiffs'

---

[8]Although many of the experts in this case reviewed
the medical records of Plaintiff Kujawsky, the Plaintiffs
only filed an excerpt from Kujawsky's deposition.  (See
Ex. 7 to Crockett Decl. ("Kujawsky Dep.").)

[9]See, e.g., Ex. A to Evid. Objs. to Pls.' Decl. Obj.
11 (Gray declares he slept on the floor because he was
(continued...)

declarations are based on personal knowledge and signed under penalty of perjury.  The existence of discrepancies between Plaintiffs' versions and what is documented in the jail records does not render the Plaintiffs' declarations inadmissible, or even unreliable.  This is especially so given the Plaintiffs' contention that the County maintains grossly inadequate inmate records that are incomplete and unreliable.

Defendant raises numerous other evidentiary objections to the declarations such as: (1) unqualified expert opinion and improper opinion;[10] (2) lacks

---

[9](...continued)
afraid of falling out of bed; Defendant objects that misstates the evidence because medical records indicate Gray was approved for a low tier, low bunk cell assignment); Obj. 17 (Gray declares that some of his medications cause episodes of tardive dyskinesia; Defendant objects because the jail medical records do not indicate he suffered from that condition); Ex. F to Evid. Objs. to Pls.' Decl. Obj. 12 (Wolfheil states that he waited a year for his lumps to be biopsied; Defendant argues this misstates the evidence because the records state that Wohlfeil repeatedly refused treatment); Ex. C to Evid. Objs. to Pls.' Decl. Obj. ¶ 14 (Miller declares she submitted numerous blue slips requesting blood work; Defendant objects this assumes facts contrary to evidence because the records only show one blue slip); Ex. B to Evid. Objs. to Pls.' Decl. Obj. 3 (McClellan states he took the medication Trazodone and Visatril; Defendant objects that this assumes facts not in evidence).

[10]See, e.g., Ex. E to Evid. Objs. to Pls.' Decl. ¶ 2 (Rosson states that he wants to make a difference for others by improving medical and mental health care for all prisoners in Riverside County jail; Defendant objects that this is improper opinion by a lay witness because the evidence actually shows that inmates receive adequate medical and mental healthcare); Ex. C to Evid. Objs. to Pls.' Decl. ¶ 6 (Miller states that she had trouble
(continued...)

foundation;[11] (3) vague;[12] and (4) irrelevant.[13] At the class certification stage, the Court makes no findings of fact, or any ultimate conclusions on Plaintiffs' claims. Thus, it is not necessary to resolve every evidentiary issue raised by the Defendant, especially when the majority lack merit and are raised on objectionable grounds. See Cholakyan, 281 F.R.D. at 550; Jimenez v. Domino's Pizza, Inc., 238 F.R.D. 241, 246 (C.D. Cal. 2006) ("a strategy of blunderbuss, repetitive, blanket objections" is "an unhelpful diversion."). Accordingly, to the extent the Court considers any statement in the Declarations to which Defendant objects, the Court overrules the objection.

---

[10](...continued) adjusting and felt depressed when her medications were changed; Defendant objects this is improper expert opinion because she is not qualified to opine on whether other medications would have been more effective).

[11]See, e.g., Ex. E to Evid. Objs. to Pls.' Decl. ¶ 10 (Rosson states that he did not get his night time pills at regular times at Presley; Defendant objects "lacks foundation").

[12]See, e.g., Ex. A to Evid. Objs. to Pls.' Decl. Obj. 16 ("Gray states it "got so bad I had to be put in the hospital"; Defendant objects that "got so bad" is vague).

[13]Ex. F to Evid. Objs. to Pls.' Decl. Obj. 31 (Wolfeil states that dental care is very bad; Defendant objects that is irrelevant because no Plaintiff has standing to raise dental issues); Ex. D to Evid. Objs. to Pls.' Decl. ¶ 17 (relevance objection to Patterson's statement because treatment cited occurred before January 1, 2013); Ex. C to Evid. Objs. to Pls.' Decl. ¶ 5 (relevance objection to Miller's statement because events occurred before 2013).

### a.   Quinton Gray

Plaintiff Gray is a former prisoner of the Riverside Jails.  (Gray Decl. ¶ 2.)  He suffers from multiple chronic medical and mental health conditions, including seizures, high blood pressure, severe arthritis, and visual and auditory hallucinations and depression.  (Id. ¶ 2.)  While he was in the Riverside Jails, Gray only received his medications after he "went to Court."  (Id. ¶ 6.)  He has encountered difficulties getting his medications at the appropriate times: pill call was often cancelled, his medicine was not timed to be taken with meals, and he did not receive medication when he went to court.  (Id. ¶ 14.)  In addition, it was very difficult for Gray to renew his medications; he had to file multiple blue slips and grievance forms before it was renewed, resulting in gaps in administration of the pills.  (Id. ¶¶ 15, 16.)  Gray was placed in a safety cell five times during his imprisonment.[14]  (Id. ¶ 28.) The conditions in the safety cells were filthy, and there were feces on the walls.  (Id. ¶ 29.)  While he was in the cells he did not receive any treatment and was given

---

[14]At the hearing, Defendant argued that Gray's Declaration was not credible because Riverside Jail records indicated that he was only placed in a safety cells once.  The Court does not find this discrepancy sufficient to disregard Gray's Declaration, and it would be inappropriate to make a credibility determination as to the number of times that Gray was placed in a safety cell at the class certification stage.  Moreover, finding that Gray had only been placed in a safety cell once would not defeat commonality as to alleged deficiencies in Defendant's safety cell policies; the issue only goes to credibility of Gray's Declaration.

very little food and water. (Id.)  Gray was once held in
a restraint chair and while restrained he soiled himself
and was provided no food or water. (Id. ¶ 31.)  In order
to avoid the safety cell, Gray would not tell custody
staff if he was feeling very depressed or hearing voices.
(Id. ¶ 32.)  Gray felt uncomfortable speaking about his
mental health problems with nursing staff because the
custody officers were present and could hear what he was
saying.  In addition, he knew the custody staff reviewed
all medical grievances. (Id. ¶¶ 34-35.)  Finally, Gray
suffered repeated seizures while he was in prison.
Despite his seizure condition, he was not assigned to a
lower tier, and thus was forced to take the stairs
despite the danger he might be injured. (Id. ¶ 3.)  He
fell once and hit his teeth on the stairs. (Id.)

### b.  Brandy McClellan

McClellan has been in the custody of the Riverside
Jails since early November 2013. (McClellan Decl. ¶ 1.)
When McClellan arrived at Presley the custody staff asked
her whether she was on "psych meds," if she had been
suicidal in the past, and whether she felt like hurting
herself or others, and she answered "no" to all of these
questions. (Id. ¶ 3.)  After requesting to see a
psychiatrist, she was prescribed Trazodone and Vistaril
to treat her anxiety and mood swings. (Id. ¶ 5.)  After
taking the medication for a short time, she had to be
transported to the emergency room because she began

feeling dizzy, foaming at the mouth, and slurring her speech.  (Id. ¶¶ 8-9.)  When McClellan returned to the hospital, the nurse continued to provide her with the same combination of medication, but she refused to take it.  (Id. ¶ 9.)  After refusing the medication, McClellan filed a blue slip requesting a change in medication, but did not see a psychiatrist again until several weeks later.  (Id. ¶ 9.)  McClellan's medication was changed and she is now supposed to take some of her medicine in the morning and some at night; however, the evening pill call often happens between 3:00 and 4:00 p.m.  (Id. ¶ 10.)

### c.  Julie Miller

Miller has been in the custody of Riverside Jails since May 2011.  (Miller Decl. ¶ 1.)  When Miller first arrived she submitted numerous blue slips requesting blood work and to see the infectious disease clinic, but her requests were ignored until five months later when a judge issued a court order regarding the requested treatment.  (Id. ¶ 14.)  Miller did not receive medication to manage her manic depression and attention-deficit hyperactivity disorder until several months after she entered the jail.  (Id. ¶ 5.)  Her medications have been changed several different times while in jail, and each time she has not been informed of the side effects of the medicine or monitored to see if the medications are working.  (Id. ¶ 6.)  She gained 60 pounds as a side

effect of one medication she was prescribed.[15]   She does
not receive her sleeping medication at the appropriate
time because the medication delivery happens anytime
between 3:00 p.m. and 8:00 p.m.  (Id. ¶ 9.)  When her
prescription runs out, she must file a blue slip to get
it renewed, which sometimes takes a long time and results
in time without any medication.  (Id. ¶ 10.)  When Miller
meets with mental health staff it is in the attorney
visiting non-contact booth, and there is darkened glass
between her and the staff.  (Id. ¶ 12.)  Her meetings
with mental health staff are often overheard by custody
staff.  (Id. ¶ 13.)

### d.   John Rosson III

Rosson has been in the custody of Riverside Jails
since September 2008.  (Rosson Decl. ¶ 1.)  Rosson
suffers from a history of hyperlipidemia, non-insulin
dependent diabetes, hypertension, deep vein thrombosis,
recurrent cellulitis, anxiety, paranoia, depression, and
is bipolar and has a personality disorder.  Rosson was
given multiple medications, including psychotropic

---

[15]At the hearing Defendant argued that jail records
indicate that Miller actually lost weight during her time
in custody, and thus her declaration lacks credibility
and should not be considered.  Plaintiffs argued that
Defendant's conclusion is drawn from an interpretation of
jail records from the wrong period of time.  This is
another example of a factual dispute that is not resolved
appropriately at the class certification stage.
Furthermore, the existence of a factual dispute is not
sufficient to disregard the Miller's Declaration as
lacking credibility.

medications, to treat these conditions, but staff did not
monitor whether medication for one condition would have a
negative effect on a different condition.  (<u>Id.</u> ¶ 6.)   In
addition, he did not get his nighttime pills at a regular
time, and would sometimes receive them as early as 2:00
or 3:00 p.m.  (<u>Id.</u> ¶ 10.)   There were many times when
Rosson's medications were not renewed on time, and
without his medications he suffered anxiety, depression,
paranoia, began to hear voices, and sometimes tried to
harm himself.  (<u>Id.</u> ¶ 6.)   The times Rosson was placed in
the safety cells the cells were dirty, sometimes with wet
blood and feces stains on the floor.  (<u>Id.</u> ¶ 7.)   When
Rosson's condition did not stabilize in the safety cell
he was sent to Riverside County Regional Medical Center
for an evaluation.  (<u>Id.</u>)   Rosson has had difficulties
seeing mental health staff; often waiting for weeks.
(<u>Id.</u> ¶ 11.)   Any meetings with the psychiatrist always
happen at his cell door where other inmates can overhear
the conversation.  (<u>Id.</u> ¶ 12.)

### e.   Michael Wohlfeil

Wohlfeil has been in the custody of Riverside Jails
since January 2011.  (Wohlfeil Decl. ¶ 1.)   He suffers
from hypothyroidism, Hepatitis C, back pain, and "foot
drop."  (<u>Id.</u> ¶ 4.)   Shortly before Wohlfeil entered jail,
his doctor told him he needed to be tested for colon
cancer.  Once in jail, he began developing lumps on his
body, losing weight, and suffering diarrhea attacks five

or six times a day.  (Id. ¶ 5.)  He filed a blue slip to see a doctor for his thyroid medication, but did not get a prescription until the judge in his case issued a court order.  (Id. ¶ 6.)  Wohlfeil did not see a doctor about his other medical conditions for five months, and after he saw the doctor it was over a year before his tumors were biopsied.  (Id. ¶ 8.)  The tumors were not cancerous, and he had surgery to remove the two largest ones.  (Id. ¶ 10.)  He did not receive an MRI for his back pain until October 2013, and after the MRI he was prescribed pain medication.  He saw a gastroenterology specialist for his diarrhea in July 2013, but could not complete the procedures ordered by the specialist because he was not given appropriate pre-procedure instructions. (Id. ¶ 12.)  He has experienced lapses in medication due to delays in renewing his prescriptions.

