**PRISON LAW OFFICE**
DONALD SPECTER (SBN 83925)
SARA NORMAN (SBN 189536)
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704
Email:  dspecter@prisonlaw.com
           snorman@prisonlaw.com

**AKIN GUMP STRAUSS HAUER & FELD LLP**
SHAWN HANSON (SBN 109321)
DANIELLE GINTY (SBN 261809)
NICHOLAS GREGORY (SBN 275582)
KELSEY MORRIS (SBN 277859)
580 California Street, Suite 1500
San Francisco, CA 94104-1036
Telephone: (415) 765-9500
Fax: (415) 765-9501
Email: shanson@akingump.com, dginty@akingump.com
           ngregory@akingump.com, kmorris@akingump.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION – RIVERSIDE

| | |
|---|---|
| QUINTON GRAY, et al., on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>COUNTY OF RIVERSIDE,<br><br>Defendant. | Case No. EDCV13-0444 VAP (OP)<br><br>**CLASS ACTION**<br><br>**STIPULATION TO AMEND COMPLAINT** |

The parties, having reached a preliminary agreement to resolve this litigation without trial, have agreed that certain closely related claims relating to disability discrimination are also appropriate for resolution in the present case.

Therefore, the parties hereby stipulate pursuant to Rule 15(a)(2) to the filing of Plaintiffs' Third Amended Complaint, attached as Exhibit A.  Defendant's so

stipulating is not, and should not be interpreted as, agreement that the new allegations are true.  The parties stipulate that the Answer previously filed by Defendant shall be deemed the Answer to the Complaint, as amended, once the Third Amended Complaint is accepted for filing.

**IT IS SO AGREED AND STIPULATED**.

DATED: November 12, 2015          LEWIS BRISBOIS BISGAARD & SMITH LLP

By:  _____/s/ Arthur K. Cunningham_____
Arthur K. Cunningham
Attorneys for Defendant,
COUNTY OF RIVERSIDE

**IT IS SO AGREED AND STIPULATED**.

DATED: November 12, 2015          PRISON LAW OFFICE

By:  _____/s/ Sara Norman_____
Sara Norman
Attorneys for Plaintiffs

All signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized the filing

_____/s/_____
Sara Norman

**STIP. TO AMEND COMPLAINT**

# EXHIBIT A

**PRISON LAW OFFICE**
DONALD SPECTER (SBN 83925)
SARA NORMAN (SBN 189536)
1917 Fifth Street
Berkeley, California 94710
Telephone: (510) 280-2621
Fax: (510) 280-2704
Email: dspecter@prisonlaw.com
         snorman@prisonlaw.com


**AKIN GUMP STRAUSS HAUER & FELD LLP**
SHAWN HANSON (SBN 109321)
DANIELLE GINTY (SBN 261809)
NICHOLAS GREGORY (SBN 275582)
KELSEY MORRIS (SBN 277859)
580 California Street, Suite 1500
San Francisco, CA 94104-1036
Telephone: (415) 765-9500
Fax: (415) 765-9501
Email: shanson@akingump.com, dginty@akingump.com
         ngregory@akingump.com, kmorris@akingump.com,

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION -- RIVERSIDE

| | |
|---|---|
| QUINTON GRAY, ANGELA PATTERSON, STANLEY KUJAWSKY, JOHN ROSSON III, BRANDY MCCLELLAN, JULIE MILLER, MICHAEL WOHLFEIL, DAVID MADRID, and NIKKO QUARLES, on behalf of themselves and all others similarly situated,<br><br>            Plaintiffs,<br>v.<br><br>COUNTY OF RIVERSIDE,<br><br>Defendant. | Case No. EDCV13-0444 VAP (OP)<br><br>**CLASS ACTION**<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

## NATURE OF THE ACTION

1.    Riverside County has one of the largest jail systems in California, with nearly 4,000 men and women held in five detention facilities ("Riverside jails"). This population consists of both pretrial detainees and people serving sentences in local custody (collectively referred to herein as "prisoners").

2.    The thousands of men and women locked up in Riverside's jails face cruel and inhumane deficits in medical and mental health care.  Defendant has known for years that its inadequate health care delivery system places prisoners entering the jails at a serious risk of harm but has failed to take the necessary steps to mitigate the risk.  As a result, prisoners in the Riverside jails are subjected to policies and practices that systematically deprive them of their constitutional right to basic life-saving care.  Further, prisoners with disabilities face discrimination in housing and in denial of reasonable accommodations as set forth below, in violation of the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act.

## JURISDICTION

3.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.  Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202; 42 U.S.C. § 1983;  42 U.S.C § 12101 et seq.; and 29 U.S.C. § 794.

## VENUE

4.    Venue is proper in the Central District of California under 28 U.S.C. § 1391(b) because Plaintiffs' claims for relief arose in this district and Defendant is located in the district.

## PARTIES

**Plaintiffs**

5.     At the time of the filing of the Complaint and the First Amended Complaint in the Case, Plaintiff Quinton Gray was a prisoner in the Riverside jails in custody of Defendant Riverside County.  He has multiple chronic medical and mental health conditions, including seizures, high blood pressure, severe arthritis, and visual and auditory hallucinations and depression.  He has experienced repeated treatment failures, including delays in adjusting medication regimens, lack of appropriate laboratory monitoring and frequent missed doses. His initial intake form, similar to other Riverside files, documented "no" to all questions (including history of seizures and high blood pressure)—demonstrating inadequate intake procedures. Even when Mr. Gray has been seen, he has not received adequate basic primary care: for example, he was not screened for high cholesterol or diabetes, despite his chronic high blood pressure.

6.     Further, Mr. Gray was placed on potent psychotropic medications which were either suddenly discontinued or multiple doses missed, placing him at serious risk of serious side effects and psychiatric decompensation.  He in fact experienced significant, injurious side effects from his medication mismanagement and treatment failures.  Mr. Gray has exhausted his administrative remedies.

7.     At the time of the filing of the original Complaint in this case, Plaintiff Angela Patterson was a prisoner in the Riverside jails in custody of Defendant Riverside County.  After sustaining severe injuries in a car accident in June 2009, Ms. Patterson had a temporary filter placed in her inferior vena cava (IVC), the blood vessel supplying the heart, to prevent blood clots.  She was booked into the Riverside jails shortly thereafter, where she was subjected to multiple delays, cancellations, appointment mix-ups, and failures to provide appropriate follow-up regarding safe removal of the temporary filter.  Nearly a year later, when she was finally taken for surgery, it was found that the filter could not be removed due to the build-up of scar tissue.  As a result, Ms. Patterson is now condemned to a lifetime of

daily anticoagulation medications and frequent laboratory monitoring, with significant risk of fatal bleeds and other complications.  She is 27 years old.  If physicians had appropriately obtained and reviewed her records, and made efforts to refer her for IVC filter removal in a timely fashion, it is likely that the filter could have been removed and Ms. Patterson would need no further treatment.

**8.**     In addition, she has experienced multiple delays in follow-up with the orthopedic and vascular surgery clinics.   As of late 2012, she still had not had a follow-up CT scan of her head to determine whether a growth on her scalp was a slow-growing tumor, more than a year after it was ordered to be performed.  Since being placed on anti-coagulant therapy and for the duration of her stay in the Riverside jails, she has also not had timely and effective medication monitoring and administration, resulting in frequent stretches of time throughout her time in the jails where her anticoagulation levels are too low or too high, placing her at risk for further complications.  Ms. Patterson has exhausted her administrative remedies.

**9.**     At the time of the filing of the original Complaint in this case, Plaintiff Stanley Kujawsky[1] was a prisoner in the Riverside jails in custody of Defendant Riverside County.  He has been subjected to substandard care while in Defendant's custody, with inadequate medication administration and treatment of his high blood pressure and multiple delays in the work-up and diagnosis of his chronic neck pain.  As a result, he has suffered and continues to suffer unnecessary pain and Defendant's treatment has endangered his cardiovascular health.  Mr. Kujawsky has exhausted his administrative remedies.

**10.**     Plaintiff John Rosson III is a prisoner in the Riverside jails in custody of Defendant Riverside County.  Mr. Rosson suffers from bipolar affective disorder

---

[1] Due to a clerical error, Mr. Kujawsky is referred to as Stanley Kwawsky or Kujansky in the Riverside jail records.

THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

and has received and continues to receive substandard mental health care while in the jails that has endangered his health and safety.  While in the Riverside jails, he has been prescribed major psychotropic medications which have repeatedly been renewed without any regular assessment of his progress, side effects, and co-existing medical issues, a clear violation of the standard of care and particularly dangerous given his history of diabetes and hyperlipidemia, which can be worsened by the psychotropic medications he takes.  Acute psychiatric symptoms, such as hearing voices, have been ignored by Riverside jail mental health treatment staff. He suffers frequent lapses in medication delivery: after one such episode in early 2013, when he was denied his necessary psychotropic medications for more than two weeks, he became actively self-harming and cut himself.  As a result, he was placed in a filthy "safety cell" with blood and feces on the wall and subsequently in the county hospital for several days.  He continues to experience medical delivery interruptions to this day.  Mr. Rosson has exhausted his administrative remedies.

11.     At the time of the filing of the Second Amended Complaint in this case, Plaintiff Brandy McClellan was a prisoner in the Riverside jails in the custody of Defendant Riverside County.  She experienced a dangerous and entirely predictable and avoidable side effect of the psychotropic medications she was prescribed, resulting in her hospitalization after she nearly collapsed and had serious cardiac complications.  Nonetheless, in order to get any attention from mental health staff after returning from the hospital she had to file a health care request form ("blue slip") and wait several weeks to be seen by a psychiatrist.  During this time, the medications she had been misprescribed and which caused her hospitalization continued to be presented to her at pill call.  If she had not had the presence of mind to refuse them, she could have been in serious danger.  The treating psychiatrist was not made aware of her hospitalization until she told him.  Ms. McClellan has exhausted her administrative remedies.

12.     At the time of the filing of the Second Amended Complaint in this case, Plaintiff Julie Miller was a prisoner in the Riverside jails in the custody of Defendant Riverside County.  She is a chronic care patient with major depression and suspected bipolar disorder.  She is given Norvir for her medical condition in the jails.  In February 2013, Ms. Miller was prescribed Paxil and Trazodone.  Norvir inhibits the metabolism of both of these drugs and as a result, can increase blood levels of the drugs to dangerous levels.  Increased blood levels of Trazodone and Paxil can be associated with more side effects, including dry mouth, sedation, dizziness, and weight gain, which she has experienced.  Also, both drugs increase serotonin blood levels, placing Ms. Miller at higher risk of serotonin syndrome -- a potentially life-threatening condition consisting of altered mental status, muscle contractions, fever and autonomic instability.  There is no notation in her medical file to indicate that she was regularly assessed for possible side effects from these medications, nor is there documentation that those medications were given at lower doses while she was on Norvir.  She has never been told about possible side effects of new medications or monitored to determine their effects.  Ms. Miller has exhausted her administrative remedies.

13.     At the time of the filing of the Second Amended Complaint in this case, Plaintiff Michael Wohlfeil was a prisoner in the Riverside jails in the custody of Defendant Riverside County. Since early 2011 Mr. Wohlfeil has suffered from chronic daily diarrhea and has lost more than 30 pounds. Given this history, he should have been promptly evaluated for possible colon cancer.  But after an initial referral in 2011, it took more than two years for Mr. Wohlfeil to be seen by a gastroenterology clinic and finally receive a recommendation for an upper endoscopy and a colonoscopy.

14.     Early in his confinement in Defendant's custody, Mr. Wohlfeil complained of lumps on his skin; these tumors subsequently grew in number to

cover much of his body.  Despite the knowledge of the tumors by Jail medical staff, however, no biopsies were done until October 2013.  Had they been malignant, Mr. Wohlfeil might not have survived Defendant's substandard medical care and attention.  Mr. Wohlfeil also reported lower extremity weakness and severe back pain to Defendant's staff in 2011. Although an MRI was ordered for him multiple times, he did not receive one for two and a half years.  Mr. Wohlfeil also reported a history of Hepatitis C on his intake form in 2011, and was recommended for testing for this disease in May 2011. Even though failure to conduct this testing put Mr. Wohlfeil at risk for liver scarring and possible liver failure, he has never been tested for Hepatitis C while in Defendant's custody. To get assistance from medical staff, he has had to file grievances and obtain a court order. Mr. Wohlfeil has exhausted his administrative remedies.

