# EXHIBIT A

**Review of Riverside County Jail Medical Services**

Scott A. Allen, MD

**Introduction**

I have been asked jointly by counsel representing the County of Riverside and counsel representing plaintiffs in the matter of Gray v. County of Riverside to provide an independent assessment of the medical care provided by the County in its jail system and to make recommendations as indicated as part of an alternative resolution process.

In my task, I am pleased to report that I received the full cooperation of the staff of the Riverside County Sheriff's Department and County medical staff, both in Corrections Health Service and at the Riverside University Medical Center (RUMC, formerly Riverside County Regional Medical Center or RCRMC).  In particular, I wish to thank Lieutenants Maurice LeClair and Hal Reed, as well as Correctional Health Services (CHS) Administrator William Wilson, CHS Medical Director Dr. Victor Laus and RUMC Medical Director Dr. Arnold Tabuenca, as well as nursing supervisors Stillwell, Reeves, Adewunmi and Redler for their flexibility and cooperation during my investigation.


**Expert Qualifications**

I am a physician licensed in the state of California.  I am board certified in Internal Medicine and am a Fellow of the American College of Physicians. I am a Professor of Clinical Medicine and Associate Dean of Academic Affairs at the University of California Riverside School of Medicine.

I have been a physician since 1991.  I have worked in the field of correctional health care for the past 17 years.  From 1997 to 2004, I was a full time correctional physician for the Rhode Island Department of Corrections; for the final three years I served as the State Medical Program Director for the department where I oversaw all medical care for the State of Rhode Island prisons and jails for both men and women, including medical, psychiatric and dental services.  From 2005 to 2011, I worked full time in the Eleanor Slater Hospital, the state psychiatric hospital, on secured units caring for patients that included both sentenced and forensic populations.  I am a member of the Society of Correctional Physicians and a Fellow of the American College of Physicians.

I have written and published over twenty peer-reviewed papers in academic journals related to prison health care and am on the editorial board of the International Journal of Prisoner Health Care.   I have served as an independent expert to the Federal Court on standards of hepatitis C management in prisons, and have served as a plaintiff's expert in a number correctional health cases. I have

consulted on detention health issues both domestically and internationally for the Open Society Institute and the International Committee of the Red Cross and domestically for the Department of Homeland Security among others. I have worked with the Institute of Medicine on several workshops related to detainee healthcare. I co-founded and am co-director of the Center for Prisoner Health and Human Rights at Brown University and co-investigator for the University of California Criminal Justice and Health Care Consortium.

A more detailed listing of my experience in correctional health care, my participation in the development of national correctional policy and standards, my experiences as a consultant and expert witness, and a list of my publications are included in my curriculum vitae, which has been provided to counsel for the plaintiffs and the County.

I am familiar with the degree of care and skill ordinarily exercised by members of the medical and behavioral health professions involving the care and treatment of inmates and pre-trial detainees in correctional facilities.

**Standards**

While it is understood that the Riverside County Jail is not currently accredited by the National Commission on Correctional Health Care (NCCHC), the Standards for Services in Jails (2014 Ed.) provides a useful benchmark for *minimum* standards for jail health services in the Unites States, and I will refer to those standards in this report.[1]

In addition to the NCCHC standards, I will make reference in this report to community medical standards.  While the acceptable clinical practice of medicine allows for a wide variety of approaches to practice, community medical standards are the point in which the greater body of experts and practitioners in the field have found agreement and are established by the standard of care accepted by the community at large.

Broadly speaking, a community medical standard has been established which has already taken into consideration all points of view and evidence, and that is what I will use as a standard for care.  There is no separate or unequal standard of care for inmates of correctional institutions; there are merely logistical challenges and reasonable accommodations and modifications of standard medical approaches that are a direct result of the constraints of confinement settings.  Those exceptions and accommodations to security needs should be absolutely minimal and rarely interrupt and never prevent essential healthcare delivery.  To the extent that providing medical care in a correctional setting raises some unique challenges, I

---

[1] When I cite the 2014 NCCHC Standards for Health Services in Jails, the standard is in the following format:  the letter "J" followed by letter "A" through "I" and a number.  For example, the standard for Receiving Screening is J-E-02.

draw on my knowledge of standards and practices as a physician experienced in correctional healthcare and familiar with standards of the field.

In general, when I refer to minimal community standards, I refer to services a patient with Medicaid coverage would likely be eligible to receive in a community health center or similar setting, recognizing that inmates are not constitutionally entitled to the most sophisticated care money can by, but to adequate medical care.

Finally, when I do make reference to constitutional standards to health care (based on the Eighth Amendment prohibition on cruel and unusual punishment), I do so not as a lawyer (which I clearly am not) but as a physician with extensive experience in actually providing that level of care in jails and prisons and in helping the courts to define that standard in practical terms.


## Methods

My investigation of the medical services at the Riverside County Jail involved the following methods:

1) *Site Visits*:  In the course of my review of medical services in the county jails, I have personally visited all five jail facilities at least once and two facilities (Robert Presley and Southwest) twice.

2) *Record Reviews*:  I have reviewed selected medical records and medication administration records at all five sites.  Records typically were selected because the inmate had a chronic medical condition or had been recently seen by medical staff.

3) *Staff Interviews*:  During all site visits I had the opportunity to conduct staff interviews.  During the course of my investigation, I had opportunities to question the RUMC Medical Director Arnold Tabuenca, MD, Correctional Health Services (CHS) Administrator William Wilson, the CHS Medical Director Victor Laus, MD, nurses supervisors at all of the facilities as well as physicians and nurses at various sites.  In addition, I had the opportunity to speak with a number of Sheriff's Deputies about the interface of security with the health care operations.

4) *Inmate Interviews*:  I interviewed a sampling of inmates at all five facilities.  In total, I conducted private one-on-one interviews with over fifty individual inmates.  In addition, I conducted some brief interviews with a number of inmates in segregation at their cell doors in the housing unit.

5) *Document Review*:  I reviewed numerous documents provided by the parties relating to the health services at the Riverside County Jail.  In addition to the comments provided, I also reviewed publicly available documents including

the 2011 Grand Jury Report, the 2011 IQM report and the Riverside County budget.

## Background of Medical Services at Riverside County Jail

*Impact of budget cuts to jail health care services*:

According to Sheriff Sniff's July 15, 2011 response to the 2010-2011 Grand Jury Report, "…beginning fiscal year 2008/2009, the conflict between legal responsibility and practical authority resulted in deep cuts to medical personnel staffing levels, *without consideration for how those cuts affected the respondent's (the Sheriff's Department) ability to fulfill the legal responsibility." [*Emphasis added].   Sheriff Sniff then went on to report that:

> … the budget and medical personnel staffing cuts beginning fiscal year 2008/2009 unacceptably impacted the delivery of medical services, and unacceptably impacted other jail operations as well.  To confirm and accurately assess the extent of this impact, the respondent requested evaluations from the Corrections Standards Authority (CSA) and the Institute for Medical Quality (IMQ).  Both CSA and IMQ found that emergency and basic medical services were not being delivered within the intent of the CCR Title 15 Minimum Standards for Local Detention Facilities.