### f.  Angela Patterson

Patterson was an inmate in the Riverside Jails from July 2009 to March 2013.  (Patterson Decl. ¶ 1.)  In June 2009, doctors placed a temporary filter in her inferior vena cava (IVC) to prevent blood clots in her legs from traveling to her heart.  (Id. ¶ 4.)  The filter was intended to be in place for three months, and during this time Patterson was prescribed blood-thinners.  Patterson was transferred directly from the hospital to Presley, and she released her medical records to the County and informed the County jail staff of her medical conditions

and the IVC filter when she arrived.  (Id. ¶ 7-8.) Surgery to remove the filter was not scheduled until June 2010, and when it did occur, the surgery was unsuccessful because too much scar tissue attached to the IVC.  As a result, the IVC filter is now permanent and Patterson must remain on blood thinning medication for the rest of her life.  In addition, daily doses of medication were often not delivered because of understaffing; pills were delivered at different hours throughout the day; she did not receive medication when she went to court; and she does not receive regular blood testing or monitoring. (Id. ¶¶ 20-22.)  Finally, she never received follow-up treatment for a lump on her scalp.  (Id. ¶ 23.)

### iv. Plaintiffs' Expert Opinions

Plaintiffs filed the expert opinions of Dr. Pablo Stewart and Dr. Thomas Wilcox in support of their Motion. (See Stewart Decl. (Doc. No. 29); Stewart Reply Decl. (Doc. No. 103); Wilcox Decl. (Doc. No. 35-1); Wilcox Reply Decl. (Doc. No. 104).)  Defendant filed voluminous evidentiary objections to both expert opinions.

### a.  Dr. Pablo Stewart

Defendant filed 418 evidentiary objections to Dr. Stewart's 42 page Declaration (Stewart Evid. Objs. (Doc. No. 79)); as well as additional, separate, objections to Dr. Stewart's analysis of the medical care individual Plaintiffs and inmates received.  (See Stewart Inmate

Evid. Objs. (Doc. No. 81).) Defendant also filed an additional 136 evidentiary objections to Dr. Stewart's Reply Declaration. ("Stewart Evid. Objs. 2" (Doc. No. 114).) Plaintiffs filed responses to all of Defendant's objections to the first Declaration.[16] See Pls. Resp. Def.'s Objs. (Doc. Nos. 96, 98, 99, 100, 101, 106, 107, 108, 109.) Defendant's objections to Dr. Stewart's first declaration boil down to the argument that Dr. Stewart is not qualified to render an expert opinion because he relies on sources, namely inmate declarations and grievances, that are not reasonably relied on by experts in the field. (Stewart Evid. Objs. at 3.) Accordingly, Defendant objects that all of his opinions are "ipse dixit conclusions"; his declaration lacks foundation; and all references to medical records are inadmissible hearsay.[17]

---

[16]After submitting approximately 500 evidentiary objections to Dr. Stewart's Declaration, Defendant has the audacity to suggest that, under Federal Rule of Evidence 103, Plaintiffs are not permitted to respond to these objections because there is no procedural basis for Plaintiffs to file any kind of response. (See Def.'s Response at 7-11.) Federal Rule of Evidence 103 governs rulings on evidence, and after reviewing the Rule, the Court finds no basis for Defendant's contention. In a reply, it is perfectly appropriate for the moving party to respond to issues in raised by the non-moving party in opposition. Accordingly, the Court will consider the Plaintiffs' response to Defendant's objections to Dr. Stewart's Declaration, as well as Plaintiffs' response to the hundreds of other evidentiary objections Defendant submitted in opposition.

[17]Defendant also objects on the basis that the medical records that Dr. Stewart reviewed in forming his opinion were not submitted to the Court, and therefore are hearsay. The medical records described in Dr.

(continued...)

54

Dr. Stewart is a psychiatrist and Clinical Professor in the Department of Psychiatry of the University of California, San Francisco.  He has experience managing, monitoring, and reforming correctional mental health systems, and previously served as a Director of Forensic Psychiatric Services for the City and County of San Francisco.  (Stewart Decl. ¶¶ 1-4.)  Dr. Stewart has served as a psychiatric expert to federal courts and other organizations implementing remedial decrees or inspecting facilities regarding the provision of mental heath care in correctional institutions, including the United States Department of Justice, the State of New Mexico, and federal courts in the Eastern District of California.  (Id. ¶ 3.)

Dr. Stewart reviewed healthcare records from current and former Riverside prisoners, Riverside jail health care policies, prisoner declarations and grievances, death reports, autopsy reports, safety cell and restraint chair logs, audits and reports regarding health care

----

[17](...continued)
Stewart's declaration are not offered for the truth of the matter asserted.  Rather, they are illustrations of the reasons for Dr. Stewart's opinion.  As the Ninth Circuit case cited by the Defendant states, "Rule 703 merely permits such hearsay, or other inadmissible evidence, upon which an expert properly relies, to be admitted to explain the basis of the expert's opinion." Paddack v. Dave Christensen, Inc., 745 F.2d 1254, 1261 (9th Cir. 1984).  Accordingly, the Court may consider the medical records in the context of Dr. Stewart's opinion, but they are not being considered, at this stage, for their truth.

delivery in the Riverside jails, and budget and staffing information.  (Id. ¶ 5.)  In addition, Dr. Stewart submitted a reply declaration after reviewing the declarations of the County employees, the declarations of Defendant's physicians, and the County's records of court orders.  (Stewart Reply Decl. ¶ 1.)  Dr. Stewart has not yet visited the Riverside Jails or spoken to staff or prisoners; however, he offers his preliminary opinion that the County fails to deliver adequate and appropriate mental health care to inmates in its jails.  (Id. ¶¶ 7-8.)

Defendant does not contest Dr. Stewart's training or experience.  Rather, Defendant argues that his opinion is inadmissible because it is based on information on which reasonable experts in the field would not rely.  (Stewart Evid. Objs. at 3; Opp'n. at 14-15.)  Specifically, Defendant criticizes Stewart's consideration of inmates' grievances on the basis that the grievances are contradicted by jail records, and many recent grievances were "created by inmates at the direction of counsel for Plaintiffs'."  (Opp'n. at 15.)  In addition, Defendant argues that inmates often lie, so a grievance or a declaration written by an inmate is not reliable.  (Id. at 14-15; see, e.g., Ex. B to Stewart Inmate Evid. Objs. at 7 ("Hearsay . . . No reasonable expert would rely on the declaration of an inmate as a sole source of information.").)  Defendant's criticism is supported by

Defendant's expert Dr. Gislason, who criticizes Dr.
Stewart's consideration of Gray's and Rosson's
declarations because he finds the declarations
untrustworthy.  (Gislason Decl. ¶¶ 28-29, 70.)

    The Court notes that Dr. Gislason does not challenge
the type of information, _i.e._, inmate grievances and
declarations.  Rather, Dr. Gislason challenges the
specific declarations of Rosson and Gray on the basis
that he believes they are not credible.  After reviewing
the testimony and qualifications of Dr. Stewart, and the
declaration of Dr. Gislason, the Court finds that Dr.
Stewart's consideration of the inmates' declarations and
grievances as one of several sources informing his
opinion is a valid methodology and does not render his
opinion inadmissible.

    Aside from Defendant's objections to Dr. Stewart's
methodology, a large number of Defendant's other
"objections" are simply catalogued disagreements with Dr.
Stewart's opinions.  (_See_, _e.g._, Stewart Evid. Obj. 34
(Objection because Defendant's Expert, Dr. Gilbert,
reached a different conclusion regarding adequacy of
County's core patient treatment processes and policies).)
Other common objections include "lack of standing," lack
of foundation, hearsay, reliance on documents dated prior
to 2013, and "misstates the evidence."  (_See generally_
Stewart Evid. Objs.; Stewart Inmate Evid. Objs.)  The

Court has reviewed Defendant's objections that Dr. Stewart's opinion misstates facts in the record and finds that the "misstated facts" are more accurately cast as differences in opinion. Similarly, Defendant's "relevance" objections to Dr. Stewart's opinions are largely disagreements about how to interpret facts in the record. (*See*, *e.g.*, Ex. A to Stewart Inmate Evid. Objs. ("Dr. Stewart unnecessarily and unreasonably criticizes the County for complying with the statute.").) Accordingly, to the extent the Court has relied on any portions of Dr. Stewart's declaration to which Defendant objects, Defendant's objection to Dr. Stewart's testimony is overruled.[18]

---

[18]Defendant's objections to Stewart's Supplemental Declaration are largely similar, with the addition of the following objections: (1) new evidence in reply; (2) improper expert argument under United States v. Cano, 289 F.3d 1354, 1363 (11th Cir. 2002); (3) best evidence rule; and (4) improper summary to prove content (Fed. R. Evid. 1006). (*See* generally Def.'s Objs. to Stewart Reply Decl.) It is not necessary for the Court to address these objections for the purposes of this Motion, especially since many are raised on questionable grounds. Defendant asserts the "new evidence in argument in reply" objections when Dr. Stewart opines on information submitted by the Plaintiffs in Reply, and even when he opines on declarations submitted by the Defendant in Opposition. (*See*, *e.g.*, *id.* at Obj. 111.) Cano addresses a lay witness delivering a "jury argument from the witness stand"; it does not address an expert's opinions. *See* 289 F.3d at 1363. Finally, the best evidence and "improper summary to prove content" objections do not apply to Dr. Stewart's descriptions of the court orders because the references are made only for the purpose of Dr. Stewart explaining the basis for his expert opinion.

In his Declarations, Dr. Stewart evaluated a variety of sources.  In regard to his opinions regarding suicide prevention, Dr. Stewart discusses three inmates who committed suicide while held in Riverside Jails.  The first was a 24-year-old war veteran who suffered posttraumatic stress disorder and bipolar disorder.  When he was booked, he attempted to stab himself with a pen, and was placed in a safety cell.  Once in the safety cell he admitted to previous suicide attempts.  He was removed from the safety cell after Mr. Matloff, a marriage and family therapist, interviewed him through the pill slot in the door and determined he was no longer suicidal. (Stewart Reply Decl. ¶ 7.)  He was then placed by himself in a cell that contained a telephone with a cord. (Stewart Decl. ¶ 81.)  An hour later he was found unconscious with the cord wrapped around his neck, and he later died.  (Id.)  Dr. Stewart opines that Mr. Matloff was unqualified to assess whether the inmate was suicidal, it was inadequate to conduct such an interview through the pill slot, and that the inmate's death could have been prevented with proper placement and monitoring of his condition.  (Id.; Stewart Reply Decl. ¶ 7.)

Another inmate admitted to suicidal thoughts at intake, was placed in a safety cell, and then six hours later was cleared for release from the safety cell.  A day later he committed suicide by fashioning a noose from a bed sheet and hanging himself from a bookshelf.  Dr.

Stewart opines that he was inadequately monitored, and that his suicide was preventable. (Id. ¶ 82.)  A third case of suicide involved an inmate who had entered the Riverside Jails based on allegations of sexual acts with a child.  He committed suicide by hanging himself with a bed sheet attached to the top bunk of the bed in his cell during a 90 minute period in which he was unobserved. Dr. Stewart opines that he should have been monitored for self-harming behavior due to the nature of his alleged crime.  (Id. ¶ 83.)

Dr. Stewart concludes that the County "clearly intends the Riverside jails to operate according to system-wide policies, but that does not mean those policies are adequate." (Stewart Decl. ¶ 12.)  Dr. Stewart identifies the following deficiencies in Defendant's mental health policies and procedures:

- Chronic staffing shortages[19] (¶¶ 28, 29).
- Inadequate intake polices and procedures, including reliance on intake officers with no specialized training to conduct mental health

---

[19]Dr. Stewart acknowledges that the staffing shortages have improved since 2011 and that the County is currently staffed at or near their own desired staffing levels, but questions whether the desired levels of staffing are adequate given his assessment that the amount of mental heath care provided is insufficient. (Stewart Decl. ¶ 29.)

screenings during intake procedures (¶¶ 18, 30-
37; Reply Decl. ¶ 12).[20]

- Failure to provide timely access to mental
  health care (¶¶ 51, 58; Reply Decl. ¶ 13).