15.     Plaintiff David Madrid is a prisoner in the Riverside jails in the custody of Defendant Riverside County.  He was born with a club foot: his right foot turns inward significantly and his toes are curled in tightly, making him unable to walk normally without footwear to correct for the condition.  He has been refused appropriate footwear in the Riverside jails.  Since his arrival in August 2015, he has been allowed only plastic slip-on shoes that fall off his foot and make it impossible to walk normally, or to walk at all without serious pain.  As a result, he has significantly limited his walking and has lost his ability to exercise to maintain his cardiovascular health.  He has been refused the reasonable accommodation of shoes that support his foot and allow him to walk without any valid justification for the refusal.

16.     Plaintiff Nikko Quarles is a prisoner in the Riverside jails in the custody of Defendant Riverside County.  On or about September 5, 2015, he was seriously injured in an attack by other prisoners at Southwest Detention Center. Among other injuries, his leg was broken.  He was taken for emergency care to the

**THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Riverside County Regional Medical Center, where a cast was placed on his leg and he was told that he cannot walk or place any weight on the leg.  He was also given crutches.  He was returned to Southwest Detention Center the following day and placed in a cell in the booking area of the jail.  His crutches were taken from him, over his protest, and placed outside his cell, out of reach.  As a result, for the approximately four days he spent in that cell, he had to crawl or drag himself from his bunk to the toilet as well as to pick up his food from staff at his cell door.  In addition, when he left his cell for daily dressing changes for another wound, he was refused his crutches and had to drag himself along the floor as a result.  At times Mr. Quarles found it impossible to avoid placing his weight on his injured leg, which was contrary to medical orders and caused him severe pain.

**17.**     Mr. Quarles was subsequently transferred to Presley Detention Center, where he was again deprived the use of his crutches.  He was placed in a cell with the crutches once more outside his cell door.  His complaints to the nurses he saw daily were unsuccessful.  Mr. Quarles was not provided his crutches until he was seen by a doctor, approximately three to five days after his arrival at Presley.  He has subsequently been informed by medical staff that he would require another hard cast on the leg because the premature walking he was forced to do might have reinjured it.   Although he currently has the use of crutches, he has no confidence that staff will not once again confiscate them for no reason.

**18.**     Mr. Quarles has never been charged with assault or any violent actions in the Riverside jails

**19.**     Mr. Quarles is currently housed on the seventh floor of the Presley jail, which is considered sheltered housing for medical patients, solely because of his inability to walk and his use of crutches.  As a result, he has fewer privileges and programming opportunities than he would if he were housed in general population. He has no dayroom access and no religious programming in his current restricted

medical housing, and for his GED class, he is merely provided with materials by a teacher who comes to his door.  At Southwest Detention Center before his injury, he had daily dayroom access with other prisoners in his housing unit, church services two to three times each week with community volunteers, and group classes for GED students every other week.

**Defendant**

20.     Defendant County of Riverside operates five jails -- the Robert Presley Detention Facility, the Smith Correctional Facility, the Indio Jail, the Southwest Detention Center, and the Blythe Jail – that incarcerate nearly 4,000 prisoners.  The County is responsible for providing a constitutional level of health care for those in its custody, including the funding, oversight, and corrective action to ensure adequate conditions.  As a public entity, the County is also required to ensure that it does not discrimination against prisoners with disabilities.

**FACTUAL ALLEGATIONS**

I.     **Riverside County exhibits systemic failures in the provision of basic health care to prisoners in its jails.**

21.     Defendant, by policy and practice, maintains and runs a health care system that lacks basic elements necessary to provide constitutional care: it systematically fails to identify and diagnose serious conditions, to provide timely care, to administer appropriate medications, to employ adequate staff to meet prisoners' basic needs, to maintain records that allow informed treatment decisions, to establish legally required confidentiality, and to identify and correct its own failings.

22.     Prisoners' access to health care is so inadequate at all the Riverside jails as to constitute deliberate indifference to their serious medical and mental health needs.  Further, Defendant is deliberately indifferent to the fact that these systemic failures result in significant injury and a substantial risk of serious harm.

8

**A.    Delays in and denial of access to care**

23.    Defendant has a policy and practice of failing to provide timely access to necessary health care and is deliberately indifferent to the risk of harm and injury to prisoners that results from this systemic failure.  Care is often delayed or denied entirely, causing unnecessary pain and suffering as well as physical injury to the patients.  The two basic mechanisms to alert health care staff to prisoners' needs -- intake screening and sick call – are inadequate in both policy and practice.

**1.    Intake screening and treatment planning**

24.    Riverside's jail screening and intake process fails to adequately identify and treat the medical and mental health care problems of newly arriving prisoners.

25.    Insufficient numbers of nursing staff are available to identify and evaluate medical conditions on intake, resulting in dangerous delays in treatment. Prisoners are rarely assessed for communicable diseases when they arrive at the jails, and medically high-risk prisoners do not have histories taken, physical assessments, or treatment plans.

26.    Plaintiff Quinton Gray arrived at the Riverside jails with a chronic seizure disorder and high blood pressure.  His initial intake form nonetheless has "no" marked for every question about health care needs, including those that should clearly be marked "yes."  Numerous other prisoners with longstanding chronic conditions have intake forms with the same deficiencies, demonstrating an inadequate intake screening process.

27.    As a result, prisoners are placed at serious risk of harm.  For example, one woman who regularly takes medication for her chronic severe high blood pressure entered the Riverside jails on September 9, 2011.  She received no medication or, indeed, any recorded medical screening or attention until she suffered chest pain and hypertensive emergency nearly three weeks later.  At that time, she was sent to the emergency room at Riverside County Regional Medical Center

9

(RCRMC) and found to have blood pressure of 230/140 -- high enough to cause a stroke, vision loss, or a heart attack.

28.     Another woman with multiple serious medical conditions, including hypothyroidism, diabetes, and a recent history of gastric bypass surgery, had no record of any of these crucial health factors on her booking form, in which every question regarding the presence of health care needs was marked "no." Treatment for her serious chronic conditions was delayed, resulting in significant health risks.

29.     Another patient who arrived in the Riverside jails with multiple longstanding chronic conditions -- a seizure disorder, asthma, psoriasis, and Hepatitis C -- had "no" marked for every question on his booking form regarding medical history.  As a result, he did not receive all of his necessary medications for several weeks.

30.     Another prisoner with a clear prior history of diabetes, glaucoma, and arthritis has a booking form from August 2012 noting no chronic conditions and no medications.  It is unlikely, from subsequent records, that he failed to report his conditions: his records show that he informed nurses at pill call five days later of the conditions and he subsequently filed grievances and obtained court orders for care.

31.     Plaintiff Julie Miller had to get court order to get her chronic care medications started five months after her arrival in the Riverside jails.

32.     Initial mental health screening at the jails is faulty because it is performed by untrained custody staff, a practice that Riverside Sheriff Stanley Sniff knows is inadequate and dangerous because, as he states, "correctional officers may not recognize hidden medical and/or mental health problems that could be best observed by a medical/mental health expert.  This could result in delaying needed treatment."  Appropriate screening is particularly important since, according to the Sheriff,  "the time period immediately following admission to a jail is the most dangerous time for an inmate, and over half of in-custody deaths occurred within

10

one month of admissions, with 24% of deaths occurring within two days of admission."

33.     One man admitted to the Smith Jail had no recorded intake or screening at all.  He was eventually placed in a suicide watch "safety cell" and given psychotropic medications (Zoloft and Trazodone).  His medical records contain no diagnosis, medical administration records, review of symptoms, psychiatric history, social history, review of current medications, allergies, mental status examinations, vital signs, risk assessments or treatment goals.

34.     Plaintiff John Rosson was started on psychotropic medications including Risperdal, Trileptal, Trazodone and Prozac with no recorded evaluation for his underlying medical conditions, despite the fact that he had a noted history of diabetes and hyperlipidemia and Risperdal can worsen these conditions.

35.     Plaintiffs Quentin Gray, Julie Miller, and Brandy McClellan were similarly prescribed powerful psychotropic medications with inadequate assessment and treatment planning regarding medication interactions, safety, and efficacy.

36.     Another patient was prescribed Trazodone, Risperdal and Zoloft although he had a pre-existing seizure disorder and type-II diabetes.  Risperdal lowers the seizure threshold and can worsen type-II diabetes.  On the day he was prescribed Risperdal, Trazodone and Zoloft, he submitted a health needs request stating he had a seizure in his cell. Risperdal should be attempted to be lowered or discontinued if patients are having uncontrolled seizures prior to starting or on the medication.  There is no documentation of screening for active seizures prior to initiating Risperdal and no documentation addressing co-management of his seizure disorder and use of Risperdal with a neurology specialist.

**2.      Sick call and access to care**

37.     Even if their serious medical concerns are flagged at intake, patients are often unable to obtain care because the sick call system is inadequate.  Outside

11

monitors have repeatedly found the Riverside jails incapable of providing the daily sick call that state law requires. These conditions harm prisoners, who experience extreme difficulty in obtaining necessary medical and mental health appointments. In the absence of a functioning sick call system they must either obtain a court order from the criminal court or file repeated blue slips (health care request forms) and grievances. Plaintiff Quinton Gray has never seen a Riverside jail doctor without an order from the Superior Court for care. He has received three orders: in late 2011, in June 2012, and in September 2012. Plaintiffs Stanley Kujawsky and Michael Wohlfeil similarly have had to obtain court orders to see a doctor in the Riverside jails.

38. Court orders, blue slips, and grievances regarding health care are routinely ignored. The County maintains an extensive computerized list of court-ordered appointments that notes how long the prisoners have been waiting; delays of one, two, or three months are common. One prisoner obtained a court order on November 21, 2011, that orders her "to see medical doctor within 48 hours to be evaluated for severe pain due to hernia on back. Court recommends medication treatment to control pain." After waiting several weeks, the prisoner filed a grievance asking that the order be honored. The response, dated December 23, 2011, acknowledged the court order and the month-long delay and stated that "nurses confirmed they are waiting for the doctor to show up to see the court orders." Plaintiff Stanley Kujawsky was prescribed pain medication without ever seeing a doctor in the jails; he received a court order on November 22, 2011, to see a doctor for his pain, but was not actually seen until January 25, 2012.

39. Some prisoners who request medical attention are told that doctors are only seeing patients with court orders for care.

40. Prisoners also file repeated blue slips without any result except a $3 charge exacted for each request. As a result, they are placed at serious risk of harm.

12

For example, one patient filed numerous blue slips complaining of serious stomach pain but was never seen by a doctor.  After three months of such complaints, he submitted a blue slip stating that he was vomiting blood, a symptom that can indicate an emergency leading to death and which is at minimum is concerning for gastric disease such as peptic ulcers or cancer.   The patient should have seen a physician immediately, had his vital signs and blood counts checked, and possibly even have been referred to an emergency room or gastroenterologist for further evaluation.  None of this was done.   He was not even referred to see a doctor for another month.

41.   Compounding the problem, prisoners often have extreme difficulty grieving inadequate access to care since they must request grievance forms from sheriffs' deputies, who often refuse to provide them.  Plaintiff Quinton Gray filed a grievance in September 2012 noting serious ongoing problems with access to medical and mental health care, and stating that he had to get a grievance form from "an outside agency" because of custody staff's refusal to provide him with a form and their interference with access to adequate health care.

42.   As a result of these policies and procedures, prisoners experience dangerous delays in access to both primary and specialty care.

43.   One woman entered the Presley jail with Stage Four colon cancer in late July 2011.  In early August, she was seen for abdominal pain, nausea and vomiting, similar to the colon cancer symptoms she had experienced on first diagnosis.  Her outside medical records, obtained at that time by the County, documented chemotherapy in 2009 for colon and ovarian cancer and a recent CT scan showing possible recurrence.  With these strong indicators that her cancer had returned, she should have received a colonoscopy and referral to an oncologist within a very few weeks.  Although both referrals were made on August 3, neither was completed by the time she was released from custody in December 2011.  For

13

more than four months, County medical providers demonstrated gross incompetence and negligence, with unexplained delays, apparently lost referrals, and a botched attempt at a colonoscopy, for which she was not given a basic bowel preparatory procedure – an elementary mistake.   Throughout this time, the patient repeatedly complained of abdominal pain and rectal and vaginal pressure.  The lack of care for her malignancy possibly allowed it to progress to a point where she was no longer a candidate for further treatment, shortening her life expectancy.  The inadequate treatment for her symptoms forced her to endure unnecessary pain and suffering.