According to the 2011 IMQ assessment, as of January 2011, the detention health staff experienced a *44% reduction* in staff due to budget cuts.  My own interviews with administrators and physicians confirmed that the 2008/2009 budget directives devastated medical staffing.  In the case of the physicians, staffing went from five physicians (including Dr. Laus, the medical director and four other physicians) to three.  However, in the face of almost doubled workloads, two of the remaining physicians resigned.  In spite of efforts to find replacements, the County was unable to fill those vacancies, and for a period of roughly two years, *one physician*, Dr. Laus, remained to provide health care to *all five adult facilities from Blythe to Temecula*.  Nursing staff was similarly devastated, resulting in *only one facility out of the five with continuing 24/7 health coverage*.  To put this in perspective, this reduced staffing was asked to provide adequate care across five geographically spread facilities with an average daily population of over 3700, and annual admissions numbering nearly *sixty thousand* in 2014.

The 2011 IMQ consultants also noted a rise in court orders directing the department to address unmet health needs of inmates appearing before the court as part of their routine criminal proceedings.  My finding confirms that some four years later, the courts continue to issue numerous orders to the department to address unmet health needs of inmates.  Court orders relating to health care have been in excess of 150 per month as recently as the first quarter of this year.  This is an extraordinary finding, and documents a lack of faith by the courts in the County's ability to meet its statutory and constitutional obligations for the provision of health care to county

inmates.  As noted by IMQ in 2011, such court orders "should be rare and only seen under unusual circumstances."  In my experience, I have never seen such a high number of court orders directed at a correctional healthcare program.

*Inter-departmental Issues*

The provision of health care in Riverside County Jails is complicated by evolving relationships between County departments – specifically the Sheriff's Department and the County Hospital (Riverside University Medical Center – previously known as Riverside County Regional Medical Center).  In response to the confused lines of authority noted in the grand jury reports, a MOU was drafted and signed outlining the responsibilities and expectations of each department in the provision of care.

However, in my interviews with key personnel and administrators from both departments, I found that some confusion remains in relation to budgeting for services provided.  By the end of my investigation, it was not clear to me that the County has resolved what I would call perverse economic incentives for the individual departments that could lead to inappropriate or costly care by one department on the one hand or could lead to limited access to care by the other department on the other hand.

For example, it was the belief of the County hospital administration that RUMC is budgeted for a fixed amount to provide inpatient and consultation medical care. This at least theoretically creates an incentive for the Sheriff to shift care to the higher cost setting by pressing to send inmates to hospital earlier than clinically indicated and keep them in hospital longer than clinically indicated as hospital care does not cost the Sheriff any additional funds.  At the same time, the hospital may feel pressure to discharge inmate patients prematurely as each day results in additional costs that cannot be recouped.  It is important to be clear that I see no evidence that either department has actually yielded to these real or perceived perverse fiscal pressures, but if these perceptions are indeed based on reality, budgeting should be reviewed in order to mitigate these perverse incentives so that decisions regarding the appropriate level of care and setting are not unduly influenced by them and the appropriate agencies are adequately funded for any care they provide.  While in the end, this is all County money, I am trying to draw attention to an arrangement that might actually be driving overall costs to the County to a higher level than they need to be while at the same time creating unnecessary liability risks.

**Challenges of Realignment**

California is currently undergoing a historic reform of incarceration practices largely driven by litigation.  Sweeping changes have resulted, including AB 109, also known as "realignment," legislation crafted in an effort to deal with state prison overcrowding among other concerns.  As a result of realignment, county jails across

Review of Medical Care – Riverside County Jails, July 15, 2015 – S. Allen, MD                6

the state now face significant new and previously unanticipated challenges. In addition to being asked to accommodate higher numbers of inmates who historically would have been held in the custody of the state in state prisons, jail facilities are being asked to provide what essentially is prison care in facilities that were designed as jails.  Jails historically house inmates for shorter periods of time. The new AB 109 inmates will typically serve much longer terms in the county jails, terms ranging from months to years.

This change has consequences for both the conditions of confinement, programming, educational and work opportunities.  But it also has consequences for health care. Realignment has created a host of new challenges to county jails and placed increased burdens on the provision of health care in a system that was designed around short stays, but now has a significant sub-population that can be expected to be confined to the county facilities for months or even years.

**Overall Findings**

The current level of care in the Riverside County Jails is inadequate, poses a significant risk of serious harm to inmates confined there and in the opinion of this expert does not meet minimal constitutional standards.

The inadequacy of the current health system can be almost entirely attributed to two factors: 1) inadequate financial support provided to the department by the County over a period of years and 2) correctable programmatic deficiencies and institutional barriers both within the facilities and within the County Hospital and clinic system.

At the same time, I found the department medical staff including nurses, doctors and administrators and the Sheriff's Department liaisons on the whole to be professional and competent.[2]  This finding is critical because it suggests that if the historical structural and resourced based issues are addressed, care could be brought up to meet constitutional standards.

In my opinion, the department has the capacity to correct their many deficiencies if they are provided with adequate resources on an ongoing basis.  Indeed, a plan for reform articulated by Correctional Health Administrator William Wilson is well thought out and holds promise for eliminating deficiencies. In the course of my investigation I was able to learn about the plan for reform in some detail, and I can confirm that important initial steps to bring health care into compliance with constitutionals standards have recently been undertaken.  The department has a reasonable plan.  I reference this plan where helpful in relevant findings and recommendations in this report.

Yet while the department has a reasonable plan, what the department doesn't have yet is a track record of success in providing constitutionally appropriate care.

A Riverside Grand Jury and an outside consultant noted deficiencies in health care delivery as far back as 2011.  Four years have passed with only initial and incomplete reforms and improvements, most of them relatively recent.  In the past year, meaningful corrective measures have picked up in pace, but there has not been enough time for those interventions to have corrected the deficiencies brought on by years of fiscal neglect.

---

[2] This is an overall impression.  I will make specific comments about the professional qualifications of the physicians elsewhere in this report as not all are fully qualified to provide care to adults.

Review of Medical Care – Riverside County Jails, July 15, 2015 – S. Allen, MD          8

**Specific Findings**

The section that follows outlines specific deficiencies noted in my review.  If there is a relevant NCCHC standard, I note it. [3]  No adverse finding is based solely on an inmate claim made during an interview although some were identified first by an interview; all problems described were verified either by the medical record or by staff or in some cases, by both.

*Accreditation status*:

Currently, the Riverside County Jail Health Services are not accredited with NCCHC or the American Correctional Association.  According to the Medical Administrator, Mr. Wilson, the department is considering applying for accreditation with the NCCHC.

*Staffing:*

Currently staffing remains short of the department's own stated plan and is not sufficient to deliver appropriate medical care.  A reasonable staffing recruitment plan is in place, and efforts to recruit new physicians and nurses is underway, but four years after the department was made aware by consultants of staffing deficiencies, the staffing levels proposed by the department have not yet been met.  According to a Correctional Healthcare Services Personnel Tracking report provided to me through counsel, as of May 28, 2015, one of the five full time physician positions and three of the six nurse practitioner positions remain unfilled.  For the entire health care service, 62 of 217 (roughly 28%) of the authorized positions remain unfilled.