- Failure to manage medication administration (¶¶
  66, 75), including prescribing medication (¶¶
  39, 43, 49), monitoring side effects and track
  dangerous drug interactions (¶¶ 39-42), relying
  on inmates to initiate refills of medication,
  including psychotropic medication (¶ 75); and
  failing to distribute medication at proper times
  and in proper doses (¶¶ 39, 73, 76).

- Inadequate suicide prevention policies,
  including delegating decisions regarding removal
  from safety cells to unqualified mental health
  staff and conducting evaluations of inmates in
  safety cells through the pill slot (¶¶ 78, 79,
  Reply Decl. ¶ 7).

- Misuse of safety cells and restraint chairs as
  disciplinary measures (¶ 94).

- Failure to care for inmates in safety cells and
  restraint chairs, including failure to monitor
  restrained inmates, perform regular motion

---

[20]Dr. Stewart notes that the County's written policy
now provides that a registered nurse will do a follow-up
health screening with all inmates, but finds that this
policy is still inadequate because it does not provide a
time frame for the screening except that it has to be
done prior to the inmate being housed in the jail
population and does not require the nurse to have any
mental health training.  (Stewart Decl. ¶ 19, n.3.)

checks, administer mental health treatment, or provide food and water.  In addition, there is a pattern of inmates being removed from safety cells before the internal 48 hour time limit and then being returned to the cell shortly after (¶¶ 88, 90. 92, 93, 95, 97, 98; Reply Decl. ¶ 6 n.1).

- Failure to clean safety cells (¶ 88).
- Failure to ensure appropriate record-keeping (¶ 100).
- Use of custody staff to enter health requests into medical records system which violates inmates's privacy and inhibits mentally ill inmates from seeking help they need (Reply Decl. ¶ 3).

### b.   Dr. Todd Wilcox

Defendant submitted 291 objections to the 37 page Declaration of Dr. Wilcox, and 185 to Dr. Wilcox's Reply Declaration.[21]  (Wilcox Evid. Objs. (Doc. No. 82); Wilcox Reply Evid. Objs.)  Plaintiffs filed a response to all of Defendant's objections to Dr. Wilcox's first Declaration. (Doc. No. 97.)

---

[21]Defendant's objections to Dr. Wilcox's Reply Declaration are largely similar, if not identical, to the objections submitted to Dr. Stewart's Reply Declaration. Accordingly, the Court declines to rule on these objections for the reasons stated above in regard to the objections to Dr. Stewart's Reply Declaration.

Dr. Wilcox is a physician who has worked in jail and prison environments for 18 years.  (Wilcox Decl. ¶ 1.) He is currently the Medical Director of the Salt Lake County Jail System.  (Id.)  He has assisted facilities and organizations around the country, such as the California Department of Corrections and Rehabilitation, the Mississippi Department of Corrections, Pima County Department of Institutional Health, the National Institutes of Corrections, the American Jail Association, and the American Correctional Association, in improving their delivery of care.  (Id.)  Dr. Wilcox's opinion is based on his "extensive experience studying and researching correctional systems," his experience in the field, his experience as an expert and monitor in prison and jail condition cases, and a review of depositions of county employees, the declarations of named Plaintiffs, and inmates' medical files and records.  (Decl. ¶ 3.)  In addition, Dr. Wilcox submitted a reply declaration after reviewing the declarations of the County employees, the declarations of Defendant's physicians, and documents related to the County's court order tracking system.  Dr. Wilcox has not yet visited the Riverside Jails or spoken to staff or prisoners.  (Id. ¶ 4.)

Defendant does not challenge Dr. Wilcox's credentials, instead it objects to Dr. Wilcox's expert opinion on the same grounds it objects to Dr. Stewart's, i.e., Dr. Wilcox's reliance on inmates' declarations and

grievances.  For the reasons stated above in relation to Dr. Stewart's declaration, the Court finds that Dr. Wilcox has employed reliable methodologies and is qualified to give an expert opinion on the medical and mental health care provided by Defendant in the Riverside Jails.  Defendant also objects to Dr. Wilcox's opinions on the basis they are improper expert testimony, lack foundation because the practices did not result in harm, consist of "ipse dixit conclusions," improperly rely on pre-2013 jail conditions, and are substantively incorrect.  Again, the Court need not resolve all of these evidentiary objections for the purposes of class certification, especially since many of the objections are repetitive and based on questionable grounds.  See Cholakyan, 281 F.R.D. at 550.

Dr. Wilcox opines that there is "widespread, pervasive, and systemic neglect throughout the critical systems of the healthcare delivery model" and that the "severe deficiencies" within the jail system are best corrected through a common remedy.  (Wilcox Decl. ¶¶ 5, 6.)  In his Declarations, Dr. Wilcox identifies the following deficiencies in Defendant's policies and procedures:

- A system-wide practice of not following or implementing the policies and procedures

governing the provision of health care to
prisoners (¶ 12).

- Grossly inadequate medical records system and
note taking that deviates from written policies
(¶¶ 13, 95, 96, 119).

- Reliance on court orders to spur provision of
medical care (¶¶ 14, 38, 39; Reply Decl. ¶¶ 6-
15).

- Inadequate staffing and reliance on temporary
staff (¶¶ 22, 27-29, 96, 114; Reply Decl. ¶ 19).

- Ineffective intake screening performed by
untrained custody staff who fail to identify
health concerns and accurately record medical
issues on booking forms (¶¶ 31, 32, 115).

- Failure to provide timely care (¶¶ 39, 49, 51,
55, 59).

- Lack of adequate policies and procedures to
provide for specialty medical consultations and
procedures (¶¶ 63, 67).

- Deficient procedures in the distribution and
refill of medications, including delivery of
evening pills in the early afternoon (¶¶ 79, 81,
94, 115).

- Defendant's medical and mental health grievance
policy inappropriately involves custody staff

and violates inmates' privacy (¶ 73, Reply Decl.
¶ 18).[22]

- Inadequate policies to ensure quality assurance,
  including insufficient use of outside mechanism
  to ensure quality (¶¶ 102-105, 120).

### v. Court Orders

In their Reply, Plaintiffs organized and submitted
the County's records of court orders issued from
Riverside County Superior Courts to Riverside County
jails from 2011-2014 ("court orders")[23] into five
exhibits. (See Exs. A-E to the Decl. of Megan Lynch
("Lynch Decl.") (Doc. No. 92.) Ms. Lynch, with the
assistance of John Bonacorsi, organized the court orders
by year and then catalogued the court orders within that
year based on several different categories. Exhibit A
organizes records of all of the court orders issued in

---

[22]Dr. Wilcox acknowledges that Defendant changed its
policy so that requests for healthcare are provided
directly to nursing staff instead of being screened by
custodial staff, but opines that the new policy continues
to violate inmates' privacy, and thus create a risk of
harm, because the deputy is responsible for inputting the
request into the system and is aware of contents of the
request. As a result, prisoners remain in the "awkward
position of relaying sensitive information to those who
monitor their behavior on a daily basis." (Wilcox Reply
Decl. ¶ 18.)

[23]The documents submitted are the records of the
court orders and not copies of each individual court
order issued. For ease of reference, the Court refers to
the individual entries as "court orders." Defendant
provided Plaintiffs with the records of the court orders
in discovery.

2011 into eight "sheets"[24]: (1) Court Orders 2011; (2)
JIMS Court Order Key; (3) Court Order History 2011[25]; (4)
Medical; (5) Mental Health[26]; (6) Unique Medical and
Mental Health[27]; (7) Urgent[28]; and (8) Annual Statistics.

_____

[24]"Sheet" is a term of art used by Excel, the brand of software Defendant used to create records of the court orders turned over to Plaintiffs.  Plaintiffs also used Excel in producing the Exhibits submitted to the Court. (Lynch Decl. ¶ 4.)

[25]Sheet one includes: the prisoner's booking number, the issue date of the court order, the category assigned to the order by the County, and other identifying information.  (Lynch Decl. ¶ 6.)  This sheet is a modified version of Joint Trial Exhibit 4377, which was produced by Defendant.  Sheet two contains a key that explains the codes used in the other sheets.  (Lynch Decl. ¶ 6.)  This sheet is a modified version of Joint Trial Exhibit 4377, which was produced by Defendant. Sheet three "appears" to contain notes regarding the County's responses to the court orders.  (Id.)  This sheet is a modified version of Joint Trial Exhibit 4377, which was produced by Defendant.

[26]Sheet four lists all the court orders from 2011 that pertain to medical treatment.  (Lynch Decl. ¶¶ 16-21.)  Lynch created this sheet by using the County's code, as provided in sheet two, to identify all the orders that had been marked by the County as relating to medical needs.  Sheet five lists all the court orders from 2011 that pertain to mental health treatment. (Lynch Decl. ¶¶ 16-21.)  Lynch created this sheet by using the County's code to identify all the orders that had been marked as the County as relating to mental health.  Lynch then manually reviewed these records and removed entries "clearly not related to mental health treatment in jails."  (Id. ¶ 23.)

[27]Sheet six lists the booking number of each prisoner who received a medical or mental health care court order during 2011.  (Lynch Decl. ¶¶ 24-28.)  This sheet was created by Bonacorsi at Lynch's direction.

[28]Sheet seven lists all "urgent" medical and mental health orders for 2011.  This list was complied by conducting a search of all court orders using the terms: A.S.A.P, before, day, emergency, forthwith, hours, hrs., immediately, today, tomorrow, urgent, w/in, week, and within.  (Lynch Decl. ¶¶ 29-30.)

The court orders from 2012 (Ex. B), 2013 (Ex. C), and 2014 (Ex D), were organized in the same manner.  Exhibit E compiles all the information from Exhibits A-D and provides a statistical analysis of the court orders issued in 2011-2014.

   Defendant objects to Lynch's analysis on the basis that neither Lynch or Bonacorsi are experts, they are not qualified to determine whether a court order pertains to medical or mental health care based on "allegedly disputed system-wide policies"; they are not qualified to assess whether the county's codes relate to medical or mental health care allegedly based on one of the disputed system-wide policies; they are not qualified to determine whether a court order is irrelevant to medical or mental health treatment in jails; and they are not qualified to determine whether a particular court order is "urgent." (Def.'s Objs. to Pls.'s Ex. A-E.)  In addition, Defendant objects that the records of the court orders do not reflect court orders for medical and mental health care that was allegedly denied as a result of one of Defendant's policies.  (Id.)

   Federal Rule of Evidence 1006 provides that "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary or calculation."  Fed. R. Evid. 1006.  When a chart or

summary of evidence "does not contain complicated calculations requiring the need of an expert for accuracy, no special expertise is required in presenting the chart," and thus a lay witness may establish the foundation for admission of the summary evidence under Rule 1006.  <u>Terry v. City of San Diego</u>, 2011 WL 1897491, *7 (S.D. Cal. May 18, 2011) (quoting <u>U.S. v. Jennings</u>, 724 F.2d 436, 442 (5th Cir. 1984)).  The process Lynch and Bonacorsi used is explained in detail in her declaration.  After reviewing the Lynch Declaration and the exhibits, the Court is satisfied that her methodology of categorizing the court orders is sufficiently reliable and that the level of data analysis performed does require specialized expertise or training.[29]  Furthermore, the Court notes that the court orders were organized based on Defendant's coding system, and recognizes that the court orders do not represent medical or mental health that was denied based on one of the Defendant's

---

[29]The methods used consist of sorting the court orders using the County's coding labels, applying the "remove duplicate" function of Excel, and using the "find and replace" and "keyword search" function of Excel.  To the extent some discretion was exercised, it was in manually deleting orders not related to mental or medical health care treatment at the jails, such as orders related to releases of medical information, competency evaluations and attorney access to records.  Defendant argues it is impossible to make such decisions without the original court orders and that Lynch is not qualified to do so.  After reviewing the records the Court finds they provide sufficient detail such that Ms. Lynch could exclude non-relevant records.  Moreover, Defendant has not identified any specific court orders that is disputes being classified as "medical health care" or "mental health care."

alleged health care policies.  Accordingly, the Court overrules these objections and will consider the Exhibits for the purposes of this Motion.