44.     Another woman with a breast tumor suffered significant delays in care: she was denied timely appointments with a physician; multiple specialty appointments were not scheduled or were skipped, despite physician referrals; and she was frequently not notified of important test results such as biopsies, when standard practice is to notify patients of results within one to two weeks.  Nearly every time her complaints were addressed by medical staff was in response to a court order.  Her tumor was found to be benign; had it been malignant, these cumulative delays could have been life-threatening.  Although she received some medications to treat her ovarian cyst-related pain, she continued to have pain and physicians failed to order a repeat vaginal ultrasound or refer her to gynecology for further evaluation and management, as the standard of care requires.

45.     Plaintiff Angela Patterson arrived at the Riverside jails following surgery to place a temporary filter in a major blood vessel supplying her heart.  She was discharged directly from the RCRMC hospital to the jail.  Despite the fact that such filters should be removed within three months, there was no acknowledgment of the existence of the filter in her jail medical records for over a month.  Ms. Patterson then endured many months of delays, cancellations, and scheduling mix-ups in specialty care, as well as repeated medication administration failures that have continued throughout her time in the Riverside jails.  For nearly six months,

medical staff documented confusion over whether the IVC filter was temporary or permanent; they did not resolve the matter until March 2010, nine months after the filter was placed in her body.  She was not seen in surgery until June 25, 2010, at which point it was discovered that the filter could not be safely removed because of the accumulation of scar tissue.

46.     Following the surgery, a Riverside jail doctor discontinued Ms. Patterson's anticoagulation medication because of "filter removal," despite the fact that it was still in her body and there was a note in her medical records from two days earlier reporting that the filter had not been removed.  In August 2010, she was placed on life-long anticoagulation therapy.  Anticoagulation therapy has significant risks, including the risk of fatal bleeds, and requires daily medication and frequent laboratory monitoring -- a weighty burden, particularly for Ms. Patterson, who is 26 years old.  If physicians had appropriately obtained and reviewed her records and made efforts to refer her for IVC filter removal in a timely fashion (within a few months of placement), it is likely that the filter could have been removed and Ms. Patterson would need no further anticoagulant therapy, with all the risks that entails. The risks are significantly enhanced by the repeated medication administration failures she continued to suffer throughout her time in the Riverside jails: the frequent missed dosages, switched dosage times, and inadequate monitoring have resulted in blood anti-coagulation levels so low as to put her at risk for blood clots.

47.     A patient with chronic high blood pressure was inadequately screened on intake, as described above, which resulted in an emergency room visit and dangerously high blood pressure.  Subsequent months in custody saw no improvement in her care, as Riverside County medical staff failed utterly to monitor her chronic condition.  Her care was repeatedly delayed, prescribed medications repeatedly not offered, and the sub-par care led to multiple episodes of uncontrolled hypertension and preventable emergency room visits.

**48.**     A patient experiencing uncontrolled seizures and multiple emergency
room visits was not given a neurology referral for more than three months after his
arrival in the Riverside jails.  After the referral was made, he waited for two more
months to actually see a neurologist, although he was having seizures two to three
times per week, often sustaining head trauma and other injuries, and although
managing his condition was clearly beyond the scope of a general medicine
practitioner.  The neurologist recommended an EEG, which was never performed.
The patient continued to have uncontrolled seizures and emergency room visits; he
had another neurologist appointment two months later, at which point the EEG was
re-ordered.  The patient was never referred to an epilepsy specialist, despite the clear
indication that his medication regime was ineffective and such a consultation was
needed.  Continued, untreated generalized seizures place patients at high risk for
immediate injury (such as he repeatedly sustained) as well as worsening long-term
cognitive impairment, decreased function, and diminished quality of life.

**49.**     Another patient arrived in jail with a lap-band that had been surgically
inserted into his stomach for weight loss.  He soon began to demonstrate symptoms
of a esophageal obstruction (a known complication of such surgery), including
significant weight loss, nausea, vomiting, and extreme hunger.  Despite numerous
requests for help, he experienced unnecessary delays in diagnosis and treatment and
failure to respond to his multiple health complaints.  For example, after two
episodes of loss of consciousness, a documented 17-pound weight loss in 30 days,
complaints of inability to tolerate any food or liquid intake, and a blood pressure of
90/60, he was merely referred for a medical appointment more than a week in the
future.  The delays in diagnosis of his obstruction put him at risk for serious health
complications due to rapid weight loss and deprivation of essential nutrients.

**50.**     A prisoner who filed blue slips complaining of a head injury in
October 2012, after an assault, was given only Tylenol and not assessed for serious

**THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

injuries for several days, despite repeated complaints of pain in his head and right side, which are indicators of potential brain injury.  When he was finally sent to the emergency room, he was given a CT scan that showed a brain bleed.  Fortunately, the brain bleed was small; if he had suffered a more serious injury, the delay could have been fatal.

**51.**     Plaintiff Michael Wohlfeil experienced delays of more than two years in getting even basic diagnostic tests to determine appropriate treatment for his numerous tumors and his chronic diarrhea and weight loss.

**52.**     Access to mental health care is no better.  Defendant's deficient system forces mentally ill prisoners to wait weeks or months for mental health assessment and evaluation by clinical staff, during which time they are denied essential psychotropic medications and other treatment.  The Sheriff admitted this problem in July 2011, acknowledging that "such delays may impact an inmate's mental stability."  As with medical care, many mental health patients must file repeated blue slips or grievances to get seen; others are only seen by clinicians after the judges in their criminal cases have ordered care.  Patients experience a range of symptoms, from auditory hallucinations to severe depression, while enduring these lengthy delays.

**53.**     Plaintiffs Quinton Gray, John Rosson, Brandy McClellan, and Julie Miller have all experienced significant delays in access to care.  Instead of receiving the appropriate oversight that standard of care demands for patients with their significant mental health conditions, they have been forced to file blue slips and grievances, get court orders, and seek help from outside advocates in order to receive basic care and attention from mental health staff in the jails.

**54.**     Patients with serious dental care needs suffer from the same pattern and practice of injurious delays.  Patients in severe pain wait for months to see a dentist and face significant pain and suffering as a result.   For example, one patient with

**THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

only two functioning teeth lost more than 20 pounds in the six months he has been
incarcerated because he is unable to eat much of the food he is served and he cannot
afford to buy his own.  He has submitted blue slips to see a dentist to get dentures
without success.

55.     Another patient experienced serious delays in care: her complaints of
tooth pain were first documented in her health records in December 2011.  On
March 17, 2012, a progress note in her file simply reads "Back upper Rt tooth broke
and gum swollen."  This one-line progress note, with no medical history, duration of
symptoms, or full exam, is inconsistent with accepted medical standards of care.  In
addition, the patient was prescribed penicillin and motrin for her symptoms without
any mention of a dental referral or evaluation.

56.     Another patient filed a request complaining of a broken tooth and
requesting a dental referral on September 21, 2011.  He submitted a repeat request a
month later also requesting a dental referral.  He was not seen for these complaints
until November 1, 2011, at which time medical staff noted that he had decayed teeth
and referred him to dental staff without any mention of his ability to eat or whether
the tooth looked infected.  In the many months he has been waiting, he has
experienced intermittent severe pain in his teeth that makes him unable to eat
several times a week.

57.     Plaintiff Michael Wohlfeil has suffered from chronic tooth pain caused
by cavities.  He has had twelve teeth pulled in the last three years.  In all but one
case, the dentist could not or would not provide Mr. Wohlfeil with a filling and told
him that he was only able to pull the teeth.

### 3.     Specialty referrals and diagnostic tests

58.     The Riverside jails lack adequate policies and procedures to provide
patients with needed referrals for specialty medical consultations and procedures.
For example, a patient with colon cancer was referred for a colonoscopy and to an

18

oncologist on August 3, 2011, but neither was completed by the time she was released from custody in December 2011.  Given that her cancer was Stage IV, she should have been seen in a very few weeks.

59.     As discussed above, Plaintiff Angela Patterson experienced numerous delays and cancellations in specialty referrals, which likely led to build-up of scar tissue on a temporary filter in a blood vessel near her heart.  As a result, she will live the rest of her life with this filter in her chest and suffer a lifetime of serious anticoagulation medication with related health risks and the burden of frequent monitoring.  In addition, a CT scan was ordered in January 2011 to be performed in six months to rule out a possible slow-growing tumor on her scalp.  As of January 2013, it had not yet been performed – well over a year late.

60.     As discussed above, Plaintiff Michael Wohlfeil spent more than two years waiting for specialty care and tests to diagnose and develop a treatment plan for his chronic, debilitating diarrhea and the dozens of tumors that cover his body.  He still has not been tested for Hepatitis C, despite reporting a history of the disease.  These unacceptable delays exposed him to serious risk of harm.

61.     Another man with uncontrolled seizures and multiple emergency room visits was not given a neurology referral for more than three months after his arrival in the Riverside jails.  After the referral was made, he waited for two more months to actually see a neurologist, although he was having seizures two to three times per week.

62.     A man who had experienced severe recent head injuries was ordered an ENT consultation by a Riverside jail doctor but it did not take place and had to be re-ordered one month later.  When the ENT consultation finally took place, he was not sent with his crucial records and the appointment was of limited use.  He was referred for surgery on September 30, 2011, but did not receive it, and despite

**THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

1  repeated complaints of pain and two more court orders for care, he was not seen
2  again until November 8, 2011, when the surgery was re-ordered "ASAP."

3      **63.**    A patient with multiple chronic conditions -- a seizure disorder, asthma,
4  psoriasis, and Hepatitis C -- experienced multiple delays in obtaining timely
5  referrals, even after ordered by physicians, as well as follow-up, resulting in sub-
6  standard care.

7      **64.**    One prisoner who complained of a tumor on his neck in September
8  2012 was referred for an ultrasound but it was not done for nearly six weeks, and the
9  results – which were atypical -- were not communicated to the prison for two weeks.
10 After the results were finally reviewed, he was ordered a CT scan and a surgery
11 referral "ASAP." Despite this order and his complaints of worsening pain, he was
12 not seen in surgery for more than four weeks, at which time the CT scan was re-
13 ordered. The CT scan results showed some abnormalities, and a follow-up CT scan
14 and surgery consultation were ordered in December 2012, but the CT scan was not
15 done and the patient was not seen in surgery until March 2013, more than three
16 months after the referral.

17     **65.**    The March 2013 appointment was of limited value because the
18 patient's medical records from a previous surgery (ordered three months earlier) had
19 never been obtained. As it was, he was scheduled for surgery on April 3, but the jail
20 did not bring him to the surgery and it had to be rescheduled for several weeks later.
21 If this patient's abnormal mass had proven to be cancerous, these delays could have
22 been deadly.

23     **66.**    A diabetic prisoner was given substandard care for his chronic
24 condition. Hemoglobin A1c tests are standard monitoring mechanisms given to
25 diabetics every three months. Despite repeated orders, there are no hemoglobin A1c
26 test results in his records from his arrival in August 2012 through February 2013, a
27 failure that places him at serious risk for inadequate care. In the same time period,

28

**THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

he was never given a foot exam, a standard annual precaution for diabetics to assess for neuropathy, despite the fact that he was being medicated for peripheral neuropathy.

### 4.    Denials of care

**67.**    Some prisoners face outright denials of basic and necessary medical care.  Plaintiff Quinton Gray was prescribed Dilantin on his arrival at the jail, but even after two emergency room readings taken over the next few days showed that the Dilantin level in his blood was far below the therapeutic level, jail medical staff did nothing for well over a year.  Plaintiff Michael Wohlfeil reported a history of Hepatitis C on his arrival at the jail in 2011, and was recommended for testing, but has not received it, placing him at risk for liver damage or failure.

**68.**    A prisoner with thyroid disease was denied medication for nearly three months.  Although her initial screening form missed the condition, it was noted repeatedly on her charts for several months by medical staff before she was finally prescribed medication.  Missed doses of thyroid medication for a prolonged period put patients at risk for severe fatigue, slow heart rates, weight gain, constipation, hair loss, edema, and eventually coma.  The same patient also has a history of gastric bypass surgery; the jail doctor refused her any dietary supplements to ensure proper nutrition throughout her jail stay, despite repeated requests.  Patients are at risk for malnutrition following bypass surgery and require life-long vitamin supplementation.  In addition, no tests were ordered to assess any nutritional deficiencies, another violation of the standard of care.