Current physician salaries may not be competitive with other correctional medicine opportunities in the state and this is likely related to the failure of the department to attract board certified physicians. Of the seven physicians identifies as working for the department, I can verify only one (Dr. Chakmakian) currently holds current board certification in a recognized American Board of Medical Specialties discipline. Dr. Montenegro is one of the physicians who is not board certified, and only appears to have training in pediatrics – training that is not appropriate for an adult facility. One of the physicians, Dr. Sawires was previously disciplined by the licensure board in Michigan for an apparent failure to disclose past disciplinary issues on an application. (J-C-07)

---

[3] My inclusion of the standards is merely for reference and although I do describe deficiencies, inclusion of the standard in this section does not mean I have necessarily concluded that the standard is not being met.  I do summarize standards that I feel are not being met later in this document.

Review of Medical Care – Riverside County Jails, July 15, 2015 – S. Allen, MD                9

*Physical space for medical care:*

With the exception of the Southwest Detention Center, clinic space in most facilities small, cramped and poorly designed.  Some clinic spaces in the Banning facility have open walls that allow people outside the clinic to listen in on private medical consultations.  Much of the clinic space appears not to have been architecturally designed to be clinic space – especially in the older facilities.  Overall, outside of the Southwest Detention Center, clinic space too small and is inadequately designed.  The small clinical space can limit the number of patients being seen and the efficiency of flow or multitasking (such as a doctor and nurse working together at the same time in the same space) and the lack of privacy violates confidentiality and inhibits patients from providing candid histories that are required for provision of care and is a violation of NCCHC standards and the community standard.  (J-D-03, J-A-09)

*Infirmary or Intermediate Level of Care*

Across the entire system, the Riverside County Jail has no ability to provide infirmary level or intermediate level of care.  As a result, inmate patients requiring higher level of must be transferred to outside facilities with the attendant higher medical and security costs. (J-G-03)

*Screening on Intake and Initial Health Assessments:*

Currently, non-medically licensed Deputies (who have been trained in the Academy) perform much of the initial screening of inmates for health problems.   The facility is moving towards a screening process performed entirely by licensed staff, but to date, they have not reached that goal.  In cases where Deputies perform screening, nurses only evaluate those inmates who have positive findings based on the short 20 question screening questionnaire administered by the deputies.  There does not appear to be a subsequent initial health assessment performed on the full population within 14 days.  Currently, initial assessments are being done only if screening identifies a problem or if the inmate seeks care themselves.  This approach does not meet NCCHC standards and by increasing the risk that significant health issues are not identified early places patients at an unreasonable risk of harm. The department is moving towards screening by licensed nursing staff for all inmates, but has not yet reached that goal, and therefore has not yet met the standard. (J-E-02 and J-E-04)

Currently, screening for TB involves a risk based strategy rather than a universal screening protocol at intake.  The department is in the process of changing to universal intake screening by nurses and a more effective universal TB screening protocol.  All facilities visited do have negative pressure isolation rooms for the housing of inmates suspected of having active TB. (J-B-01)

*Continuous Quality Improvement:*

Continuous Quality Improvement, recommended in May 2011 by IMQ, has only just started.  There is insufficient track record to assess the quality and effectiveness of this essential program.  The facilities currently have very little data to help guide medical operations. The Correctional Health Administrator and Medical Director in cooperation with the staff have initiated initial efforts at assembling and analyzing programmatic information.  Initial CQI efforts focus on analysis the specialty referral process in order to reduce backlogs and wait times.  CQI is an essential process to assure quality and timeliness of health care delivery and is required to meet standard of care. (J-A-06)

*Utilization Management:*

There is no formal identifiable process for reviewing utilization of medical services.  Specifically, there is no utilization management committee.  Utilization management is a process that comes out of the managed care field and it is used for standardizing criteria and approval procedures for outside high cost care.  It can be an effective tool for both cost containment and for establishing standardized approaches to specialty care and other high cost items such as durable medical equipment.

*Medical Records:*

Medical records are currently paper-based.  A paper based medical records in a jail system that is geographically spread out is woefully inefficient.  Inmates are frequently transferred between facilities but records do not always arrive with the inmate.  A review of records reveals a pattern of unsigned telephone orders by physicians – some as old as one week – and key lab results that have been filed without notation or acknowledgment by a physician or nurse practitioner.  Documentation of clinical encounters is often brief and incomplete.  There is almost no documentation by physicians of patient education about their illnesses, their lab or test results or the treatment plan.  Handwriting is frequently poor, and some providers do not use a signature stamp so it is unclear to a reviewer who wrote the note and their professional capacity (doctor versus nurse or other staff).  Problem lists are often incomplete.  Lab and radiology results are frequently filed without provider sign off and abnormal results were often filed without any documented intervention to address the abnormality. Also, a significant deficiency currently is that the facility is not using a unified health record and mental health records are kept separately from other medical records.  This is a bad practice that significantly increases the risk of drug interactions and inappropriate care. (J-H-01 and J-H-03)

The department has contracted to deploy a correctional Electronic Health Record (EHR) imminently (at the time of the drafting of this report).  I was able to see a brief demonstration of the HER prior to its deployment.  At the time of my investigation, this new system had not yet deployed.  While I was impressed with

the demonstration of the software by the vendor, it is too early to comment on whether or not this new system will adequately address charting deficiencies.

Electronic health systems are living software solutions requiring set up, maintenance and continuous modification and maintenance of a functioning computer network.  It also requires ongoing staff training.

The County's demonstrated ability to deploy an EHR is mixed at best.  At the County Hospital where I am on staff, I was part of the initial deployment of the Next-Gen EHR for outpatient clinics (and I have been part of the launch of two other EHR systems in previous settings).  After four years of network problems and training and maintenance and modification problems, the Next-Gen system proved to be slow, unreliable (frequent crashes), difficult to find archived scanned items and nearly impossible to scan or review prior encounters efficiently.  It is now being abandoned in favor of an entirely new EHR program in part due to compatibility issues with partner organizations, something that was not fully anticipated at the time of the programs initial selection.  Next-Gen looked good when it was demonstrated too, but the County was unable to successfully deploy it, or at least it did not solve all of the problems it was hoped to solve and it created new ones.  This does not necessarily mean the County was not thoughtful or reasoned when it selected Next-Gen, but it illustrates how hard it is to actually deploy a system, and is some indication of the County's ability to do so.  So, while there is reason to be optimistic that the new EHR system will help correct documentation deficiencies, it is way too early to tell whether it will actually succeed.  As with other areas cited in this report, the County has a reasonable plan, but not a track record of success.


*Chronic Disease Management*

Chronic disease management is inadequate. (J-G-01)

My review found management of chronic illnesses such as asthma, diabetes, HIV and hypertension, among others, to be *ad hoc*, incomplete, inconsistent, and reactive as opposed to proactive. Care of chronic diseases appears to be driven more by inmate self advocacy including court intervention than by widely accepted clinical guidelines (including but not limited to those referenced by the NCCHC and Federal Bureau of Prisons).

There is no reliable centralized list of patients with chronic care conditions.  Lists are maintained locally at individual housing stations and consist of cases identified by nurses on the housing units which does not allow for tracking of chronic disease management as patients move both within the facility or between facilities.  The facility did provide me with chronic disease protocols but based on my record review, but I based my conclusions on the actual ongoing care of chronic illness being provided and documented, such as regularly scheduled follow up visits (those

appear to be scheduled inconsistently – if at all – by individual physicians and nurses with no clearly documented logic or clinical reasoning).