According to Lynch's analysis, a total of 9,316 court orders relating to medical or mental health treatment were issued between January 1, 2011 and March 10, 2014. During this time period, a little over 4,000 different prisoners received court orders related to healthcare. (See Ex. E to Lynch Decl. at 766).[30]  1,737 of the court orders during this period related to what Plaintiffs classified as "urgent" medical needs.  (See Ex. E to Lynch Decl. at p. 766.)  For example, an order issued on November 6, 2013, states "Deft to be seen immediately following court by jail mental health staff." (Ex. E to Lynch Decl. at 521; see, e.g., December 11, 2013 Court Order, "Crt Ord. Deft. be seen by jail physician regard med. cond. and meds within 24H" (Id. at 389); May 2, 2012 Order, "Def to be seen by jail medical staff ASAP" (Id. at 232); August 3, 2011 Order, "Inmate to be seen by medical staff within 48 hours." (Id. at 114)).

Some of the court orders appear to reflect a poor record of compliance by the Defendant with previous court

---

[30]In 2011, 2,892 court orders issued; in 2012, 2,998 court orders issued; in 2013, 2,870 court orders issued, and as of May 14, 2014, 556 court orders issued.  (See Ex. A to Lynch Decl. at 504, Ex. B at 489, Ex. C at 416, Ex. D at 238.)

orders. (Wilcox Reply Decl. ¶ 11; Stewart Reply Decl. ¶
18.)  In addition, some of the orders relate to what
appear to be serious medical conditions, such as brain
tumors and heart conditions.  (Wilcox Reply Decl. ¶ 9;
Stewart Reply Decl. ¶ 15.)  After reviewing the court
orders, Dr. Stewart opined that in a well-functioning
health care delivery system, there would be no need for
inmates to raise health care concerns with the judges
presiding in their criminal cases and no need for the
judge to take action. (Stewart Reply Decl. ¶ 14.)  Dr.
Stewart was "astounded" by this practice, and opined that
the "sheer scope" of the orders demanded accounting.
(Stewart Reply Decl. ¶¶ 14, 17.)  Similarly, Dr. Wilcox
concluded that in his experience, he has "never seen
courts involved in the minutia of the day-to-day health
care of prisoners as I see here." (Wilcox Reply Decl. ¶
15.)  Both Dr. Wilcox and Dr. Stewart agree that although
the court orders are not proof that the medical care
ordered was necessarily needed or had previously been
denied, the "extraordinary numbers and nature of the
court orders" support the existence of a systemic policy
of failing to provide timely medical care.  (Wilcox Reply
Decl. ¶ 7; Stewart Reply Decl. ¶ 13.)  Indeed, Dr. Wilcox
concludes that "the most egregious constraint on timely
access to healthcare is that routine healthcare is
accessed via court orders mandating that healthcare
providers see and treat patients." (Wilcox Decl. ¶ 61.)

In opposition, Defendant submitted the Declaration of
Jerry Gutierrez, the Correctional Chief Deputy.  (<u>See</u> Ex.
D to Decl. of Cnty Personnel (Doc. No. 86). )  Mr.
Gutierrez explains that the court orders are completely
ex parte procedures, and the court "never" inquires as to
whether the inmate has sought medical care through the
regular procedures before requesting a court order.[31]
(<u>Id.</u> ¶ 22.)  On many occasions, the inmate did not make a
request through regular procedures, the inmate did not
file a grievance before requesting the court order, the
medical or mental health care was already scheduled, or
the medical or mental health care was not medically
appropriate.  (<u>Id.</u>)  Mr. Gutierrez met with some of the
criminal judges on the Superior Court to request they
inquire as to whether the inmate has sought medical care
through the regular procedures before issuing a court
order.  (<u>Id.</u> ¶ 24.)

### vi. Grand Jury Reports

In California, the Grand Jury has the responsibility
to review the operations of all local governments within
that jury's county.  (Ex. 150 to Crockett Decl., ("The
California Grand Jury System") at 2104.)  Under

---

[31]As Correctional Chief Deputy, Mr. Gutierrez is
responsible for "corrections support" and ensuring
compliance with policies and procedures in the Riverside
Jails.  (Gutierrez Decl. ¶¶ 2, 4.)  Mr. Gutierrez offers
no explanation as to how he has knowledge of what occurs
during Superior Court proceedings, or the practices of
the Superior Court judges when issuing orders regarding
medical and mental health care.

California Penal Code section 919(b), the Grand Jury is required to inquire into the condition and management of public prisons within the County. (Id. at 2118; Cal. Penal Code § 919(b).) In 2010-2011, the Grand Jury issues two reports concerning conditions in Riverside Jails: 2010-2011 Mental Health Detention Services Grand Jury Report (Ex. 15 to Crockett Decl., ("2011 Mental Health Grand Jury Report")) and the 2010-2011 Riverside County Detention Health Care Administration Grand Jury Report (Ex. 149 to Crockett Decl., ("2011 Medical Grand Jury Report")).

The 2011 Mental Health Grand Jury Report identified several deficiencies in the provision of mental health care in Riverside Jails and made numerous recommendations to the County, including: (1) mental health personnel should be assigned to each jail and should screen inmates during the intake proceeding for possible mental illness using a validated mental health screening tool; (2) a mental health evaluation should be conducted for any inmate who screens positively for possible mental illness within 24 hours of booking; and a qualified medical professional should complete and document a mental health evaluation within two weeks of booking; (3) medications should be distributed and administered properly with trained health care personnel monitoring for side effects; (4) mental health staffing should be available on a 24-hour basis; (5) a confidential self-referral

system for inmates should be developed; and (6) a computer system should be implemented to allow prompt, up-to-date access to inmates' medical and mental health records.  (See 2011 Mental Health Grand Jury Report at 307-10.)

Similarly, the 2011 Medical Grand Jury Report identified serious deficiencies in the staffing and provision of medical care in Riverside Jails, including violations of California law in regard to the provision of medical care and the medical assessment of inmates held in physical restraint chairs and safety rooms.[32] (2011 Medical Grand Jury Report at 2093-98.)

In response to the 2011 Grand Jury reports, the Sheriff's Department acknowledged that "budget and medical personnel staffing cuts had . . . unacceptably impacted the delivery of medical services," and there was a "need to remedy these issues."  (Ex. 125 to Crockett Decl. ("Sheriff's Response to 2011 Medical Grand Jury Report") at 1799, 1802; Ex. 16 to Crockett Decl. ("Sheriff's Response to 2011 Mental Health Grand Jury Report") at 316.)  The Sheriff's Department requested the

---

[32]A key Grand Jury recommendation was that all health care administration authority be transferred back to the Riverside County Sheriff.  It appears that the provision of health care has been affected by a division between the "legal authority" of the Sheriff's Department and the "practical authority" of the Riverside County Regional Medical Center ("RCRMC").  (Sheriff's Response to 2011 Medical Grand Jury Report at 1802.)

Corrections Standards Authority ("CSA") assess whether the Riverside Jails were compliant with California law, and also contracted with Inmate Medical Quality ("IMQ") to conduct an expert analysis on staffing at the Riverside Jails.  (Sheriff's Response to 2011 Mental Health Grand Jury Report at 316.)  The CSA Report found that the provision of medical and mental health care in the Riverside Jails did not comply with the intent of California law[33] in several areas, including medication delivery, access to medical and mental health care staff, use of safety cells and restraint chairs, and the inmate grievance processes.  (Ex. 18 to Crockett Decl. ("2011 CSA Report").)  The IMQ Report found medical and mental health staffing at the Riverside Jails was inadequate, and that as a result of inadequate staffing there were deficiencies in many areas, including the evaluation of inmates at booking, distribution of medications, and medical evaluations of inmates held in safety cells and restraint chairs.  (Ex. 14 to Crockett Decl. ("2011 IMQ Report").)

Finally, the Sheriff's Department, Detention Mental Health Services, and Detention Health Services entered into a Memorandum of Understanding to provide adequate services and personnel for Riverside Jail inmates in need

---

[33]California law does not apply to this action.  The Court only recites the facts related to the Grand Jury reports and subsequent state actions as evidence of commonality.

of mental and medical health care in 2011.  (Ex. 13 to Crockett Decl. ("MOU").)  The MOU includes an agreement as to minimum staffing patterns and levels, as well as the need to implement policies in compliance with California law.  It also provides specific policies governing various aspects of the delivery of medical and mental health care, including intake, that are intended to bring in the policies in compliance with California law.

In 2012, the Grand Jury issued a second report concerning mental health care in the Riverside Jails. (Ex. 148 to Crockett Decl., ("2012 Mental Health Grand Jury Report")).  The Report noted that despite the MOU, staffing levels actually had decreased and that there were a large number of vacancies in mental health staffing.  In response, Mental Health Detention Services contended that, due to the use of per diem clinical therapists and overtime for mental health employees, its current level of staffing was at 91 percent.  (Ex. 17 to Crockett Decl., ("Response to 2012 Mental Health Grand Jury Report").)

### vii.    Defendant's Evidence in Opposition to Commonality

Defendant submitted extensive evidence in Opposition, including the declarations of 14 County employees,[34] four physicians[35], and Bradley Gilbert, the Chief Executive Officer for the Inland Empire Health Plan.  Defendant offers this evidence in support of its two main arguments against commonality.  First, Defendant argues that although there may have been issues in regard to the policies and provision of medical and mental health care in the past, any issues have been resolved.  (See Opp'n. at 40 ("Plaintiffs' motion is based largely on a

---

[34]Arnisa Adewumni, Institutional Supervising Nurse at Smith and Twin Pines Ranch Juvenile Center ("Adewumni Decl."); Allison Apgar, Mental Health Clinical Therapist II ("Apgar Decl."); Lt. Edward Delgado, Lieutenant at Presley ("Delgado Decl."); Jerry Gutierrez, Correctional Chief Deputy ("Gutierrez Decl.); Deborah Johnson, Deputy Director of Forensics at the Riverside County Department of Mental Health ("Johnson Decl."); Victor Laus, Chief of Medical Speciality, Detention Health Services ("Laus Decl."); Daniel Matloff, Clinical Therapist II at Banning ("Matloff Decl."); Espergene Manalo, Nurse ("Manalo Decl."); Gregory Prouty, Pharmacy Director of Riverside County Health System and Riverside County Regional Medical Center ("Prouty Decl."); Rhonda Reeves, Supervising Institutional Nurse at Southwest Detention Center ("Reeves Decl."); Leticia Stillwell, Institutional Supervising Nurse at Presley ("Stillwell Decl."); Carl Strong, Mental Health Services Supervisor at Southwest Detention Center ("Strong Decl."); William Wilson, Assistant Hospital Administrator and Director of Detention Health Services ("Wilson Decl."); Joseph McNamara, Correctional Captain ("McNamara Decl.") (See Doc. No. 86.)