**69.**    Another prisoner fell and hurt his back at Presley in November 2010 and again in March 2011.  He was provided inadequate neurologic exams after his falls, several-month delays for scheduling of x-rays and consultations (even when ordered "as soon as possible"), and inadequate trial of physical therapy; his back pain went essentially untreated.  Two clinic appointments were cancelled due to

"too many ad-segs" and one was cancelled because a wheelchair van was not available.

70.     A patient with high blood pressure and a history of coronary artery disease complained to staff of an irregular heartbeat and chest pain in July 2012.  He was told simply to tell staff if it happened again, which is dangerously inappropriate due to the serious risk of heart attack this patient presents.  Five weeks later, he was found unresponsive, pale, and sweaty, with high blood pressure and a heart flutter.  There is no indication in his medical records that any tests were done or vital signs taken at the jail; he was subsequently hospitalized for several days.  A month later, in September 2012, the jail doctor ordered a regime of blood pressure checks (daily for five days, weekly for two weeks, and then monthly) as well as a follow-up appointment; the blood pressure checks were not done and the appointment never took place.  In November 2012, his blood pressure was found to be high, but he was not seen by a doctor.

71.     The same patient has records from July 2012 noting that he has Hepatitis C, but there is no further follow-up regarding this condition in his medical record, a clear violation of the standard of care, which requires a determination of whether he has cirrhosis or is a candidate for treatment.

**B.  Substandard medication management and administration**

72.     Reliable and systematic medication delivery is an essential element to a constitutional health care system.  Defendant has a policy and practice of failing to prescribe, provide, and properly manage medication, and of providing incorrect, interrupted, or incomplete dosages.  As a result, prisoners with serious health care conditions are placed at substantial risk of harm and are in fact harmed.

73.     Many patients are provided substandard care because there is inadequate staff to distribute medications.  (Staffing deficiencies are described in more detail in the following section.)  Medication deliveries are often skipped

entirely, leaving patients without essential treatment.  Plaintiffs Quinton Gray, Angela Patterson, Stanley Kujawsky, and John Rosson have experienced numerous skipped medication dosages at various Riverside jail facilities, placing Mr. Gray at serious risk for heart attack, stroke, and seizures; exposing Ms. Patterson to an increased risk of recurrent thrombosis; endangering Mr. Kujawsky's cardiovascular health, and seriously endangering Mr. Rosson's mental health and risk of self-harm.

74.     Other prisoners face the same problems.  One patient who is prescribed medications for his chronic high blood pressure has experienced a dangerous number of missed doses: for example, in April 2011 he was not given nine doses of both of his medications, and in September 2011 staff did not administer 14 doses of one and eight doses of the other medication.  Another patient who has been prescribed medications for his diabetes has experienced numerous missed medication doses – 21 missed doses in one month alone.

75.     One patient with a fractured foot was prescribed pain medications but repeatedly denied scheduled doses of his medications throughout the second half of 2012, despite his frequent requests.

76.     In practice, medication distribution in the jails takes place only once or at most twice daily, leaving patients who require multiple daily dosages, or bedtime delivery, unserved.  Since the Smith facility is so large, nurses start evening pill call at approximately 2 p.m. to allow them to deliver medications throughout the institution.  This includes sleep medications: some patients receive their pills in the middle of the afternoon and fall asleep within a few hours.  Pill call is erratic for many prisoners, and evening pills might arrive any time from 3 to 11 p.m., if at all, which is particularly dangerous for diabetics, many of whom must receive medications at regular intervals, coordinated with meal times.  Plaintiffs Julie Miller, Brandy McClellan, and John Rosson have experienced and continue to experience these fluctuating medication delivery times to their detriment.

THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Throughout 2012 and 2013, Plaintiff Angela Patterson has had her medications
delivered at inconsistent times, including being switched by jail staff from morning
to evening, despite the fact that the medication should be taken at the same time
daily, likely affecting her treatment stability.

77.     Defendant's policy and practice is to require patients to alert staff when
their medications run out.  As a result, some prisoners' prescriptions are not
renewed until they file multiple health care requests or grievances, resulting in
significant treatment interruptions with resulting, predictable harm to the patients.
Plaintiffs John Rosson and Julie Miller are two of the many prisoners who suffer
from this policy and practice.  In another example, a patient at Southwest Detention
Center has experienced several one-month gaps between refills of his psychiatric
medications, including Paxil.  Paxil has a well-documented discontinuation
syndrome: the lengthy lapses in medication delivery place him at serious risk for
severe discontinuation symptoms including flu-like symptoms, nausea, vomiting,
and headaches.  A Presley patient prescribed pain medications for his severe back
pain is frequently deprived of the medications when the prescriptions run out and
refills are not provided; doctors also renew his medications without assessing their
efficacy.

78.     Plaintiff Stanley Kujawsky has been denied medications on the days he
goes to court for hearings in his criminal case as well as on the days he goes to see
outside specialists for medical care.  These deprivations are pursuant to policy and
practice: numerous other prisoners are denied medications altogether when they
attend court hearings or are transported to outside appointments.  Some prisoners
regularly miss medications in the morning because they are asleep and staff
routinely fail to announce medication delivery effectively.

79.     Riverside also has a policy and practice of failing to monitor the effects
of medication to determine whether dosages are correct or medications should be

changed.  Plaintiffs Quinton Gray, Angela Patterson, Stanley Kujawsky, Brandy McClellan, Julie Miller, and John Rosson have suffered from inadequately monitored medication regimens which have seriously endangered their health and forced them to endure unnecessary pain and suffering.  Their problems are typical of those experienced by medical and mental health patients in the Riverside jails.

**80.**    For example, one man with high blood pressure has been given two medications to treat his condition, but on occasion, without explanation, he has been abruptly discontinued from one of the medications.  No monitoring of his condition is documented in his medical records, suggesting that either such documentation is missing or it was never charted -- either way, lack of proper documentation can be dangerous for patient care and signifies a concerning level of disorganization within the medical department.

**81.**    The same patient's file lacks any progress notes documenting any blood pressure, history, physical exam or lab tests during the duration of treatment. In general, when starting or changing blood pressure regimens, patients' blood pressures should be checked to ensure that they are not over-medicated or given low blood pressure, which can be dangerous.  In addition, without monitoring blood pressure, there is no way to know if the patient was actually adequately controlled -- high blood pressure could put him at risk for strokes, brain bleeds and heart attacks. Further, because one of his medications can be associated with electrolyte abnormalities, the standard of care requires physicians to check basic blood tests for sodium, potassium and kidney function levels either prior to or shortly after starting such agents.  None of this was done.

**82.**    A diabetic man who entered the Riverside jails with an elevated blood sugar count was prescribed medications and ordered glucose checks twice daily for two weeks and then weekly thereafter, as well as various blood work.  These orders were apparently ignored, however, along with two subsequent orders for weekly

blood sugar checks: his health records show only two glucose checks over the next several months and no evidence that he ever had the blood work performed.  This failure to monitor his condition placed him at serious risk of harm, particularly since one of the medications he was prescribed, Glipizide, can make patients hypoglycemic.

83.     In one of the most disturbing events of medication mismanagement, a patient who was clearly documented as allergic to Dilantin was repeatedly prescribed the medication, placing him at serious risk of medical complications.  He had to repeatedly refuse doses of the medication in June 2012.

84.     Psychotropic medications also are not monitored to determine whether they are effective or whether they cause severe side effects.   Quinton Gray, Julie Miller, and Brandy McClellan all experienced distressing and painful side effects (including involuntary muscle contractions and incontinence for Mr. Gray, significant weight gain for Ms. Miller, and severe cardiac complications for Ms. McClellan) that could have been avoided or ameliorated with oversight, monitoring, and treatment adjustment that met the community standard of care.

85.     Patients face serious consequences from the denial of appropriate medications.  For example, one man experienced uncontrolled seizures resulting in serious injuries.  His medication regimen was clearly ineffective, but he was merely prescribed increases in his existing medication, contrary to the standard of care.  He continued to suffer from frequent seizures and resulting physical injuries.

86.     Another patient fell in his cell and hurt his hand (he uses a cane due to leg injuries, but is only allowed it to ambulate longer distances).  He was sent to the emergency room one day later with increasing pain in his hand.  He was found to have suffered a fracture and prescribed Vicodin and Ibuprofen for the pain.  He was never given these medications on his return to the jail, and suffered unnecessary pain as a result.

**THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

87.     Medication lapses can be particularly devastating in the mental health realm.  According to Sheriff Sniff, "continuity in delivery of mental health medications may affect the stability of an inmate's mental health and is critical to inmate care."  More specifically, delays in administering psychotropic medications to mental health patients can result in serious harm.  Such harm is occurring in the Riverside jails: prisoners experience frequent gaps in medication delivery, as the Sheriff has admitted.  Sometimes psychotropic medications are not distributed at all in entire housing units, since nurses are simply overwhelmed.  At other times, patients' medications are abruptly changed with no examination and no explanation.

88.     These interruptions harm prisoners.  Plaintiff John Rosson experienced a lapse of more than two weeks in medication delivery, despite filing a blue slip and speaking to a doctor about his need for the medications.  As a result, he became despondent and self-harming, cutting his arm and leg.  He was placed in a filthy safety cell and the county hospital, where his medications were final stabilized.  The medication failures have been of long standing: Mr. Rosson has filed repeated grievances over the last several years regarding medication failures, but these attempts to obtain appropriate care have been unsuccessful.

89.     Similarly, over many months in the Indio, Presley, and Smith jails, Plaintiff Quinton Gray had his powerful psychotropic medications either suddenly discontinued or multiple doses missed.  Another man held in the Presley facility experienced significant lapses, without explanation, in receiving medication for his bipolar disorder: his Zoloft was not renewed for nearly one month, and his Topomax was not renewed for nearly three months.  Further, neither medication was appropriately titrated on being restarted.  Sudden discontinuation of these medications can cause manic episodes and seizures as well as physical symptoms such as nausea, vomiting, and headaches; sudden resumption after a significant gap

in time can also cause damaging side effects.  The patient in fact experienced depression and severe mood swings due to the medication mismanagement.

90.    Similarly, a patient at Smith had his psychotropic medications and dosages changed repeatedly over two years, including the abrupt and unexplained cessation of his antipsychotic medications.  A Presley patient also had psychotropic medications abruptly started, stopped, and renewed over several years with little or no evaluation or assessment.  This pattern and practice of medication mismanagement places these patients at serious risk for decompensation, untreated mental illness, and severe side effects.

91.    Another patient arrived at the jails with a diagnosis of bipolar disorder, on psychiatric medications, and with a reported history of prior suicide attempts. Bipolar disorder has one of the highest rates of suicide for any psychiatric condition, 20 to 30% higher than the suicide rate of the general population.  He was prescribed Lithium and Depakote, medications typically used for bipolar disorder.  He had multiple documented suicide attempts while in jail, and multiple visits to safety cells.  Despite severe and life-threatening suicide attempts there is no documentation of any psychiatric intervention, including psychiatric hospitalization, assessment or change in medications.  Even after repeated attempts at self-hanging he continued to have access to implements by which he could attempt to hang himself again.  When he did receive medications, they were not given as directed and were given inconsistently.

92.    Another prisoner has a history of high blood pressure treated with the medication Norvasc.  He was started on the drug Olanazapine. A patient with this history should have had baseline labs done prior to initiation of Olanazapine, including a lipid panel and HbA1C levels, because Olanazapine can cause weight gain, hyperlipidemia and metabolic syndrome, which would place him at higher risk of cardiac and metabolic complications.  No such baseline assessment was done.

THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

This patient's medical administration records indicate that on multiple occasions he was not given Risperdal.  Missing doses of Risperdal can cause discontinuation symptoms of nausea, sweating, dizziness and dyskinesias.

93.     Another prisoner was prescribed Thorazine and Prozac. This patient's medications were renewed late, doses were not delivered, and his medications were abruptly discontinued, with no indication that he was assessed prior to discontinuation and no rationale given for discontinuation. This left the prisoner at risk for rebound tardive dyskinesias, extrapyramidal symptoms, and worsening psychiatric symptoms.

94.     Another prisoner with a history of schizophrenia was prescribed a high dose of Thorazine, which was suddenly discontinued in October 2012.  Sudden discontinuation of Thorazine can lead to rapid decompensation of psychotic symptoms (e.g., voices, paranoia).  His antipsychotic was restarted two months later but at a much lower dose.  The two-month period without an anti-psychotic medication left him at risk for worsening psychiatric symptoms.  Two weeks later he attempted suicide by cutting his neck and wrists and was hospitalized.