In a number of reviewed cases, care of chronic disease patients appeared to be negligent and overall care of chronic diseases could be characterized as deliberately indifferent.

Some examples follow:

*Asthma-* Asthma care in the cases reviewed does not meet nationally accepted standards. The facility makes no use of Peak flow meters. Peak flow meters are inexpensive plastic devices that allow for reliable objective assessment of the severity of a patient's ability to breath and are considered a standard part of asthma management. In some cases reviewed, patients with significant asthma histories were not evaluated by physicians unless they presented with an acute attack. In one case, an inmate with a significant history of asthma noted on intake has not ever been seen by a physician at the jail over his entire 15 month period of incarceration. During this period, he did have an order for a rescue inhaler, but was not assessed by a physician at any time to assure that the treatment plan was effective. During an acute asthma attack, he was sent to an outside Emergency Room (the only documented physician encounter during the fifteen month period of incarceration). On return from the Emergency Room, he was not reassessed by a facility physician. An order for prednisone documented by the ER physician was never noted or ordered by the facility and the inmate never received this critical medication for his serious and acute medical condition.

*Diabetes-* Diabetes care at the jail facilities is inconsistent. Known diabetics do typically receive adequate monitoring by nurses with assessment of blood sugar by finger stick testing as ordered by a physician. However, regular evaluation by a physician is inconsistent. Measurement of Hemoglobin A1C (HgbA1C – a standard measure of diabetic control) on arrival and at recommended intervals (typically every 90 days) is inconsistent. In one case, a known diabetic had been detained for nearly 3 months with no lab work or HgbA1c ordered. Accommodation for special footwear for diabetic with diabetic neuropathy was inconsistent (failure to provide adequate footwear can result in significant foot injuries leading to significant complications including infections and amputations. The standard footwear in Riverside jails is inexpensive disposable slippers which are not appropriate and provide inadequate protection for diabetics and others with neuropathies.) In another case, the inmate discontinued his own diabetic medication, but this was never reported to a physician by nursing, and the patient was not called in to discuss his decision to unilaterally discontinue his medications. In yet another case, an inmate did receive blood work with a significantly high HgbA1c documented in March 2015 documenting poorly controlled diabetes. As of May 20, 2015, a physician had not reassessed the patient nor had the results been explained to the patient. In another case at Robert Presley, an elevated HgbA1C was noted by the

doctor in March, but the treatment plan was not adjusted and the results were never discussed with the patient.

*Hypertension*- Management of hypertension in the Riverside County Jail did not meet nationally accepted guidelines for the cases I reviewed (Ref: NCCHC October 2014 guidelines for hypertension, JNC 8).  Specifically, patients with hypertension did not typically receive complete initial exams and work-ups, they did not consistently receive appropriate laboratory or EKG tests.  In one case, the inmate went four days without medications.

*HIV*- HIV care in the Riverside County Jail does not meet nationally accepted guidelines.  In the cases I reviewed, I documented interruption in critical antiretroviral medications on arrival (April 26, 2015 the inmate submitted a slip reporting HIV and need for continuation of medications.  First meds given on May 7, 2015, some ten days later).  In one case of an inmate with HIV who had been incarcerated for two years, CD4 cell counts (which should be checked every 90 days) had not been ordered since late 2013 (over a year and a half).  In that same case, he had not been seen by an HIV specialist in over a year and a half.  In general, consultation with HIV specialists for inmates with HIV appears to be rare if it occurs at all.

*Other chronic conditions*- In other cases where inmates had known chronic care needs, care was infrequent and cavalier.  In Blythe, an inmate with known chronic lung disease, heart disease (previous heart attack), diabetes and gout had not been seen by a physician in nearly five months.  A patient at Southwest was noted on intake to have a history of Barrett's esophagus, a serious esophageal condition that requires chronic acid suppression with medications, but no acid blocking medication was ordered and the patient was placed on daily aspirin (presumably for stroke risk), a medication that can exacerbate the condition.  A patient who had undergone a kidney transplant in the past went four days without medications.  A patient at Southwest with seizure history on medications noted on intake waited two days without medications.  Later, when labs were drawn, he was never informed of results.

*Timely Access to Care:*

The Riverside County Jail is not consistently providing timely access to care for serious medical conditions.  Shortcomings in timely access to care occur in two distinct areas.  The first is timely access to a facility physician for serious medical care.  The second is timely access to specialty care that cannot be provided on-site.

*Timely access to facility physicians*- Across the system, I documented unacceptably long waits to see a physician, with typical waits ranging from five days to two months or more.  For the most part, this appeared to be related to limited staffing of physician providers.  In other cases where

physician availability has been improved, it appeared to be simply an established informal standard based on past practice. (J-A-01)

*Timely access to specialty care* -The Riverside County Jail is not providing timely access to specialty care for patients with serious medical conditions. This appears largely to be the result of barriers to access to specialty care at the Riverside University Medical Center.  Due to limits in its own capacity, RUMC has difficulty accommodating specialty consultations for patients in the community as well, but when RUMC is unable to accommodate a detention health consultation need, the County has no alternative arrangements with other clinical providers to secure the needed care.   In the past, some of the delay was the result of limitations in availability of deputies to accompany inmate patients (at Robert Presley, outside trips were limited to two patients per day owing to security staffing constraints – this information was volunteered by deputies at my initial briefing), but this barrier has reportedly been removed. (J-D-05)

*Telemedicine*

Despite being spread across a very large geographical areal and despite high logistical and financial costs of transporting patients for specialty visits, the Riverside County Jail currently does not use telemedicine technology for either general physician or specialty consultation.

*Physical Disability Issues*

The Riverside County Jail makes minimal accommodations for inmates with physical disabilities and in many cases the accommodations are overly restrictive or inadequate to accommodate the disability.  For inmates who require durable medical equipment such as wheelchairs, walkers or canes, they are restricted to special housing units (SHU's) that do not offer a higher level of care and sometimes don't even offer fully accessible facilities (such as fully accessible showers).  Their restriction to those units is based simply on their use of durable medical equipment and the policy is presumably designed to contain such equipment to a restricted area for security purposes.  The resulting restriction on housing and movement for disabled inmates based solely on administrative convenience or security concerns without individualized risk assessment, alternative risk mitigation efforts and without providing adequate housing accommodations with or without a higher level of care and support for the disability raises ADA concerns.

Additionally, the facility has an overly restrictive approach to accommodating medical conditions.  Two common examples include mattresses and shoes.  The standard shoe provided by the facility is a disposable slipper that offers little support or foot protection.  This is not appropriate for patients with diabetes, other neuropathies or other lower extremity injuries or disease; yet, requests for accommodation for a more supportive shoe are often dismissed due to overly

restrictive medical criteria.  Similarly, the standard mattress provided for inmates is quite thin – even by correctional standards – and yet reasonable requests for an additional mattress to accommodate chronic conditions are often dismissed due to overly restrictive criteria.  Staff are understandably concerned about "opening the floodgates" to requests for special accommodations, but many other facilities in the state and the country manage these same issues more effectively without adverse consequences to the staff or facility. (J-G-02 and J-G-10)

*Pharmacy Services*

The Riverside County Jail operates locked residential facilities seven days a week, twenty four hours a day, yet pharmacy services are provided by the County Hospital Pharmacy only five days a week and not on holidays.  The facilities manage on weekends and holidays by use of a limited stick of common medications, and in rare occasions, they can access support from the hospital pharmacy on weekends or holidays. (J-D-01)

The facility makes little use of Keep On Person (KOP) medications.  Keep On Person programs remove unnecessary barriers to care by allowing appropriate patients to have immediate access to low risk medicines such as lotions or inhalers.