[35]Dr. Lee Gislason, Psychiatrist ("Gislason Decl."); Dr. William Klein, Internist ("Klein Decl."); Dr. Kendall Wagner, Orthopedic Surgeon ("Wagner Decl."); James Lineback, Internist with experience providing medical care to inmates in the Los Angeles County jail system ("Lineback Decl.") (See Doc. No. 88.)

purported medical and mental health care system which does not currently exist.").)  Defendant disputes any evidence relating to conditions before January 1, 2013, and argues that in light of the current policies and practices at the Riverside Jails, any deficiencies in care are simply isolated deviations and do not suffice to support a finding of commonality.  Second, Defendant offers extensive evidence in support of its contention that the specific medical and mental health care received by the named Plaintiffs, as well as other individual inmates described in Plaintiffs' evidence, was constitutionally adequate.  In addition, Defendant offers evidence that its policies are constitutionally adequate because they are equal to the "community standards" for Medi-Cal recipients under the Inland Empire Health Plan.

### a.   Current Conditions

As the Court detailed above in regard to the Grand Jury reports, in 2009 and 2010, the County made significant cuts to the budgets for medical and mental health care in the Riverside Jails.  As a result of these cuts, as well as an influx of inmates from the California state prison system, the Riverside Jails were confronted with a decrease in medical and mental health staffing and an increase in medical and mental health needs.  Defendant contends that any deficiencies in the provision of health care caused by those unique circumstances have been remedied, and thus Plaintiffs' complaints are either

moot, or reflect isolated deviations from the County's policies. Defendant identifies the policies it contends currently apply, including:

- Staffing: Increases in levels of staffing and coverage of vacancies in permanent positions through per diem employees, county temporary employees, overtime work, and registry employees. (Wilson Decl. ¶¶ 7,8; Johnson Decl. ¶ 6.)

- Intake: Some inmates are screened by nurses during the intake process. (Adewunmi Decl. ¶ 4.) Those who are not screened by nurses are interviewed by trained correctional officers regarding the inmate's medical and mental health history and needs. (Reeves Decl. ¶ 8.) If an inmate identifies a need for medical or mental health services, or the correctional officer observes such a need, the inmate is referred for treatment. (Delgado Decl. ¶¶ 8-10; Adewunmi Decl. ¶ 4.) Before an inmate is placed in the general population a "classification deputy" interviews the inmate to determine housing, and can also refer the inmate for medical or mental health treatment. (Adewunmi Decl. ¶ 4; Reeves Decl. ¶ 8, Delgado Decl. ¶ 13; Strong Decl. ¶ 5; McNamara Decl. ¶ 4.)

- Access to Medical Care: Recently, Defendant changed its policy regarding medical and mental health request slips, which are also known as "blue slips." Inmates now hand the blue slips directly to a nurse or other medical staff and the requests are no longer handled by the correctional officers. All requests for medical care are entered into the Jail Information Management System ("JIMS") by a deputy. (Delgado Decl. ¶ 15; Reeves Decl. ¶¶ 8, 10.) The response to the request is tracked, and the goal is to triage all requests in 24 hours and provide a response within five days. (Reeves Decl. ¶¶ 11-12.) JIMS automatically prints out a list of any inmate not seen within five days and the sergeant assigned to that area is responsible for ensuring that inmate is seen. (Delgado Decl. ¶ 17.)

- Medication: The Pharmacy Director for the Riverside County Medical Center pharmacy uses a program, CIPS, to address potential drug interactions. (Prouty Decl. ¶ 4.) A nurse provides twice daily pill call. Inmates may refuse their medications. (Reeves Decl. ¶ 27.) Medications which require more frequent administration may either be kept on the inmate's person or administered by a nurse. (Reeves Decl. ¶ 29.)

- Prescription Renewals: if the medication is non-essential, the inmate must request a renewal. If the medication is for an essential medical issue, the medication will be renewed by the medical staff without any action by the inmate. (Reeves Decl. ¶ 25.)

- Inmates have a right to obtain outside care at their own expense. (Gutierrez Decl. ¶ 16.)

- Court Orders: Riverside Jails do not rely on court orders to provide medical or mental health care. Inmates often request a court order before seeking the care through a request or grievance, and the judges issue the orders without inquiring as to whether the inmate has sought other means of getting the care needed. (Gutierrez Decl. ¶ 22.)

- Safety Cells: It is the County's policy to clean the safety cells after every use. (Delgado Decl. ¶ 23.) A Detention Health Services nurse assesses the inmate shortly after the inmate is placed in the safety cell.[36] (Adewunmi Decl. ¶ 25; Reeves Decl. ¶ 30.) Medical staff check on the inmate at least every eight hours after the initial assessment, and the policy requires a

---

[36]It is unclear whether this policy only applies to suicidal inmates. Strong states that if an inmate is placed in a safety cell for reasons other than potential suicide, a psychiatrist will see the inmate within 24 hours. (Strong Decl. ¶ 17.)

81

Mental Health employee see the inmate at least every 24 hours. (Adewunmi Decl. ¶ 25; Reeves Decl. ¶ 30; Strong ¶ 15.) All the safety cells are monitored by camera, and there is a visual check of any inmate in the safety cell every 30 minutes. (Delgado Decl. ¶ 19.) An inmate may not be kept in a safety cell for more than 48 hours. (Delgado Decl. ¶ 19.) If an inmate was placed in a safety cell because he is potentially suicidal or self-harming, he may only be released after authorization by a Mental Health employee. (Delgado Decl. ¶ 21.) If the inmate is can not be released after 48 hours he is transferred to an outside mental health facility. (Delgado Decl. ¶ 22.)

- Restraint Chairs: Inmates in restraint chairs are evaluated by Detention Health Services staff directly after placement and then at least every four hours. (Reeves Decl. ¶ 31.) Inmates may not be kept in a restraint chair for more than six hours. (Delgado Decl. ¶ 24.) A sergeant reviews whether continued placement is necessary every two hours. (_Id._) Restraint chairs are monitored by camera and the policy requires visual checks every two hours and allowances for range of motion every thirty minutes. Before the increase in staffing, medical and mental health staff did not have time to accurately

record all of the contacts with inmates in safety cells, and presumably in restraint chairs.  (See Delgado Decl. ¶ 22.)

### b.  Adequate Medical Care

Defendant argues the evidence it submitted demonstrates that the care the named Plaintiffs, as well as various other inmates, received, was adequate.[37]  For example, Dr. Wagner reviewed the medical records of each named Plaintiff and found that the care provided meets or exceeds the applicable standard of care.  He also provides a detailed analysis regarding Plaintiff Kujawsky.  (See generally Wagner Decl.)  Dr. Gislason disagrees with Plaintiffs' expert, Dr. Stewart, regarding whether the named Plaintiffs, as well as many of the unnamed inmates described in Dr. Stewart's report, received adequate care, and whether the policies are adequate.  (Gislason Decl. ¶ 7 ("In sum . . . I disagree with Dr. Stewart's assertions regarding mental health care in the Riverside County Jails.")).  Similarly, Dr. Lineback opines that it was within the standard of care

---

[37]In their Reply, Plaintiffs do not challenge the qualifications of any of Defendant's experts.  The Court has reviewed the qualifications of these doctors and notes that only Dr. Lineback has any experience working in prisons.  The Court has some doubts as to the ability of these experts to opine on the adequacy of medical and mental health policies and procedures in the prison context.  At this stage, the Court has not relied on these experts' opinions regarding the adequacy of the policies and thus it is not necessary to perform a full Daubert analysis as to their qualifications.

to leave Patterson's IVC filter in place; and that Gray did not actually suffer a seizure, and instead suffered an episode of syncope (passing out) as a side effect of his medication.  (Lineback Decl. ¶¶ 9-11; 16-18.) Similarly, Dr. Klein disagrees with Plaintiffs' expert, Dr. Wilcox, and opines, based on review of the medical records of individual Plaintiffs and inmates, that the combinations of drugs prescribed were appropriate.  (See, e.g., Klein Decl. ¶¶ 8, 9.)

In regard to the adequacy of the Defendant's policies, Defendant submits the Declaration of Dr. Gilbert, who is the CEO of the Inland Empire Health Plan ("IEHP").  ("Gilbert Decl.") (Doc. No. 56.)  IEHP is an agency of Riverside and San Bernardino Counties and serves as the Local Initiative Medi-Cal Managed Care Plan for both counties.  Dr. Gilbert reviewed the allegations in Plaintiffs' complaint and compared the alleged policies to the "community standard for Medi-Cal members," on the basis that the majority of jail inmates were eligible for Medi-Cal before incarceration and will continue to be eligible after they are released.  (Id. ¶ 69.)  For example, Dr. Gilbert concludes that the ability for an inmate to choose to pay for a private provider is comparable to an IEHP member choosing to go to an out-of-network doctor.  (Id. ¶ 34.)  Dr. Gilbert even opines that the standard of care in Riverside Jails is actually higher than the community standard in certain respects;

e.g., inmates receive a twice daily reminder to take their medication, but members in the community do not receive an equivalent "summons."  (Id. ¶ 51.)  Dr. Gilbert concludes that the medical and mental health care standards in the Riverside Jails are "comparable" to the standard of care members in IEHP should receive.  (Id. ¶ 71.)

### viii.    Commonality Analysis

Plaintiffs contend, based on the above evidence, that the question common to all members in the Class and the Subclasses is whether Defendant's systemic practices constitute deliberate indifference to the medical and mental health care needs of inmates and place inmates a substantial risk of serious harm in violation of the Fourteenth and Eighth Amendments.  Furthermore, they contend that the common question may generate common answers that are capable of resolving the litigation "in one stroke."  Reply at 3 (quoting Wal-Mart, 131 S. Ct. at 2551).

Defendant argues the commonality requirement for the Class and Subclasses has not been satisfied here because: (1) Plaintiffs have not met their burden of demonstrating "significant proof" of the existence of any systemic policies; (2) Defendant's evidence refutes all of Plaintiffs' contentions and accurately portrays current conditions and policies regarding medical and mental

health care; (3) any claim that an inmate receives inadequate medical or mental health care requires an individual determination and may not be resolved on a class-wide basis; and (4) even as alleged by Plaintiffs, the policies are comparable to community standards and all named Plaintiffs and inmates referenced in the papers received adequate care.  As discussed below, these arguments are unavailing.

Defendant's contention that an individual inquiry is required to determine whether each member of the proposed class receives inadequate medical or mental health, and thus suffered an injury, is misplaced.  As in Parsons II, Plaintiffs' injury is that Defendant's alleged policies expose each inmate to a "substantial risk of serious harm."  754 F.3d at 678 ("What all members of the putative class and subclass have in common is their alleged exposure, as a result of specified statewide ADC policies and practices that govern the overall conditions of health care services and confinement, to a substantial risk of serious future harm to which the defendants are allegedly deliberately indifferent.").  Thus, an individual determination is not required because it is the exposure to the policy that constitutes the harm; courts have routinely held that "many inmates can simultaneously be endangered by a single policy."  Id. (collecting cases).

Plaintiffs challenge numerous policies and practices of the Defendant. Some of these policies are written, official policies of the Riverside Jails; for these it is clear that commonality exists.[38] See Parsons II, 754 F.3d at 664. In regard to Plaintiff's claims that Defendant has policies and practices that deviate from the written policies,[39] the key question before the Court is whether there is "sufficient evidence of systemic issues in the provision" of medical and mental health care or whether "Plaintiffs' allegations are simply many examples of isolated instances of deliberate indifference." Parsons I, 289 F.R.D. at 521. A policy or practice may be inferred from a widespread practice or evidence of repeated constitutional violations for which the errant officials are not reprimanded. Menotti v. City of Seattle, 409 F.3d 1113, 1147 (9th Cir. 2005) (citing

---

[38]These include: (1) the medical and mental health staffing levels and reliance on temporary and per diem employees to fill vacancies; (2) using custody staff to conduct intake interviews and screen for medical and mental health issues; (3) requiring inmates to request renewals of non-essential prescriptions; (4) using custody staff to enter data regarding medical and mental health blue slips and grievances into JIMS; (5) allowing mental health staff qualified as marriage and family therapists to make decisions regarding release from safety cells for potentially suicidal inmates; and (6) performing mental health treatment and counseling for inmates in safety cells through the pill slot.