C.     **Severe staffing deficits**

95.     Many of the deficits described herein stem from the inadequate health care staffing levels maintained by Defendant in the jails.  There are simply not enough doctors, nurses, mental health providers, pharmacists, or medical records staff to meet the needs of the population.

96.     Defendant's policy and practice of severely understaffing health care positions in the jails is long standing and has been repeatedly censured by the county Grand Jury.  In 2010, the Grand Jury found that "[m]ental health staff is not available in any county jail facility in sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental

**THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

disorders." The Grand Jury Report released on June 14, 2012, states the problem in clear terms:

> In July, 2011, DMH was advised. . . .that the medical/mental health staffing levels in county jails needed to be restored to 2007 levels, in order to be in compliance with [state law]. As of this writing, the Grand Jury learned through sworn testimony that during the eight months following the 2010-2011 Grand Jury report, DMH staffing levels were allowed to decrease even further.

97. Medical care is no better: according to the independent Inmate Medical Quality evaluators, invited by Sheriff Sniff to identify deficiencies in jail health care, "[t]he request for medical care exceeds the capability of the staff to meet the demands." The Detention Health Services administrator agreed, admitting that "the demand exceeds the resources available to provide the requested services."

98. Long-term medical vacancies are endemic, particularly given the competition with the higher salaries offered by the state prison system. For example, at the beginning of 2011, there were only three physicians for well over 3,000 prisoners in the five jails. Two doctors subsequently resigned and for at least several months, there was not a single physician, physician assistant, or nurse practitioner working in the Riverside jails – only a "Chief of Medical Specialty" who rarely saw patients. Only two of the five full-time physician positions in the jails were filled as of May 31, 2012.

99. Other medical staffing is also deficient. As of May 2012, the County had multiple vacancies for nurses and nurse supervisors, and only 65 of 101 total Detention Health Services positions were filled. Further, according to the state's Corrections Standards Authority (CSA), a body with statutory duty to regularly inspect county facilities, "there is no budget for overtime and no staff available to provide services in the event of illness, injury, or vacation."

**THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**100.**   Staffing has not improved meaningfully since that time.  As of September 2013, the County had only a 63% fill rate for medical staff in the jails, including three of five physician slots vacant; all three nurse practitioner slots vacant; and 22 of 57 institutional nurse slots vacant.  County records from October 7, 2013, show similar severe deficiencies: three of five physician slots are still empty and the sole physician's assistant position is also empty.  The October 2013 records further show 28 out of 73 institutional nurse positions vacant (including senior and supervisor positions, and excluding positions at the juvenile halls) and 16 out of 42 licensed vocational nurse positions vacant (excluding positions at the juvenile halls).

**101.**   Defendant lacks the staff necessary to provide minimally adequate dental care.  By the County's own assessment, two full-time dentists and two full-time dental assistants are required to offer basic dental care to the nearly 4,000 prisoners.  As of May 2011, only one dentist and one dental assistant were working in the jails. As of October 2013, there were still just one chief of dentistry and one dental assistant working in the jails.

**102.**   A patient at the Smith Jail with chronic high blood pressure filed a grievance complaining that although the doctor had ordered blood pressure checks every three days, he had only received them twice in the preceding 23 days.  The grievance response from Senior Corporal Diaz confirms that the patient "is still not having his blood pressure checked.  When he asked the nursing staff they stated they do not have the time."

**D.     Violations of patients' confidentiality rights**

**103.**   According to the Grand Jury, Riverside "has no confidential self-referral system by which inmates can request mental health care without revealing the nature of their request to correctional officers," as required by federal and state law.  *See* 45 C.F.R. §§ 164.500 *et seq*.; Cal. Civil Code §§ 56.10 *et seq.*  Requests

for medical care have historically not been confidential, since they too have been
delivered to medical staff by custody staff.   Prisoners were until recently directed to
give blue slips requesting health care directly to custody staff; many believe that
they must provide as much detail as possible about their health care needs in order
to increase their chances to be seen.  It remains to be seen whether the policies,
changed on paper, result in improved privacy.  Further, many prisoners, including
Plaintiffs Gray and Kujawsky, also must file grievances in order to be seen by
clinicians.  To get grievance forms, they must persuade custody staff that their
concerns are significant.  The grievances are then heard by custody staff, who make
the determination whether to involve health care staff.

**104.**   Examination space at Southwest Detention Center is not confidential:
patients can overhear other patients' examinations through an open door, as they
wait in the hallway for their own treatment.

**105.**    In addition, mental health care encounters are often held in the
presence of custody staff and even other prisoners.  Such violations of privacy do
not allow for effective treatment, since they reduce the likelihood that patients will
provide a thorough account of their concerns and needs.  Plaintiffs Miller, Rosson,
and Gray have all experienced such substandard mental health encounters.

### E.    Poor records administration

**106.**   Adequate health care cannot be provided in the absence of adequate
health records: clinicians must know their patients' medical histories, past diagnoses
and treatment, and for psychiatric patients, a history of suicidal thinking or attempts.

**107.**   Riverside's medical records system is profoundly disorganized and
incomplete.  Some psychiatric patients have no diagnosis recorded, despite the
prescription of psychotropic medications.  Some patients are prescribed medications
but lack any record of medication administration in their file, or any record that the

32

effects of the medication were tracked and reviewed.   All three Plaintiffs' health care records demonstrate Riverside's failures in this area.

**108.**   It is not surprising that record-keeping is inadequate: as of December 6, 2011, the entire medical records staff for five jails and well over three thousand prisoners was three medical records technicians and no medical clerks.

**109.**   The record-keeping gaps impact patient care because clinicians and nurses will be unable to track physician's orders, medication administration records, and general patient care.

### F.   Inadequate quality assurance

**110.**   Not surprisingly, given the paucity or records and severe staffing shortages, Riverside officials lack the ability to identify and correct the problems described herein.   Health care staff do not systematically correct identified deficiencies, and there is inadequate staff for oversight and review of care.

## II.   Even If Prisoners See Health Care Providers, They Do Not Receive Constitutionally Adequate Medical or Mental Health Care

**111.**   As detailed in the previous section, Riverside's lack of the basic elements of a health care delivery system -- policies and procedures to ensure timely access to appropriate care, medication management, adequate staffing, patient confidentiality, medical records, and quality assurance – harms Plaintiffs and members of the plaintiff class.   Even when they are able to see health care providers, prisoners are by policy and practice denied adequate medical and mental health care in the Riverside jails: they experience gross treatment failures, inadequate examinations, and the failure to provide necessary specialty appointments and diagnostic tests.

### A.   Substandard medical care

**112.**   Plaintiffs Gray, Patterson, Kujawsky, and Wohlfeil, on behalf of themselves, the plaintiff class, and the medical subclass, assert the following.

113.   Prisoners – even those with serious medical conditions -- rarely see physicians, and health care records demonstrate a paucity of appropriate follow-up, monitoring, and specialty referrals, as well as improper care.

114.   Plaintiff Quinton Gray has chronic high blood pressure that has been inadequately monitored and controlled by Riverside jail medical staff.  He has experienced multiple elevated blood pressure measurements without any assessment of the efficacy of his medications and dosages.  He has twice gone without blood pressure check for more than four months, despite his history of elevated readings and despite the fact that regular readings had been ordered by physicians.  In addition, he is frequently not provided his medications at all, thus increasing his risk of poorly controlled blood pressure.  Uncontrolled blood pressure can cause heart attacks, heart failure and strokes.

115.   Mr. Gray's seizure disorder has also been inadequately treated.  He was prescribed Dilantin on his arrival at the jail, but two emergency room readings taken over the next few days showed that the Dilantin level in his blood was far below the therapeutic level.  Jail medical staff did nothing for well over a year, at which point a Dilantin level check was ordered, then re-ordered after it was not performed.  Moreover, Mr. Gray is frequently not provided his Dilantin at all, placing him at serious risk for seizures, which he has experienced in the jails.

116.   Plaintiff Angela Patterson has experienced significant and damaging sub-standard health care, as described above, which has likely caused her permanent injury.

117.   Plaintiff Stanley Kujawsky has chronic high blood pressure.  Sub-standard care in the Riverside jails has endangered his cardiovascular health.  First, multiple dosages of his blood pressure medication have not been administered as prescribed at several different jails.  He has been denied his long-prescribed medications on his transfer to different jails in the Riverside system and has been

34

denied medications when jail staff allow the prescriptions to run out without refilling them.  He is also denied medications on the days he appears in court as well as the days he has specialty care appointments in the Riverside county hospital, in part because there are no medical staff on duty at the Presley jail who could deliver the medications on his return, after 6 p.m.  As a result of these missed dosages of blood pressure medication, Mr. Kujawsky has suffered from abrupt and repeated fluctuations in his blood pressure.

**118.**   Mr. Kujawsky has filed repeated grievances on this denial of medications, notably on June 15, 2012; July 15, 2012; August 15, 2012; and January 30, 2013.  These grievances have either been granted or ignored, but the problem has not been solved.

**119.**   Further, the blood pressure medication Mr. Kujawsky has been prescribed in the jails -- Clonidine -- is usually a last-resort drug to control blood pressure since it can cause severe dizziness and low blood pressure and in particular can cause rebound tachycardia (an elevated heart rate) if doses are missed.  It should not be prescribed unless a patient can take it consistently and reliably, which is clearly not the case in the Riverside jails, as medical staff should well know and as is amply demonstrated by the medication administration record showing repeated missed doses of his medications.   Moreover, the frequent use of Ibuprofen, as prescribed to Mr. Kujawsky, can also elevate blood pressure, which has likely contributed to some of his high readings.

**120.**   Plaintiff Michael Wohlfeil has experienced significant and damaging sub-standard health care, as described above, which has placed him at serious risk of harm.

**121.**   Other patients experience similarly inadequate and at times life-threatening medical care.  For example, one patient arrived in the Riverside jails after having been assaulted with a crowbar just three weeks earlier.  He had spent

**THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

two of those weeks in the hospital and had undergone surgery to repair his jaw and
implant hardware.  Despite obvious facial injuries and blood noted in his ear on his
arrival at the jail, he was not seen by a doctor for three weeks, and not until he
received a court order for treatment.  At that time, his severe recent head trauma was
noted and the doctor ordered an ENT consultation.  However, it did not take place,
and the consultation had to be re-ordered one month later.  Following a second
court-ordered doctor's appointment, the patient's implanted hardware was found to
be coming out of his jaw.  He was diagnosed in the emergency room with a
fractured dental plate.  He was again referred for an ENT consultation, which finally
took place a week later.  Because he was not sent with his crucial records, however,
the appointment was of limited use.  He was referred for surgery on September 30,
2011, but did not receive it; despite repeated complaints of pain and two more court
orders for care, he was not seen again until November 8, when the surgery was re-
ordered "ASAP."  Throughout, the patient was never seen except in response to a
court order.  Repeated warning signs – complaints of incontinence, evidence of
memory loss and confusion – were ignored, and there are no documented attempts
to determine whether he was experiencing brain trauma symptoms or displaying
underlying dementia, psychiatric disease, or cognitive deficits.   Had the patient
been evaluated when he was first noted to have his injuries at the time of booking,
with records requested sooner and a more timely evaluation and appointment in both
the ENT clinic and the oral and maxillofacial surgery clinic, his serious
complications could have been minimized and they certainly would have been
treated earlier, likely reducing the unnecessary pain and suffering that he endured.

  **122.**   A patient at the Smith jail was seen by a nurse for ear pain on August 2,
2011.  The doctor did not examine him, but prescribed medication over the
telephone.  Five days later he was seen again by a nurse for worsening pain and
redness of the ear; the doctor, again over the telephone, referred him to the

**THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

emergency room at RCRMC.  Following that visit, the same doctor prescribed antibiotics over the telephone, which he never received.  Two weeks later, he had another emergency room visit and was again prescribed the same antiobiotic by the same doctor by telephone.  Three weeks after that, on September 15, the patient underwent tympanoplasty and mastoidectomy at RCRMC.  On his return to the jail after the surgery, he was prescribed Vicodin and antibiotics over the telephone but never received them.  On September 22, he reported blood coming from the ear but was only seen by the nurse and not a doctor; the doctor ordered medications over the telephone.  He again reported bleeding on October 1 to the nurse but was not seen by a doctor.  He was finally seen on October 5, 2011, by a specialist at RCRMC and was noted to have pus in his ear.  Throughout the entire ordeal, he never once saw a doctor at the jail.