Ordered medications are not provided to inmates who are in transit or at court. (This deficiency was noted in 2011 by IQM but facility staff were apparently unaware of this when I raised the issue during my visit).  In one case, an inmate who had been hospitalized for a soft tissue infection (cellulitis) and was discharged from the hospital with a continuing order for oral antibiotics and then missed four doses of antibiotics over a day and a half following his hospital discharge because that is how long he was in transit from the County Hospital back to the Blythe facility by way of Indio and Riverside facilities.  The facility currently has no mechanism for providing necessary medications for inmates in transit or in court despite the department being made aware of this deficiency for over four years.

*Sick Call*

Provisions for sick call at Riverside County Jails are inadequate.  Current practice requires inmate to submit written requests in order to be considered for a sick-call evaluation.  Across all facilities with the exception of Blythe, nurses rarely assessed acute complaints within 24 hours, and typically inmates had to wait days.  Waits to be evaluated by a physician were even longer, typically ranging from five days to weeks or even months. By the NCCHC standard, when an inmate request involves a clinical symptom, a face to face encounter should occur within 48 hours, 72 hours on weekends.(J-E-07)  Also, inmates report that face to face requests for care are often rebuffed by directing the inmate to file a written request on the "kite," the standard medical request form.

*Grievances*

All facilities experience a high level of grievances by inmates alleging inadequate
care.  While there are procedures for staff review of grievances, there is no
comprehensive analysis or summary by category of types of grievance that could be
used to alert health administrators to systematic problems. (J-A-11)

*Dental*

Dental care when provided appears to meet minimal standards, but there are
significant delays in access to such care.  In one case of a dental abscess noted by
medical staff in Banning, the inmate had waited 14 days for consultation with dental
clinic. (J-E-06)

*Segregation*

Standards dictate that inmates held in segregation are evaluated by both mental
health and medical staff.  Nursing staff reported that they do check on inmates held
in segregation, often when they are on a housing unit doing a pill pass, but there is
not documentation or log to document that these important checks are being
performed at the required intervals (a daily check is required for complete isolation
in a one man cell).   This does not meet the NCCHC standard for the monitoring of
inmates in segregation. (J-E-09)

*Restraints*

There is inadequate documentation of medical monitoring of inmates held in
restraints.  In one case in Blythe, there was no available documentation that an
inmate who had been held in a restraint chair (a very high risk restraint mechanism
that is rarely used in most correctional settings) had been monitored for adverse
health effects by medical staff.  (J-I-01)

*Impact of a high security environment on health care*

It is important to note for context that the Riverside County Jail is one of the
restrictive jail environments I have ever seen.  I base this conclusion not only on my
direct observations but on numerous discussions with deputies and patients during
my visits.

There appears to be no meaningful risk-based classification and all inmates are
treated as if they are high risk.  While this may seem to allow for some efficiency for
security purposes, such restrictive conditions of confinement create unnecessary
barriers to care and introduce significant inefficiencies and risks in the delivery of
health care.  This approach seems particularly harsh and problematic for inmates
who may be detained in these facilities for longer periods, such as the AB 109
population.

In all facilities, the vast majority inmates are confined to their cells (or very small housing units) nearly twenty-four hours a day.  (They are let out for daily showers and twice a week for recreation time in a closed gymnasium).  There is little or no programming and little out door time.  They rarely if ever get direct sunlight or fresh air.  Their access to health care personnel is limited by their limited movement and relies on a paper driven "kite" system for reporting a health concern.  If nursing does not come to their cell to give them the opportunity to raise concerns, their only other alternative to get medical attention is to call a "man down" medical emergency.

Conditions that are overly restrictive can and do have impact on inmate health and well-being and increase risks of adverse health events.  Minimally, they create barriers to access to required medical care.  I use the term "barrier to care" broadly, but in this case, there are literal physical barriers to care in the form of cells and housing units.  Obviously all correctional facilities have these barrier, but many have more freedom of movement and provide for more opportunities for the inmates to interact with health care staff.

*Reviews of In-Custody Deaths*

NCCHC Standards call for a multi-disciplinary review of all in-custody deaths within 30 days to include an administrative review, a clinical review and if a suicide, a psychological review.  According to a corrected list of 29 in-custody deaths since 2008 provided by the County through counsel, the department was unable to locate files for 5 deaths.  Of the seven deaths that occurred more than 30 days ago but less than one year, no multi-disciplinary death reviews appear to have occurred based on the documentation provided to me in response to my request for in-custody death reviews. This is a missed opportunity to identify preventable causes of death. (J-A-10)

Records for the other deaths provided have no consistent format.  Some are short summaries of one or two pages.  Others are hundreds of pages.  In some cases, the documentation includes a sign-in sheet or Power Point presentation apparently from a death review meeting, and in some of those cases, medical personnel are in attendance. Based on the documentation provided, proper death reviews as described in the relevant NCCHC standard are not occurring with consistency if at all and if they have occurred, there is no documentation provided in response to my request to demonstrate that they have occurred at all in the past year.

In addition, after providing an initial lists of in-custody deaths, the department submitted a revised list that removed a number of names, with the explanation that the earlier list included inmates who had not died "in-custody."  The corrected list, though, also included deaths noted as "NIC" which I read as "not in-custody" as there also were no files provided for those cases, but also removed names from the earlier list who clearly had died in custody (Julio Negrete, for example, an in-custody

homicide death from 2013 appears on original list, but is removed without explanation from the revised list). At the same time, a suicide from 2012 (Sonny Mazon) correctly appears on the revised list, but was not listed on the earlier more comprehensive list of deaths. (Mazon died from injuries related to a hanging while in-custody and so should appear on the list of in-custody deaths even though he died in an outside hospital.)

The overall impression I am left with is that the department does not have a good handle on in-custody deaths. Records of five deaths are missing. This is nothing short of stunning and reflects very poorly on the department. For cases where records are provided, reviews are inconsistent and incomplete and tend to be heavily biased towards events following the death and not events leading up to the death, and the medical and psychological viewpoint is often missing. This is a critical failing because careful reviews of in-custody deaths are essential in identifying ongoing risks to health and safety of inmates in an institution. In this area, the department falls well short of correctional standards and raises a real concern that inmates are at unreasonable risk of harm from preventable cuases of death.

### Summary of 2014 NCCHC Jail Not Being Met or Requiring Further Work

The following is my summary of *priority* areas that the department should continue focus on in order to be ready for NCCHC accreditation:

J-A-01 Access to Care
J-A-06 Continuous Quality Improvement Plan
J-A-09 Privacy of Care
J-A-10 Procedure in the Event of an Inmate Death
J-A-11 Grievance Mechanism for Health Complaints
J-C-02 Clinical Performance Enhancement
J-D-03 Clinic Space, Equipment, And Supplies
J-D-05 Hospital and Specialty Care
J-E-02 Receiving Screening
J-E-04 Initial Health Assessment
J-E-07 Non-Emergency Health Care Requests and Services
J-E-09 Segregated Inmates
J-E-12 Continuity and Coordination of Care During Incarceration
J-G-01 Chronic Disease Services
J-G-02 Patients with Special Health Needs
J-I-01 Restraint and Seclusion

**Discussion**

The Medical Program at the Riverside County Jails was challenged by drastic cuts to budget and personnel that occurred more than five years ago.  My review concludes that those cuts had significant impact on the quality of health care in the County jails resulting in my current finding that care in the Riverside County Jails does not meet constitutional standards.  Other reviewers as far back as 2011, including a Grand Jury, reached the same conclusion.  Yet, four years after those findings, care is still sub-standard and unacceptable.