[39]Such as (1) failure to provide timely care and instead relying on court orders; (2) failure to adhere to medical records policies and note taking requirements; (3) failure to monitor inmates for dangerous drug interactions and refill medications in a timely manner; and (4) failure to monitor inmates in safety cells and restraint chairs.

<u>Nadell v. Las Vegas Metro. Police Dep't.</u>, 268 F.3d 924, 929 (9th Cir. 2001)).  When examining liability for an improper custom or practice, courts should look at whether the practice at issue reflects "isolated or sporadic incidents" or is one of sufficient duration, frequency, and consistency such that the alleged conduct may be the "traditional method of carrying out policy." <u>Trevino v. Gates</u>, 99 F.3d 911, 918 (9th Cir. 1996); <u>see Parsons I</u>, 289 F.R.D. at 521.

Plaintiffs have provided "significant proof," at the class certification stage, of the existence of systemic policies governing the provision of medical and mental health care that deviate from the written policies. Unlike cases cited by Defendant, Plaintiffs have identified specific systemic policies relating to (1) the timeliness of treatment; (2) administration of medication; (3) maintenance of medical and mental health records; and (4) the use of safety cells and restraint chairs and monitoring of inmates held in restraint, that differ from the County's written policies.  <u>See Stevens v. Harper</u>, 213 F.R.D. 358, 382 (E.D. Cal. 2002) (alleging that the provision of mental health care is inadequate without identifying specific policies); <u>Mathis v. GEO Grp., Inc.</u>, 2012 WL 600865, at *6 (E.D.N.C. Feb. 23, 2012) (no commonality where plaintiff failed to specify any specific policy and instead alleged a "constellation of unspecified "organizations, systems, policies,

procedures, practices, acts, and omissions."). Plaintiffs have supported the existence of the alleged inadequacies in the written and unwritten systemic policies with declarations illustrating the impact of these deficiencies on individual inmates, including named Plaintiffs.[40]  This is not the extent of Plaintiffs' proof, however.  Unlike the cases cited by the Defendant, Plaintiffs have offered more than a collection of isolated instances.  See e.g. Lewis v. Casey, 518 U.S. 343, 359 (1996) (factual findings consisting of only two instances of lack of access to law library was a "patently inadequate basis for a conclusion of systemwide violation and imposition of systemwide relief."); Amador v. Baca, 2014 WL 1679013, at *5-8 (C.D. Cal. Mar. 12, 2014) (156 declarations, without any additional evidence, was not sufficient evidence to demonstrate a common practice or policy that deviated from the written policy).

---

[40]Defendant argues that Plaintiffs must demonstrate systemic deficiencies by providing statistical evidence of the percentage of prisoners who suffered harm as a result of an unwritten policy, i.e., the number of documented instances where prisoners were not provided their medications in proportion to the total number of prisoners in the jail.  Applying this methodology, Defendant argues Plaintiffs rely on anecdotal evidence from 59 inmates that occurred over a three-period of time.  (Opp'n. at 16.)  The Court agrees that this evidence, on its own, is not significant proof of the existence of practices that deviate from the official policies.  Nevertheless, Plaintiffs have offered other evidence, including expert opinion and the County's own records, that support their claims.  The anecdotes are mere illustrations of the impact of the these policies, and are not offered as statistical proof of their existence.  (See Reply at 20 n.5.)

In addition to the declarations, Plaintiffs provided
the expert opinions of Dr. Stewart and Dr. Wilcox, who,
based on their review of the safety cell logs,
grievances, records of court orders, and inmates' medical
records, each identified several systemic deficiencies in
Defendant's medical and mental health policies, including
deviations from the County's written policies.
Furthermore, in support of the alleged policy that
Defendant fails to provide timely access to medical and
mental care, Plaintiffs submitted records of over 9,000
court orders regarding medical and mental health care.
Some of these court orders appear to concern routine
medical issues such as prescriptions and doctor visits,
and others appear to instruct urgent action and concern
serious medical and mental conditions.  The Court
recognizes the limits of these records, and does not
interpret the records as suggesting that each order
necessarily reflects an instance of failure to provide
timely care.  Nevertheless, the sheer volume of the
records, as well as Dr. Stewart's and Dr. Wilcox's
interpretation of the court orders, strongly suggest that
there are systemic deficiencies in access to care that go
beyond the isolated experiences of the named Plaintiffs
in this action.

Finally, the Grand Jury reports and the related
correspondence lend additional support to Plaintiffs'
contention that the policies are designed and implemented

at a systemic level, and thus are best suited for class wide resolution.  See Parsons I, 289 F.R.D. at 521 (court found that a cure notification to the contractor responsible for providing medical care to prisoners "tips the balance" in favor of commonality).  In particular, the Grand Jury reports note deficiencies in the Defendant's policies related to several areas, including intake, staffing, access to care, safety cells, and restraint chairs, health care requests, medical records, and recommended actions the Defendant take to remedy the identified issues.  These reports support a finding of commonality, and suggest that questions regarding the adequacy of Defendant's policies are best addressed on a class-wide basis.

    Defendant seeks to distinguish this case from Parsons II by submitting extensive rebuttal evidence and evidentiary objections in support of its Opposition.  Indeed, in Parsons II, the Ninth Circuit noted with seeming dismay that the defendants:

        [R]elied on a few declarations by some ADC
        officials in which those officials summarized
        formal ADC policies — several of which had been
        modified mere days before the defendants filed
        their brief in the district court.  The
        defendants did not submit rebuttal expert
        declarations, nor did they offer evidence that

the newly revised written statements of ADC
policy reflected the actual policy and practice
of the ADC facilities.  Further, the defendants
did not address the individual policies and
practices complained of by the plaintiffs nor
present evidence meant to deny their existence.
Rather, the defendants argued in a general
fashion that ADC written policies are the only
statewide policies and practices.

754 F.3d at 663-64.

The voluminous evidence submitted in opposition to
Plaintiffs' Motion does not undermine the existence of
commonality.  Rather, Defendant has succeeded in
identifying multiple triable issues of fact as to whether
the common policies and practices identified constitute
deliberate indifference.  For example, the Defendant's
experts disagree with the Plaintiffs' experts regarding
whether Defendant's policies and treatment of specific
inmates were adequate.[41]  Defendant has provided new
statistics regarding staffing, and Plaintiffs' experts
opine that the staffing levels remain inadequate.
Defendant submits declarations stating that the intake

---

[41]The Court notes that any trial in this action will
not involve adjudication of the quality of treatment
rendered to each individual plaintiff, or named
Plaintiff.  Any disputes over the quality of care
provided to an individual inmate goes to the question of
whether that inmate's experience is an example of the
serious harm that may result as a consequence of
Defendant's medical and mental health policies.

deputies are properly trained and qualified to screen for

medical and mental health conditions, and Plaintiffs'

experts opine they are not.  At the hearing, Defendant

argued that the Court must resolve each of these factual

disputes prior to class certification and determine not

only whether the materials relied on by Plaintiffs'

experts were reliable, but also decide whether the

information contained within the materials is credible.

For example, whether to credit a named Plaintiff's

declaration that he was given certain medicine or the

Riverside Jails records which do not have a record of

that medicine being administrated.  As Defendant's

argument suggests, at the class certification stage, the

Court cannot resolve questions as to the adequacy of the

policies identified without engaging in an assessment of

the merits that goes well beyond what is required in

order to determine commonality.


     To the extent the Court makes any findings as to the

merits, it is limited to what is required to determine

commonality.  In this regard, the Court finds the

Defendant's explanation of the 9,000 court orders is not

sufficiently credible to support a finding that these

records must be disregarded in considering whether

commonality exists.  Similarly, Defendant's explanation

of the missing entries in the safety cell and restraint

chair logs does not convince the Court it should

disregard this proof of the County's deviation from

written policy.  Moreover, the Court may not, at this stage in the proceedings, make a blanket credibility determination as to all inmate grievances and declarations based merely on Defendant's contention that an inmate is an inherently untrustworthy person.

Finally, Defendant contends that the evidence it submitted demonstrates "current" conditions in the Riverside Jails, and that any allegations or evidence of conditions or policies before January 1, 2013 are irrelevant.  Given current conditions and policies, Defendant argues that Plaintiffs have failed to demonstrate significant proof of any ongoing deficiencies in the provision of health care.  (Opp'n. at 17-19.)  In support for this argument, Defendant relies on cases where it was undisputed that remedial measures were in place, and the defendant moved for judgment as a matter of law.[42]  See Kress v. CCA of Tennessee, LLC, 694 F.3d 890, 893-94 (7th Cir. 2012) (court granted summary judgment in favor of the defendant on injunctive and declaratory relief claims after jail warden testified

_____

[42]Defendant also relies on cases where courts held that individuals do have standing to seek class wide injunctive relief solely on the basis of isolated constitutional violations, such as a single illegal stop or single illegal chokehold.  See City of Los Angeles v. Lyons, 461 U.S. 95, 105, 103 (1983); Hodgers-Durgin v. de la Vina, 199 F.3d 1037, 1044 (9th Cir. 1999).  These cases are not applicable to the present action, where named Plaintiffs and class members continue to be subject to the Defendant's policies, and exposure in and of itself constitutes an injury.

that all inadequacies in prison conditions had been
resolved and plaintiff did not contest that the remedial
measures were taken).

    The Court has reviewed all of the declarations and
documents submitted by the Defendant, and has noted where
there have been recent changes to the policies at issue
in the action.  Plaintiffs' experts have also reviewed
the policies and opine that they remain constitutionally
inadequate despite the modifications.  In addition,
Plaintiffs' proof of unofficial practices extends to 2013
and 2014.  The County's declarations flatly refuting
these unofficial practices and its expert opinions
disputing the adequacy of specific instances of care does
not, in light of Plaintiffs' proof, undermine a finding
of commonality.

    Moreover, in regard to the Defendant's intake
policies, the declarations of the County employees
confirm that actual intake practices differ from the
written policies.  Under the MOU, "prior to any newly
booked inmate being housed in the jail population, a
follow-up intake health screening and assessment will be
completed on the inmate by a registered nurse."  (MOU at
261.)  The declarations of several county employees state
that an inmate is interviewed by a "classifications
deputy" before he is placed into general housing.  (See
Adewunmi Decl. ¶ 4; Delgado Decl. ¶ 13; Reeves Decl. ¶ 8;

Strong Decl. ¶ 5; McNamara Decl. ¶ 4.)  An inmate is
referred to a medical or mental health staff only if he
or she discloses medical or mental health issues, or the
classifications deputy observes medical or mental health
issues.  (See Adewunmi Decl. ¶ 4; Delgado Decl. ¶ 13;
Reeves Decl. ¶ 8; Strong Decl. ¶ 5; Wilson Decl. ¶ 20;
McNamara Decl. ¶ 4.)

     In sum, Defendant's evidence and extensive
evidentiary objections confirm that there exist common
questions regarding the Defendant's systemic medical and
mental health care policies and practices.

### ix. Commonality Conclusion

     The Court has considered all evidence submitted in
support of, and in opposition to, the Motion, and finds
commonality exists as to the allegations that the
following systemic policies constitute deliberate
indifference to a substantial risk of serious harm.  The
Court has included citations to where named Plaintiffs'
have alleged direct exposure to the policies[43]:

---

     [43]The Court notes that none of the named Plaintiffs
specifically alleged that they were denied care as a
result of inadequate medical staffing; however, several
Plaintiffs alleged delays in the distribution of
medication that Plaintiffs' experts attribute to
understaffing.

### a.   Medical Care Subclass

- Inadequate medical staffing and reliance on temporary staff (Wilcox Decl. ¶¶ 22, 27-29, 96, 114; Wilcox Reply Decl. ¶ 19).

- Ineffective intake screening performed by untrained custody staff who fail to identify health concerns and accurately record medical issues on booking forms (Wilcox Decl. ¶¶ 31, 32, 115; Patterson Decl. ¶¶ 7-8; McClellan Decl. ¶ 3; Miller Decl. ¶ 14).