123.    Another patient with a long history of seizures endured many months during which he was denied all seizure medications.  Jail medical staff were aware of his seizure disorder on November 8, 2011, but despite multiple blue slips requesting care, he was not prescribed seizure medications until April 9, 2012.  He suffered several seizures in custody which would likely have been prevented if he had been evaluated by a physician sooner and continued on his stable, home anti-seizure medication regimen.

124.    Another patient was seen, pursuant to court order, for ovarian cyst-related pain.  She was given some medication but continued to have pain.  Jail physicians failed to order a repeat vaginal ultrasound or refer her to gynecology for further evaluation and management, as the standard of care requires.

125.    Even when prisoners get to see the doctor, the examinations are often ludicrously inadequate.  Patients at Presley are "examined" in the non-contact attorney visiting booth.  However, instead of sitting on the well-lighted attorney side of the booth facing the patient behind glass, the doctor places himself outside of the

booth, where the deputies ordinarily sit, visible only through a slot for passing documents.  No meaningful physical examination is possible under such conditions. Without meaningful physical examinations, the standard of care cannot be met.

## B.    Substandard mental health care

**126.**   Plaintiffs Gray, Rosson, McClellan, and Miller, on behalf of themselves, the plaintiff class, and the mental health subclass, assert the following.

**127.**   Riverside County lacks an adequate system to provide a basic level of constitutional mental health care.  In the absence of such a system, the County fails utterly to provide appropriate, informed diagnoses and treatment plans, ensure continuity of psychotropic medication, monitor prisoners prescribed such medication, make available medications that are effective in treating serious mental disorders, or provide necessary therapeutic treatment.

**128.**   Many prisoners do not get the right medications, the right dosages, or appropriate ongoing care: the Grand Jury found that "[i]nmates with assessed moderate mental health problems such as neuroses, phobias, panic disorders, etc., are not always offered appropriate mediation and counseling by qualified staff to get and maintain them in a stable condition."  As a result, they suffer severe side effects and decompensation.

**129.**   Mentally ill prisoners are regularly started on powerful psychotropic medications with no record of any evaluation or treatment plan that takes into account medication interactions and underlying medical conditions.  This practice is dangerous because it does not allow subsequent monitoring or review, and places patients at serious risk of harm through lack of treatment or inappropriate treatment for their mental illness.

**130.**   Even prisoners prescribed appropriate medications face frequent disruptions in medication delivery, including abrupt cessation and missed pill

deliveries, which cause serious suffering for these mentally ill patients, as described in more detail in the prior section on medication administration.

**131.**   No tracking is done of patients' symptoms and any reaction they might have to the medication, except for a cursory, non-confidential questioning at their cell doors.  The monitoring of vital signs such as weight, cholesterol, and glucose levels, which is essential to ensure the patients are not suffering adverse effects from psychotropic drugs, is absent.  Dosages are changed abruptly, with no explanation.

**132.**   On arrival in the Riverside jails, Plaintiff Quinton Gray was prescribed several powerful psychotropic medications with no evaluation or assessment by a mental health professional regarding his underlying physical condition and medical treatment needs, and no baseline laboratory test to monitor known risky side effects of the medications.

**133.**   One of his medications, Geodon, must be taken with food or much of it is not absorbed.  Mr. Gray was not ordered to be given his Geodon with food, which placed him at risk for varying blood levels and varying side effects and efficacy.  He was also started on the maximum dose, which increases the risk of severe side effects such as acute muscle stiffness and tremors.  Several months later, Mr. Gray's medications were discontinued suddenly without appropriate tapering off of the maximum dose of Geodon, which placed him at risk for rebound tardive dyskinesia, seizures, discontinuation syndrome (flu-like illness) and decompensation of psychiatric symptoms (paranoia, hallucinations, and thought disorganization).

**134.**   Months later, Mr. Gray was started on a second antipsychotic while also on Geodon, despite the lack of clinical evidence that treating schizophrenic patients with two antipsychotics provides better efficacy or treatment outcomes, and despite the increased risk of side effects and drug-drug interactions.  When prescribed together, Mr. Gray's two medications increase the risk of tardive dyskinesia (such as tongue-biting), acute muscle stiffness and tremors, and cardiac

events (arrhythmias).  Both medications also lower the seizure threshold and when given together in a patient with a history of seizure disorder, could cause increased seizure events.

135.   In July 2012, Mr. Gray was started on Benadryl and Cogentin at the same time, with no documented explanation in his health care records.  There is never a need to treat a patient with both of these medications at the same time, and they have multiple side effects including constipation and delirium.

136.   Multiple doses of Mr. Gray's medications have not been administered to him during his stay in the jails.  Missed doses can alter blood levels in a way that increases side effects (including worsening of tardive dyskinesia), variably changes seizure thresholds and can cause decompensation of psychiatric symptoms.

137.   As a result of Defendant's failed mental health delivery system, Mr. Gray has in fact experienced twitching, tongue-biting, increased seizures and tongue swelling, all predictable side effects from taking near maximum dose of these two antipsychotic medications.  He lives with racing thoughts, disorientation, depression, and chronic sleep loss.  He has not been appropriately monitored or treated for these damaging side effects and signs of the inefficacy of his medication regimen.

138.   Plaintiff John Rosson, as described above, has experienced repeated failures to adequately treat and monitor his serious mental illness, culminating in an extended deprivation of his long-term psychotropic medications.  As a result, he decompensated and exhibited symptoms of self-harm serious enough to warrant hospitalization.

139.   Plaintiff Brandy McClellan experienced medication mismanagement that severely endangered her health when she was started on Thorazine, an outdated antipsychotic medication far from the standard of care in a modern mental health delivery system, along with Vistaril, a medication with overly sedating effects that

may impair a patient's ability to realize there is a problem.  Thorazine presents an unacceptable risk of sudden death due to cardiac arrhythmia and in fact, Ms. McClellan experienced a cardiac event serious enough to land her in the hospital. Riverside mental health staff not only failed to monitor her when she was placed on this dangerous combination of medications, but they were unaware of the dangerous effect she experienced, and the medications continued to be offered to Ms. McClellan daily at pill call for weeks after her hospitalization.  They were not changed until she herself notified mental health staff.  This event demonstrates dangerous indifference to patient care.

140.   Plaintiff Julie Miller has also been placed at serious risk by substandard care in the Riverside jails.  She has been prescribed multiple psychotropic medications that have the potential to interact dangerously with each other and with one of her physical medications, with no adjustments or monitoring of her condition to assure her safety and the efficacy of her mental health care.

141.   These failures are typical of the policies and practices that produce substandard mental health care generally for patients in the Riverside jails.  For example, one Southwest Detention Center patient was maintained on Paxil, an antidepressant with an extremely short-half life that can lead to a severe discontinuation syndrome if the dose is missed even for 24 hours.   He has experienced multiple incidences of missing days of medications as well as not having his medications renewed for one month periods, placing him at risk for severe discontinuation symptoms as well as decompensation. There are no medication monitoring standards set in place, particularly to monitor for weight gain on Paxil.  His medications were repeatedly renewed without evidence of evaluation.

142.   Another patient housed in Presley was started on multiple antipsychotic, anti-depressant, and bipolar disorder medications.  Multiple times her medications were renewed, stopped, started or changed without any documentation

THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

or assessment: in particular, her medications were renewed repeatedly for more than two years without any indication of ever being evaluated by a medical doctor; during this period two new medications were started without a medical evaluation or documentation of informed consent; and once her medications were not renewed for an entire month.  Sudden discontinuation of medications puts patients at risk for severe side effects and decompensation of psychiatric illnesses.  She was also started on multiple medications at high doses without appropriate titration, resulting in severe side effects, and subjected to the abrupt discontinuation of medications that might have been helpful for her symptoms.  Further, she was placed on safety-cell observation but was never evaluated by a medical doctor despite this being a psychiatric emergency.

**143.**   Another Presley patient was prescribed multiple psychotropic medications, two of which are relatively contraindicated and should have had clear documented psychiatric necessity for concomitant use including special monitoring for side effects.  There was none in her records.

**144.**   Further, the patient was started and stopped on multiple medications and had doses changed without any documentation of evaluation for efficacy, side effects or informed consent.  Such reviews were essential for this patient, since she was placed on Thioridazine, a drug used to treat psychosis, anxiety and insomnia, that with long-term use can cause tardive dyskinesia, a highly distressing and uncomfortable phenomenon consisting of involuntary movements.  There is no documentation she was ever evaluated for such side effects.

**145.**   In addition, she had significant periods of not receiving her medications as well as frequent missed delivery of individual doses, placing her at risk for discontinuation syndrome including intense anxiety, flu-like symptoms, headache, nausea/vomiting, and parasthesias as well as rapid decompensation of mental illness.  Moreover, despite missing significant periods of medications, the medications were

suddenly restarted or given again at their regular doses rather than appropriately re-titrated.  One of her medications, Lamotrigine, can result in a life-threatening rash if it is suddenly started  after stopping it for several days, as happened in her case. Sudden starting of Paroxetine, another of her medications, can lead to severe gastro-intestinal upset, sedation and anxiety.

**146.**   A patient at Smith was started on numerous psychotropic medications without any documentation he was monitored for efficacy or side effects.  He experienced significant lapses in medication administration, placing him at risk for discontinuation syndrome associated with his medications, including severe headache, nausea, vomiting, flu-like symptoms, agitation and anxiety.

**147.**   One reason for this inadequate care might be the abysmally poor communication with clinical staff that some prisoners experience.  For example, one Smith prisoner described his interview as taking place in a non-contact attorney visiting booth, with glass separating doctor from patient.  He answered some questions from the psychiatrist, who then held up a piece of paper on which he wrote words such as "mood swings" and "voices."  The patient nodded in response. No history was taken – he is a disabled veteran with severe anxiety and PTSD – and there was no discussion of medication side effects.  The entire session lasted 15-20 minutes.  The psychiatrist then briefly held up a piece of paper with information about medications, but the patient did not have a chance to read it.  The psychiatrist handed the paper to a deputy, who gave it to the patient and rushed him to sign it. When the patient asked, "can I read it?" the deputy responded: "just sign it."  The patient did not find out the names of the medications he was prescribed for three days after he started taking them.  For the first two days, when he asked the nurses the names of the pills, they would respond but he could not understand.  When he requested clarification, they would say "next person" and rush him through.

**THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

148.   Another prisoner arrived at the Smith jail with a list of her prescribed psychotropic medications, which was placed in her property.  She waited two weeks to see a psychiatrist, but could not recall for him which medications she had taken and did not have the list to consult.  He told her he would prescribe medications and when she asked for her diagnosis, and he responded "That is not important right now, just go ahead and take your medications."  A week later, the pills arrived and she took them without knowing what they were.  Within three days, she experienced a severe reduction in her ability to function and could not walk unassisted.  She stopped taking the pills.  A week later, her mother spoke to a sergeant and told him that the medication list should be retrieved from her property.  He assured her it would be done and the proper pills would be dispensed.  The following day, new pills arrived, which again made her feel "woozy" and "dizzy."  She again stopped taking them.

149.   A crucial element of an adequate mental health care delivery system is an appropriate means to assess and monitor patients who exhibit or contemplate self-harming behavior.  Here, too, Riverside's practices fall far short of acceptable mental health care procedures.  Prisoners believed to be suicidal or self-harming are placed in a barren cell with only a rough smock to wear and a hole in the ground to relieve themselves.  The so-called "safety cells" are often filthy and stink of the urine and feces that is visible on the walls and floor.  Patients are left in the cells for many days, with inadequate monitoring or supervision and no meaningful treatment, under lights that are never turned off.  Plaintiff Quinton Gray was forced to endure these conditions for 48 hours simply because he told custody staff on entering the jail that he needed psychiatric medications.  John Rosson has also experienced the damaging conditions and treatment deprivations in safety cells and, like many other Riverside patients, has been moved in and out of the regional medical center for suicidality to little effect.  Another man was placed in a safety cell and removed

44

more than a day later with no risk assessment, explanation, or criteria for removal – a gross departure from the standard of care.