The budget cuts visited upon the medical program by the Riverside County Board of Supervisors prior to the 2011 Grand Jury Report are deeply troubling as they document a failure of the Supervisors to recognize or accept their constitutional obligations to provide health care to inmates detained in county facilities.

Health care budgets are determined by factors such as the number of admissions and releases of inmates and the acute and chronic health care needs of those inmates.  While the County does indeed have a legitimate interest and responsibility to assure that care is fiscally responsible, efficient and cost-effective, cutting funding for necessary medical services based on financial pressures alone without regard to adverse effects on the ability of the department to provide minimally appropriate care is not defensible from a constitutional and statutory point of view.  Simply put, reasonable access of inmates to medical care cannot be limited simply to contain cost, no matter how pressing the fiscal pressures on the County.  In my opinion, these draconian budget cuts done, in Sheriff Smith's words "*without consideration for how those cuts affected the respondent's (the Sheriff's Department) ability to fulfill the legal responsibility,*" are a clear foundation for any claim of deliberate indifference by the County to the serious health needs of the inmates in their custody.

At the same time, it is clear to me that the County has now embarked on significant efforts to remedy the self-inflicted wounds to the department brought on by the drastic budget and personnel cuts.  Significantly, an experienced correctional health administrator, Mr. William Wilson, was hired, while structural changes were made to the health care delivery program with the full support of the Sheriff and the County Hospital.  Equally important, requisite financial resources are now increasing.

The plan for improvement of care described to me by key leaders including Dr. Arnold Tabuenca, Mr. William Wilson and Dr. Victor Laus is encouraging and largely consistent with the recommendations I have made in this report. I have confidence that, given the correct level of *ongoing and sustained* support by the County, these individuals are capable of bringing care within the Jails up to standard.  While they have taken initial steps, at the time of my review, it is too early to measure significant impact.  But the early signs are encouraging, including the successful recruitment of physicians and nurses, the securing of a contract for an Electronic

Health Record, initial CQI and data collection strategies, and revisions to the functional relationship between the Sheriff's department and the County Hospital.

I will take care to point out that, in my opinion, the significant deficits in care that I have documented in this report do not appear to be the result of unqualified or uncaring medical professionals.  On the contrary, Dr. Victor Laus and the nurses who did not abandon their posts during the long period of short staffing are to be commended for their commitment to the County and their patients.  The vast majority of the fifty or so inmates I interviewed spoke well of the nursing staff, and I found those nurses with whom I interacted to be both competent and caring.  While the inmates opinion of doctors was mixed, their most common complaint was that the doctors were rushed and did not take the time to explain things to them or answer their questions – this is consistent with my finding that the physicians historically have been stretched much too thin.

In my professional opinion, the failure to provide adequate care is a direct result of decision by the County to cut funding for an essential and constitutionally mandated basic service.  All that followed was completely predictable and completely preventable.  The good news, then, is that it is also fixable.  To that end, I provide both general and specific recommendations going forward.

**General Recommendations**

It is imperative that the Riverside County Board of Supervisors recognizes and acts upon the obligation of the County to provide adequate access to health services for inmates in the County jails as required by California law and the U.S. Constitution.  I am encouraged to see that the Board has supported the recent efforts to improve access to care as I have described in this report, but is critical that this support be durable and ongoing.

While recent efforts to improve care are laudable, the overall record of the County in the past five years is cause for concern.  Going forward, the parties would be advised to develop mechanisms to guarantee ongoing support of health services commensurate with the ever changing needs of the Jail population.

According to medical leadership in the department, the County has been supportive to individual and specific requests for funding to secure needed resources, but that funding is being doled out in a piecemeal fashion.  It is essential that the department be provided with an appropriate and predictable overall budget to allow for proper long-term planning.

At the same time, effects of realignment must be considered.  The County, along with all other counties in the state, must recognize and deal with the fact that the jails now house two different populations:  the traditional jail population and the translocated prison population created by AB 109.  The facilities were designed for short-term detention, but a growing population of inmates may spend years housed

in the county jails.  This will require a rethinking of all detention programming,
including medical.

**Specific Recommendations**


*1. Accreditation status*:

*The department should move forward with the process of preparing for, applying for
and securing accreditation with the National Commission on Correctional Care.*

If the department follows through with its current plan, I think the jail would be able
to secure accreditation within a year or so.  In addition to providing a standardized
approach to improving the health delivery system, securing accreditation would do
much to re-establish trust in a department whose reputation has suffered, and
would make a positive impression on the courts as it relates to the epidemic of court
orders.


*2. Staffing:*

*The department should follow through in restoring appropriate medical professional
staffing levels, and then work to maintain them and adjust them to address changing
needs.*

The department has made important strides in correcting staffing deficits that
resulted from the draconian budget cuts of recent years, but by its own tracking, still
needs to fill (at the time of the tracking report provided to me) 62 full time
positions, mostly in nursing. If necessary, salary levels should be adjusted to make
sure they are competitive with other jobs in the California correctional medicine
market.  Competitive salaries for board certified internal medicine or family
medicine physicians working in correctional settings should be above $200,000
annually and include continuing medical education support and health and
retirement benefits. As board certification has become the community standard, I
strongly recommend that the department actively recruit primary care physicians
who are board certified in either Internal Medicine or Family Medicine.

When target staffing levels are achieved, ongoing reassessment of changing needs
and appropriate adjustments to staffing levels is essential.  Key measures such as
wait times to see provider and compliance with chronic care guidelines can be used
to assess adequacy of staffing levels.

*3.  Physical space for medical care:*

*The department should examine and consider options to develop newer and more suitable clinic space to support health operation; space should be large enough to accommodate clinical operations while also securing appropriate privacy for patients.*

With the increasing population and changing character of detention (longer sentences with the AB 109 population) combined with national trends in aging populations in jails, the department should consider options to develop newer and more suitable clinic space to support health operation.  The clearest opportunity is in the new East County Detention Center.  It would be advisable to consult closely with county correctional health staff on the plans for clinic space before breaking ground on this project.

*4.  Infirmary or Intermediate Level of Care*

*The department should explore options for developing at least one facility that could provide a higher level of medical care such as infirmary or sub-acute levels of care.*

Currently, the department does not have any unit in any facility that is capable of providing for a higher level of care than that expected for an essentially healthy "ambulatory" or "community" population.  This forces the department into situation where the only mechanism for providing any care that requires a higher level is through Emergency Rooms or the County Hospital.  The department should consider the development of at least a small infirmary that could provide care such as simple intravenous medications or basic post-operative wound care so that inmates are not kept in higher cost settings any longer than they need to be.  It should be noted that the space would have to be appropriately designed to support this function and would likely involve new construction.