- Inadequate medical records system and note taking practices that deviate from written policies (Wilcox Decl. ¶¶ 13, 95, 96, 119; Patterson Decl. ¶ 9).

- Failure to provide timely medical care (Wilcox Decl. ¶¶ 39, 49, 51, 55, 59; Wohlfeil Decl. ¶¶ 4-6, 8-12; Patterson Decl. ¶¶ 10-12; Rosson Decl. ¶ 5).

- Reliance on court orders to spur provision of medical care (Wilcox Decl. ¶¶ 14, 38, 39; Wilcox Reply Decl. ¶¶ 6-15; Wohlfeil Decl. ¶ 6; Gray Decl. ¶ 10; Kujawsky Dep. at 43-45).

- Lack of adequate policies and procedures to provide for specialty medical consultations and procedures (Wilcox Decl. ¶¶ 63, 67; Wohlfeil Decl. ¶ 7; Patterson Decl. ¶¶ 23-24).

- Deficient procedures in the distribution and refill of medications, including delivery of

evening pills in the early afternoon (Wilcox Decl. ¶¶ 79, 81, 94, 115; Wohlfeil Decl. ¶ 13; Patterson Decl. ¶¶ 13, 18-22; Gray Decl. ¶ 12; Miller Decl. ¶ 9; Kujawsky Dep. at 49).

- Medical request and grievance policy that inappropriately involves custody staff (Wilcox Decl. ¶ 73, Reply Decl. ¶ 18; Gray Decl. ¶¶ 23-25).

### b.   Mental Health Care Subclass

- Inadequate mental health staffing and chronic staffing shortages (Stewart Decl. ¶¶ 28, 29).

- Inadequate intake polices and procedures, including reliance on intake officers with no specialized training to conduct mental health screenings during intake procedures (Stewart Decl. ¶¶ 18, 30-37; Stewart Reply Decl. ¶ 12; Miller Decl. ¶ 14).

- Inadequate mental health record-keeping system (Stewart Decl. ¶ 100; McClellan Decl. ¶ 9).

- Failure to provide timely access to mental health care, including reliance on court orders (Stewart Decl. ¶¶ 51, 58; Stewart Reply Decl. ¶ 13; Gray Decl. ¶ 16; McClellan Decl. ¶ 11; Miller Decl. ¶¶ 5, 7-10; Rosson Decl. ¶ 12).

- Failure to manage mental health medication administration (Stewart Decl. ¶¶ 66, 75), including prescribing medication (Id. ¶¶ 39, 43,

49), monitoring side effects and tracking dangerous drug interactions (Id. ¶¶ 39-42), relying on inmates to initiate refills of medication, including psychotropic medication (Id. ¶ 75); and failing to distribute medication at proper times and in proper doses (Id. ¶¶ 39, 73, 76) (see Gray Decl. ¶¶ 6, 12, 14; McClellan Decl. ¶¶ 7, 9, 10; Rosson Decl. ¶ 5, 6, 10).

- Inadequate suicide prevention policies, including delegating decisions regarding removal from safety cells to unqualified mental health staff and conducting evaluations of inmates in safety cells through the pill slot (Stewart Decl. ¶¶ 78, 79, Stewart Reply Decl. ¶ 7; Gray Decl. ¶ 22).

- Failure to care for inmates in safety cells and restraint chairs, including failure to monitor restrained inmates, perform regular motion checks, administer mental health treatment, or provide food and water.  In addition, there is a pattern of inmates being removed from safety cells before the internal 48 hour time limit and then being returned to the cell shortly after (Stewart ¶¶ 88, 90, 92, 93, 95, 97, 98; Stewart Reply Decl. ¶ 6 n.1; Gray Decl. ¶¶ 28-33; Rosson Decl. ¶ 7).

- Failure to provide mental health treatment in a confidential setting and grievance policy which

inappropriately involves custody staff and
mental health practices (Stewart Reply Decl. ¶
3; Gray Decl. ¶¶ 7, 8, 25-27, 35; Miller Decl. ¶
13, 15, 16; Rosson Decl. ¶ 13).

The Court does not find commonality exists as to the
following alleged practices: unsanitary safety cells,[44]
inadequate facilities to conduct inmate interviews and
deliver medical treatment,[45] quality assurance, and the
use of safety or restraint chairs for purely punitive or
disciplinary purposes.

### 3.  Typicality

"The commonality and typicality requirements of Rule
23(a) tend to merge." Wal-Mart, 131 S. Ct. at 2555 n.1.
"The purpose of the typicality requirement is to assure
that the interest of the named representative aligns with
the interests of the class." Wolin v. Jaguar Land Rover
North Am., LLC, 617 F.3d 1168, 1175 (9th Cir. 2010).

---

[44]Dr. Stewart opines that the safety cells are often
filthy, but the only evidence he appears to rely on for
this conclusion are the declarations of two named
Plaintiffs.  Defendant submitted a declaration from a
County employee stating that it is the County's policy to
clean the safety cells after every use, and any failure
to clean is a deviation from that policy.  Evidence of
two instances of deviation from the policy is not
sufficient to demonstrate commonality.  See Amador, 2014
WL 1679013, at *6 ("In light of these declarations,
plaintiffs' 168 declarations fall short of the
"significant proof" required to show that defendants had
a pattern and practice of strip searching CRDF inmates on
an unsanitary floor.").

[45]The allegations related to this alleged policy
appear to be limited to one of the five Riverside Jails.
(SAC ¶ 142.)

"The test of typicality 'is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'"  Ellis, 657 F.3d at 984 (quoting Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992).  Thus, typicality is satisfied if the plaintiff's claims are "reasonably co-extensive with those of absent class members; they need not be substantially identical."  Id.

As discussed in regard to Defendant's argument regarding standing, the alleged injury among the class members is that the Defendant's medical and mental health policies result in exposure to a substantial risk of serious harm.  Any differences in the named Plaintiffs' specific medical or mental needs do not defeat typicality.  Accordingly, Plaintiffs have satisfied the typicality factor.

### 4.   Adequate Class Representation

Finally, under Rule 23(a)(4), the named plaintiffs must be deemed capable of adequately representing the interests of the entire class, including absent class members.  See Fed. R. Civ. P. 23(a)(4) (requiring "representative parties [who] will fairly and adequately protect the interests of the class").  The adequacy inquiry turns on: (1) whether the named plaintiff and class counsel have any conflicts of interest with other

101

class members and (2) whether the representative
plaintiff and class counsel can vigorously prosecute the
action on behalf of the class.  See Ellis, 657 F.3d at
985.

     Defendant does not challenge the adequacy of any of
the named Plaintiffs as representatives.  The Court notes
that two of the named Plaintiffs, Gray and Patterson, are
no longer subject to the custody of Riverside Jails and
are currently being held in state prison.  That Gray's
and Patterson's individual claims have been rendered moot
does not render them, as proposed representatives of the
injunctive relief class, inadequate.  See Cnty. of
Riverside v. McLaughlin, 500 U.S. 44, 52 (1991) ("That
the class was not certified until after the named
plaintiffs' claims had become moot does not deprive us of
jurisdiction."); Amador, 2014 WL 1679013, at *8.  Thus,
the Court is satisfied that the named Plaintiffs do not
have any interests antagonistic to the remainder of the
class, nor does Plaintiffs' counsel have any conflicts
with the putative class.  The named Plaintiffs have
actively participated in the litigation thus far, and
express an interest and commitment to responding to the
requests of class counsel and other parties in the
litigation.  Accordingly, the named Plaintiffs are
adequate representatives.

**D.   Rule 23(b)**
     Since Plaintiffs have demonstrated they meet the

requirements of Rule 23(a), the Court turns to Rule 23(b).  Of the three basis for certification under Rule 23(b), Plaintiffs seek certification under Rule 23(b)(1) and Rule 23(b)(2).

### 1.    23(b)(2)

Plaintiffs seek certification under Rule 23(b)(2). Certification is appropriate under Rule 23(b)(2) when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); Amchem Products, Inc. v. Windsor, 521 U.S. 591, 614 (2009).  "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.  It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." Wal-Mart, 131 S. Ct. at 2557.  The "primary role" of a 23(b)(2) action is to allow civil rights actions seeking injunctive and declaratory relief to be brought on a class wide basis.  See Parsons II, 754 F.3d at 686; Walters v. Reno, 145 F.3d 1032, 1047 (9th Cir. 1998) ("Rule 23(b)(2) was adopted in order to permit the prosecution of civil rights actions."); Baby Neal for & by Kanter v. Casey, 43 F.3d 48, 63 (3d Cir. 1994) ("The writers of Rule 23 intended that subsection (b)(2) foster institutional reform by facilitating suits that challenge

widespread rights violations of people who are individually unable to vindicate their own rights."); Parsons I, 289 F.R.D. at 524 ("injunctive relief stemming from allegedly unconstitutional conditions of confinement are the quintessential type of claims that Rule 23(b)(2) was meant to address.").

Plaintiffs contend that certification under Rule 23(b) is appropriate because the deficiencies in Defendant's medical and mental health policies apply to all members of the class, and thus injunctive and declaratory relief are appropriate remedies.  Plaintiffs seek (1) a declaration that Defendant's acts, omissions, and policies of the Defendant are in violation of the rights of Plaintiffs under the Eighth and Fourteenth Amendments; and (2) an injunction ordering Defendant to "develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm that Plaintiffs and members of the Plaintiff class suffer due to Defendant's inadequate medical and mental care" that addresses staffing, access, screening, emergency responses, medication and supplies, chronic care, mental health treatment, and quality assurance.  (SAC ¶ 191.) Defendant argues certification under 23(b)(2) is not appropriate because Plaintiffs have failed to demonstrate commonality and the proposed injunctive relief fails to satisfy Rule 65(d).  (Opp'n. at 35-38.)

As discussed above, Plaintiffs demonstrated
commonality.  Plaintiffs challenge alleged systemic
inadequacies in Defendant's medical and mental health
care policies, which are applicable to the proposed class
as a whole.  If Plaintiffs succeed on their claims,
injunctive and declaratory relief will provide relief to
all members of the proposed class.  See Parsons II, 754
F.3d at 686-87 (certifying 23(b)(2) class of prison
inmates challenging prison healthcare policies); Ashker
v. Governor of State of California, 2014 WL 2465191, at
*7 (N.D. Cal. June 2, 2014) (certifying 23(b)(2) class of
inmates at state prison challenging secured housing unit
confinement policy); Rosas, 2012 WL 2061694, at *5
(certifying 23(b)(2) class of prisoners challenging
policy of deliberate indifference to unlawful violence);
Amador, 2014 WL 1679013, at *8 (certifying 23(b)(2) class
of prisoners challenging prison strip search policy).

Defendant contends that class certification must be
denied because the request for relief is at a
"stratospheric level of abstraction" and fails to comply
with Rule 65(f).  (See Opp'n. at 38 (citing Shook v. Bd.
of Cnty. Commissioners of Cnty. of El Paso, 543 F.3d 597,
604 (10th Cir. 2008))).[46]  Under Rule 65(f), an injunction

_____

[46]In Shook the Tenth Circuit Court of Appeals
affirmed a district court's denial of class certification
on the basis that the injunctive relief requested was too
vague.  In Parsons II, the Ninth Circuit rejected
reliance on Shook as out of circuit precedent, and then
reasoned that certification was proper even under the
Shook standard because plaintiffs had described their
(continued...)

must state its terms specifically and describe in reasonable detail — and not by referring to the complaint or other document — the act or acts restrained or required.  Fed. R. Civ. P. 65(f).