150.   Riverside's current practices concerning use of safety cells and safety "restraint chairs" are ineffective and potentially dangerous.  Deputies routinely log that prisoners are placed in safety cells for "destroying jail property" or for being "combative with jail staff."  Using the safety cell as a punitive measure exceeds the proper use of such placements, which is to protect and treat patients who exhibit or contemplate imminent self-harming behavior.  It also makes it less likely that patients will report serious emotional distress or suicidal ideation.  People placed in Riverside's safety cells sometimes go more than 10 or 20 hours without offers of food, and 10 hours or more without offers of water.

151.   In some cases, when placing a prisoner in the safety cell, deputies also strap his or her arms and legs to a restraint chair, completely immobilizing that person for hours or even days at a time.  These placements are often disciplinary as well, such as for "destruction of jail property."  These chairs are dangerous: as reported in the national press, they have caused the death of people subjected to their use in other jurisdictions, some who suffered from seizures and choked to death on their own vomit and others who developed blood clots from the immobilization and died as they were released from the chair.  Even without causing death, the improper use of these chairs can exacerbate patients' injuries while preventing them from demonstrating the need for immediate medical care.  Riverside's logs of restraint chair use are limited to documenting the time that the chair is used and do not indicate why the chair was used or why the duration of its use was appropriate; the logs also demonstrate frequent failures in provided necessary checks on the restrained person's welfare.  These practices remove accountability and depart from the standard of care required for mental health treatment.

45

### III.   Defendant has known for years of the significant risk of harm from its inadequate jail health care system and has failed to take reasonable steps to mitigate the risk to prisoners

152.   Defendant Riverside County has for many years woefully underfunded detention health care.  The lack of infrastructure and staff to deliver life-saving care has resulted, as Sheriff Stanley Sniff has told the Board of Supervisors, in a "crisis in the jail system."

153.   The County's own Grand Jury as well as several independent auditors have come to the same conclusion: dangerous deficits in health care services at the jails threaten the lives and health of the thousands of men and women they hold.

154.   The severe deficiencies in health care services in Riverside's jails are thus well established by admissions from Sheriff Sniff and reports from state and county watchdogs and independent auditors.  Defendant has long been aware of the harm its deficient system causes to patients with serious health care needs through these reports as well as numerous grievances and health needs requests from prisoners.  Defendant's failure to take action to ameliorate the conditions constitutes deliberate indifference to Plaintiffs' serious health care needs.

155.   Several 2011 reports documented extensive health care violations in the jails.  The 2010-11 Grand Jury Report: Riverside County Detention Health Care Administration found systemic failures in treatment, medication management, record-keeping, and administration of forced medications, among other areas.  On July 5, 2011, the Sheriff responded that he "generally concurs with the findings of the Grand Jury and has been outspoken on the need to remedy these issues over the last two years."

156.   The Grand Jury's report on mental health care deficiencies, 2010-11 Grand Jury Report: Mental Health Detention Services, noted serious health care staffing deficiencies.  Again, the Sheriff agreed with this assessment.  The Grand

Jury released an updated report in June 2012, noting that mental health staffing has in fact decreased since its prior year's report.

157.   The Sheriff invited the state's Corrections Standards Authority (CSA), a body with statutory duty to regularly inspect county facilities, to perform an additional inspection in January 2011.  The CSA found numerous violations of state law, including a widespread failure to provide daily sick call and insufficient oversight of prisoners on suicide watch.  They also found serious deficits in medication administration: missed pill calls, night-time medications administered between 4 and 6 p.m., and prisoners going to court denied medications entirely.

158.   At the CSA's recommendation, Sheriff Sniff contracted with the independent Inmate Medical Quality (IMQ) to identify deficits and make recommendations.  IMQ performed their evaluation May 2-5, 2011, and reported significant and potentially harmful systemic deficiencies in staffing, screening, sick call, quality assurance, medical records, management of communicable diseases, medication management, and use of restraints and safety cells for suicidal or self-harming prisoners.  As with both of the Grand Jury reports, the Sheriff accepted these findings as requiring immediate and drastic attention.

159.   The health care deficiencies in the Riverside jails, and Defendant's awareness of them, predate the 2011 reports and stem in part from years of drastic cost-cutting measures.  As Sheriff Sniff has explained, the County made "deep cuts to medical personnel staffing levels" in fiscal year 2008-09, which "unacceptably impacted the delivery of medical services. . . and other jail operations."  Instead of correcting the problem, the County made another 20% reduction in medical and mental health care staff as of July 1, 2010.

160.   On January 12, 2012, Plaintiffs' counsel sent Defendant officials a sixteen-page letter detailing the systemic problems set forth in this Complaint.

**THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Defendant did not make any substantive response to the specific concerns described in the letter.

**161.**   The County's systemic failures, as outlined in this Complaint, in Plaintiffs' January 2012 letter, and in the numerous reports of independent auditors, result in significant injury and the unnecessary and wanton infliction of pain in violation of the Eighth and Fourteenth Amendments.  The injuries, as described above, include drastically inadequate cancer treatment that may have significantly decreased one patient's life expectancy; severe and unnecessary pain; unconstitutional conditions on suicide watch; exacerbated mental illness from failure to provide appropriate screening and medications; and severe reactions from inadequate and frequently interrupted medication delivery.

## IV.   Disability discrimination

**162.**   The County, by policy and practice, discriminates against certain prisoners with disabilities in the following ways.

**163.**    Prisoners with mobility impairments who are housed in special units because they have mobility impairments or use assistive devices are provided fewer privileges and programming as a result.  This denial of privileges and programming constitutes disability discrimination.  For example, Plaintiff Nikko Quarles is housed in the medical floor at the Presley jail solely because of his mobility impairment and use of crutches.  As a result, he is denied the dayroom access and religious programming he had before he became disabled, and his educational programming opportunities are more limited.

**164.**   Prisoners who need reasonable accommodations for their mobility impairments have been denied or have faced significant delay or difficulty obtaining them due to unduly restrictive security concerns.  For example, Plaintiff David Madrid, who has a club foot, has been repeatedly denied footwear that would allow

1  him to walk normally and without serious pain, despite the fact that such footwear is
2  available and provided to other prisoners.

3      **165.**   Prisoners who use assistive devices such as canes, crutches, and
4  walkers, have them confiscated or disallowed due to unduly restrictive security
5  concerns and have been provided no substitute or n inadequate or poorly functioning
6  substitute.  For example, Plaintiff Nikko Quarles, who has no record of violence in
7  the Riverside jails, has been denied the use of his crutches both inside and outside of
8  his cell, despite the fact that he is under doctor's orders not to place weight on his
9  injured leg.  As a result, he has had to crawl and drag himself to obtain basic
10  services such as nursing care and use of the toilet, causing him pain and possibly
11  further injuring his leg.

CLASS ACTION ALLEGATIONS

13  **Plaintiff class**

14      **166.**   Plaintiffs bring this action on their own behalf and, pursuant to Rule
15  23(a), b(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of all adult
16  men and women who are now, or will be in the future, in the custody of Riverside
17  County and who are now, or will be in the future, subject to an unreasonable risk of
18  harm due to Defendant's policies and practices of denying prisoners minimally
19  adequate medical care and minimally adequate mental health care, and are subject to
20  disability discrimination based on failure to provide equivalent programming in
21  restricted housing and failure to provide reasonable accommodations for mobility
22  impairments.

23      **167.**   The class is so numerous that joinder of all members is impracticable.
24  There are currently nearly 4,000 people incarcerated in the five Riverside jails, all of
25  whom are entirely dependent on Defendant for medical and mental health care.  All
26  prisoners are at risk of developing serious medical and mental health conditions
27  while in the Riverside jails.  Due to Defendant's policies and practices, all Riverside

28

49

**THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

jail prisoners receive or are at risk of receiving inadequate health care while in the Riverside jails.

168.   There are questions of law and fact common to the class including whether the failure to provide minimally adequate medical and mental health care violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution and whether Defendant has been deliberately indifferent to the serious health care needs of class members.  Defendant is expected to raise common defenses to these claims.

169.   Since there are several thousand class members, separate actions by individuals would in all likelihood result in inconsistent and varying decisions, which in turn would result in conflicting and incompatible standards of conduct for Defendant.

170.   Defendant has acted and failed to act on grounds that apply generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.

171.   The claims of the named Plaintiffs are typical of the claims of the class and subclasses, since their claims arise from the same policies, practices, and courses of conduct and their claims are based on the same theory of law as the class's claims.

172.   The named Plaintiffs, through counsel, will fairly and adequately protect the interests of the class.  Plaintiffs do not have any interests antagonistic to the plaintiff class.  Plaintiffs, as well as the Plaintiff class members, seek to enjoin the unlawful acts and omissions of Defendant.  Further, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

**Medical Subclass**

THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

**173.**   Plaintiffs Gray, Patterson, Kujawsky, and Wohlfeil bring this action on their own behalf and, pursuant to Rule 23(a), b(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of a subclass of prisoners (hereinafter "Medical Subclass") who are now, or will in the future be, subjected to the medical care policies and practices of the Riverside jails.

**174.**   The Medical Subclass is so numerous that joinder of all members is impracticable.  There are currently nearly 4,000 people incarcerated in the five Riverside jails.  All prisoners are at risk of developing serious medical conditions while in the Riverside jails.  Due to Defendant's policies and practices, all Riverside jail prisoners receive or are at risk of receiving inadequate medical care while in the Riverside jails.

**175.**   There are questions of law and fact common to the Medical Subclass including whether the failure to provide minimally adequate medical care violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution and whether Defendant has been deliberately indifferent to the serious health care needs of Medical Subclass members.  Defendant is expected to raise common defenses to these claims.

**176.**   Since there are several thousand Medical Subclass members, separate actions by individuals would in all likelihood result in inconsistent and varying decisions, which in turn would result in conflicting and incompatible standards of conduct for the Defendant.

**177.**   Defendant has acted and failed to act on grounds that apply generally to the Medical Subclass, so that final injunctive or corresponding declaratory relief is appropriate respecting the Medical Subclass as a whole.

**178.**   The claims of the named Plaintiffs are typical of the claims of the Medical Subclass, since their claims arise from the same policies, practices, and

51

courses of conduct and their claims are based on the same theory of law as the Medical Subclass's claims.

**179.**   The named Plaintiffs, through counsel, will fairly and adequately protect the interests of the Medical Subclass.  Plaintiffs do not have any interests antagonistic to the Medical Subclass.  Plaintiffs, as well as the Plaintiff class members, seek to enjoin the unlawful acts and omissions of Defendant.  Further, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

**Mental Health Subclass**

**180.**   Plaintiffs Gray, Rosson,  McClellan, and Miller bring this action on their own behalf and, pursuant to Rule 23(a), b(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of a subclass of prisoners (hereinafter "Mental Health Subclass") who are now, or will in the future be, subjected to the mental health care policies and practices of the Riverside jails.

**181.**   The Mental Health Subclass is so numerous that joinder of all members is impracticable.  There are currently nearly 4,000 people incarcerated in the five Riverside jails.  All prisoners are at risk of developing serious mental health conditions while in the Riverside jails.  Due to Defendant's policies and practices, all Riverside jail prisoners receive or are at risk of receiving inadequate mental health care while in the Riverside jails.

**182.**   There are questions of law and fact common to the Mental Health Subclass including whether the failure to provide minimally adequate mental health care violates the Due Process Clause of the Fourteenth Amendment and the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution and whether Defendant has been deliberately indifferent to the serious health care needs of Mental Health Subclass members.  Defendant is expected to raise common defenses to these claims.

183.   Since there are several thousand Mental Health Subclass members, separate actions by individuals would in all likelihood result in inconsistent and varying decisions, which in turn would result in conflicting and incompatible standards of conduct for the Defendant.

184.   Defendant has acted and failed to act on grounds that apply generally to the Mental Health Subclass, so that final injunctive or corresponding declaratory relief is appropriate respecting the Mental Health Subclass as a whole.

185.   The claims of the named plaintiffs are typical of the claims of the Mental Health Subclass, since their claims arise from the same policies, practices, and courses of conduct and their  claims are based on the same theory of law as the Mental Health Subclass's claims.