*5.  Screening on Intake:*

*The department should follow through with its plans to ensure that all newly arrived inmates are screened on arrival by licensed nursing staff.  Similarly, all new arrivals should be screened for tuberculosis.*

In order to comply with NCCHC standards on screening and initial health assessment, the department has two options.  In option one, a licensed nurse would screen all newly arrived inmates and those with problems identified by the nurse would be referred to licensed providers (nurse practitioners or physicians) as indicated.  In option two, screening would continue to be done by trained non-licensed deputies, but all inmates would be seen for a complete intake health assessment performed by an appropriately trained registered nurse within 14 days.

While both approaches would meet standard, I support the departments stated plan to move forward with universal screening by licensed nurses of all newly arrived inmates in accordance with the NCCHC "Full Population Assessment" option (J-E-04).

While past procedures for tuberculosis likely meet minimum standards, I am supportive of the department's newly implemented procedures for more comprehensive screening of this high risk population.  Effective screening is important not only for the facility, but for the public health at large.

*6. Continuous Quality Improvement:*

*The department should continue to develop a Continuous Quality Improvement program.*

Continuous Quality Improvement, recommended in May 2011 by IMQ, has only just started, but the fact that it has started is critically important.  As the department steps up its CQI program, it may wish to confer with Riverside University Medical Center as that facility has technical expertise and experience in developing and deploying CQI programs.

Information gleaned form well functioning CQI processes helps administrators improve both quality of care as well as efficiency of care and can help identify opportunities for cost containment.

*7. Utilization Management:*

*The department should develop a utilization management process.*

Most inmates housed in correctional facilities are the sole responsibility of the detaining authority, an arrangement that makes most jail and prison health systems both the health provider and the insurer.  Managed care approaches to allocating resources for high cost care have become an established mechanism for standardizing and controlling utilization of health resources.  The department could consult with other detaining institutions both in the state and elsewhere to learn more about the utilization management process for incarcerated populations.

*8. Medical Records:*

*The department should follow through with its plan to deploy a correctional Electronic Health Record and provide ongoing IT support to both the network infrastructure and IT support for end users of the software.*

Based on a very brief demonstration of the EHR system that will soon be deployed, I am optimistic that it has the promise to dramatically improve documentation, communication, and continuity of care across a dispersed system, as well as allowing health administrators to better track and address shifting healthcare needs across multiple facilities.  At the same time, it will only work if this system receives ongoing competent and timely IT support for the system.  The contract signed by the County with the vendor does indeed address this aspect, but it will take time to ensure that the system does deploy properly, is modified according to facility needs and is maintained and improved in an ongoing basis.  This will require ongoing evaluation and monitoring to verify successful deployment and ongoing support of a functioning EHR given the inherent complexity of these systems and the County's mixed track record with EHR's.

*9.  Chronic Disease Management*

*The Department should develop a chronic disease management process that references established guidelines (both correctional and community) for the management of common chronic conditions such as, but not limited to, diabetes mellitus, asthma, hypertension, HIV and hepatitis C.*

A functioning chronic disease program identifies inmates with chronic diseases and follows them proactively with documented treatment plans based on widely accepted clinical guidelines (including but not limited to those referenced by the NCCHC and Federal Bureau of Prisons).  With the deployment of an Electronic Health Record, one of the major barriers to tracking inmates with chronic disease is removed.  This provides an excellent opportunity for the department to develop and deploy a chronic disease program.

*10.  Timely Access to Care*

*a. Timely access to facility physicians- The Department should adjust staffing in order to accommodate timely access to care consistent with the timely access benchmarks established by the NCCHC.*

The current staffing plan, if fully realized, is likely to solve this problem of timely access to care within the facilities.  CQI approaches should be used to monitor wait times so that staffing patterns can be adjusted based on need.

*b. Timely access to specialty care –The Department should continue to work with the Riverside University Medical Center to provide more timely access to specialty care for serious medical problems.  If the RUMC is unable to provide timely access to care, the Department must secure those specialty services from other community providers as the community standard for timeliness is*

*established by the entire community, not by the standard set by department's chosen community partner.*

Providing timely access to specialty consultation should probably be approached on two different tracks simultaneously.  The department should continue to work with the County hospital in order to prioritize and accommodate inmate specialty care needs in a timely manner.  Whenever the hospital is able to provide care in a timely manner, it is likely to be the most cost-effective option.  However, the department should also explore establishing alternative providers to be used when the County hospital is unable to provide the care in a timely manner.

Also, a department review of off-site specialty consultations (from the last annual report) reveals that eye clinics account for a large proportion of consultations (roughly a quarter of the 1622 annual off-site consultations).  As one of the greatest costs associated with specialty care is actually the security costs of transporting and guarding the inmate patients, it may be more cost effective to contract with outside providers to provide care on-site in the facility.  Eye clinics do require some special equipment, so it is hard to say if on-site care can be provided in a cost-effective manner, but the costs of transport and security high enough that on-site care even with specialized equipment may less expensive.

## 11. Telemedicine

*Given the obstacles in moving inmates across a geographically dispersed system, the Department should explore Telemedicine as an option for access to sub-specialty consultation.*

With improvements in technology and the lowering of costs, telemedicine is becoming more common both in and out of correctional environments.  Telemedicine is a particularly useful tool in correctional settings with facilities that are geographically remote from community health settings as is the case in the Riverside County system.

## 12. Physical Disability Issues

*The Department should review the handling of inmates with disabilities who are currently confined to restrictive units not for the purposes of accommodating their special needs per se or for the purposes of providing a higher level of care, but for administrative convenience in meeting legitimate security concerns.*

The department should consult with other facilities in the state or country to learn about less restrictive approaches to dealing with inmates with disabilities.

*13. Pharmacy Services*

*The Department should consider increasing on-site pharmacy services at the jails from the current five days a week to seven days a week.  The department should liberalize the use of Keep on Person medications – especially for inhalers and medications that are available over-the-counter in the community.*

The Riverside County Jails operate and admit new inmates twenty-four hours a day seven days a week.  Although there are back-up procedures for weekends and holidays including use of stock medicines at each facility (a practice I support), regular pharmacy support seven days a week, or minimally six days a week, would decrease the risk of interruptions in continuity of medical treatments

Keep on Person (KOP) medications can improve asthma care as well as decrease utilization of nursing resources for routine care involving common medications that are over-the-counter in the community.

The department must develop a process to provide scheduled medications for serious and/or chronic health conditions for inmates who are in transit or transport between facilities, to and from hospitals and clinics and courts.  This can be accomplished in many cases by providing unit dosing or blister packs of non-controlled medications to cover the transport period directly to the inmate for self-administration.

*14. Sick Call*

*The department should review Sick-Call procedures to remove unnecessary barriers to timely access to care.*

A nurse should evaluate patients with symptomatic complaints in a timely manner as defined by the guidelines established by the NCCHC Jail Standards. Those needing consultation with a nurse practitioner or physician should not be subjected to unreasonably long waits.  Attempts should be made to see patients as soon as possible, and the practice of making inmates arbitrarily wait a specified period to be evaluated is not defensible and should be abandoned.  Also, while a written request for health services (a "kite") is a reasonable option, it should not be a requirement to request care.  For tracking purposes, face-to-face requests can be logged by nursing staff.