In evaluating a proposed injunction at the class certification stage in a prison conditions case, the Ninth Circuit recently clarified that the district court should assess whether the proposed relief is "is appropriate respecting the class as a whole."  <u>Parsons II</u>, 754 F.3d at 689; <u>Ashker</u>, 2014 WL 2465191, at *7 ("numerous courts have expressly held that plaintiffs are not required to satisfy Rule 65(d) in order to obtain class certification.").  This requirement is satisfied where plaintiffs have described the "general contours of an injunction that would provide relief to the whole class, that is more specific than a bare injunction to follow the law, and that can be given greater substance and specificity at an appropriate stage in the litigation through fact-finding, negotiations, and expert testimony."  <u>Id.</u>  In a prison conditions case, it is not feasible at the class certification stage to propose specific remedies as any injunction must "closely track the violations established by the evidence at trial," comply with the Prison Litigation Reform Act, account for

_____

[46](...continued)
injunction in sufficiently specific terms by submitting expert testimony outlining the alleged policy deficiencies and potential remedies.  754 F.3d at 689 n.35.

changing conditions in prisons, and involve prison officials in the process of determining an appropriate remedy.  Id.

In Parsons II, the Ninth Circuit affirmed certification of a 23(b)(2) class of prisoners challenging medical and mental health policies on the basis that the injunctive relief proposed was based on expert reports that explained how the challenged policies were deficient and the sorts of policies remedies that could alleviate the alleged violations.  Id.  Here, as in Parsons II, Plaintiffs have provided the "general contours" of the proposed injunctive relief by submitting expert reports that identify specific deficiencies and possible remedies.  Accordingly, certification under 23(b)(2) is appropriate.

## 2.  23(b)(1)

Plaintiffs also seek certification under Rule 23(b)(1)(A) and 23(b)(1)(B).  Under 23(b)(1)(A), class certification is appropriate if the prosecution of separate actions by individual members of the class would create the risk of "inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class."  Fed. R. Civ. P. 23(b)(1)(A). A "core example" of an action under 23(b)(1)(A) is the "situation in which many individuals, all challenging a single government policy, bring separate suits for

injunctive relief."  Newberg on Class Actions § 4:11 (5th ed.)  Thus, certification is appropriate under 23(b)(1)(A) because if each member of the proposed class litigated their claims individually there would be a risk of that each individual case would impose a different standard on the County.  See Ashker, 2014 WL 2465191, at *7 (certifying class of inmates claiming prison policy violated the Eighth Amendment pursuant to 23(b)(1)(A)). Accordingly, the requirements for certification under 23(b)(1)(A) are met.

An action under 23(b)(1)(B) is appropriate when prosecuting "separate actions by or against individual class members would create a risk of . . . adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests."  Fed. R. Civ. P. 23(b)(1)(B).  The classic application of the rule is in "limited fund" cases, where the putative class members' only source of recovery comes from a limited fund.  See Ortiz v. Fibreboard Corp., 527 U.S. 815, 834–838 (1999).  Nevertheless, the rule may be applied outside the "limited fund" context, and in particular has been applied in actions by prisoners challenging the conditions of their confinement.  See Hilton v. Wright, 235 F.R.D. 40, 53 (N.D.N.Y. 2006) (certification of inmate class challenging prison's Hepatitis C treatment

policy under 23(b)(1)(B)); <u>Ingles v. City of New York</u>, 2003 WL 402565, at *8 (S.D.N.Y. Feb. 20, 2003) (certification under 23(b)(1)(B) of class of inmates challenging prison's use of force policy and seeking injunctive relief); <u>Coleman v. Wilson</u>, 912 F. Supp. 1282, 1293 (E.D. Cal. 1995) (certification of inmate class challenging prison's mental health care policies under 23(b)(1)(B)).

The Classes and Subclasses proposed seek injunctive relief, that, if granted, would affect the rights of similarly situated potential plaintiffs who are affected by the Defendant's policies. If the Plaintiffs do not succeed on the their claims, the ability of future plaintiffs to challenge the same practice will be inhibited under stare decisis. <u>See</u> <u>Riley v. Nevada Supreme Court</u>, 763 F. Supp. 446, 453 (D. Nev. 1991) (certification of class of inmates sentenced to death challenging state court policies under 23(b)(1)(B) because "collateral estoppel would not bind a subsequent plaintiff to a finding of constitutionality. However, if the subsequent plaintiff ended up in this particular court, our previous finding of constitutionality would bind the subsequent plaintiff as a practical matter because of stare decisis.").

Defendant opposes certification under both sections of 23(b)(1) on the basis that Plaintiffs have not proposed an enforceable injunction. (Opp'n. at 39.) The

Court has addressed Defendant's challenge to the proposed injunction above, and accordingly, finds the Classes and Subclasses appropriate for certification under Rule 23(b)(1)(A) and 23(b)(1)(B).

**E.   Appointment of Class Counsel**

After certifying a Class and Subclasses, the Court must appoint class counsel.  Fed. R. Civ. P. 23(g). Under Rule 23(g), the Court considers the work counsel has done in identifying or investigating potential claims in the action; counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; counsel's knowledge of the applicable law, and the resources that counsel will commit to representing the class.  Id.

Plaintiffs' counsel submitted the declarations of Shawn Hanson (Doc. No. 35) and Sara Norman (Doc. No. 30), which attest to the experience, qualifications, and resources of Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") and the Prison Law Office.  These declarations clearly establish that Plaintiffs' counsel has extensive experience in complex prisoner civil rights litigation and class actions.  Ms. Norman has worked at the Prison Law Office for 18 years, and has represented prisoner plaintiff classes in several complex and significant actions in California.  (Norman Decl. ¶ 5.)  Similarly, Mr. Hanson has represented plaintiffs in several civil rights class actions, including multiple prisoner

plaintiff civil rights actions.  (Hanson Decl. ¶ 4.)  In
addition, Akin Gump, and the Prison Law Office have a
long history of advocating on behalf of prisoners through
class action law suits.  Indeed, the Prison Law Office is
a leading advocacy organization in this area of law.

Counsel has already invested thousands of hours
investigating potential claims, interviewing Plaintiffs
and class members, drafting declarations and pleadings,
and conducting discovery.  (Norman Decl. ¶¶ 2-3; Hanson
Decl. ¶ 8.)  Consequently, the Court finds that
Plaintiffs' proposed counsel are more than qualified and
appoints the Prison Law Office and Akin Gump as class
counsel.

**F.  Stay**

On June 5, 2014, the Ninth Circuit's opinion in
Parsons II affirmed certification of a class action
brought by prisoners challenging the provision of
healthcare and the conditions of confinement in prisons
under the control of the Arizona Department of
Corrections.  The issues addressed in Parsons II are
largely similar to the questions presented in this case,
and the Court has looked to the reasoning of Parsons II
in ruling on class certification.  On July 3, 2014, the
defendants in Parsons II requested a rehearing en banc.
On July 8, 2014, the plaintiffs in Parsons II were
ordered to file a response to defendants' request for
rehearing en banc, and on July 29, 2014, the Parsons II

plaintiffs filed a Response to Petition for Rehearing En Banc.   The Ninth Circuit has not yet issued a decision as to whether it will rehear Parsons II en banc.

The County argues that these events indicate that Parsons is likely to be reversed en banc.   At the hearing, the Court raised the issue of a stay pending the Ninth Circuit's decision as to whether it will grant en banc review of Parsons II.   Although Defendant suggested a stay would be appropriate at the hearing, the County did not request a stay in a formal motion.

A district court has the discretionary power to stay cases to control its docket and promote efficient use of judicial resources.   Dependable Highway Express v. Navigators Ins. Co., 498 F.3d 1059, 1066 (9th Cir. 2007); Lockyer v. Mirant Corp., 398 F.3d 1098, 1110-09 (9th Cir. 2005) (citing Landis v. North American Co., 299 U.S. 248 (1936)).   "In determining whether a stay is appropriate pending the resolution of another case, a district court must consider various competing interests, including: (1) the possible damage which may result from the granting of a stay; (2) the hardship to the parties if the suit is allowed to go forward; and (3) the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." Nelson v. Sisto, 2009 WL 2579194, at *1 (E.D. Cal. Aug. 20, 2009) (citing Lockyer, 398 F.3d at 1110-09).   The Court must

balance the likely length of the stay against the strength of the justification given for it; the longer the stay, the greater the showing must be to justify it. <u>Yong v. I.N.S.</u>, 208 F.3d 1116, 1119 (9th Cir. 2000).

At this time it is uncertain whether the Ninth Circuit will rehear <u>Parsons II</u> en banc.  The Court notes that <u>Parsons</u> is currently set for trial beginning on October 21, 2014 and a stay has not been entered in that proceeding.  In this case, a stay would result in hardship to the Plaintiffs, especially since the case involves the alleged existence of conditions in the Riverside Jails that result in inadequate medical and mental health care for inmates.  It is unknown how long the Ninth Circuit will take to decide whether to consider <u>Parsons</u> en banc.  The uncertainty of the length of the stay outweighs the interest in staying class certification because there is a possibility <u>Parsons</u> will be reheard en banc.  Accordingly, a stay of this Order is not warranted at this time.  If <u>Parsons</u> is reheard en banc, the Court will consider a motion to stay the proceedings at that time.

## VII.  CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiffs' Motion for Class Certification and DENIES Defendant's Motion to Dismiss.  The following Class and Subclasses are certified under Rule 23(b)(2), (b)(1)(A), and (b)(1)(B) and defined as:

(A) Class — all prisoners who are now, or will be in the future, subjected to the medical and mental health policies and practices of Riverside County.  Named Plaintiffs Gray, Patterson, Kujawsky, Wohlfeil  Rosson, McClellan, and Miller are appointed Class Representatives.  The class is certified as to the alleged practices detailed in the Medical and Mental Health Subclasses.

(B) Medical Subclass — All prisoners who are now, or will in the future be, subjected to the medical care policies and practices of the Riverside Jails.  Named Plaintiffs Gray, Patterson, Kujawsky, and Wohlfeil are appointed class representatives.  The Subclass is certified as to the following alleged practices:

1. Inadequate medical staffing and reliance on temporary staff;

2. Ineffective intake screening performed by untrained custody staff who fail to identify health concerns and accurately record medical issues on booking forms;

3. Inadequate medical records system and note taking practice that deviates from written policies;

4. Failure to provide timely medical care;

5. Reliance on court orders to spur provision of medical care;

6. Lack of adequate policies and procedures to provide specialty medical consultations and

procedures;

7.   Deficient procedures in the distribution and refill of medications, including delivery of evening pills in the early afternoon;

8.   Medical request and grievance policy that inappropriately involves custody staff.

(B) Mental Health Subclass — All prisoners who are now, or will in the future be, subjected to the mental health care policies and practices of the Riverside Jails.  Named Plaintiffs Gray, Rosson, McClellan, and Miller are appointed class representatives.  The subclass is certified as to the following alleged practices:

1.   Inadequate mental health staffing and chronic staffing shortages;

2.   Inadequate intake polices and procedures, including use of intake officers with no specialized training to conduct mental health screenings during intake procedures;

3.   Inadequate mental health record system;

4.   Failure to provide timely access to mental health care;

5.   Failure to manage mental health medication administration, including prescribing medication; monitoring side effects and tracking dangerous drug interactions; relying on inmates to initiate refills of medication, including psychotropic medication; and failing to distribute medication at proper times and in

proper doses;

6. Inadequate suicide prevention policies, including delegating decisions regarding removal from safety cells to unqualified mental health staff and conducting evaluations of inmates in safety cells through the pill slot;

7. Failure to care for inmates in safety cells and restraint chairs, including failure to monitor restrained inmates, perform regular motion checks, administer mental health treatment, or provide food and water. In addition, there is a pattern of inmates being removed from safety cells before the internal 48 hour time limit and then being returned to the cell shortly after;

8. Failure to provide mental health treatment in a confidential setting and grievance policy which inappropriately involves custody staff and mental health practices.


(C) Akin and Gump and the Prison Law Office are appointed counsel to the Class and Subclasses.


Dated:  September 2, 2014          _____

                                          VIRGINIA A. PHILLIPS
                                   United States District Judge