186.   The named plaintiffs, through counsel, will fairly and adequately protect the interests of the Mental Health Subclass.  Plaintiffs do not have any interests antagonistic to the Mental Health Subclass.  Plaintiffs, as well as the Mental Health Subclass members, seek to enjoin the unlawful acts and omissions of Defendant.  Further, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

**Disabilities Subclass**

187.   Plaintiffs Madrid and Quarles bring this action on their own behalf and, pursuant to Rule 23(a), b(1), and (b)(2) of the Federal Rules of Civil Procedure, on behalf of a subclass of prisoners (hereinafter "Disabilities Subclass") who are now, or will in the future be, subjected to policies and practices of the Riverside jails regarding specialized or sheltered housing for prisoners due to their mobility impairments and need for assistive devices, and the provision and confiscation of accommodations for prisoners with mobility impairments.

188.    The Disabilities Subclass is so numerous that joinder of all members is impracticable.  There are currently nearly 4,000 people incarcerated in the five

Riverside jails.  Although the exact number of prisoners with mobility impairments is unknown, plaintiffs believe there are dozens of prisoners with these disabilities, all of whom are at risk of being placed in sheltered housing due to a mobility impairment or unable to receive reasonable accommodations for mobility impairments.

**189.**   There are questions of law and fact common to the Disabilities Subclass including whether the failure to provide reasonable accommodations for mobility impairments violates the ADA and Section 504 of Rehabilitation Act and whether placement of prisoners in more restrictive housing environments due to their disabilities violates the ADA and Section 504 of the Rehabilitation Act. Defendant is expected to raise common defenses to these claims.

**190.**    Since in Plaintiffs' belief there are dozens of  Disabilities Subclass members, separate actions by individuals would in all likelihood result in inconsistent and varying decisions, which in turn would result in conflicting and incompatible standards of conduct for the Defendant.

**191.**    Defendant has acted and failed to act on grounds that apply generally to the Disabilities Subclass, so that final injunctive or corresponding declaratory relief is appropriate respecting the Disabilities Subclass as a whole.

**192.**    The claims of the named plaintiffs are typical of the claims of the Disabilities Subclass, since their claims arise from the same policies, practices, and courses of conduct and their  claims are based on the same theory of law as the Disabilities Subclass's claims

**193.**    The named plaintiffs, through counsel, will fairly and adequately protect the interests of the Disabilities Subclass.  Plaintiffs do not have any interests antagonistic to the Disabilities Subclass.  Plaintiffs, as well as the Disabilities Subclass members, seek to enjoin the unlawful acts and omissions of Defendant.

Further, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

## CLAIMS FOR RELIEF

### First Cause of Action

**(Plaintiffs Gray, Patterson, Kujawsky, Rosson, McClellan, Miller, and Wohlfeil and the plaintiff class**

**v. Defendant County of Riverside)**

**(Eighth Amendment; 42 U.S.C. § 1983)**

194.   By its policies and practices described in paragraphs 1 through 165, Defendant subjects Plaintiffs and the Plaintiff class to an unreasonable risk of harm and injury from inadequate health care.  These policies and practices have been and continue to be implemented by Defendant and its agents or employees in their official capacities, and are the proximate cause of Plaintiffs' and the Plaintiff class's ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

195.   Defendant has been and is aware of all of the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.

### Second Cause of Action

**(Plaintiffs Gray, Patterson, Kujawsky, Rosson, McClellan, Miller, and Wohlfeil and the plaintiff class**

**v. Defendant County of Riverside)**

**(Fourteenth Amendment; 42 U.S. C. § 1983)**

196.   By its policies and practices described in paragraphs 1 through 165, Defendant subjects Plaintiffs and the Plaintiff class to an unreasonable risk of harm and injury from inadequate health care.  These policies and practices have been and continue to be implemented by Defendant and its agents or employees in their official capacities,  and are the proximate cause of Plaintiffs' and the Plaintiff class's

ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment.

197.   Defendant has been and is aware of all of the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.

**Third Cause of Action**

**(Plaintiffs Gray, Patterson, Kujawsky, and Wohlfeil and the Medical Subclass v. Defendant County of Riverside)**

**(Eighth Amendment; 42 U.S.C. § 1983)**

198.   By its policies and practices described in paragraphs 1 through 165, Defendant subjects Plaintiffs and the Medical Subclass to an unreasonable risk of harm and injury from inadequate medical care.  These policies and practices have been and continue to be implemented by Defendant and its agents or employees in their official capacities,  and are the proximate cause of Plaintiffs' and the Plaintiff class's ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

199.   Defendant has been and is aware of all of the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.

**Fourth Cause of Action**

**(Plaintiffs Gray, Patterson, Kujawsky, and Wohlfeil and the Medical Subclass v. Defendant County of Riverside)**

**(Fourteenth Amendment; 42 U.S. C. § 1983)**

200.   By its policies and practices described in paragraphs 1 through 165, Defendant subjects Plaintiffs and the Medical Subclass to an unreasonable risk of harm and injury from inadequate medical care.  These policies and practices have been and continue to be implemented by Defendant and its agents or employees in their official capacities,  and are the proximate cause of Plaintiffs' and the Plaintiff

56

class's ongoing deprivation of rights secured by the United States Constitution under the Fourteenth Amendment.

201.   Defendant has been and is aware of all of the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.

## Fifth Cause of Action

### (Plaintiffs Gray, Rosson, McClellan, Miller, and the Mental Health Subclass v. Defendant County of Riverside)

### (Eighth Amendment; 42 U.S.C. § 1983)

202.   By its policies and practices described in paragraphs 1 through 165, Defendant subjects Plaintiffs and the Mental Health Subclass to an unreasonable risk of harm and injury from inadequate mental health care.  These policies and practices have been and continue to be implemented by Defendant and its agents or employees in their official capacities,  and are the proximate cause of Plaintiff's and the Plaintiff class's ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

203.   Defendant has been and is aware of all of the deprivations complained of herein, and has condoned or been deliberately indifferent to such conduct.

## Sixth Cause of Action

### (Plaintiffs Gray, Rosson, McClellan, Miller, and the Mental Health Subclass v. Defendant County of Riverside)

### (Fourteenth Amendment; 42 U.S. C. § 1983)

204.   By its policies and practices described in paragraphs 1 through 165, Defendant subjects Plaintiffs and the Mental Health Subclass to an unreasonable risk of harm and injury from inadequate mental health care.  These policies and practices have been and continue to be implemented by Defendant and its agents or employees in their official capacities,  and are the proximate cause of Plaintiff's and

57

1    the Plaintiff class's ongoing deprivation of rights secured by the United States

2    Constitution under the Fourteenth Amendment.

3        **205.**   Defendant has been and is aware of all of the deprivations complained

4    of herein, and has condoned or been deliberately indifferent to such conduct.

5

6                              **Seventh Cause of Action**

7    **(Plaintiffs Madrid and Quarles and the Disabilities Subclass v. Defendant County of Riverside)**

8                      **(Americans with Disabilities Act)**

9        **206.**   By its policies and practices of discriminating against prisoners with

10   disabilities as described in paragraphs one through 165, Defendant violates the

11   Americans with Disabilities Act, 42 U.S.C. § 12132 and 28 C.F. R. § 35.152(b)(1).

12       **207.**   Plaintiffs Madrid and Quarles and the subclass of prisoners with

13   disabilities they represent are qualified individuals with disabilities as defined by the

14   ADA.

15       **208.**   Defendant has violated the ADA by failing or refusing to provide

16   plaintiffs with reasonable accommodations and other services related to their

17   disabilities.  *See generally* 28 C.F.R. Section 35.130.  Defendants have violated the

18   ADA by failing to make "reasonable modifications in policies, practices, or

19   procedures when the modifications are necessary to avoid discrimination on the

20   basis of disability . . . ."  28 C.F.R. Section 35.130(b)(7).

21       **209.**   Defendant has violated the ADA by failing to "furnish appropriate

22   auxiliary aids and services where necessary to afford individuals with disabilities . . .

23   an equal opportunity to participate in . . . a service, program, or activity of a public

24   entity."  28 C.F.R. Section 35.160(b)(1).

25       **210.**   Defendant has violated the ADA by failing to "ensure that inmates or

26   detainees with disabilities are housed in the most integrated setting appropriate to

27   the needs of the individuals."  28 C.F.R. Section 35.152(b)(2).

28

**THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

**211.**   As a result of Defendant's policy and practice of failing to provide reasonable accommodations, Plaintiffs Madrid and Quarles, and the subclass of prisoners with disabilities they represent, do not have equal access to jail activities, programs, and services for which they are otherwise qualified.

## Eighth Cause of Action

**(Plaintiffs Madrid and Quarles and the Disabilities Subclass v. Defendant County of Riverside)**

**(Section 504 of the Rehabilitation Act)**

**212.**    By its policies and practices of discriminating against prisoners with disabilities as described in paragraphs one through 165, Defendant violates Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

**213.**   Plaintiffs Madrid and Quarles and the subclass of prisoners with disabilities they represent are qualified individuals with disabilities as defined by Section 504 of the Rehabilitation Act.

**214.**   At all times relevant to this action, Defendant was the recipient of federal funding within the meaning of the Rehabilitation Act. As a recipient of federal funds, Defendant is required to reasonably accommodate inmates with disabilities in their facilities, program activities, and services.

**215.**   As a result of Defendants' policy and practice of failing to provide reasonable accommodations, Plaintiffs Madrid and Quarles, and the subclass of prisoners with disabilities they represent, do not have equal access to jail activities, programs, and  services for which they are otherwise qualified.

## PRAYER FOR RELIEF

**216.**   Plaintiffs and the class they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint.  Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the Defendant as alleged herein, unless

59

Plaintiffs are granted the relief they request.  The need for relief is critical because the rights at issue are paramount under the Constitution and laws of the United States.

217.  WHEREFORE, Plaintiffs, on behalf of themselves and the class they represent, request that this Court grant them the following relief:

A.  Declare the suit is maintainable as a class action pursuant to Federal Rule of Civil procedure 23(a) and 23(b)(1) and (2);

B.  Adjudge and declare that the conditions, acts, omissions, policies, and practices of Defendant and its agents, officials, and employees are in violation of the rights of Plaintiffs and the class they represent under the Eighth and Fourteenth Amendments to the U.S. Constitution, the ADA, and Section 504 of the Rehabilitation Act;

C.  Order Defendant, its agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, to develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm that Plaintiffs and members of the Plaintiff class suffer due to Defendant's inadequate medical and mental health care and disability discrimination. Defendant's plan shall include at a minimum the following:

1.  Staffing: Staffing shall be sufficient to provide Plaintiffs and the Plaintiff class with timely access to qualified and competent clinicians who can provide routine, urgent, emergent, and specialty health care;

2.  Access: Policies and practices that provide timely access to health care;

3.  Screening: Policies and practices that reliably screen for medical and mental health conditions that need treatment;

4.  Emergency response: Timely and competent responses to health care emergencies;

**THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

5.  Medication and supplies: Timely prescription and distribution of medications and supplies necessary for medically adequate care;

6.  Chronic care: Timely access to competent care for chronic illnesses;

7.  Mental health treatment: Timely access to necessary treatment for serious mental illness, including medication, therapy, inpatient treatment, suicide prevention, and suicide watch;

8.  Quality assurance: A regular assessment of health care staff, services, procedures, and activities designed to improve outcomes, and to identify and correct errors or systemic deficiencies; and

9.  Disability discrimination: Policies and practices to ensure prisoners placed in specialized housing due to disabilities are provided equivalent programming to what they would otherwise receive and to ensure that prisoners with mobility impairments are provided reasonable accommodations for their disabilities.

D.  Enjoin Defendant, its agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, from continuing the unlawful acts, conditions, and practices described in this Complaint and from failing to provide minimally adequate health care and from discrimination based on disability;

E.  Award Plaintiffs, pursuant to 42 U.S.C. §§ 1988, 12205 and 12133, and 29 U.S.C. § 794(a), the costs of this suit and reasonable attorneys' fees and litigation expenses;

F.  Retain jurisdiction of this case until Defendant has fully complied with the orders of this Court, and there is a reasonable assurance that Defendant will continue to comply in the future absent continuing jurisdiction; and

G.  Award such other and further relief as the Court deems just and proper.

61

**THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Dated: November 12, 2015    PRISON LAW OFFICE

**By:** _/s/ Sara Norman_____
DONALD SPECTER
SARA NORMAN
Attorneys for Plaintiffs

AKIN GUMP STRAUSS HAUER
& FELD LLP

By: __/s/ Danielle Ginty_____
SHAWN HANSON
DANIELLE GINTY
NICHOLAS GREGORY
KELSEY MORRIS

Attorneys for Plaintiffs

**THIRD AMENDED CLASS ACTION COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**