*15. Grievances*

*Grievances should be categorized and analyzed as part of a Continuous Quality Improvement process.*

The facilities continue to experience high numbers of medical grievances.  Although these can be a lagging indicator in an environment that is experiencing

improvements, a systematic review of these complaints can provide critical information to guide the administration in areas that might require more attention. Systematic analysis of grievances should be part of a functioning Continuous Quality Improvement program.

*16. Dental*

*Dental Clinics should be scheduled and staffed to allow for timely access to appropriate dental care.*

The department should look at dental staffing and clinic scheduling to ensure timely access to care.  For remote or smaller jails, arrangements for community consultation should be considered for inmates with acute dental issues (such as dental abscesses) when an in-facility dental consultation cannot be provided in a timely manner.

*17. Segregation*

*The department should establish procedures to ensure that inmates held in isolation and segregation have daily assessments by medical personnel and institute a logging procedure for those encounters.*

Inmates held in isolation face increased adverse physical and mental health risks while simultaneously experiencing increased barriers in access to care.  NCCHC standards require that health staff must check inmates in segregation or isolation daily.  Facility staff assured me that nursing staff was checking inmates in segregation on a daily basis, but they were unable to produce any log or documentation of this process.  Clearer policies with a logging procedure would better document that the facilities are meeting this standard of care.

*18. Restraints*

*Policies and procedures for health care monitoring of inmates held in restraints should be developed in compliance with NCCHC standards.*

Use of restraints carry significant risks to the health and well being of inmates. Standards dictate that health care staff must continuously monitor inmates held in restraints.  This is critically important for facilities that use restraint chairs, as these chairs have been associated with risk of blood clot formation and high risk of pulmonary emboli and even death.

*19. Impact of a high security environment on health care*

*The department should consult with other jail facilities in the state and in the nation to learn about less restrictive detention practices that do not compromise facility safety*

*and security, particularly for those inmates expected to remain incarcerated for longer
periods of time.*

Environment of care can affect the health and well being of both staff and inmates.
Corrections as a field continues to evolve, and this time of review provides an
opportunity for the department to learn about alternative approaches to detention
that involve risk-stratification of the population.  While this particular
recommendation involves the security domain, it is relevant to the health care
insofar as it affects removal of barriers in access to care and opportunities to
promote healthier lifestyles with more activity and freedom of movement for
appropriately screened inmates.  Many other institutions have demonstrated that
less restrictive opportunities for lower risk inmates can be deployed without
compromise to the safety or security of the institution.

*20. Review of In Custody Deaths*

Documentation provided regarding in custody deaths does not meet compliance
with the NCCHC standard regarding timely review.  The department should
prioritize implementing standardized death reviews as described by the NCCHC Jail
Standards within 30 days of the death and keep careful records of those reviews in
order to identify and remedy preventable causes of death.

**The Issue of Correctional Health Care Cost**

As the history of trouble with detention health services in Riverside County is
largely as story about poorly conceived directives to control the cost and the
disproportionate budget impact of detention health, it is important to consider the
broader issue of rising health care cost and the impact of those rising costs on
correctional health settings.

For much of the past decade, all health care costs in the U.S. (in the community and
in corrections) have been rising for a variety of reasons.  Costs for physician
services, hospitalization and drugs have all gone up.  Corrections has felt these
increases more acutely in part because the correctional populations concentrate
individuals requiring high cost care, including those with mental illness, HIV and
hepatitis C (all of which have extremely high drug costs) as well as many other
chronic health conditions including aging populations.

According to publically available FY2014/2015 budget figures, the most recent
annual expenditures for detention health services by Riverside County were

$19,488,022.[4]  For an average daily population of roughly 3800 adults, this translates roughly to an annualized per inmate health cost of $5000.  To put that in some perspective, the average annual per inmate cost of heath care for inmates in 2011 nationwide was $6047 per inmate per year.[5]

In the California state correctional system, the cost per inmate has now risen to roughly $18,000 per inmate per year.  It was $7747 in 2005, prior to the Federal Receivership.[6]  (Per inmate health spending is prisons is generally somewhat higher than for jails, but accurate jail data is hard to come by so this is still the best reference point.)

The rising costs of incarceration in general, and the cost of providing health care to those incarcerated, is a growing cause for concern across the nation.  Efforts to contain health costs through improved efficiency of detention health operations are essential, but even with those efforts, the costs of incarceration will remain high.

Under the Affordable Care Act, some believe there may be new opportunities in correctional settings recouping some health costs in new ways, but those mechanisms remain unclear and unproven and in the near term, they cannot be relied upon.

It is important to understand that the two factors driving detention health costs most are 1) the rising number of individuals who are incarcerated and 2) the rising cost of health care everywhere.  The Riverside County Correctional Health Services has no control over either of these factors.

There is a growing consensus nationally that the only way to bring down costs of incarceration is to reduce our dependence on incarceration.  While the practicality of that option is beyond the scope of this report, it is important to note that there are medically based alternatives to incarceration including community based

---

[4] County of Riverside 2014/2015 Recommended Budget.  Available at:
http://countyofriverside.us/Portals/0/Government/Budget%20Information/2014-2015%20Recommended%20Budget/BudgetDetail.pdf

[5] Pew Charitable Trusts/ MacArthur Foundation.  State Prison Health Care Spending. July 2014.  Available at:
http://www.pewtrusts.org/~/media/Assets/2014/07/StatePrisonHealthCareSpendingReport.pdf

[6] Prison Legal News.  California Prison Healthcare Costs Soar Under Federal Receiver.  October 10, 2014.  Available at:
https://www.prisonlegalnews.org/news/2014/oct/10/california-prison-healthcare-costs-soar-under-federal-receiver/

treatment for mental illness and addiction that have been used successfully to divert appropriate individuals and to reduce recidivism.

What is within the scope of this report to this report is the fact that while rising jail health care costs are a compelling and important fiscal issue with profound implications for other public programs, cost alone can never be used to justify cutting health care services to inmates below the minimally accepted constitutional or statutory levels.

**Conclusion**

As a direct result of drastic budget cuts to the medical program in the Riverside County Jails over five years ago, medical services were severely adversely impacted. In spite of very recent and significant efforts, at this time, medical care at the Riverside County Jails does not, in the opinion of this expert, meet minimal constitutional standards and poses a significant risk of serious harm to inmates confined to jail.

In my opinion, the plan for reconstituting a functional and minimally acceptable health care program outlined to me by the County Correctional Health Services leadership is well thought out and promising.  That plan deserves the full support of the County with appropriate dedicated funding as required.

Given the history and record of the County in voluntarily meeting its constitutional obligations to jail inmates in the area of healthcare, I recommend that any consent agreement include ongoing monitoring and mechanisms for enforcement of such an agreement in order to ensure the County does not waiver in or abandon its current commitment to establishing and maintaining constitutionally defensible medical care for the individuals it detains.

This revision or the initial draft report, now final with the exception noted below, respectfully submitted to Counsel for the County of Riverside and the Counsel for the Plaintiffs in the matter of Gray v. County of Riverside on July 15, 2015.

Scott A. Allen, MD

Note:  This draft submitted is missing analysis of medication administration practices and issues relating to identifying medication interactions between medical and psychiatry as that analysis, which requires coordination between myself and Dr. Gage, has not been completed at the time of the submission of this report.