# EXHIBIT B

# Bruce C. Gage, M.D.

# General and Forensic Psychiatry

**FINAL REPORT**

July 15, 2015

This report was completed by the undersigned at the request of counsel for plaintiff and defense in the US District Court Case, Gray v. Riverside County, EDCV 13-00444-VAP.  The specific charge, memorialized in a 3/15/15 letter from counsel for the parties is as follows:

> "Your charge is to determine whether the mental health care currently provided poses a significant risk of serious harm to prisoners confined in the Riverside jails and, if so, to make recommendations for improvements that will provide the minimum care guaranteed by the U.S. Constitution. In order to do so, you will be provided with reasonable access to the jail facilities (Presley Detention Center, Smith Correctional Facility, Southwest Detention Center, Indio Jail, and Blythe Jail, as well as the Riverside County Regional Medical Center, to the extent it houses prisoners under the jurisdiction of the Riverside County Sheriff for treatment purposes), staff, prisoners, and documents (including prisoners' health care records), as necessary to properly evaluate the adequacy of the health care delivery system and correctional policies and practices. On your site visits you may have confidential and voluntary interviews with any prisoner and voluntary interviews with correctional and health care staff members."

There remain three outstanding issues as of the date of this report:  assessment of medication administration, whether there are concerning prescribing practices involving the interaction of psychotropic and medical medications, and whether I will be provided any information regarding two 2105 suicides for evaluation.  The first two contemplate coordination between myself and the medical expert, Dr. Allen.  If necessary, I will complete an addendum to this report once that outstanding issues are addressed.

The opinions rendered in this report are those of the undersigned alone and are rendered within a reasonable medical probability and certainty. My opinions are based on my background, education, training, clinical practice and other professional experience, my review of the materials in this case, and my knowledge of the relevant medical and scientific literature.

My work on this matter is being charged at a rate of $350 per hour.

### Qualifications

I am a board certified psychiatrist licensed to practice in the State of Washington.  I am certified in General Psychiatry and Forensic Psychiatry by the American Board of Psychiatry and Neurology.  I completed my undergraduate training at the Massachusetts Institute of Technology, receiving a degree in chemistry.  I then went to medical school at the University of Washington, completing my degree in 1983.  Following a year of post-doctoral training in physiology, I completed a general psychiatry residency at Cambridge Hospital/Harvard Medical School, where as chief resident I did specialty training in forensic psychiatry.

After two years in a clinical and teaching position with UCLA at the Sepulveda Veterans Hospital, I joined the University of Washington (UW) at The Washington Institute for Mental Health Research and Training located at Western State Hospital (WSH). I remained at these institutions in various roles until 2008 when I became Chief of Psychiatry for the Washington State Department of Corrections (WA DOC). I was the founder and Program Director of the UW Forensic Psychiatry Fellowship until 2008. I hold an appointment as Clinical Associate Professor at the UW.

Throughout my career, I have evaluated and treated thousands of patients for behavioral disorders, including numerous mood and psychotic disorders. Currently, I do direct care, consult on challenging clinical cases for WA DOC, conduct forensic evaluations (including private cases), provide monitoring services and consultation, and teach residents and other trainees in the areas of mental illness and forensics. I am a member of the Psychopharmacology Committee of the American Academy of Psychiatry and the Law.

A copy of my *curriculum vitae* is attached, which includes a listing of all publications I authored in the past ten years.

**Trial Testimony and Deposition Testimony in the Last Four Years**
Trial Testimony:
2015
State of Alaska v. Karan Clifton (Superior court of Alaska, Third Judicial District)

2014
State of Washington v. Isaac Zamora (Skagit County Superior Court, Washington)
Sheard v. Daniel Habeeb and Robert Polakoff (King County Superior Court, Washington)

2013
Lashawn Jones, et al., and the United States of America v Marlin Gusman, Sheriff
In the Estate of Akagi, (Snohomish County Superior Court, Washington)

Deposition Testimony:
2014
Sheard v. Daniel Habeeb and Robert Polakoff (King County Superior Court, Washington)

2013
In the Estate of Akagi, (Snohomish County Superior Court, Washington)
Watson v Dyncorp International and The Continental Insurance Company (U.S. Department of Labor, Office of Administrative Law Judges)

2011
Williams v. McDonnell Douglas Corp, et al. (King County Superior Court, Washington)

## DATABASE

The following constitutes the database for this report. The staffs of the Riverside Sheriff's Department (RSD) and Department of Mental Health (DMH) were uniformly helpful and provided information and access to both staff and inmates. Their professionalism was notable and appreciated.

1. Gray v Riverside – Order Granting Plaintiffs' Motion for Class Certification; Denying Defendant's Motion to Dismiss
2. Site visits to all facilities, including interviews of staff and patients
   a. Indio and Blythe jails on 5/20/15
   b. Robert Presley Detention Center (RPDC) on 6/1/15 and 6/4/15
   c. Larry D. Smith Correctional Facility (SCF) on 6/2/15
   d. Southwest Detention Center (SWDC) on 6/3/15
   e. Detention Care Unit (DCU) on 6/4/15
3. Mental Health Detention Positions by Jail Site dated 4/20/15
4. Mental Health Detention Positions by Jail Site dated 5/27/15
5. Correctional Healthcare Services Organizational chart dated 3/15
6. Correctional Healthcare Services Staffing (undated and redacted)
7. Letter from Deborah Johnson to Lt. Maurice LeClair dated 5/18/15 regarding Forensic Mental Health coverage at all five Riverside jails
8. Riverside County Department of Mental Health Detention Clients Served 2013-2014, dated 1/12/15
9. Riverside County Sheriff's Department Jail Release/Length of Stay Data from 2009 to 3/3/15
10. Excel spreadsheet entitled "4 – Court Orders 2014"
11. Gray vs. County of Riverside: Court Orders for First Two Weeks of 2014
12. Gray vs. County of Riverside: Court Orders for First Two Weeks of 2015
13. Untitled Riverside County Sheriff's document regarding facility capacities and average census, undated
14. Safety Cell logs from all facilities for 2014
15. Riverside County Sheriff's Department Corrections Division Policies
    a. Mental Health Services, number 508.12 dated 1/28/14 (one copy with edits, the other clean)
    b. Inmate Medical Care, number 508.06 dated 1/28/14
    c. Emergency Restraint Chair, number 503.07 dated 9/7/12
    d. Safety Cells, number 504.24 dated 2/15/11 and 5/20/14
    e. Suicide Prevention Program, number 508.15 dated 11/1/07
    f. Sexual Assault, number 501.24 dated 10/28/14
    g. Inmate Medical Care, number 508.06 dated 1/28/14 and 11/4/14
    h. Inmate Meals, number 509.04 dated 10/28/14
    i. Medical Screening/Medical Release, number 508.10 dated 2/15/11
    j. Inmate Death Review Meeting, number 501.22 dated 7/25/16
16. Riverside County Sheriff's Department Indio Jail Procedures Manual
    a. Restraint Chair, number 503.07 dated 6/11/09
    b. Safety Cells, number 504.24 dated 12/10/08
    c. Suicide Prevention Program, number 508.15 dated 10/29/02 and 10/28/14
    d. Inmate Medical Care, number 508.06 dated 10/28/14
    e. Mental Health Services, number 508.12 dated 10/28/14
    f. Routine Medical Treatment, number 508.14 dated 10/28/14
17. Riverside County Sheriff's Department Blythe Jail Procedures Manual
    a. Emergency Restraint Chair, number 503.07 dated 1/23/13

b.  Safety Cells, number 504.24 dated 3/2/04
c.  Suicide Prevention Program, number 508.15 dated 12/4/07
18. Riverside County Sheriff's Department Robert Presley Detention Center Procedures Manual
    a.  Restraint Chair, number 503.07 dated 7/18/12
    b.  Safety Cells, number 504.24 dated 12/10/08
    c.  Suicide Prevention Program, number 508.15 dated 3/1/98
19. Riverside County Sheriff's Department Larry D. Smith Correctional Facility Procedures Manual
    a.  Restraint Chair, number 503.07 dated 7/18/12
    b.  Safety Cells, number 504.24 dated 3/11/08
    c.  Suicide Prevention Program, number 508.15 dated 9/25/07
    d.  Inmate Medical Care, number 508.06 dated 10/28/14
20. Riverside County Sheriff's Department Southwest Detention Center Procedures Manual
    a.  Restraint Chair, number 503.07 dated 4/17/13
    b.  Safety Cells, number 504.24 dated 7/18/12
    c.  Suicide Prevention Program, number 508.15 dated 12/14/05
    d.  Mental Health Services, number 508.12 dated 10/28/14
21. Riverside County Sheriff's Department Corrections Division Forms
    a.  Inmate Request for Healthcare Visit, RSD Form 511 dated 5/11
    b.  Health Information for Pregnant Inmates, RSD Form 575e dated 5/22/13 (in English and Spanish)
    c.  Inmate Classification Assessment, RSD Form 504.02 dated 10/28/14
    d.  Release Medication Instruction Sheet, P504.10 dated 11/4/14
    e.  Jail Information Management System (JIMS) screen shot of Medical History/Suicide Assessment Form, undated
    f.  Receiving Sheet – Defendant Information, RSD Form 500 dated 7/03
22. Detention Mental Health Intersystem Screening form, undated
23. Riverside County Department of Mental Health Forms
    a.  MH Admission, dated 6/16/11
    b.  Brief Assessment, dated 10/7/13
    c.  Psychiatric Updates, dated 11/14/13
24. Riverside County Interagency Adult Detention Healthcare Memorandum of Agreement, submitted 12/9/11
25. County of Riverside Department of Mental Health – Mental Health Detention Services Policy and Procedures Manual, approved 4/9/12
26. Riverside County Department of Mental Health policies
    a.  Confidentiality/Privacy Disclosure of Individually Identifiable Health Information, number 239 dated 4/14/03
    b.  Compliance Plan, number 101 dated 4/30/07
27. Riverside County Detention Health Services Policy/Procedures
    a.  Health Care Staff Procedure (Standardized Procedures), number G-108 dated 8/14
28. Riverside County Regional Medical Center Detention Health Services – Adult Policies
    a.  Inmate Contact and Consultation with Private Physician(s), number 211 dated 1/20/10
29. County of Riverside, Board of Supervisors policies
    a.  Health Privacy and Security Policy, number B-143 dated 4/14/03

30. County of Riverside Notice of Privacy Practices dated 4/14/03
31. Riverside County Detention Health Services First Responder/AED Competency Checklist, undated
32. Riverside County Correctional Healthcare Services General Guidelines
    a. Medication: Essential (with edits shown) dated 11/14
33. Riverside County Correctional Healthcare Services Nursing Assessment Protocols
    a. Tuberculosis Surveillance
    b. Tetanus Prophylaxis
    c. Taser Probe Removal
    d. Pregnancy Testing
    e. Pepper Spray
    f. Oxygen Administration
    g. Keep on Person Program
34. Riverside County Correctional Healthcare Services Forms
    a. Receiving Screening, dated 9/14
35. Memorandums from Victor Laus, MD, MBA, CCHP regarding
    a. Special diets, dated 8/19/14
    b. Guidelines regarding medical orders for wearing soft (orange) shoes, and orthopedic shoes, dated 9/24/14
    c. Abuse and misuse of Neurontin, dated 9/12/13
    d. Guidelines for management/treatment of obstructive sleep apnea and use of nasal continuous positive airway pressure
    e. Guidelines for medical orders for lower bunk bed
36. Riverside County Correctional Healthcare Services definitions for Correctional Healthcare Services Statistic Sheet, undated
37. Riverside County Correctional Healthcare Services Acceptable Abbreviations, undated
38. Riverside Community Hospital Emergency Department Medical Clearance form, redacted example, undated
39. Riverside County Regional Medical Center Detention Health Services presentation "Know Your Role: Man Down 1[st] Responder", undated
40. Mental Health Detention Risk Training: MHSA Workforce Education and Training presentation, undated
41. Riverside County Sheriff's Department Trainee Corrections Training Manual
42. Riverside County Sheriff's Department presentations
    a. Assessing The Elderly, undated
    b. Emergency Treatment Services, undated
    c. Suicide, undated
    d. Legal and Medical Necessity Criteria, undated
    e. Welfare and Institutions Code 5150 Process Vs. Voluntary (6000), undated
    f. Mental Health Crisis Intervention Training (MHCIT) History, undated
    g. Untitled CIT training by A. Fuzie, R Martinez, D. Schoelen, A. Chadwick, and H. Sylvester, undated
    h. Suicide by Cop, undated
    i. The E.A.R. Model, undated

      j.   Verbal Judo: Communication Techniques

43. Document entitled "The Prison Rape Elimination Act (PREA): Implications for Rape Crisis Centers", undated and unattributed

44. Riverside County Regional Medical Center Detention Health Services PREA Post Test, undated

45. Riverside County Regional Medical Center Detention Health Services presentations
   a. Sexual Abuse in Detention: Health Care Providers Response and the Prison Rape Elimination Act, undated
   b. Sexual Assault Response Team, undated

46. Document entitled "RED FLAGS: Warning Signs for Sexual Assault, Sexual Abuse, or Sexual Harassment in Detention – Inmate against Inmate", dated 9/06

47. Document entitled "RED FLAGS: Warning Signs for Sexual Assault, Sexual Abuse, or Sexual Harassment in Detention – Staff Member against Inmate", dated 9/06

48. Notice (in English and Spanish) regarding changes in requesting jail health care services, changes effective 3/26/14

49. Interviews of the following patients (DMH numbers):  950772462, 950754538, 950681583, 960829305, 970023734, 970069255, 970006254, 960874377, 950706477, 970038456, 970061721, 970028684

50. Mental health grievances from January through March 2015, numbers 12272, 12264, 12261, 12252, 12217, 12209, 12196, 12195, 12181, 12176, 12144, 12130, 12119, 12094, 12080, 12066, 12017, 12008, 11941, 11925, 11924, 11892, 11891

51. Suicide reviews from 2012 – 2014:  RC123140001, RC121850001, BC120290001

52. Safety cell logs from January through March 2015 for all facilities

53. Restraint chair logs from January through March 2015 for all facilities

54. Detention Mental Health Sheriff MOU Monthly Report – May 2015

55. MHS 8005 Supervisor Report – Quality Improvement Chart Review Audits –
   a. SWDC – 5/7/15, 7/28/14, 3/26/14
   b. RPDC – 3/2/15, 8/11/14, 4/24/14
   c. Indio – 3/23/15, 8/11/14, 5/22/14
   d. SCF – 5/7/15, 8/27/14, 7/28/14, 3/26/14
   e. Blythe - none

56. RPDC Roster of Inmates in FMH Housing on 6/1/15

57. SCF Roster of Inmates in FMH Housing on 6/1/15

58. Correctional Health Services Dashboard – May 2015

59. Correctional Health Services Monthly Statistical Report Adult Detention Services – May 2015

60. Detention Mental Health Sheriff MOU Monthly Report – May 2015

61. Pharmacy report for mental health medications for 6/1/15

62. Mental health roster for inmates for 61/15

63. Inmates positive for mental health screening 5/1/15-5/7/15

64. Medical records of the following patients (DMH numbers):  950772462, 950754538, 950681583, 960829305, 970023734, 970069255, 970006254, 960874377, 950706477, 970048356, 970061721, 970028684

65. Memo from Riverside County Department of Mental Health regarding laboratory records of the patients enumerated in 62 dated July 2, 2015

66. Laboratory records for the following patients (DMH numbers):  950772462, 970023734

67. Screenshots of mental health intake screening questions from EHR that goes live June 29, 2015
68. A listing of all mental health encounters from May 2015 for SWDC, SCJ, RPDC, Indio, and Blythe
69. Riverside Country Department of Mental Health Policy 248, Adverse Incident Reports, Reviews, and the Morbidity and Mortality Review Committee
70. Memo from Deborah Johnson to Andre O'Harra entitled "Mental Health Step Down Program/Larry Smith Correctional Facility", dated June 18, 2015
71. RCDMH Documentation Manual, revised January 2015
72. Email from Susan Carroll regarding two encounter codes not included in the RCDMH Documentation Manual dated 7/13/15

## SUMMARY OF SALIENT FINDINGS

### Jail General Information

Riverside jails have a total capacity of 3914 and an average daily census of 3794. The capacities and average daily census at each jail are as follows:

- Indio jail (Indio) – 353 capacity, 353 average census
    - This is a small jail built in the traditional style of linear cells.
    - There are two safety cells and a small wing of cells that are used for protective custody and specialized medical access though these are not licensed beds or an infirmary. They can also be used as administrative segregation cells; they do not have cameras.
    - Note that a new and much larger jail is being built at Indio that will reportedly have a more modern design as well as more program space
- Blythe jail (Blythe) – 115 capacity, 110 average census
    - This is a small jail built in the traditional style of linear cells with limited space and resources. There are no safety cells.
- Robert Presley Detention Center (RPDC) – 815 capacity, 720 average census
    - This facility was built in 1989 and is designed primarily for indirect monitoring (custody staff are not embedded with the population but are generally in booths and have limited contact with inmates)
    - There are 8 safety cells
- Smith Correctional Facility (SCF) – 1520 capacity, 1499 average census
    - This facility was built in stages and has numerous different types of settings from highly secure settings with officer booths designed for indirect monitoring to dormitory-style settings.  It has the greatest capacity for programming of existing facilities
    - There are four safety cells
- Southwest Detention Center (SWDC) – 1111 capacity, 1112 average census
    - This facility, while more modern, is designed primarily for indirect monitoring
    - There are four safety cells

Annual bookings for the jails have been relatively stable since 2009. In 2014 there were 57,695 bookings. Of these 46.4% stayed a day or less, 11.5% stayed 1 to 3 days, 10.9% stayed 3 to 5 days, 14% stayed 5 to 14 days (note that the 30.1% in the RSD report is a miscalculation), and 17.2% stayed longer than 14 days. AB 109, which provides for those who would have been previously sentenced to prison to be housed in county jails, is expected to increase the number of long-term stays. While this population

focuses on lower-level felonies there is no reason to expect that they would have lower mental health needs.

RPDC is the primary intake facility doing about 60 bookings per day (about 40% of total bookings). SCF books about 20 per day but releases about 40 per day. Bookings at SWDC are intermediate between these two.  Daily bookings at Indio and Blythe are generally in the single digits.

Yards are highly variable but generally are sufficiently large and provide access to fresh air. Most have basketball hoops and limited exercise equipment. They provide for good staff observation by direct visualization and/or by camera.

Day rooms also vary throughout the facilities but are typical of jail day rooms with spider tables dominating the available floor space. Televisions and telephones are available.

In general the jails have very limited programming space, most of which is poorly arrayed for doing mental health treatment (e.g. set up as classrooms, too small a space).  The only programming space set up to provide for restraint of group participants was at RPDC (used primarily for the incompetent to stand trial program run by Liberty).  What programming space is available is not used by mental health, primarily because mental health is not allowed to meet face-to-face patients.

Mental health staff compete with attorneys and each other for limited noncontact booth access. This sometimes interferes with providing timely service.  The patient side of the booth generally provides for good privacy. However, clinicians are often in the space shared by other staff and other clinicians, both reducing privacy and making it difficult to hear and carry on a proper interview.  This is discussed further below.

**Mental Health Population Data**

Department of Mental Health (DMH) data from fiscal year 2013 to 2014 reveals the following:

- 7777 inmates were provided any mental health services
- 78.6% of those served were male
- services were provided across the age spectrum from 18 to geriatric
- the diagnostic breakdown was as follows
  - less than 1% with ADD or ADHD
  - 6.5% with bipolar disorder
  - 5.1% with the primary drug alcohol diagnosis
  - 9.9% with major depression
  - 1.8% were manic
  - 52.7% with mood and anxiety or adjustment disorders other than those detailed above
  - less than 1% with an "organic" disorder
  - 18.6% with schizophrenia or other psychotic disorder
  - tiny fraction with somatoform disorders
  - 2.6% with missing diagnosis

DMH leadership reports that 35% of the jail population is identified as having an active DMH case.  The RSD reported that about 40% of the population has a mental health diagnosis.  DMH estimates that 18%

of the population has a serious mental illness such as schizophrenia, bipolar disorder, or major depression, which does not comport with the above statistics.

The mental health detention services monthly jail profile survey from May 2015 gives the following summary of the population for RPDC.

- 432 open cases
- 94 new cases opened
- 292 patients receiving psychotropic medications
- 448 psychiatric encounters
- 1342 mental health clinical encounters
- 60 safety cell assessments of which 23 were sent out for 4011.6 evaluations (civil commitment)
- 50 patients was the average census in mental health housing units
- 297 mental health encounters on the mental health housing units
- the average response time for inmate mental health care requests was four days

On 6/1/15 RPDC had 51 males and 31 females in mental health housing.  It is unclear of the female unit is included in the above numbers from DMH.  Of the 51 males, 35 had intermediate custody levels (3 and 4, with 6 being the highest) and 19 were custody level 3.  Of the 31 females, 25 were intermediate and 19 were custody level 3.  None were at custody levels 1 and 2; it is my understanding that these individuals are generally released to the community.

The mental health detention services monthly jail profile survey from April 2015 gives the following summary of the population for SWDC (which has no formally designated mental health housing units).

- 529 open cases
- 163 new cases opened
- 224 patients on psychotropic medications
- 438 psychiatric encounters
- 701 mental health clinical encounters
- 67 mental health safety cell evaluations/assessments completed
- the average response time to inmate mental health care requests was three days

The mental health detention services monthly jail profile survey from May 2015 gives the following summary of the population for SWDC.

- 538 open cases(the mental health services supervisor estimates that about 100 of these are cases that need to be closed)
- 170 new cases opened
- 240 patients receiving psychotropic medications
- 438 psychiatric encounters
- 964 mental health clinical encounters
- 66 safety cell assessments of which 23 were sent out for 4011.6 evaluations
- the average response time for inmate mental health care requests was three days

The mental health detention services monthly jail profile survey from April 2015 gives the following summary of the population for SCF.

- 427 open cases
- 173 new cases opened
- 345 patients receiving psychotropic medications
- 440 psychiatric encounters
- 1431 mental health clinical encounters
- 58 safety cell assessments of which 23 were sent out for 4011.6 evaluations
- 64 patients who were ever placed in the residential mental health housing units
- 338 mental health encounters on the housing units
- 197 designated as severely mentally ill (psychotic disorder, bipolar disorder, or major depression) of which 95 were reported to be stable
- the average response time for inmate mental health care requests was five days

The mental health detention services monthly jail profile survey from May 2015 gives the following summary of the population for SCF.

- 457 open cases
- 163 new cases opened
- 376 patients receiving psychotropic medications
- 485 psychiatric encounters
- 1381 mental health clinical encounters
- 52 safety cell assessments of which 23 were sent out for 4011.6 evaluations
- 64 patients was the average census in mental health housing units
- 261 mental health encounters on the housing units
- the average response time for inmate mental health care requests was four days

On 6/1/15 SCF had 57 males in mental health housing.  Of the 57 males, 30 had intermediate custody levels 18 were custody level 3.

The mental health detention services monthly jail profile survey from May 2015 gives the following summary of the population for Indio.

- 132 open cases
- 83 new cases opened
- 103 patients receiving psychotropic medications
- 114 psychiatric encounters
- 571 mental health clinical encounters
- 30 safety cell assessments of which 23 were sent out for 4011.6 evaluations
- the average response time for inmate mental health care requests was three days

The mental health detention services monthly jail profile survey from May 2015 gives the following summary of the population for Bythe.

- 27 open cases
- 15 new cases opened
- 6 patients receiving psychotropic medications
- 15 psychiatric encounters

- 26 mental health clinical encounters
- 0 safety cell assessments of which 23 were sent out for 4011.6 evaluations
- the average response time for inmate mental health care requests was three days

It is of note that the roster of inmates on the mental health roster as of 6/1/15 indicated the following:

- RPDC – 64
- SCF – 32
- SWDC – 41
- Indio – 27
- Blythe – 0

It is unclear how to reconcile these numbers.  How the two sets of numbers are determined is also unclear.

**Riverside County Interagency Adult Detention Healthcare Memorandum Of Agreement**

Several aspects of this agreement are important to summarize.  The agreement specifies that mental health care will be "consistent with the 'community standard'" which it goes on to say is "defined as care that the average person in the community has access to through established and accepted mental health care practices and procedures."  The agreement later specifies that DMH "will provide a broad scope of detention mental health care and ancillary services. These will include, but not limited to [sic], the screening, referral and care of mentally disordered inmates, providing on-site psychiatric and clinical services at each RSD correctional facility, referrals to outpatient mental health treatment services, evaluation treatment of inmates held in safety cells or in restraint chairs, crisis intervention response and treatment, referral of mentally disordered inmates to appropriate treatment facility pursuant to Penal Code 4011.6, discharge aftercare planning, mental health records management, and health service audits."  The agreement also specifies with regard to access to care that "all inmates are entitled to routine nonemergency medical, dental, and mental health care. Every inmate will be provided necessary healthcare without regard to his or her ability to pay." It specifies that, "For each inmate treated by mental health staff, that the MH treatment staff will develop a written treatment plan. … This treatment plan will include referral to treatment after release from the facility when recommended by treatment staff."

The agreement specifies that "Inmate referrals and requests for services will be triaged daily within twenty-four hours by a qualified mental health practitioner, and receive treatment within three calendar days of referral or request. Urgent request will be handled immediately." It also requires DMH to "evaluate and assess the mental health care needs of each inmate placed in a restraint chair, sobering cell, or safety cell…."  The agreement specifies that inmates will have the opportunity to make requests for services daily.  While the agreement indicates that such requests will be obtained from housing unit custody staff, this practice was changed recently to provide that such requests are taken by nursing staff at pill call.

With regard to intake/receiving assessment the agreement specifies that Riverside Sheriff's department "corrections staff will perform the initial intake health screening assessment on all inmates…."  It goes on to add that prior to them being accepted for booking "any individual who appears to have medical or mental health needs will be directly referred to DHS medical staff."  It also specifies that newly booked

inmates will have an "intake health screening and assessment" completed by a registered nurse before being housed in jail population. It specifies that this should be done in a way that "allows the inmate to maintain privacy and exchange confidential medical or mental health information with the nurse. RSD staff may only visually observe the screening for safety and security purposes."  With regard to mental health, this health screening is to include:

> "Does arresting/transporting officer have any information that indicates inmate is a medical, mental health, or suicide risk; has the inmate attempted suicide or thinking [sic] about committing suicide now; as the inmate had a recent loss of a loved one or close friend; is he/she being treated for mental health problems now or in the past; any prior mental health contacts while in custody; and etc. ('Yes' answers to these type of questions will be referred to medical and/or mental health for additional in-depth screening)"

The agreement specifies that RPDC will be the primary location for mental health housing, specifically that "A sheltered mental health housing unit at the Robert Presley detention Center, or designated facility, will be utilized as the primary housing for inmates requiring mental health sheltered housing."  It goes on to say that "except for security concerns, healthcare staff will make the final determination as to inmate assignments to sheltered housing; however, inmates must be able to perform activities of daily living. Healthcare staff in conjunction with the RSD's Classification Unit staff will determine specific bed assignments. RSD correctional staff will enforce these assignments.

Within six months of this agreement there was to be a "forced medication" program for psychotropic medications developed in the jails.  This has not been done.

Facility space is supposed to be provided for services. The RSD is to "provide DHS and DMH with space conducive to rendering quality healthcare."  It goes on to say that "DHS and DMH will consult and coordinate with the RSD for staffing and space requirements needed for the implementation of new healthcare programs prior to these programs being implemented. As facilities are remodeled or new ones are planned and constructed, RSD will consult with DHS and DMH regarding the needs and requirements for inmate medical care."

With regard to training, the agreement specifies that "RSD, DHS, and DMH will work together to establish and provide ongoing training that is applicable to its personnel assigned to RSD correctional facilities. The curriculum shall include, but not be limited to, inmate suicide prevention, the intake screening process, security issues, recognition of inmate medical and mental health problems, radio communications, policy and procedures, emergency, and disaster procedures, etc."

The agreement provides for specific service and staffing levels.  One provision with regard to nursing is that there will be "24 hour per day, seven day per week intake nursing coverage by a registered nurse at all RSD facilities, except for Blythe jail. Registered nurse coverage at the Blythe jail will be 16 hours per day."

Mental health staffing provides some specificity but is given in general terms for the most part. For instance it requires the Clinical Therapist coverage be "24/7 at RPDC, 12/7 at SWDC, SCF and Indio, and eight hours per week at Blythe."  It also provides that there will be 24/7 on-call psychiatric coverage and supervisor coverage.  It specifies one full-time psychiatrist at RPDC, SWDC, SCF, and Indio and eight hours per week at Blythe.

Gray v. Riverside Report

## Staffing

It is important to begin by noting recent history with regard to funding in the county in general. With the financial crisis of 2008 and 2009, there was a substantial reduction in staffing in the jails. Mental health leadership reported that staffing dropped to about 60% of the pre-recession levels. Some of these positions have begun to be restored and there is a good deal of active hiring going on right now both in medical and mental health positions.

The staffing positions the County reported filled in Mental Health Detention Positions (updated 4/20/15) was richer than that reported at most sites.  The County reported 100% of positions filled, including the large number in background check (note that it is unknown how many will pass background checks and then ultimately be hired).  None of the facilities reported having all their positions filled.

Mental health staffing consists primarily of Clinical Therapist I and Clinical Therapist II.  The former are not licensed and the latter are; both are master's level clinicians. There is no difference in the supervision level for these two groups. There are no occupational therapists, recreational therapists or other ancillary service providers other than psychiatric prescribers.

### Indio

The staffing model at the Indio jail provides for 1.0 Mental Health Services Supervisor, 5.5 Clinical Therapist I/II, 1.0 psychiatrist, and 1.0 Office Assistant.  The County reported all those positions filled.  The jail Mental Health Services Supervisor reported 1.0 supervisor, 5.5 Clinical Therapist I/II, 0.7 psychiatrist (provided by three different psychiatrists), and no office administrator.  However, the facility reported that it was about to bring on a full time psychiatrist and a full time psychiatric nurse practitioner, providing more psychiatric time than the staffing model.

### Blythe

The staffing model at the Blythe jail provides for 1.2 Clinical Therapist I/II and 0.2 psychiatrist (supervision is provided by the Indio Mental Health Services Supervisor).  The County reported 0.2 psychiatrist and 0.2 Clinical Therapist I/II with one Clinical Therapist I/II in background check.  The jail medical staff and the mental health supervisor reported ca. 0.06 psychiatrist and 0.4 Clinical Therapist I/II.  The Mental Health Services Supervisor reported that there was a plan to implement an as yet uncertain amount of telepsychiatry (possibly 0.2 positions) and that a full time Clinical Therapist would be starting soon.

### RPDC

The staffing model at the RPDC provides for 0.6 PD CT II, 1 Medical Records Technician, 1.0 RN IV, 13 Clinical Therapist I/II, 1.0 psychiatrist, and 1.0 Office Assistant III and 2.0 Office Assistant II..  The County reported that all these positions were filled except 6 Clinical Therapist positions, which were reportedly all in background check. Mental health staff on site reported that they have nine Clinical Therapist I/II (primarily Masters level marriage and family therapists and Masters level social workers), one psychiatric nurse works nights and weekends (a medical nurse is on duty during the day shift seven days per week), one full-time psychiatrist, five part time psychiatrists (who constitute almost one full-time position between them), and one Mental Health Services Supervisor who is a psychologist (the only psychologist currently in the jail mental health system).

DMH leadership reports that they had recently been staffed for 12 Clinical Therapists and that this is to increase to 15.  They report that the additional 6 Clinical Therapists are being hired.  They also note that there are 2.5 psychiatric FTEs available but they have not been able to fill those positions.

**SCF**

The staffing model at the SCF provides for 2.0 Behavioral Health Specialists III, 15 Clinical Therapist I/II, 1.5 psychiatrist, and 2.0 Office Assistant II.  The County reported that there are 8 Clinical Therapist I/II and one BHS III in background check and that then all positions would be filled.  The County also noted that there are to be 8 positions to be added to SCF including one Mental Health Services Supervisor, 6 Clinical Therapist I/II, and one Office Assistant III.  Reportedly, the Mental Health Services Supervisor and two Clinical Therapist I/II are in background checks.

Mental Health Services Supervisor reports that there are eight full time Clinical Therapists, two per diem Clinical Therapists that are just short of full time, two office assistants, one medical records technician, one full-time psychiatrist, one 0.7 FTE psychiatrist, one 0.4 FTE psychiatrist and one psychiatrist working 60 hours per month.

**SWDC**

The staffing model at the SWDC provides for 8 Clinical Therapist I/II, 1.9 psychiatrist, and 3 Office Assistant II.  The County reported that there are three Clinical Therapist I/II in background check and then all positions would be filled.

The jail Mental Health Services Supervisor reports that there are nearly 7 Clinical Therapists (5 full time and two are contract, one full-time the other about 0.8 FTE), three office assistants, and 1.75 FTE psychiatrist (covered by three contract psychiatrists).

**On-Call Psychiatric Services**

On-call after hours psychiatric coverage is provided by the county psychiatrists assigned to the Evaluation and Treatment Service (ETS).  They will occasionally provide telephone orders but as noted elsewhere, this is the exception rather than the rule.  They are primarily used for consultative purposes regarding the need for further evaluation or civil commitment.

<u>**Intake Screening**</u>

Arresting officers are required to fill out a "Defendant Information" form. This form includes basic demographic information, arrest information, booking charges, and some limited screening information such as questions about suicidality, whether the arrestee was in motor vehicle accident or involved in a fight, whether there was any loss of consciousness, any special housing needs, and whether an "okay to book" was required.

A pre-booking screening is conducted either by deputies or by nursing staff.  The plan is for this function to be done by nursing staff but that has not yet occurred; some institutions are further ahead than others on this (varying from none to 80%). Deputies conducting the screenings are provided four hours of training in conducting screenings by a nurse and also get 16 hours of mental health training.

All facilities other than Blythe have 24 hour nursing staff on duty and there are nursing stations in the booking areas. Deputies typically consult local nurses if they have a question about whether to book

someone into the jail. If there is a question about their suitability for booking they are sent with the
arresting officer to an emergency room for clearance.

Those nursing screenings I observed always involved custody standing nearby, clearly able to hear and
see the complete interaction.

The full screening questionnaire entitled "Receiving Screening" includes the following elements:

- a question about specific medical conditions
- whether the inmate is taking any medications
- whether the inmate is allergic to any medications
- whether the inmate has been hospitalized within the past three months
- whether the inmate has any open wounds
- a series of questions about drug and alcohol use
- tuberculosis related questions
- questions regarding prostheses, glasses, and mobility
- and three questions about mental health, specifically
    - "Have you ever tried to harm yourself or inflict injury on others, take your own life, or
      thinking of it now?"
    - "Have you ever been treated/hospitalized for psychiatric problems?"
    - "Have you ever been sexually assaulted, abused, raped?"
        - It also asked whether the inmate reported this
- there are some questions regarding female reproductive issues

The nurse then provides observations targeted at drug/alcohol intoxication and withdrawal, obvious
respiratory problems, behavioral abnormalities, level of consciousness, and skin condition. There is then
a place for the nurse to provide a narrative of the assessment. The form includes referrals to mental
health and other services as an option. Nursing staff inform me that they do not have access to CIPS
(the pharmacy database) so cannot look up medications prescribed during past jail stays.

Those that are found to be a danger to self or overtly mentally ill are typically placed in safety cells
directly. Those who are overtly intoxicated are placed in sobering cells where they are evaluated for
potential detoxification after they have sobered. Those who are capable of completing the classification
process enter a queue for the classification officer after completion of booking and screening, generally
waiting in a holding cell. Once classification is completed and their property has been inventoried,
inmates are placed in holding cells awaiting placement. The expectation is that placement will occur
within 24 hours of booking. Indio staff reported that they almost always secure housing within 12 hours;
other facilities reported that placement reliably occurs within 24 hours.

For those referred to safety cells or other urgent or emergent needs, mental health is expected to see
them within 24 hours. In most cases they are seen in the booking area prior to housing. At this time,
mental health staff do varying degrees of assessment but are typically expected to complete a form
entitled a Brief Assessment, however I saw numerous instances where there were just progress notes
entered, sometimes for extended periods, with no formal assessment. In one case of a female in a safety
cell at RPDC (*767), she had been seen at intake and a progress note entered (though no Brief
Assessment done) with a plan for further evaluation but none was ever done; she was placed in a safety

cell some weeks later after making suicidal statements and with obvious signs of a mental illness, including psychotic symptoms.

Mental health staff review ELMR for past history and current medications and also obtain releases of information for those receiving services elsewhere.  Records reflect this is being done fairly reliably; I saw one intake patient in a safety cell who had just come in and these had both been done. As noted below, the ability to secure psychotropic medication prescriptions upon admission is highly variable.

Mental health staff make a determination of the level of services needed at the present time. If necessary, mental health staff work with RSD to effect transport to another facility, the emergency room, Emergency Treatment Center (ETS), or DCU.  Mental health staff report that they have no difficulty initiating transfers when necessary.

The RSD uses a number of attachable signs to indicate the population inside cells in the booking area which other inmates can see.  This includes "Psych" and "PC".

At RPDC, there are two non-contact booths for interviewing in the booking area. However, because the staff side has no barrier there is effectively only one that can be used at a time. This sometimes interferes with timely assessment.

SCF nursing staff estimates that about 20% of bookings result in a referral to mental health.  However, data provided by RSD indicated that there were only 3 intake screenings positive for mental health in the first week of May, 2105.  Given that there are on average more than 1000 bookings per week, this number is either incorrect or reflects profoundly poor detection given the general prevalence of mental illness.

**Access To Care**

Once inmates are defined as a mental health client, they must be seen at least monthly by jail mental health staff. There are no provisions for removing patients from the mental health rolls. There are also no formal utilization review and utilization management processes. Patients are enrolled if they have been in prior treatment with the County, they have obvious mental illness, they engage in bizarre behavior, or a clinician evaluates them as needing services. As noted above, about 35% of inmates are identified as open cases.

While not formally an access to care issue, I noted that clinical staff referred to patients by their last name only.

**Deployment of Staff**

In order to properly examine access to care it is important to consider how staff are arrayed and the kinds of services they are expected to deliver.

According to a May 18, 2005 letter from DMH to Lieutenant Maurice LeClair the jails provide the following general coverage:

- RPDC has mental health staff on-site 24 hours a day seven days a week. On-call coverage is provided by DMH and local mental health leadership who are always on call.
- SCF has mental health staff on-site 24 hours a day seven days a week. On-call coverage is provided by DMH and local mental health leadership who are always on call.

- SWDC has mental health staff on-site 12 hour a day seven days a week. On-call coverage is provided by DMH and local mental health leadership who are always on call.
- Indio has mental health staff on-site 12 hour a day seven days a week. On-call coverage is provided by DMH and local mental health leadership who are always on call.
- Blythe has mental health staff on-site 9 out of 10 working days for a total of 80 hours every two weeks. On-call coverage is provided by DMH and local mental health leadership who are always on call.

<u>Indio</u>

The 5.5 Clinical Therapists do not have assigned caseloads and essentially function interchangeably. Their primary function is crisis response, assessment, safety cell review, and monthly check-ins of those identified as being on the mental health rolls.

Clinical Therapists occasionally provide short courses of therapy. This might include cognitive behavioral therapy (CBT), psychoeducation, problem-solving, and some dialectical behavior therapy (DBT).

There are no mental health groups. The Mental Health Services Supervisor reported that when the new jail opens they intend to begin running groups.

<u>Blythe</u>

There is very limited mental health time available.  As noted above, both psychiatric and Clinical Therapist time are about to increase but even with this additional time, services will be limited to crisis response, assessment, and monthly check-ins with very limited structured treatment.

<u>RPDC</u>

While RPDC provides 24/7 mental health coverage, that coverage provides limited treatment capacity and is primarily arrayed for crisis response.  At present, the 9 Clinical Therapists are arrayed as follows:

- one team of three assigned to 12 hour days shifts
    - one with primary responsibility for safety cells but can also help elsewhere
    - one assigned to the residential mental health units
    - one float primarily responds to general population mental health kites
- one team for assigned to 12 hour day shifts
    - one with primary responsibility for safety cells but can also help elsewhere
    - one assigned to the residential mental health units
    - two floats primarily respond to general population mental health kites but can also help elsewhere
- two clinical therapists who cover the night shift

One of the two teams is on each day.  This means that there is essentially one clinical therapist on duty each day for the up to 120 residential mental health patients. While the census on the male and female units is generally less than this, it is typically 80 or more.

The general population is served by an average of 1.5 Clinical Therapists.

<u>SCF</u>

SCF is staffed similar to RPDC. They provide 24/7 mental health coverage. During most nights there are two Clinical Therapists on duty taking three of the ten positions. A clinical therapist is assigned to the residential mental health unit every day of the week. The remainder cover crises, safety cell reviews, requests for service, and assessments.

SWDC

The seven clinical therapists at SWDC provide on-site coverage 12 hours per day. There are three or four assigned each day. One is assigned to safety cells intakes and crisis calls and two others to continuing care (safety cell follow-ups and monthly required visits for those on mental health rolls). One is assigned to do all the AB 109 work (diversions from prison now constituting about 25% of the jail's population). As noted previously, this population gets additional resources directed at transition.

**Access to Residential Care**

Placement in residential settings is ultimately the decision of classification. The mental health staff report that their recommendations are generally honored. However it is also clear that patients are sometimes transferred without the knowledge of the local mental health staff, including transfers to a different facility of those in residential settings. Inmates are also placed in the residential settings by custody staff and then reviewed by mental health for subsequent placement recommendations. Criteria for admission are not specified; most patients come by way of safety cell placement.

Planned transfers to a residential setting in a different facility is effected through a process beginning at the unit team level which then makes a referral through the local jail classification system which then refers the case to the head count management unit (HMU) at the central office. Classification can deny the transfer but there is a mental health liaison Lieutenant who assists in these cases.

In cases of planned transfers, clinicians provide a transfer call or email to the receiving facility to notify them of a coming patient and any salient needs. There is no formal documentary requirement.

**Requests for Services**

Inmates may request mental health services by completing an Inmate Request for Mental Health Care, essentially a kite, that is rendered by nurses at pill call and retrieved by nurses at pill call. During the pill call I observed one patient turn in such a request and the LVN returned a carbon copy to the patient. These requests are logged into the JIMS system which is then used to track completion of the patient contact.

Recall that all kites are require a clinical contact with the requesting patient. There is currently a breakdown in the system as the paper request completed by the patient often does not come to the mental health staff until after the three day time frame when they are expected to see the patient. Nursing staff triage the requests within 24 hours and enter them into JIMS but mental health staff do not participate in the triage process.

Review of JIMS revealed that many requests are not seen within the three day timeframe. A large number of the requests being tracked were noted to be "pending". I also note that the date of entry into the JIMS system is not necessarily the date the request was written but is the date that it is entered into this database.

I reviewed JIMS for request information. For requests sent in during the previous week at SCF 15 were indicated as "new" (meaning that the request had not yet been reviewed by SCF mental health staff), 50 were indicated as "pending" (meaning they had been reviewed but not yet seen), and 34 were completed. Mental health staff were clear that they were unable to meet the three day timeframe on a regular basis. At SWDC the numbers were zero new, 24 pending and 56 complete. The SWDC Mental Health Services Supervisor reports that these requests drive about 40% of their clinical time.

Problems with mental health access are reflected in grievances and the responses by DMH staff, including not meeting time frames, not being seen in response to written requests and direct requests to deputies.

In reviewing medical records, it also became clear that staff frequently instruct inmates to kite for services rather than the clinician making their own referral. And this occurred for conditions that might potentially be urgent such as a patient with a finger "filled with pus", a patient with a substantial psychiatric history not taking medications, and a patient complaining of adverse reactions,

**Psychiatric Services**

While emergency response is generally good as is follow-up of those already receiving services, response to routine cases may take more than two weeks; the target is one week. This is consistently reported by DMH, medical staff (when they know), patients, and the psychiatrists themselves.

Problems with psychiatric access are reflected in grievances and the responses by DMH staff, including not getting medications continued upon admission and not being seen timely for routine requests, sometimes for several months.

Patients on psychotropic medications are seen regularly by a psychiatrist. There is an attempt to maintain continuity of care but because of the fragmented psychiatric coverage this is often not possible. Psychiatrists report that they are able to schedule follow-ups at necessary intervals. They have about 60-90 minutes for initial assessments and about 30 minutes for medication follow-up. Most report seeing 10-15 patients per day of which four are typically new, not including safety cell assessments.

Psychiatrists are involved in safety cell assessments both in terms of direct assessment (which is required by 48 hours) and in decisions about managing this population.

At RPDC and SWDC, there is a psychiatrist on site 7 days per week during the day. SCF generally has 7 day per week coverage. On site coverage is not available consistently at other locations. Those needing psychiatric services at off hours are either sent to another facility, the emergency room, the ETS, or DCU.

**Call Buttons**

Call buttons are available in administrative segregation and in the residential mental health units. Inmates report that the call buttons work and that deputies usually respond within a matter of minutes though occasionally do not respond at all; note that in one of the successful 2012 suicides (reviewed below) there was a question of whether the deputy responded to a call. I tested the call button system at RPDC; it functioned normally and the deputy responded immediately.

**Institutional Transfers**

When inmates are transferred between facilities they are screened by both nursing and mental health. Nursing screening is done within 12 hours of transfer. The mental health assessment is expected to be done within three days of transfer.  Records reviewed were insufficient to determine whether or not this is occurring reliably.

Clinical staff and pharmacy staff both noted a challenge in transporting medications at the time of transfer. Nursing staff and pharmacy staff may both remove medications from the medication cart and place them in the red bag for transport. There is no formal procedure for doing this, reportedly at least in part because transfers are highly unpredictable and assistance is provided by whatever staff is available. Once the red bag is loaded it is zipped and locked. Staff at RPDC report medication transfer failures every week or two.

**<u>Suicide Assessment And Monitoring</u>**

**Suicides**

There have been two suicides in 2015, neither of which has yet been fully reviewed.  There were no suicides in 2013 or 2014.  There were three suicides in 2012; I reviewed all three of these cases.  None of them included any evidence of a medical or mental health review by Detention Medical Services or DMH.  They primarily reflect a law enforcement investigation.

RC123140001 involves the case of a man arrested for a sex offense who committed suicide by hanging. He had minimal criminal history.  He denied mental health problems during August and October of 2012 screenings including denying suicidal ideation, he made no requests to see medical or mental health, and he had no mental health contact.  He had visits from his wife and had written undated letters to his family that do not indicate an intent to hurt himself or any intention not to return home.  Security checks appear to have been done timely and the response by deputies and medical was prompt and appropriate.

RC121850001 is the case of a person arrested for robbery who committed suicide by hanging the day following arrest.  The decedent had initially been placed in a safety cell on the day of arrest at 1441 for making suicidal statements, which he had made more than once during the arrest and booking process. The way the mental health note reads, the clinical interview may have been conducted at cell front (though the investigation does not say one way or the other) and the note suggests the evaluation was brief.  The investigation states:

> "I went to RPDC and interviewed Mental Health Clinical Therapist [redacted]. [The Mental Health Clinical Therapist] said on [date of arrest], [the Mental Health Clinical Therapist] started [the] shift about 1800 hours. [The Mental Health Clinical Therapist] was informed there was an inmate placed in the safety cell at mail intake for making suicidal statements and he was refusing to speak to mental health personnel. [The Mental Health Clinical Therapist] was provided the inmates [sic] name as [redacted], date of birth as [redacted]. [The Mental Health Clinical Therapist] used a program called 'Elmer' [sic] to conduct a background check on [the decedent]. [The Mental Health Clinical Therapist] was unable to locate any mental health history for [the inmate]. [The Mental Health Clinical Therapist] went to … intake and spoke to [the decedent] in the safety cell. [The decedent] told [the Mental Health Clinical Therapist] he was

not suicidal. [The Mental Health Clinical Therapist] stated [the decedent] 'fit the protocol' to be cleared from the safety cell and he had good eye contact when he was speaking to [the Mental Health Clinical Therapist], was smiling, and was not making suicidal statements. [The Mental Health Clinical Therapist] spoke to classification department for housing purposes and [the decedent] told them he had 'no psych issues.' About 2000 hours, [the Mental Health Clinical Therapist] cleared [the decedent] from the safety cell for housing."

The inmate was subsequently placed in GP housing and a trustee noted that, while assisting the decedent into housing, the decedent "commented that he wished the deputy would have shot him because he will be imprisoned for a long time." The trustee noted that the decedent asked for a Bible. The decedent ate breakfast the next morning and nobody noticed anything out of the ordinary. An inmate housed next door to the decedent reported the decedent "'hollering'" about 0800 or 0900 hours and believed the decedent was trying to use the call button.  This inmate did not hear any verbal response from the deputy nor did a deputy come to the cell. The trustee who had helped him move in discovered the inmate hanging in his cell shortly after 1100.

The deputy on duty reported having completed a security check at 1048. The description of the body suggests that the decedent had been dead for two or more hours.

This incident is reportedly being investigated for employee misconduct.

BC120290001 involves a person with a substantial criminal history. During the booking process the decedent "made suicidal statements and attempted to stab his left arm with a ballpoint pen while he was signing intake paperwork." The decedent was placed directly into a safety cell shortly after midnight. The decedent was interviewed by mental health at 1019 the same day and "deemed to be suicidal and not cleared for housing." At 1125 that same day the decedent was seen by a psychiatrist who also found the decedent suicidal and not cleared for housing. The following day at 0834 the decedent was interviewed by the same mental health staff and "deemed capable to contract for his own safety and cleared for housing." At 0930 the decedent was moved to a holding cell and at 1046 was found in the holding cell unresponsive with the phone cord wrapped around his neck. The decedent was pronounced brain-dead and life-support terminated several days later.

The first interview by the mental health staff "took place through the pill slot of safety cell #1". The mental health staff reported that the decedent "seemed to be all 'doom and gloom' during the interview…and told [the mental health staff] that [the decedent] had nothing to live for and, 'I've got nobody.'" The decedent also reported a prior suicide attempt by hanging the previous year. The psychiatrist concurred that the decedent was suicidal and also ordered Paxil and trazodone. The following interview by the mental health staff showed the decedent to be "still depressed, but seemed 'brighter' and had an improved mood than the day before." The decedent reportedly "promised [the mental health staff] that he was not going to kill [him/herself], and just wanted to go to protective custody housing. [The mental health staff] felt that although the decedent was still a little depressed, [the decedent] was now able to contract for [the decedent's own] safety and was cleared to be housed."

It is apparent from reading the report that the decedent was able to wrap the phone cord around his neck and remain seated so it was not obvious that he had hung himself.

As a result of the suicide, phone cords were shortened in intake areas.

**Suicide Monitoring**

The policy is to refer those needing constant or one-to-one monitoring for civil commitment.  There is no provision for constant or one-to-one monitoring pending transport or at any other time in the jails.  The jails provide routine 15 minute checks (with some appropriate randomization of the time of checks) and camera visualization of those on suicide watch, though a deputy is not assigned to observe the computer monitors at all times.  While there is theoretically some capacity to modify conditions of confinement, inmates are routinely placed in a suicide smock with a suicide mattress.

There is no provision for any step-down suicide monitoring.  Inmates are either on full suicide monitoring or released to the routine deputy checks on their housing unit.

Spot checks for cut-down tools (sometimes just scissors, at others a classic hook knife) and first aid kits showed them to be available.  Sometimes staff had to hunt for them, though never longer than a minute.

**Safety Cells**

There is no provision for suicide monitoring other than in safety cells. Safety cells are frequently used and inmates are placed there primarily when inmates make statements about intent to harm themselves and also when they are behaviorally disturbed.  Sergeants have final say about who is placed in a safety cell. If there is disagreement mental health, the decision is usually moved up the chain of command though this is not formally provided for in policy.

Policy prevents the use of a safety cell for more than 48 hours at which time; if there is continued danger to self or behavioral disruption that would otherwise necessitate usage of a safety cell, the inmate is to be sent for evaluation for evaluation for civil commitment.  While there is a stated practice not to use the safety cells repeatedly, there were numerous instances of inmates being placed in safety cells multiple times within a short period without referral for involuntary commitment.  However, I did not see evidence of removal and immediate return to the safety cell except in one instance.

I visited all safety cells and looked inside almost all.  I entered one to two in each facility (except Blythe which has no safety cells).  The safety cells are uniformly small austere cells with only a door window and no furniture or lavatory fixtures; toileting occurs through a grate in the floor.  Most safety cells are suicide resistant though some have low ceilings with non-recessed fixtures that can be reached and dismantled though have a limited potential for weaponizing or creating an anchor point.  They all have cameras and almost all have good coverage with a few having uncovered small areas.  Some of the lenses have been degraded by inmates scratching the surfaces, impairing visualization of small movements and details and some of them can be readily covered owing to the low ceilings.  The cleanliness of the safety cells was quite variable with half being quite malodorous.  There was visible fecal material and garbage in the grates of two safety cells.

Safety cell and special housing logs from 2014 demonstrate that 15 minute checks are being recorded by deputies on a consistent basis at all institutions; it is not possible to ascertain the accuracy of the logs but they are complete and are not filled out in advance.  I saw deputies filling out these logs while on site visits.  However, almost all logs are incomplete to some degree in that they either do not indicate that the inmate was seen per policy by nursing or, more often, by mental health.  Many logs also do not demonstrate that water was offered as required by policy and the offering/taking of food is often not

indicated.  Restraint logs indicate that circulation checks were done per policy in most instances but a substantial minority were not in compliance.

Review of records did demonstrate that those in safety cells were seen timely by mental health.  Policy requires that those placed in safety cells are seen within 24 hours and this was met in almost all cases, and was generally exceeded as mental health often saw those in safety cells more frequently than required.  Most of these evaluations are reportedly done in the noncontact booths but are occasionally done at cell front if the patient refuses to come out or is too agitated to be safely removed; however, the above suicide reviews call this into question. Occasionally cell front visits are necessary because custody staff are unable to bring the patient to the booth. Mental health staff indicate that this is a rare occurrence. During my visit I witnessed mental health staff conducting evaluations primarily in the booths but some did them at cell front.  Record review indicates that cell front evaluations are not rare.

Medical evaluations by nursing staff are generally done each shift, though not always within 8 hours of previous evaluations.  Nursing staff report these assessments are typically done inside the cells. I reviewed several of the associated "Safety Cell Flow Chart" forms that nursing staff use to track this function. They were filled out completely and included important information such as food consumption, suicidality, mental status observations, and vital signs or refusal to allow vital signs. However, unlike mental health charting, in most cases this charting did not reflect timely evaluation.

**Post Release Monitoring**

Those released from safety cells and returning from outside hospitals are expected to be seen daily for one week by mental health staff. Record review demonstrated that this was virtually never happening. Most of these patients are seen several times during the week after release but the frequency of contact is highly variable. Most are seen on the day following release but not all.  At the end of the seven day period, a plan for subsequent follow-up is supposed to be generated. The presence of such a plan was inconsistent. In general the expectation is to reduce the frequency of visits from weekly to every two weeks to monthly.

**General Population Mental Health Services**

General population mental health treatment services consist almost entirely in the provision of medication and crisis response.  Those inmates on the case rolls of Detention Mental Health (DMH) are expected to be seen at least monthly, but this consists primarily of a check-in rather than provision of treatment.  There is very little individual therapy.  While some effort is made to maintain continuity of providers, this is rarely achieved both due to how staff are arrayed and because the mental health service is primarily crisis oriented.  There are no mental health groups being run for the general population except for co-occurring disorders groups being run at SCF.

Mental health staff are not located or assigned to segregation but cover it on a rotating basis. Mental health staff are expected to make weekly visits to segregation but are not expected to round on every inmate but to respond to requests for services. During my visit I saw mental health staff on a segregation unit arranging to evaluate a patient. Mental health does not provide any routine screening of those going into segregation. Medical staff also do not provide any routine screening of those going into segregation.

Even in general population, mental health staff see patients in non-contact booths.  Clinical Therapists and psychiatrists report that lack of sufficient spaces limits access to patients as does lack of sufficient custody staff ("runners") to bring patients to the booths.

There is a plan is develop rehabilitative capacity at SCF.  Mental health is to conduct groups targeted at criminogenic needs such as Seeking Safety, Moral Reconation Therapy, Thinking for a Change, and Anger Management.

**Residential Mental Health In The Jails**

At present the residential mental health units are run at a high level of security, discussed further below. They are allowed the same property as in administrative segregation.  This is despite the fact that of the 139 in residential mental health as of 6/1/15, 65% (90/139) were intermediate custody (levels 3 or 4 with 6 being the highest) and 41% were custody level 3.

There is a plan to create a "step-down unit" at SCF. This would reportedly allow staff more direct access to this patient population. At present staff access to residential mental health patients is severely limited.

Deputies assigned to the residential mental health units have enhanced mental health training. Review of the training materials reveals that it is adequate but the quality of the training itself is unknown.  All deputies interviewed indicated that they had had the training.

**RPDC**

The male residential setting consists of two pods of with a capacity 42 each. These are located on the unit designated 5B.  The unit is rarely filled to capacity as many of the two-person cells are kept as singles due to the difficulty some mentally ill have with cellmates.  The total census usually runs around 60.

The female residential setting consists of one pod with a capacity of 40.  These are located on the unit designated 6B.

The population on these units includes varying classification levels, including administrative segregation and protective custody.

The physical plant of these units is the same. Each consists of pods of approximately 40 cells arranged in two tiers. Barriers have been erected to prevent jumping from the second tier. Cells are two-person and include a toilet. There are two shower stalls on each tier. The cells are not suicide proof.  Visibility into the cells is good; the cells do have cameras. Deputies provide indirect supervision, primarily remaining in the control station surveying the cell fronts, dayrooms, and monitors. Deputies do cell checks when inmates are in their cells.  There is a lower tier dayroom that includes several spider tables and a telephone. Television is available in the dayroom. The upstairs tier is a small sitting area (about 100 ft.²) with a telephone. Per custody staff on site, for those on the upper tier this is typically the only area they have access to when allowed out in the dayroom.

The cleanliness of the units was variable. Some showers were clean, others caked with residue; several were missing shower curtains.  One of the open cells I entered was malodorous and had abundant feces in the toilet.  One occupied cell had a sink full of brown liquid that I pointed out to a deputy who stated

they would follow up. Ceiling tiles were missing and vents were filthy.  There was water on the floor of 5B. The tables were generally clean; the floors were varied. Patients' cells were also quite varied in terms of cleanliness. Some were neat and others exhibited the accumulation of several days' worth of detritus such as Styrofoam food containers, wrappers, and papers. Virtually all had writing or stains on the walls. Staff periodically clean rooms when inmates are out of their cells.

These units are run at nearly a maximum level of security. The patients eat in their cells. They are not out of their cells unrestrained in the presence of staff. Unlike similar units that are not designated residential mental health, they are allowed out of their cells only in small groups rather than as a whole day room unit or by tier as is the case in similar units without a mental health population.  This is partly because they are allowed out based on their status, e.g. PC allowed out as a group.  RSD staff also conveyed that the mentally ill have been shown "by experience" to be more dangerous and unpredictable and that this assumption has influenced the degree of security in these units.  This means that they get less opportunity for unstructured out of cell time than similarly housed and classified inmates, which was reported by both mental health staff and the patients. It was difficult to get a clear sense of how much out of cell time they had a week. Custody staff made different reports regarding time out of cell in the dayroom.  This varied from once per day to three opportunities out of their cell in the day room each day. The length of this might vary depending on the numbers and other activities going on but reportedly varied from 15-45 minutes. The patients themselves reported fairly uniformly that they had one or two opportunities to come out of the room each day; a number of them noted that they frequently missed a morning opportunity. The times out of cell reported by the patients varied from 15 to 45 minutes, consistent with custody staff reports. During their time out of cell they can socialize, watch television, shower, or use the telephone. There are no structured activities provided. They have access to a yard that is adequately large with access to fresh air. The yard has a basketball hoop and an exercise device.  The yard time is governed by a deputy assigned to recreation. Available information suggests that those in the residential mental health unit get access to the yard one or occasionally two times per week for up to 90 minutes.

Mental health staff are not permitted to meet face-to-face with patients in either of these units, regardless of whether they are restrained. They must meet in non-contact booths. These booths are inadequate for general clinical purposes; the sound is extremely poor and I found it very difficult to conduct an interview as we frequently could not understand each other owing to the poor quality sound and the ambient noise.  It is reasonable to use such facilities for agitated or otherwise imminently dangerous individuals.

As a result of these limitations, mental health staff do not run any structured programs. They meet with patients who request contact during morning pill call (I observed such requests being made during a morning pill call) or through a kite or who staff identify as having a clinical need. These contacts are thus essentially crisis driven and do not reflect a structured, proactive approach to treatment. There are no treatment plans for this population and no structured courses of individual therapy were apparent. Some Clinical Therapists provide psychoeducation and medication information during their meetings.

As noted above, there are two Clinical Therapists assigned to all the residential mental health beds, with only one being on duty at any one time most days.  After hours crises are handled by the Clinical Therapist on duty for the whole institution.

The treatment team is said to consist of the Clinical Therapist assigned to the unit, the nurse, and the deputies. However there is no formal treatment team meeting of clinical staff where a treatment plan is generated (in part because clinical staff consists only of one Clinical Therapist on duty each day and the psychiatrist is consumed with seeing patients). Because of confidentiality considerations, their meetings focus primarily on behavior rather than a discussion of clinical issues.

There is no program room available on the units but there is a room available nearby (two for the sixth floor). The one on the sixth floor has been modified with desk space oriented to the wall.  There is no capacity for restraint of inmates in these spaces.  Mental health is not permitted to use the program rooms. Religious services and education reportedly do meet face-to-face with groups in this room, except for those on administrative segregation who are met one-to-one.

Embedded within 5B are 20 beds that are dedicated to a program to restore competence to stand trial. This is run by Liberty Health under a contract and has its own independent staffing. This program does provide some direct service to patients.  This consists of individual sessions conducted in the noncontact booths that focus on competency restoration and medication education and 3 to 4 hours of groups per day (each patient is enrolled in 2 to 3 groups). These are the only groups run in residential mental health settings at the present time. They do not give involuntary medications through this program; those needing involuntary medication are sent to a state hospital. The staff for this program includes 1.4 FTE clinical therapist, one PhD psychologist who does forensic assessments, two psychiatrists who provide one day each, one half FTE RN, and one recreation therapist.  The program includes an incentive system for participation including access to candy, movies and other tangible incentives.  DMH mental health staff provide crisis response.

On the seventh floor there is medical housing; there are also safety cells there as well. Occasionally mental health patients are placed on this unit as are particularly dangerous individuals from the jail general population usually on segregation status. This is not a licensed facility.

**SCF**

Housing Unit 16 is home to the residential mental health unit at SCF; it consists of 2 pods of 32 beds each.  One is for mental health, the other is also for mental health, but some are under protective custody as well.

Both of the ponds used for mental health residential have protective barriers to prevent jumping from the second tier. The cells themselves have minimal anchor points but are not free from suicide risk.

There are three deputies on duty at all times for housing unit 16 which has a total population of 192. These deputies have additional training and mental health and those on duty verified to me that they had had this training.

The deputies report that cell searches are conducted approximately three times per week.

This unit was clean, as was the facility generally.

The population on the unit is quite varied including patients with schizophrenia, bipolar disorder, major depression, personality disorder, and cognitive deficits. There is no attempt to aggregate different populations in either of the units or in sections of the units. More acute mental health needs are either transferred to RPDC or referred for civil commitment. Self-injurious behavior is an intermittent problem.

About 25% of each of the units is allowed out to the dayroom at any one time, similar to RPDC. Dayroom time is typically in 45 to 60 minutes sessions.

Patients eat in their cells; again note that others in housing unit 16 eat out of their cells. The mentally also all receive soft trays, unlike others in housing unit 16.

There are 3 interview booths that connect directly to the mental health offices. As at RPDC there is little structured treatment except for occasional brief courses of supportive therapy. No mental health groups are being run (there is a co-occurring disorders group being run at SCF but it is for GP).

One program room is available but not used by mental health.  Religious services are held there, including in groups.

Custody staff note that there is a presumption that mentally ill pose a great risk and this is why there are increased restrictions on this unit.

The Mental Health Deputy Director stated that there is a plan to conduct mental health groups with the development of the step-down residential program at SCF that would not be as restrictive.  However, the curriculum and other program components are not yet established.

## SWDC

While there are no formally designated residential mental health settings at SWDC, one pod in E and one in G are informally used to preferentially house mentally ill. Dayroom three of the pod is intended to house the most ill. It has patients that are both mentally ill and in protective custody.

All cells are two-person. There is no suicide barrier on the second tier. Unlike at RPDC and SWDC, these settings are governed by general population provisions for time out of cell. They are let out in the dayroom by tiers the same as others in these units. They have two times out in the dayroom before lunch, two times after lunch, and one in the evening, each for about 30 to 40 minutes. A recreation deputy schedules yard three times per week, generally for one and a half hour sessions.

Here again there is program space available to these units but mental health is unable to use it and patients are seen only in non-contact booths. At SWDC there are five such booths used by Clinical Therapists. These booths have a grating that makes hearing easier. However there is a bar at eye level that interferes with seeing patients and making eye contact. This area is shared with probation and while they try not to share space it is sometimes necessary. The psychiatrist has access to an interview room that is confidential.

## Psychotropic Medication

Jail psychiatrists have access to the same formulary as community County providers. The formulary emphasizes generic medications but it is possible to get non-formulary medications if needed.  There has been an informal limitation placed on the use of quetiapine and bupropion.  This is sometimes leading to patients having these medications stopped by the pharmacy, leaving patients without medication as the psychiatrist may not be immediately notified or may be unable or unavailable to order a new medication.

Continuation of outpatient psychotropic medications after booking is an identified problem. Medical providers are not writing orders to continue psychotropic medications at the time of booking. At SCF,

staff were clear that they rarely order psychotropic medications upon admission. Nurses also informed me that it is not their general practice to accept verbal or telephone orders from psychiatrists, though there is no bar to them doing so and they will on occasion or in emergencies. There is frequently a gap of days to weeks before patients are started on psychotropic medications even when they have been ordered these medications in the community; this is demonstrated in the medical records and is a common complaint of patients. The general practice is to continue prescriptions that are active in the Riverside County mental health electronic medical record (ELMR) when a patient is seen.  Mental health staff will seek other sources of information about medication taking such as retrieving outside records and occasionally calling pharmacies.

There is no provision for involuntary medication administration in the jails. Those who need involuntary medications are reportedly sent to DCU. While there is the possibility of administering emergency psychotropic medications this is essentially never done; one psychiatrist noted that it was against policy to do so. Patients who refuse medications are not given involuntary injections of emergency medications except in very rare circumstances.  Patients who are that agitated are placed in a restraint chair and transported either to the emergency room or the DCU.

In general, prescribing practices are consistent with community practices.  Spot review of records demonstrated that laboratory monitoring of drug levels is being done fairly consistently. Abnormal Involuntary Movement Scale (AIMS) testing for those on antipsychotics is often present in the record, often conducted by an outpatient psychiatrist prior to jailing, and recorded in ELMR.  However, detailed review of individual records (see below) demonstrates that with regard to patients on antipsychotics, AIMS and laboratory monitoring for metabolic syndrome are rarely being done.

Clozapine is rarely used inside the jails owing to the difficulty in reliably and timely getting the necessary laboratory studies. However, it can be used and on rare occasions has been. These patients are usually started on clozapine in the DCU.

All psychotropic medications are delivered at pill call. There is no provision for converting these medications to keep on person. In general, keep on person medications are limited to rescue medications and self-administration of medications that need to be taken more frequently than twice a day, such as antibiotics. In most units pill call is done in the day room; inmates line up and present themselves to the nurse one at a time and deputies remain at a distance.  On the residential mental health units, mental health accompanies the nurse who does the pill call at the cell front. Deputies are also present. While there is some cursory contact and an opportunity for patients to request a clinical contact at these times, the presence of the deputy prevents discussion of personal health information. While I was told that deputies remain at a distance during pill call this was not observed to be the case. Note that I was also told that mental health was not participating in the pill call on the female unit at RPDC (DMH leadership planned to review and address this if true).

Medications are administered through the cuff/food port and mouth checks are made by both nursing and custody. One patient was caught attempting to "cheek" medication. The process for medication administration is not uniform. One LVN had medications in individual, labeled envelopes and brought them to the cell front and verified patient identity. Another used bubble pack cards and administered the medications from the cart on the lower tier. However on the upper tier, the LVN brought medications up in unmarked stacked cups and did not verify patient identity in association with a labeled source of medications.

During the pill call I monitored on 5B, 12 patients refused their morning medication.

Review of medication administration records (MAR) demonstrated that they are completed at a high rate. While the expectation is that nursing staff will notify prescribers when patients have missed three doses, this is clearly not happening reliably. In one instance during my visit, nursing staff reported that a patient had been adherent to medication but review of the MAR clearly showed that the patient had been refusing for over a week. The nurse was unaware of the coding for medication refusal.  Nursing leadership reported that the plan is to automate notification once the electronic health record goes into effect in July.

All medications are provided by the county hospital. In general, medications are delivered within 24 hours of order. There is also some for stock available in the jails. It includes some psychotropics, including haloperidol and olanzapine. Jails cannot access local pharmacies for specialized orders.

Patients report that medications are administered reliably and only occasionally do prescriptions expire without being timely renewed. Staff verified that in general medications are delivered as ordered. The exception is that sometimes depot medications are not administered as scheduled.

Grievances and the responses by Detention Medical Services and DMH reflect that problems sometimes occur including failure to transport of medications upon transfer to a different facility, refills not being done timely, orders not being filled, and medication not being administered.  [NB: As noted in the introduction, further evaluation of medication administration is pending.]

### Service Codes

I reviewed mental health service codes for encounters at all facilities for the month of May 2015.  The total number of encounters was 5848.  Each facility had the following totals:

- RPDC   1798
- SCF     1870
- SWDC   1478
- Indio    688
- Blythe    14

The service codes reflect the above description of services.  There are no codes for groups and sessions coded as individual therapy are minimal (a total of 180).  The largest numbers of encounters are for "mental health services", crisis response, and case management.  There are also a substantial number of medication management codes.  The count of codes for mental health assessment is 400 and for psychiatric assessment is 308.

### Ancillary Services

At present laboratory information is provided through paper and fax at some institutions despite there being computer access to Quest, though reportedly only 16 hours per day.  Full laboratory services are available.  Psychiatrists report that laboratory studies are usually obtained promptly but some orders are missed and sometimes refusals are not reported to them.

Psychiatrists are unable to order specialist consultation (for example Neurology), imaging or electrophysiology studies directly; they must be requested through the medical service. Psychiatrists

report that these are usually not denied but in some instances they are. Even when authorized, it can take an extended period of time (reportedly up two weeks) to get consultation or studies done. Clinical staff report that these studies are sometimes cancelled (and usually rescheduled) due to insufficient custody staff to conduct the transport. However, if an emergency exists, patients can be sent to the local emergency room where studies may be obtained more directly.

### Restraint

Behavioral restraint is not ordered by mental health staff within the jails. Custody staff can place individuals in restraint chairs for up to four hours. More prolonged restraint for behavioral reasons requires transferred to the DCU. Inmates are occasionally in restraint chairs for longer than four hours; I saw none longer than 6 hours.

There were 45 instances of use of the restraint chair from January to March of 2015.

Custody staff monitor patients in the restraint chair for circulation every two hours. Nursing staff are expected to evaluate those in the restraint chair every two hours. Mental health staff are typically called to evaluate those placed in restraint chair for behavioral reasons but may not be asked to evaluate in cases of intoxication.

Review of restraint logs demonstrates that checks are being done timely in the vast majority of instances and behavioral observations are provided. Limb rotations are logged at the specified frequency in a substantial majority of cases, though often denied due to combativeness or are refused. Nursing assessments, both initial and four hour follow-up, are not being logged at the specified intervals in many cases. Mental health generally logs regular and timely contacts but there is some inconsistency. There were many logs with accompanying audits that were done carefully and identified problems for correction.

### DCU Mental Health Services

The Detention Care Unit is located at the Riverside University Medical Center. There are 22 dedicated beds on the fourth floor of the hospital. Both medical and mental health services are provided on the same unit; the number of beds used for each varies. If the need for mental health beds increases, medical patients are moved to other medical floors in the hospital and provided a hospital watch by Sheriff's deputies. DMH staff report that they have been able to place jail patients at DCU when needed. At the time of my visit there were eight psychiatric patients on the unit; a census of 15 is not uncommon. While there are occasionally voluntary patients on the unit, most are committed under 4011.6. The average length of stay is 5 to 6 days though at the time of my visit there were two patients who had been there for an extended period of time; these longer term patients are placed on temporary conservatorships.

The majority of the patients are referred after spending 48 hours in a safety cell at one of the jails. Qualified staff at the jail complete a 4011.6 packet and then either send the patient to the emergency department or to ETS for evaluation and determination of Lanterman-Petris-Short committability by the psychiatrist on duty. They may be kept up to 72 hours and then the DCU psychiatrist may keep them for another 14 days after which a temporary conservatorship is required for continued commitment. Some patients needing longer periods of stay remain at the DCU and others may go to another hospital which generally requires that a judge stay the charges on the current criminal case.

Sheriff's deputies are located on site and provide security. All rooms have cameras; a nursing staff member is assigned to monitor the cameras at all times.

Services are provided by DMH and hospital staff. The staffing on this unit is governed by hospital staffing models. There are 2 to 3 psychiatric nurses on at any time. CNAs provide camera monitoring and some ancillary services. There are also two RN case managers who do utilization review and discharge planning in conjunction with a nurse case manager at the jails. They serve both the medical and psychiatric population.

There are no formal discharge criteria; the unit psychiatrist responded that several days without violence and being stable on medication were the informal criteria.  The psychiatrist completes a discharge summary and copies of the records are sent back to the jail (though this summary was not present in jail charts in many instances). A two-week supply of current medication is also sent with the patient to the jail; records reflect that this occurs regularly.

There is one psychiatrist covering the unit 10 hours per day, seven days per week; efforts to hire an additional psychiatrist are on-going. A social worker provides some individual therapy. There are no other mental health staff assigned to the unit. Full hospital ancillary services are available. There is a consulting internist who does a history and physical on all admissions within 24 hours.

Patients are essentially restricted to their rooms except when going for necessary medical procedures. Routine clinical services amount to psychotropic medications and, if necessary, one-to-one clinical monitoring by nursing staff for dangerousness.  There are no groups, no structured activities, and limited individual therapy.  There is no dayroom and no yard. Patients are not permitted any materials other than the Bible except under supervision when they can have limited access to reading materials and writing materials. They cannot even keep paper. The psychiatrist is allowed to see the patients in their rooms.

Patients are returned from the DCU to the jail where they may be kept in a safety cell for up to 24 hours at which point they must be seen by mental health and a plan for their subsequent care and monitoring developed.

Review of records demonstrated thorough psychiatric assessments, good ancillary service provision, and clear demonstration of need for hospitalization.

## Transition Services

Transition services are minimal other than for AB109 cases which have dedicated resources and specific expectations for linkage to community services.  In other cases, releasing patients are typically given the contact information for the local mental health clinic.  Those who are already enrolled may sometimes have an appointment set up prior to release but this is the exception.  DMH is trying to expand transition services and to specifically schedule appointments prior to release.

Patients are not provided with a supply of medications at release but must instead call a number (provided upon release) to request medications which they must then go pick up.  About 20% of releasing patients on medications actually go through this Process.  These receive a 30-day supply. Patients interviewed who had been previously released reported that they often did not have ready access to a telephone, had no access to transportation, or simply did not call.  Those who did get

medications noted that they sometimes ran out before they were able to get in to see a prescriber to get a new prescription.

## Confidentiality

Patient confidentiality is limited in the Riverside jails.  As noted previously, the intake process and pill call in residential mental health are not sufficiently confidential.  I also note that deputies sign off on grievances related to mental health which include a great deal of personal health information.

Riverside has taken some steps to improved confidentiality such as having inmates submit requests for services to nursing staff rather than deputies.

## Medical Records

Mental health and medical providers keep separate medical records. Mental health providers use an electronic medical record provided by County DMH referred to as ELMR.  Medical providers have a hard copy record and are about to transition to electronic health record (reportedly underway). Staff report that there are provisions for some interchange of information between these two electronic systems but the extent of that is unknown. At the present time medical staff and mental health staff do not have complete access to each other's information. Some basic information is exchanged. Laboratory information is available online.

ELMR is a cumbersome system. It was very difficult to track the unfolding of events in time.  Progress notes are not consistently coded within the ELMR system, making it yet more challenging to track down relevant information.  These problems were articulated by numerous clinicians and I witnessed their challenges as they helped me review records while on site.

In general notes are complete though frequently provide limited or cursory information. Forms are not consistently used as intended.

When conducting a formal assessment, Clinical Therapists complete a form inaccurately called a Brief Assessment.  It includes a basic history of present illness, psychiatric history, medical history, substance abuse history, social history, mental status examination, harm assessment, diagnosis, and a space for "notes/plans/recommendations". This document is foundational for care but is often not done in situations where policy (and good clinical practice) provides that one should be completed. While there is provision for a formal psychiatric assessment in ELMR, psychiatrists typically do not use this form but record their notes as progress notes. Psychiatric notes are of varying degrees of comprehensiveness.

## Court Orders

There has been a history of judges ordering medical and mental health services be delivered to inmates. While this number has decreased recently, judges continue to order such services. The jail reports that sometimes judges order this even when inmates have not requested services through normal channels or even sometimes may have already received services. The jails are working to coordinate more closely with the courts and make sure that courts are notified when their orders are completed.

In 2014 there were 10,890 orders directed at the jail. Of these,1818 were for mental health services.  At the time they were initially logged into the database, 1753 of these were already determined to have been complied with. One was not complied with and 49 were pending.  Of those pending, 31 were for

clinical services. Of the initial orders 254 specified the inmate be seen by psychiatry and 317 specify that the inmate be seen by mental health generally. In addition, 993 orders specified other tasks for mental health such as release of records. The remaining orders did not have to do with jail mental health services per se.

In the first two weeks of 2014 there were 75 such court orders whereas in 2015 there were 48.

## Quality Assurance And Quality Improvement

DMH has a quality improvement department. The central office assigns clinicians to review charts for medical necessity. There is no formal outcome from this but feedback is provided to clinicians. They also conduct chart reviews. Facility supervisors receive these chart reviews and provide feedback to clinicians.  Review of the audits demonstrates that they are thorough and make a clear effort to identify specific problems.  Consistent with issues noted above, commonly identified problems are insufficient information about interventions, incomplete mental status examinations, and lack of plans.

According to the data provided, DMH clinical staff served 7777 patients in fiscal year 2013-2014. Given that there are about 56,000 bookings, this means that DMH is contacting about 14% of the booked population.  This is reasonable given that most inmates stay only a matter of days.

According to DMH, about 42% of the inmate population is on its rolls.  This is a somewhat higher than expected number, but supervisors told me that there are some that need to be removed.  Also, there are limitations on removing patients from the official rolls.

According to DMH, about 26% of the inmate population is on psychotropic medications, which is a consistent with national trends.

DMH also collects information on the provision of services.  As noted in the section describing the jail population, there are some apparent inconsistencies in this information that need to be clarified or corrected.

## Training

Deputies have an Academy lasting six months; the Correctional Academy lasts three months.  Review of the mental health training component demonstrates that its content is adequate. The quality of training itself is unknown as I was unable to attend any of these training sessions.


# CLINICAL CASE REVIEWS

### 950772462

The patient was admitted to RPDC April 2, 2015. This is a patient with a well-known psychiatric history of a serious mental illness with psychotic symptoms and a history of suicide attempts including stabbing himself three days before being admitted. An April 3, 2015 note indicates that he had an assessment done that day but I was unable to find any assessment. There is a progress note from April 5 in response to a call from deputies regarding the patient expressing suicidal ideation. Following this evaluation he was placed in a safety cell. He was seen by a psychiatrist that same day who found overt evidence of mental illness and started an antipsychotic medication and a mood stabilizer. He was seen regularly over

the next two days with documentation reflecting evident mental illness. He was cleared to be released from the safety cell April 6 but immediately tried to run from deputies and was placed directly back in the safety cell. According to a psychiatric progress note he was removed from the safety cell on April 8 and placed in mental health housing. He was next seen April 13, 2015. He refused to meet with the clinical therapist on April 14 per deputies.

He was transferred to SCF on April 17 and placed in general population. The next note is from April 18; there is no indication that mental health had been notified of this patient's transfer. He was seen daily over the next several days. On April 20 the patient asked about being re-housed to which the Clinical Therapist responded "classification would need to make that decision." On April 22 he was placed in a safety cell because he was making threatening statements regarding cellmates and expressing paranoid ideation regarding dangers from other people. On April 23 a nurse indicated that there was no active medication order on file. The Clinical Therapist provided a psychiatric order for medications from the previous day to the nurse in order to assure medication was obtained and administered as the nurse reportedly did not have the order. Over the preceding several days the patient had been mostly refusing medication. He was released from the safety cell and placed in residential mental health housing on April 23. He was then seen daily. On April 27 the patient reported pain in his finger; the Clinical Therapist notes that the finger "appears to be pus filled" and states that the patient then agreed to request medical services.  The Clinical Therapist did inform the nurse who stated he would see the patient but that the patient needed to "submit a medical slip in order to be seen by medical doctor."

Over the next several days he stops taking medication. On May 6 he was again placed in a safety cell due to the patient expressing concerns that he would harm others. He gave very psychotic explanations for why this was so. On May 7 the psychiatrist noted that he "remains psychotic and unpredictable" and started new medication. He was released from the safety cell on May 8 and placed back on the residential mental health unit with a cellmate. He was seen sporadically over the next two weeks. On May 20 he again expressed thoughts of harming himself and others and transfer to Indio for an open safety cell was arranged. At Indio he was evaluated and determined not to need a safety cell and was transported directly back to SCF. He was not seen May 26 at which time he flushed his medication down the toilet. He was again placed in a safety cell on May 29 after expressing thoughts of harming others. During this and previous safety cell placements he was periodically agitated, yelling, and kicking the cell door and was generally unkempt.  On May 31 is referred to DCU where he remains for two days. Shortly after his return to SCF the record indicates that he is to transfer to RPDC.  A June 11 note from SCF indicates he refused to see mental health that day. There is no further documentation. The notes indicate little in the way of treatment other than some statements such as doing "cognitive restructuring" and encouraging medication compliance.  He is noted to be cognitively limited and emotionally immature with limited coping skills.

There was no Abnormal Involuntary Movement Scale (AIMS) testing in the record and no laboratories during this stay.  In September 2014, he had laboratory studies done but metabolic syndrome was not properly evaluated, though he was on risperidone.  There were appropriate studies related to the patient being on Depakote at that time.

**950754538**

This patient was admitted April 10, 2015. He was first seen April 13 after he cut himself superficially. As he continued to express an intention to kill himself he was referred to the DCU under 4011.6. He

remained at the DCU from April 13-15 where he was diagnosed with a mood disorder and started on an antipsychotic and antidepressant. Upon his return to RPDC he was not placed in residential mental health housing but a request for such housing was made on April 16 after custody requested a housing evaluation. He was transferred to SCF on April 17 and placed in general population and then several hours later was placed in the residential mental health unit. He was first seen by psychiatry April 23 and found to have psychotic symptoms. He was continued on the DCU discharge medications. He was seen periodically until transferred to RPDC in early June for unclear reasons. A June 5 note states that he "was transferred from another jail for psychiatric housing." But as he was already in psychiatric housing it is unclear what this refers to. On June 7 he was placed in a safety cell after expressing suicidal ideation and command hallucinations to harm himself. On June 9 he is released from the safety cell with the plan to "recommend MH housing."

There is no Brief Assessment or other formal assessment in the record. In general notes reflect assessment and check-in but no formal treatment interventions other than medications.

Despite being on an antipsychotic, there were no AIMS or laboratory studies.

When I saw this man he presented as relatively stable with evidence of a chronic mental illness.

**950681583**

The patient was admitted to Indio March 9, 2015 and was placed directly in a safety cell owing to being "bizarre". He was uncooperative the mental health evaluation and felt likely to be intoxicated. The following day it was determined that he was no longer in custody and was placed on a 5150 hold. The next note is from March 23 but it does not detail what happened in the intervening time. He continues to present with evidence of psychosis and the plan is to transfer him to residential mental health at RPDC. There is a request for placement in residential mental health from March 23, 2015 that notes "psychosis and unprovoked agitation". However he is transferred to SWDC and the next note is on April 7 where he continues to present as psychotic. He is first seen by psychiatry on April 9, 2015 at which time he is observed to have overt psychotic symptoms which the psychiatrist opines is probably due to being intoxicated on methamphetamine though the reason for this opinion is unclear (there are no laboratory studies); he was started on an antipsychotic.  He is not seen again until April 26 after having been transferred to SCF at an unspecified time and is refusing his medication.  He was again placed in a safety cell on May 6, 2015 after threatening his cellmate. He is seen intermittently thereafter, most often for brief contacts at pill call. The psychiatrist sees him on May 7 and changes his medication. On May 14 he is noted by the psychiatrist to be improved.  On June 2 it is discovered that he has not been getting ordered medications for the last two weeks and this is corrected.

There is no Brief Assessment or other formal assessment in the record. In general notes reflect limited assessment and check-in but no formal treatment interventions other than medications.

Despite being on an antipsychotic, there were no AIMS or laboratory studies.

When I saw this patient he was showing evidence of symptomatology and reported that he had not been taking his medications for 2 to 3 weeks. This had not been known by the staff and when we spoke to the nurse it became apparent that the nurse was misreading the codes on the MAR and that he had in fact been refusing for about two weeks.

**960829305**

It is not clear from the record when this man came in on this particular charge. There is a several month gap between the end of 2014 and May 2015 so it is assumed the he returned some time prior to his first mental health contact in May, which occurs after he is placed in a safety cell on May 23 due to making suicidal statements. A psychiatric assessment is also conducted on May 23, 2015. He is found to have some psychotic symptoms and other findings including hypomania but refuses recommended antipsychotic medications. He is removed from the safety cell following day after making statements that he claimed suicidality in order to effect a housing change. However, he is also noted to be overtly symptomatic. He is seen every few days for the following week and then intermittently thereafter. Notes reflect assessment of his condition but no treatment.  The psychiatrist also sees him several times over the next two weeks but he continues to refuse medication and remains symptomatic.

There is no brief assessment in the record. In general notes reflect assessment and check-in but no formal treatment interventions other than medications.

When I saw this patient he presented as overtly psychotic. He was refusing medication.

**970023734**

The patient was arrested on April 16, 2015 and transferred to SWDC on April 17. He was first seen by mental health on April 23. There is a short note that indicates no positive findings of mental illness. He is placed in a safety cell April 27 after making suicidal statements.  Upon evaluation, the patient reported that he was not really suicidal but owing to dislike for rapists he feared that he would be a danger to others while placed in protective custody; he wants to be removed from protective custody but is told that has to stay there because he is trying to leave his gang. He is retained in the safety cell. A psychiatrist first sees him on April 27 and then April 28 but finds no evidence of mental illness though states on April 27 that he is dangerous and thus will remain in the safety cell. After release on April 28 he is seen every few days in safety cell follow up and then about every week thereafter with no obvious findings. He was seen by psychiatry several times over the next two weeks and started on some low-dose antipsychotic medications for what was described as residual visual hallucinations from substance abuse. This was soon stopped by another psychiatrist and replaced with a soporific dose of an antidepressant owing to complaints of insomnia. There are some subsequent medication changes; they are being prescribed for unclear reasons.

There is no brief assessment in the record. In general notes reflect limited assessment and check-in but no formal treatment interventions other than medications.

Despite being on an antipsychotic, there was no AIMS and laboratory studies were inadequate to assess metabolic syndrome.

When I saw this patient, there were no obvious signs of major mental illness but substantial personality disorder was evident.

**970069255**

The patient was arrested on December 24, 2014 and jailed at SCF.  He was placed in a safety cell on January 6, 2015 after making suicidal statements. He had a limited mental health evaluation that day. The plan is for him to be seen by psychiatry. However there is a later note that states:

"Consulted with the PM crisis [Clinical Therapist], A. Carswell regarding inmate's placement in the safety cell including statements inmate made to his attorney during his visit the attorney that [sic] inmate would kill himself, as well as treatment concerns for inmate while in the safety cell due to no psychiatrist being on duty. Agreed to retain inmate in the safety cell pending further assessment by clinical and psychiatric staff."

The following day he is noted to be "bizarre" and to display other psychotic symptoms including command hallucinations to kill himself. He speaks about killing himself by hanging. He is never seen by a psychiatrist but on January 8 is sent out on a 4011.6 to DCU.  However DCU does not keep him and he is return to SCF and placed in residential mental health housing. He is seen intermittently over the next week.

He was again placed in safety cell January 16 where he is first seen by a psychiatrist on January 17. He is found to be psychotic and suicidal and the plan is to refer him to DCU for evaluation and treatment. At that time the psychiatrist indicates that he is on olanzapine 10 mg though it is unclear by whom and when this was started.

Notes indicate that he was sent from DCU to RPDC on February 3, 2015. The DCU psychiatrist provided verbal information to clinicians there. However, before he could be seen, he was transferred to SWDC where he was seen in the following day. Charting reflects a limited evaluation. The psychiatrist did an assessment on February 6. The psychiatrist changes him to risperidone and mirtazapine for unclear reasons and also notes that he wonders whether this may be malingering rather than major mental illness. He is seen by a different psychiatrist the following day in the safety cell. Because of getting varying reports the psychiatrist also wonders about the possibility of malingering. He was released from the safety cell following day. He was again placed in a safety cell and is seen by a psychiatrist on February 12. At this time, there seems to be more concern about bona fide psychosis. The following day his medications were increased but he is released from the safety cell. He was placed in the safety cell yet again on February 26. Documentation indicates that he is getting more disorganized and more preoccupied with delusions and hallucinations. The following day his medications were again increased and he is released from the safety cell. He was again placed in the safety cell March 21 and is described as rambling, agitated, disheveled, anxious, depressed, labile, distracted, psychotic, and disorganized. He is sent to DCU again. Upon his return he was placed in a safety cell after a deputy discovers him getting a sheet ready to hang himself.  There, he was again seen by the psychiatrist on April 19. He is released from the safety cell on April 21. On May 5 the psychiatrist notes that he remains psychotic but is more stable. He was seen regularly thereafter and remains quite symptomatic but does not return the safety cell.

In general, notes reflect limited assessment and check-in but no formal treatment interventions other than medications.

There are no DCU discharge summaries or notes in the record.

Despite being on an antipsychotic, there were no AIMS or laboratory studies.

When I saw this patient, I found him overtly psychotic with obvious thought disorder and actively responding to auditory hallucinations. He was grossly delusional as well. He spoke about command

hallucinations to kill himself though stated he had no intention presently. I notified local clinical staff out of concern for his potential for self-harm.

**970006254**

The patient was first seen by mental health 10/23/14, the day of his arrival to SWDC.  He manifests evident psychosis.  His first contact with psychiatry was on October 27, 2014 owing to "bizarre behavior" including "wearing towel on head, has clogged toilet, apparently trying to bathe in toilet water". He is found to be psychotic and is started on risperidone. His adherence is poor initially and November 10 follow-up shows him still to be symptomatic. He makes suicidal statements and is placed in a safety cell where he is seen by a psychiatrist on November 15 who sees no evidence of mental illness, though at this point the patient is taking his medications which are continued.  His next psychiatric visit was November 24 and he has continued to stabilize.  In the interim, he has had three mental health contacts which reflect some work on developing coping skills and then continued work with mental health every one to two weeks. On February 2, 2015 he continues to be stable.  Mental health visits are monthly. On March 30 the psychiatrist opines that it is likely that his psychosis was drug-induced and begins to taper the antipsychotic.  He refuses to see mental health May 10.  His antipsychotic is stopped May 25.  He agrees to see mental health on June 7 and reports doing well, though there is limited assessment.

Despite being on an antipsychotic, there were no AIMS or laboratory studies.

When I saw him, he was shaking uncontrollably, obviously anxious, was very paranoid, and endorsed some hallucinations but stated they were less than before he had started medication.  He stated that he quit talking with mental health after a deputy talked about his crime, believing mental health had breached confidentiality.  When I pointed out that his alleged crime was publicly known, he remained convinced, in a paranoid manner, that mental health was the culprit.

**960874377**

This patient was admitted to SCF on January 29, 2015. He was placed in a safety cell on March 7; this is the first mental health contact. Deputies called mental health to the housing unit where the patient was found to be in crisis; he "stared at the wall and mumbled." Because the therapist was unable to assess his safety, he is placed in the safety cell. He was first seen by psychiatry March 8 but refused to speak. The following day he was still uncooperative but demonstrated evidence of psychosis. He was sent to DCU where he remained until March 27. On that date, RPDC nursing contacts mental health regarding his return. It appears there was no coordination of care prior to his return.  He is more communicative but remains overtly symptomatic. The plan is for him to see psychiatry. However, he is transferred to SWDC.

He is seen by mental health at SWDC on April 5. There is a limited note that states that he "presented confused and with poor memory". An April 6 note indicates that he is in mental health housing and deputies are asking whether he can be moved to general population which mental health does not recommend. He remains in mental health housing. His next visit with psychiatry was April 8. He has overt evidence of a major mental illness with psychosis and negative symptoms; the psychiatrist offers no plan and there is no statement about medications.  A May 6 psychiatric note indicates that he is taking an antidepressant and antipsychotic. He still symptomatic but doing better. There are brief check-in visits with mental health on May 12 and June 9.

There are no DCU notes or discharge summary in the record. There is no brief assessment in the record. In general notes reflect limited assessment and check-in but no formal treatment interventions other than medications.

Despite being on an antipsychotic, there were no AIMS or laboratory studies.

When I saw this patient, he manifested obvious findings of schizophrenia with both positive and negative symptoms.

**950706477**

This patient came in to RPDC March 26, 2015.  A brief assessment is completed March 27. He shows overt evidence of psychosis.  There is also a psychiatric assessment from March 27 and 28. He is found to be severely manic and psychotic. Medications are started. The psychiatrist sees him again on April 8 and he is slightly improved. He has brief supportive contacts with mental health every one to four weeks thereafter with the last being May 8.

Despite being on an antipsychotic, there were no AIMS or laboratory studies.

When I saw this patient he was delusional, thought disordered, and hypomanic. He told me he had not been taking medications for three weeks.  He also stated that he had placed a kite to see mental health one and a half weeks previously but had not yet seen them.

**970048356**

This patient was first referred by custody due to her "bizarre" behavior. She was seen by mental health on January 5, 2015 for a brief assessment but she is largely uncooperative. She was transferred to SCF on January 9 and s saw mental health three times in the first five days. She was initially uncooperative or minimally cooperative. She is felt to be psychotic and depressed. A January 14 note indicates an intention for her to be evaluated by psychiatry. There is no further documentation until a March 4 note indicating a court order for her to be seen by mental health and psychiatry.  Owing to a lack of psychiatric coverage at SCF, she was sent to SWDC for psychiatric evaluation on March 5. At that time she is started on fluoxetine.   She remained at SCF until a safety cell placement on March 19 necessitated a brief transfer to Indio though she was transferred back the same day after being evaluated and released from the safety cell.  It is difficult to determine what happened next; it appears that she was taken to court and in the context of this had a physical altercation and assaulted a deputy. She was then transferred to RPDC and placed in a safety cell. The court specified that she be evaluated for possible commitment but she was found not to meet criteria. The primary issues have been psychiatric problems related to a traumatic brain injury. She has difficulties with concentration, impulsivity, memory, mood, and psychotic symptoms.  These problems are noted on March 29 wherein the psychiatrist also indicates the need for possible conservator. For the next two months she refused to meet with mental health and psychiatry and her medications were stopped. On May 22 she expressed a desire to get back on her medications. She remains in the female residential mental health housing. The next psychiatric visit was May 30, 2015 at which time the psychiatrist starts fluoxetine (an antidepressant) and haloperidol (an antipsychotic).

In general notes reflect limited assessment and check-in but no formal treatment interventions other than medications.

Despite being on an antipsychotic, there were no AIMS or laboratory studies.

When I saw this patient she was very reticent and provided very little in the way of response or information. It was difficult to get a clear sense of her problems.

**970028684**

It is not clear from the record when this patient came into jail. He was first seen on April 29 following placement in a safety cell though the notes do not reveal why was placed in safety cell on the first place. He was seen several times on the 29th and 30th by a psychiatrist and Clinical Therapists.  He is overtly psychotic and largely uncooperative including not taking meals. He is sent out for 4011.6 evaluation and stays at DCU for about two weeks. On the day of his return May 17 he expresses suicidal ideation to deputies at RPDC and is then transferred to SCF owing to no safety cells at RPDC. The following day he is returned to DCU where he remains.

I reviewed the record at DCU and interviewed the patient. He is very ill, slowly recovering from a catatonic or near catatonic state.

There were no DCU records in the chart and no brief assessment.

**970061721**

It is not clear from the record when this patient came into jail. He was first seen at SWDC on November 18, 2014 after being placed in a safety cell by custody following an altercation with two other offenders. He reports having had command hallucinations to harm others. The psychiatrist reports on this but finds no evidence of mental illness and the patient denied hallucinations at that present time.  Despite this he was given an antipsychotic 11/20/14. The following day the patient reported that he had been unable to get refills of his medication as an outpatient and had been off them for three weeks prior to incarceration. It is determined that he has a history of substantial psychiatric illness including a two-year hospitalization. Over the next three months he has a very rocky course with frequent trips to the safety cell and ongoing symptoms. There are concerns both about his danger to others and danger to self. In March his self-destructive behavior increases. He stabs his penis with a pencil and then bangs his head to bloodiness.  From March up until the present time he is in and out of DCU. While at DCU he pulled out his own eye (auto-enucleation).

When I interviewed this man at DCU he remained overtly psychotic. It is clear that his problem behavior and dangerousness both to self and others is related to his serious mental illness. This is a man who needs long-term hospital level care.

There were no DCU records in the chart and no brief assessment.


## OPINIONS AND RECOMMENDATIONS

In my opinion, the mental health care currently provided in the Riverside jail system poses a significant risk of serious harm to prisoners confined in the Riverside jails. There are deficiencies in the intake process, conditions of confinement (in that they contribute to inadequate care), access to care, treatment, medication monitoring, medication administration, transitional services, suicide risk

management, restraint, and confidentiality. I will address the deficiencies in each of these areas and specific recommendations within each area.  Then I will offer recommendations for overall system change designed to provide constitutionally adequate care.

Before proceeding, it is important to note that between 2008 and 2012 there were substantial reductions in medical and mental health staffing in the Riverside jails. The three county agencies (RSD, DMH, Detention Medical Services) are clear that these losses occurred. Since that time the county has restored some of the staffing and continues to hire. When staff are lost, programs and systems of care are also lost or degraded. Riverside faces the challenge of restoring program infrastructure while hiring new staff.

**Specific Deficiencies**

Each of the below deficiencies creates a risk that serious harm will ensue.

**Intake Process**

I did not see evidence that the screening process was taking undue time. I also noted that safety precautions were promptly initiated as were referrals to mental health in such cases. Mental health response was timely in most situations except when mental health staff were not on duty and in these situations transfers to other jails with services, the emergency room, the ETS, or the DCU were done timely.

At the present time, intake screening is done both by deputies and by nurses.  The plan is to convert to having nurses do all the screenings but that is not in place as yet.  Nurses are being hired and additions to the work force will certainly make this more possible.

While it is within published standards for health trained deputies to conduct intake screenings, I applaud and encourage the decision to move to a nursing screening.  Some published standards indicate that the intake mental health screening should be done by a mental health professional.  In my opinion, the plan to move to a nursing screening is sufficient as long as the mental health component of that screening is strengthened.  But until that happens the current mechanisms have deficiencies with regard to the mental health screening component.

The chief limitation is the content of the screening itself. This screening should at a minimum address: present suicidal ideation, history of suicidal behavior, current psychotropic medication (prescribed and whether taking) and other mental health services, current mental health complaints, past history of inpatient or outpatient treatment, substance abuse history (current use is generally considered part of the medical assessment), history of sexually aggressive behavior, and risk/history of sexual victimization.

The current screening does not distinguish current from past treatment, does not ask about current mental health complaints, does not distinguish current from past suicidal ideation, does not ask about substance abuse history and does not ask about sexually aggressive behavior. The questions regarding suicidal ideation are particularly limited for this important screening function.  It is essential to clearly distinguish those who are having current suicidal ideation from those who have harmed themselves or thought of harming themselves in the past.  It is also prudent to ask whether the inmate has had any recent losses though this could be considered optional at this stage of assessment. It is probably apparent why it is important to ask about any current mental health complaints; in short, such a

question increases the likelihood that conditions highly associated with danger to self and danger to others will be detected. For instance, many may deny current suicidality but yet represent a substantial risk owing to their current level of distress, psychosis, or depression.

As Mr. Cunningham points out in his June 29, 2015 letter, this is likely readily corrected with the new EHR.  The Receiving Screening form in the new EHR corrects most of these issues.  It remains limited in the area of nurse observations but in other areas it goes beyond what is minimally necessary.

It is of concern that RSD reported that only 3 intakes were positive for mental health concerns in the first week of May (which should drive referrals to mental health outside of safety cell placement).  As noted above, this is either incorrect or represents a profoundly low rate of detection of mental health concerns at intake.  It is likely that it is incorrect as even during my visit.  But if this number is incorrect, it calls into question the ability of RSD to properly monitor the intake process.  If the number is correct, this reflects a profound deficit in the intake process.

Failure to adequately screen elevates the probability of missing those at imminent risk.  That this is currently a problem is demonstrated by the fact that only one of the patients I saw and whose records I reviewed was detected at screening.  And these patients almost all had substantial mental illness and all spent time in safety cells.  Most had clear histories of mental illness as well.

Another important point to make is that the use of signs posted outside holding cells indicating things like "PC" and "PSYCH" is also problematic on several fronts.  With regard to the mentally ill, it is a violation of their confidentiality.  In my opinion, the practice also creates a risk that these individuals will be identified as potential targets in the jail.  But most disconcerting is the image of callousness towards mental illness that it creates.  It cannot help but negatively impact the mentally ill and increase their likelihood of distrusting staff and refusing clinical services.

**Conditions of confinement**

Riverside County jail system is amongst the most restrictive correctional settings I have visited. Conditions in mental health housing are particularly restrictive. Those in mental health housing are presumed to be dangerous and housed in settings being run at nearly a maximum level of custody with restrictions exceeding those of similarly housed inmates and inmates with similar custody levels. They get less yard time, less day room time, are not allowed to eat communally, and have more limited access to programming.  As a direct result, they are more isolated and receive less structured activity, both of which are deleterious to those with serious mental health conditions.

In this regard it is important to note that over half of those housed in residential mental health settings have intermediate custody levels (3 and 4) and a substantial minority are level 3.  This demonstrates that objective risk measures do not identify this population as a dangerous population.  In general, mental illness is a very small risk factor for violence and criminality; the primary determinants of risk in the mentally ill are the same as those for the non-mentally ill.

Mental health staff are not permitted to meet face-to-face with their patients. However, education, religious services, and the incompetency to stand trial program are allowed to meet face-to-face with the same population. This limitation on mental health staff is highly unusual and unduly restrictive. It directly impairs the provision of adequate treatment by effectively denying access both by virtue of logistical access limitations and by virtue of forcing clinical interactions in a setting that is not conducive

to and sometimes even precludes a clinical interaction, e.g. because of inability to adequate communicate.

These limitations have also been extended to the DCU where patients are essentially confined to their rooms with almost no access to usual hospital psychiatric treatment such as groups and structured activities.  They are isolated most of the day.

While it is certainly appropriate to limit face-to-face contact with those properly identified as presenting a substantial and imminent risk to others, no effort is made to distinguish the dangerous mentally ill from the non-dangerous.

There are no step down residential units that would provide for lower levels of custody and thereby greater opportunities for programming and treatment.  While there is a plan to create such settings, this has not yet happened. It is also important to consider the number of beds at different custody levels and whether the number is appropriate given the needs and dangerousness of the mentally ill population.

During my visits I had contact with a number of patients in mental health housing who demonstrated no evidence of imminent danger to others. What is more, many of these individuals have cellmates. If they were truly so dangerous they should not be housed with others.

Isolation is deleterious to many mentally ill and so too is lack of structure, especially for those with more serious illnesses as they are impaired in their ability to perform such tasks as activities of daily living in the absence of proper assistance, especially when under stressful conditions such as incarceration.  This also creates a greater need for the use of safety cells owing to deterioration.  It also increases the likelihood that many with limited coping skills will feel suicidal, self-harm, or claim to be suicidal in order to get a housing change or simply access contact with others, e.g. mental health, that comes with such protestations.  A good example of this is case 950772462.  Lack of physical activity is also detrimental mentally as well as physically.

The cleanliness of the housing for the mentally ill was mixed. The mental health housing unit at RPDC had evident problems with cleanliness. Further, the safety cells were often poorly cleaned and malodorous.

In summary, these kinds of restrictions not only impede access to care but are themselves dangerous to the mentally ill.  The housing practices of the Riverside jail system are discriminatory, unreasonable, and place the mentally ill at risk of worsening their condition. Those with psychotic disorders can be expected to become more psychotic under conditions of relative isolation and unstructured time. Those who are depressed, suicidal, or self-destructive are similarly placed at greater risk of harming themselves under these conditions.

**Access to Care**

Access to care contemplates not only ultimate access but timely access.  Both are necessary to provide thee risk reduction that mental health services provide.  It also entails access to the right services.

There were a variety of problems with access to care.  The most salient is that mental health staff are not permitted to meet face-to-face with patients as noted above. There are several problems with this in terms of access. Again, the most evident is that many of the non-contact booths provide such poor conditions for communication that they effectively impede or even prevent access to treatment.

Further, because of this limitation, it is not possible to conduct groups, one of the most effective treatment modalities for the mentally ill.

Access to psychotropic medications is also limited. There are two primary ways that this is demonstrated. First, psychotropic medications are frequently not continued upon admission. Medical providers are charged with writing admission orders but do not write orders for psychotropic medications. While this could theoretically be done by psychiatrists, there is insufficient psychiatric availability and there is also not a practice of nurses (who work for Detention Health Services not for DMH) accepting verbal or telephone orders from psychiatrists; several told me that they do not do this.

The more substantial problem is lack of sufficient psychiatric prescribers. Not only does this have an impact on responding to intake psychotropic medications, but it also results in unreasonable delays in being seen upon routine referral. In general, it is expected that routine referrals should be responded to within two weeks. Delays longer than this were common.  I also saw cases of patients with psychosis who had been placed in safety cells who were not seen for several weeks, e.g. 950681583.

DMH mental health staff are regularly unable to meet their contractual obligation to meet inmates who request services within three days. This was demonstrated both by the JIMS tracking system and mental health staff themselves indicated they were unable to meet this requirement. The poor coordination between Detention Health Services and DMH magnify this problem. Because mental health staff do not reliably get the written request for services filled out by the inmate, they cannot consistently and reliably prioritize cases. It is essential for mental health to be able to prioritize such requests in order to determine those that reflect potentially urgent or emergent conditions, which may require an immediate response rather than a three-day response. For routine requests for service, it is reasonable to respond within two weeks (rather than within three days). But without the written request it is not possible to make this determination.

A marker of the severity of this problem, is the abundant number of court orders directed at securing a mental health assessment or provision of mental health treatment.  While these orders have been reduced, they are still numerous.  The reduction likely reflects both the County's effort to be responsive to court orders and the recent effort to restore staffing and services.

Once identified as having mental health treatment needs, access also contemplates the availability of appropriate treatment services.  There are extremely limited treatment services outside of medications.  There is almost no individual therapy and virtually no groups or other structured activities.

Another issue best captured under access to care is placement in the appropriate setting.  I saw several patients in the SWDC who had active and serious psychoses.  In one case, the patient was experiencing intermittent command hallucinations to harm himself, was overtly responding to internal stimuli, and showed evidence of delusions and thought disorder (I notified local mental health staff of his condition). At the same time, I saw patients in recognized residential mental health settings that had much less acute conditions.  This demonstrates that either the detection system is failing and/or placement processes are ineffective.  Further, the instance of a patient (970069255) returning from DCU to RPDC and being transferred to SWDC prior to ever being seen by mental health is highly concerning. In another case, a similar transfer to SWDC occurred shortly after return from DCU to RPDC without mental health involvement (960874377).  In general, I saw evidence of frequent unplanned transfers of the mentally ill (or at least no evidence of mental health being involved).  In addition, and despite the fact

that mental health has the authority to make residential placement determinations (absent safety and security concerns), by the terms of the agreement between RSD and DMH, there was evidence that some patients were transferred out of mental health residential housing without mental health participation to GP.  This means that either there is little consideration of mental illness in the transfer and placement process or there is a breakdown in communication between mental health and custody. The way the mental health notes are written, it appears that such unexpected transfers and failure to notify or involve mental health is commonplace.  Such transfers directly impact continuity of care, which can be framed both as an access problem (in that it is not possible to render appropriate care with such frequent moves, denying patients access to appropriate services) and a treatment issue (in that it disrupts treatment).

There is also evidence that placement in residential mental health housing can sometimes take several days and that mental health recommendations for placement in residential housing are sometimes not honored, even with patients who do not pose a safety and security risk (as evidenced by their placement in ordinary GP).  This includes patients with serious mental illness such as psychotic disorders.  Case 950681583 is an example of this.

**Treatment**

Treatment services within the Riverside jail system essentially consist of crisis response and psychotropic medication.  There are virtually no groups, no rehabilitative services, and no structured activities.  A course of individual sessions for formal treatment is rare.

Mental health staff are focused on responding to safety cells, conducting assessments, responding to crises within the jail, and responding to requests for service. Mental health staff report that they are able to only provide the barest of short-term supportive treatment for the most needy. And these services are provided almost exclusively in the residential settings.

Review of encounter codes for May of 2015 is consistent with the foregoing.  The bulk of codes are for case management, unspecified mental health services, and crises.  There are small minority of encounters coded as therapy.  Assessments are also lower in number than would be expected.  There were 400 mental health assessments and 308 psychiatric assessments.  Given that there are about 5000 bookings per month, half of which stay longer than 5 days, there are about 2500 potential patients (while some may be seen during those first few days, they would be primarily crises and I would not generally expect a complete assessment in that time frame).  Given that 1008 were on psychotropic medications in May and an average census of 3794, about 27% of the population is receiving these medications.  Each of these should have a psychiatric assessment and, in general, almost all would also have a mental health assessment.  The expectation would be to see about 625 psychiatric assessments at a minimum as patients should not be placed on medications without an assessment except in emergencies.  The absence of Brief Assessments (the form Clinical Therapists use to do assessments) in many records is consistent with this finding.  Thus, there is concern not only regarding lack of structured treatment services but also inadequate assessment, even though that is a large component of the work the mental health staff are conducting.

There are insufficient staff to provide programming in the residential mental health settings. For instance at the residential mental health at RPDC, the location identified to serve the most seriously mentally ill in the Riverside jail system, there is only one mental health staff on duty during days to

provide services to up to 80 male and 40 female patients. This is untenable. The most that can be done is to survey the population and to attempt to identify those who are deteriorating or entering into crisis, which is essentially what is done. This mostly consists of a mental health staff joining nursing in pill call and responding to any urgencies that appear at that time. But even this is substantially impaired owing to lack of privacy; deputies are in direct proximity to the clinical staff when they are interacting with the patients during pill call. In fact because of this, and quite appropriately, mental health staff have been directed to avoid discussing personal health information during pill call.

The situation is similar at the SCF residential units.  The informal residential unit at SWDC fared better in terms of the restrictiveness of the setting, but no better in terms of level of treatment.

I saw no evidence of any treatment plans. As would be expected from the foregoing, mental health charting demonstrated the provision of limited assessment services and crisis intervention. There was almost no evidence of any structured, proactive treatment. While I was told that some formal treatment modalities such as cognitive behavioral therapy are offered at times, I saw no evidence of charting reflecting such interventions or a treatment plan indicating the intention to render such treatment.

Psychotropic medications are prescribed on a regular basis.  Aside from the access problems noted above, the provision of psychotropic medication services is sound. Psychiatric assessments were adequate in most cases (when done) and medication follow-up appointments were sufficiently frequent. Prescribing patterns in the records reviewed were reasonable. The County's formulary restrictions, for instance emphasizing generics first, are also reasonable, especially since non-formulary requests are granted in critical situations.

Lack of availability of psychiatrists also has the consequence of impairing continuity of care. It is both more efficient and better treatment for a patient to be seen by the same psychiatric prescriber from visit to visit whenever possible.

Treatment is also hampered by frequent and poorly planned transfers both within and between institutions.  As noted above, transfers do not always reflect attention to mental health needs.

Mental health treatment in the Riverside Jails falls well below the standard of care. Inadequate treatment magnifies the risk of mental health deterioration with the potential for grave consequences. In my opinion, the level of service is so far below the standard of care that it is inadequate to a degree that poses an unreasonable risk of harm.

**Medication Monitoring**

Psychiatric monitoring of patients on antipsychotics is inadequate.  Patients are not getting regular Abnormal Involuntary Movement Scales (AIMS) or laboratory studies to monitor for metabolic syndrome.  These tests are the standard of care because antipsychotics can cause an unremitting movement disorder (Tardive Dyskinesia) and metabolic syndrome that can lead to substantial weight gain, diabetes mellitus, and complications associated with hyperlipidemia (e.g. heart disease and stroke).  Clearly, failure to monitor for these conditions represents an unreasonable risk of substantial harm.

**Medication Administration**

There are several problems around medication administration. In addition to the lack of psychiatric prescribers and ineffective ordering of psychotropics at intake, there are several problems with medication delivery. As previously noted, medications periodically do not accompany people when they transfer between institutions. It can sometimes take several days to rectify this.

Another pattern that I saw was mental health staff having to provide nurses with orders written by psychiatrists because the nurses stated that they did not have these orders even though they had been previously written. When considered in light of the fact that many nurses stated they did not take verbal or telephone orders from psychiatrists, this indicates a breakdown between psychiatric orders and nursing taking off those orders. This is likely related to the fact that they work in two different systems and use two different records.

As I noted in my observation of pill call, one of the nurses was administering medications in an unsafe manner. She was taking stacks of unmarked pill cups containing pills to the upper tiers and distributing the medications without being able to directly verify whose medications they were, apparently relying on the order in which she nested the cups. She also did not check patient identification or numbers.

Further information on this subject may be included in an addendum.

**Transitional Services**

Transitional services are at best minimal other than for the AB109 population. DMH and mental health staff both reported an initiative to improve connection to aftercare services but this has had limited penetration thus far; the majority of patients do not get assistance in this regard. What's more, transitional services do not even attempt to address broader reentry needs.  Failure to connect to services magnifies the risk of mental health deterioration.

Another large gap in transitional services involves medication. The existing system requires that patients call a medication telephone number to request a 30 day supply of medication after they have released. Many mentally ill do not have a phone or even a home. Their transportation opportunities are also exceedingly limited. Thus it is no surprise that only 20% even make the call initially. This system unnecessarily and predictably puts patients in a position where they are unlikely to be able to continue their medication immediately post-release. The potential for harm related to this is evident. Not only does stopping medications substantially increase the likelihood of deterioration of their condition but it also puts them at risk for discontinuation syndromes that can be very uncomfortable and add additional stress at an already challenging time.

**Suicide Risk Management**

There are three primary problems with suicide risk management in the Riverside jails. The first is that there is no option for one-to-one or constant monitoring in the jails. While I recognize that the intention is to transfer those requiring that level of monitoring to the hospital, it is nonetheless necessary to provide for that level of monitoring while awaiting transfer to the hospital at the very least.  Failure to do so elevates that risk that a serious suicide attempt will not be detected in time to prevent death or morbidity.

The second problem is that there are no provisions for stepping down suicide monitoring. Patients go from safety cells wearing a suicide smock and having no belongings and soft trays directly to general population or residential mental health with routine belongings and monitoring. While there are theoretically provisions for modifying conditions of confinement while in safety cells, as a matter of practice this is not done. It is essential to provide for restoration of risky items in a controlled setting to assure that these individuals can manage safely when monitoring is limited.  Failure to provide such stepdown precludes the opportunity for close observation as items are restored, providing greater assurance that those on monitoring are capable of safely managing them before placing them under lower levels of supervision and monitoring.

A formal decrement in the monitoring itself is also important. In general, monitoring provisions should allow for moving stepwise from constant one-to-one direct monitoring to frequent checks (usually 15 minute on average) to infrequent checks (usually 30 minutes on average) to daily check-ins and finally into routine monitoring with appropriate clinical services. Systems are also moving to having some inmates at risk of suicide placed intentionally with a cellmate, primarily to provide socialization but also, of course, because the cellmate might choose to report any concerns to staff.

While elements of such a monitoring scheme are provided for (such as periodic cell checks in general population, regardless of being on suicide monitoring), it is important that each of these monitoring statuses be recognized as a level of suicide watch. This serves as a reminder to all staff that these are not just routine checks but monitoring done for the express purpose of reducing risk of self-harm. Such monitoring would include closer attention and tracking of behavior rather than simply noting that the person is alive. In essence, the Riverside jail provides only for the second step, that is, frequent checks associated with careful monitoring of behavior.

The third issue is monitoring within safety cells.  RSD has worked hard to improve the monitoring and logs for safety cells and there are clear indications that this has been effective.  Deputies are conducting checks timely and logging behaviors, fluid administration, and limb rotations (for those in restraints) the vast majority of the time and continued auditing will likely bring this to the high level of fidelity needed for this important function.  But the more concerning finding is that medical monitoring by nursing is not being done reliably.  The standards set by Riverside are reasonable and fall within the standard of care. But present practice falls well the standard, creating unreasonable risk.  It is very important for nursing evaluations to be done as soon as possible after restraint or safety cell placement to assure that there are no emergent medical or psychiatric problems driving the behavior and no contraindications to restraint or safety cell placement.  Periodic follow-up as mandated is also essential to monitor for emerging conditions.

I also note that the safety cells themselves are not optimally configured in most instances. Ideal safety cells provide for recessed fixtures and high ceilings that most absolutely prevent occupants from being able to break off pieces of fixtures to either harm themselves or create anchor points for hanging. The safety cells in the Riverside jails do not have recessed fixtures though they are very robust fixtures that are difficult to damage. Some ceilings are sufficiently high but most are easily reached.  While they are not ideal, I would not say that they create undue risk based on materials reviewed.  But the sanitary conditions are, in some cases, unreasonable and must be addressed.

I saw one instance of a safety cell being used for behavioral reasons rather than danger to self or danger to others related to mental illness. This was case 970023734. But I did not find a pattern of such use.

## Restraint

Restraint does not seem to be used excessively or for prolonged periods.  Deputies are generally doing a good job of monitoring and doing required functions (water, food, range of motion).  While there were some lapses, they were not common and RSD is auditing these logs fairly regularly.

The primary problem is being seen timely by nursing staff, heightening the risk of not promptly detecting serious medical complications of restraint.

Mental health is generally responsive but in many cases, inmates are released before they would be expected to see them (four hours).  While the release may be reasonable, it is important for mental health to evaluate those put into behavioral restraint to assure that there is not a serious mental health condition.

## Confidentiality

While confidentiality has important limitations in correctional settings, they primarily contemplate breaching confidentiality when there is an identified risk or other "need to know" situation, in which case there is no expectation of confidentiality.  Limiting confidentiality because a risk might emerge is not reasonable.  Thus, the routine expectation should be that clinical communication is confidential. This applies at intake, pill call, clinic visits, and in written communications such as grievances and requests for services.

It is expected and necessary that non-clinicians are privy to personal health information in the natural course of business such as administrative staff processing records.  But staff who do this work should be bound by clinical confidentiality.

Sharing personal health information without proper authorization is its own form of damage.  But the more substantial risk is the chilling effect that non-confidential clinical interactions have on the free and complete exchange of information between patients and clinicians.

## Recommendations Regarding Specific Deficiencies

## Intake Process

The new EHR intake screening form for nurses should be modified to add additional items regarding nurse observations.  Nurse observations at intake should include specific items regarding mood and psychosis.  The nurse should make an observation about whether the person's mood was depressed, elated, labile, or neutral. There should also be items indicating whether the inmate exhibited delusional thinking, was responding to internal stimuli, or exhibited disorganization.  Some of the language regarding current complaints (for instance "voice any anxiety?") could be improved but the form addresses most of the important subject matter.

Part of the reason these additions are important is that a mental health professional is not conducting the screening but will use this information to prioritize cases. These questions are designed to identify the most acutely dangerous mental health conditions to allow the most rapid identification of these conditions both by the nurse and the mental health clinician reviewing the form.

In terms of data collection and the ability to report out and audit the intake process, computerized systems that can readily be queried for positive screens (or standing reports) should be created.  Here again, the new EHR should readily facilitate this process.

The practice of placing signs that label inmates as "PSYCH" should be halted.  It is understandable and reasonable that RSD would want its deputies to know about potential problems and potential risks but there are many alternatives to placing a public sign.

**Access to Care**

This is better addressed below in **RECOMMENDATIONS FOR CREATING A SYSTEM OF CARE**.  The only point I will make here is that improved coordination and sharing of information between medical staff, primarily nursing, and mental health staff is essential.  Several of the problems noted above are easily remedied, such as providing requests for service to mental health clinicians timely, assuring that clinical staff make referrals themselves rather than asking patients to do so, and arranging for the provision for intake psychotropic orders.

**Treatment**

In addition to the general provisions articulated below in **RECOMMENDATIONS FOR CREATING A SYSTEM OF CARE**, some more specific recommendations are in order.

The most important populations to treat are those with severe illness and those who represent a danger to self or others by virtue of their mental illness.  Thus services should be designed to address these types of disorders.  While crisis response is an important first step, it is only a first step, just as is the case in the treatment of any medical condition.  Continued care is necessary.

In order to provide appropriate care, good assessment in all cases is an indispensable first step.  There must be sufficient resource and access to allow for a thorough assessment prior to initiation of treatment, absent an emergency (and then assessment must ensue).

For those with psychotic disorders, highly structured activities and treatment and avoidance of isolation are the key elements in addition to medication.  These patients cannot organize themselves and readily fall more deeply into their psychotic thinking.  Psychosis itself is a destructive condition that must be alleviated.  Such treatment does not seek deep psychological insight but to reduce symptoms, develop self-management skills (e.g. symptom and emotion management), develop capacities to interact sufficiently to get needs met and limit conflict, provide education about mental illness and medications, and expand living skills (activities of daily living, self-care, accessing jail and community services, etc.).  These are not highly technical interventions and do not take extensive resources.

Those with serious mood disorders often need much of the preceding.  Those with depression may also require some individual or group treatment focused specifically on depression.  There are many "off the shelf" short-term group and individual treatment modules that are readily run in correctional settings.  Many of these employ cognitive behavioral therapy but other methods are also effective.

Those with recurrent and severe self-injurious behavior require different approaches.  It is essential to be able to develop and implement behavior management plans to decrease the inadvertent reinforcement of such behavior in the correctional setting.  One of the most common dynamics is that when the system is crisis-driven, crises are reinforced as they are the only sure way to get both

correctional and clinical staff to respond.  Developing plans to limit this dynamic is important and can be expanded to other populations of acting out behavior as well.

This population also needs interventions focused on self-management rather than the development of insight or addressing psychological traumas, which is beyond the reasonable scope of what a correctional setting can offer.  While the development some capacity for Dialectical Behavior Therapy (or similar modalities) is one clear way to do this, there are simpler and less costly methods and treatments that are better suited to the correctional setting.

**Medication Monitoring**

Psychiatrists must be expected to adhere to the standard of care for medication monitoring.  While I saw evidence of some monitoring, there was a clear pattern of failure to adequately monitor those prescribed antipsychotics.

**Medication administration**

The main thing needed is to improve coordination between psychiatry and nursing. If medical nurses are going to continue to provide psychotropic medications and take off psychiatric orders, they must provide the full range of medication services including taking off verbal orders and telephone orders and promptly and reliably taking off written orders.

In addition medication administration by nursing staff needs to be standardized and done per community standards.

**Transitional Services**

The current initiative to step up transitional services is welcome and necessary.  This is identified as an essential function for a constitutionally adequate system of care.  But here again, these services need not be provided to all those with a mental illness or even all those who are receiving treatment.  The key is to identify those who, by virtue of their serious mental illness, are unable to arrange aftercare themselves.  It is also unreasonable to expect jails to provide robust transitional services to those who are incarcerated for short periods of time.  One simple way to conceptualize this is that the longer the patient is in jail, the further down the following list the transitional services needs to extend.  Transitional services for the seriously mentally ill must:

- Assure medication continuity until community services take over (in all cases)
    - This will almost certainly require that medications are given to releasing patients who do not have their own supply of medications in the community
- Assure that a mental health appointment is in place within a period of time that will allow medications not to lapse (those incarcerated for more than two weeks)
- Assist in applying for or restoring benefits (those incarcerated for more than one month)
    - Medical insurance
    - Money benefits
- Assistance in securing housing (those incarcerated for more than two months)
    - It is recognized that the jail has little control over housing but jails also have information available to them and the wherewithal to maximize successful placement.

**Suicide Risk Management**

The County is doing a good job of identifying those at risk.  In most cases, assessment is timely and adequate.  However, in two of the suicide reviews, the mental health evaluations, as reported, were inadequate.  There was no evidence that a careful evaluation of relevant suicide risk factors was done.  Further, so-called "contracts for safety" (as was done in one of the cases) have been shown to be unreliable and are discouraged by experts in suicidology.  The quality of suicide assessments must be uniformly thorough and the use of contracts for safety halted.

The practice of conducting suicide assessments (or any mental health assessments other than restrictive housing rounds) at cell front also needs to be stopped, absent an identified risk to safety, which needs to be documented in the record.

A more comprehensive and flexible monitoring and follow-up system also needs to be developed.  Suicide monitoring must be expanded.  At present, there is essentially one level of suicide monitoring in the jails:  safety cell with 15 minute checks and camera monitoring with inmates in suicide smocks on suicide mattresses.  The jail must have the capacity for one-to-one or constant monitoring, at least while awaiting transport and while transporting to a licensed setting.  This requires that there be a staff member assigned to constantly watch the individual; it is reasonable for a staff member to watch more than one person but since this would only apply for short intervals awaiting transport, it will be rare that more than one person would need such monitoring.  In addition, there must at least be step-down monitoring that moves from 15 minute checks to 30 minute checks and then periodic follow-up assessment.  Equally important, there must be provision to restore clothing, utensils, and belongings in a progressive manner while still on a formal suicide monitoring status.  This can be done by creating a pre-established set of levels as long as there is the option to modify the conditions in response to the particular risks an individual presents.  As a simple example, for some the risk is sharps while for others it is hanging and yet others are at risk of swallowing.

Similarly, flexibility of follow-up by mental health once a patient is released from suicide monitoring is also needed.  The current scheme demands that all those released be seen daily for a week and then reduce from there.  This is not being met and is an unreasonable and unnecessary burden on mental health staff.  Some minimum expectation is prudent to assure that convenience does not lead to neglect.  A reasonable minimum is to provide follow-up the next working day and then within 3-7 days.  Each case must of course be evaluated with regard to the need for more frequent and/or on-going follow-up and treatment.  The county is certainly free to continue its current practice but it must then be able to meet its policy requirements, which it is not doing at present.  My recommendation is to provide appropriately flexible follow-up to free up resources for other needed services.

The current practice of custody beginning with full precautions is preferred.  But any decrease in monitoring status requires a face-to-face by a qualified mental health professional, consistent with current practice.

Nursing assessments of those in safety cells also need to be brought in compliance with current policy, which is reasonable.

Lastly, the suicide review process needs to include a formal medical and mental health component.  DMH policy indicates that they are to do a review of critical incidents including suicides.  No such

information was included in the suicide review materials provided.  The practice should also include a formal psychological autopsy.

**Restraint**

Continue auditing the logs and monitoring.  This seems to be having good effect.  Nursing staff must be freed up and expected to provide timely assessments of those in restraint.  While there is some variation in standards for monitoring in restraint, the current policy is a reasonable standard.

**Confidentiality**

Provide for confidentiality in all settings to the maximum degree possible.  All written documents including personal health information should be processed by health care staff, including administrative staff (sealed or otherwise protected materials can be handled by any staff, e.g., for the purposes of transport).  Patient-clinician encounters should be confidential to the maximum extent possible, absent an identified (not potential) risk.  It is reasonable and desirable for deputies to be able to observe intake screenings but the content of the conversation should remain confidential, other than when appropriately trained deputies are conducting the screenings themselves and have the same requirements for confidentiality as clinical staff.

In the case of grievances, they are marked as medical or mental health and should be so directed.  This may necessitate developing a separate grievance form for health care.

Riverside could develop specialized deputies who serve dual roles of treatment and custody (beyond those who are trained in the intake screening process) as a way of maximizing safety and security and ensuring confidentiality; many systems have developed such positions. But this is an option not a need or a formal recommendation.

While it is true that HIPAA regulations do provide for disclosure of protected health information, it is on a need to know basis.  Further, the determination of the need to know is the responsibility of clinical staff on a case-by-case basis, though policy can certainly set guidelines for the type of information that rises to that level.  It is also legitimate to provide close custody monitoring of clinical interactions when there are no other reasonable options for providing for safety and security but, again, on a case-by-case basis, not as a routine practice.  It is possible to provide for confidential medical and mental health screening at intake by allowing visual observation by custody staff who cannot hear the content of the interaction.  This can be achieved in other settings as well.

**Recommendations For Creating A System Of Care**

The Riverside County jails do not have a system of care.  Staff at local facilities respond to crises and provide medications; there is limited coordination or continuity of services between settings.

I will offer recommendations in two realms: system components and system capacity.  The components are the elements of the system while capacity looks at physical plant and staffing needs.  The former is based in well-established principles of care and in light of standards emerging from legal requirements.  The latter is based on population data from Riverside County Jails considered in the context of national studies regarding the prevalence of mental illness.  Recommended caseloads are based on analysis and experience with systems that provide care sufficient to reasonably prevent harm.

In order to achieve a number of the recommendations, clinicians need to have greater access to patients, including being able to meet face-to-face and conduct groups when appropriate.  While adequate treatment could be provided without using groups, it would require far more staffing; the below is predicated on the assumption that such groups will be available, at least in the step-down settings, such as that planned for SCF.

**System Components**

The following are my recommendations for providing a constitutionally adequate level of mental health care.  By comprehensively developing the mental health system, many of the specific deficiencies will be addressed and the system will be more cost effective.  The County is clearly providing some elements of an effective correctional mental health system but is missing many as well.  The essential general features of such a system include:

- systematic screening and evaluation using valid and reliable methods
  - intake screening
  - mental health evaluation
  - mental health screening and rounds in restricted housing units
- treatment that is more than mere seclusion or close supervision
  - outpatient level services
  - residential mental health housing that is available regardless of custody level
- access to licensed level care
- involuntary treatment including the use of seclusion, restraint, involuntary medications, and involuntary hospitalization
- provisions for medical-legal demands
  - informed consent
  - privacy of protected health information (with pertinent limitations described)
  - the right to refuse treatment
- participation in treatment by trained mental health professionals
- adequate out of cell time (for both structured and unstructured activities)
- accurate, complete, and confidential records
- safeguards against psychotropic medication prescribed in dangerous amounts, without adequate supervision, or otherwise inappropriately administered
- a suicide prevention program
- mechanisms to minimize the placement of the mentally ill into maximum custody settings
- reentry planning
- training for mental health staff regarding correctional and security issues
- training of correctional staff regarding mental health issues
- quality improvement program
- policies to support the preceding

In order to accomplish the above a system must provide:

- adequate physical resources regarding treatment program space and supplies
- adequate human resources concerning numbers of properly trained and/or experienced mental health staff who will identify and/or provide treatment to inmates with serious mental illness

- adequate access for inmates to the physical and human resources within a reasonable period of time

An array of services and actual treatment must be provided in accordance with the principles laid out above.  But it is also necessary to focus resources in a manner that assures the sickest are identified and treated.  Not everybody who would benefit from treatment needs to be offered treatment.  It is completely reasonable for the County to have what amounts to a mental health "benefit" or, more strongly, the County may limit its services to those who are most in need and whose conditions place themselves and others at risk for mortality or morbidity.  Unfortunately, it is not possible to do this solely on the basis of diagnosis as some mental health disorders can vary so widely in the associated functional limitations and symptom severity that some measure of severity and functional limitation must guide the decision to treat in those cases.  Clearly, diagnosis can be used to identify the most seriously ill that will always be treated:  psychotic disorders, major depression (moderate or more severe), and bipolar disorder (properly diagnosed). Further, it will be necessary to treat those who have made suicide attempts, have suicidal ideation, or have engaged in recurrent and/or severe self-injurious behavior.  Beyond this, the primary consideration should be for those whose mental illness (excluding personality disorders) is directly related to their continuing stay in segregation or maximum security settings.  This reaches the Constitutional minimum but the County may find it to its advantage for additional correctional interests to be drivers of mental health service delivery.  Infractions, criminal recidivism, and ability to program are important interests that mental health treatment can benefit in many cases.

As the length of stay increases, owing to AB 109, it will become even more necessary to provide such structured and proactive treatment.  It is in the County's interest to rapidly identify, treat, and stabilize those who are going to remain sometimes for years.  Preventive and maintenance care are cost-effective when properly organized and delivered.

A correctional system of care that can accomplish these ends has the following components:

- Articulation of a mental health benefit that communicates clearly to inmates, staff, and the community what the jail does and does not provide in terms of mental health treatment
  - This entails a mechanism to identify three populations
    - Those not identified as needing or having needed treatment
    - Those receiving treatment
    - Those who have received treatment but now need only surveillance or case management (monthly check-in)
- Provision for confidential interactions between mental health staff and patients
  - Include explicit recognition of the limits of confidentiality in correctional settings
- Provision for mental health to have direct patient contact absent a clear and present danger
- Initial screening that does not miss important conditions and needs
  - The imminently suicidal or self-destructive
  - Those who are a danger to others by virtue of mental illness
  - Those with psychotic disorders
  - Those who are admitted on psychotropic medications
- A reliable mechanism for assuring continuation of medications upon admission, throughout incarceration, and into the community

- A robust system of detection that seeks to identify those who were missed at initial screening or who have decompensated while in jail
    - A mechanism for inmate-declared emergencies
    - A mechanism for staff-declared emergencies
    - A self-referral process (request for service or "kite")
        - Kites must be prioritized (triaged) within 24 hours
            - Emergent – to be seen ASAP
            - Urgent – to be seen the next working day
            - Routine – to be seen within two weeks
            - Response – require only a written or verbal response (e.g. "your refill has been ordered") but no formal clinical assessment or intervention
    - A staff referral process (custody and medical)
        - These may be prioritized (triaged) within 24 hours or the next working day (staff should be expected to be able to identify true urgencies and emergencies)
            - Emergent – to be seen ASAP
            - Urgent – to be seen the next working day
            - Routine – to be seen within two weeks
            - Response – require only a written or verbal response (e.g. "your refill has been ordered") but no formal clinical assessment or intervention
- A robust suicide assessment and management system
    - The above referral and detection elements are the most important element
    - The availability of constant monitoring at any time
    - A progressive step-down monitoring system
        - Stepwise decrease in staff monitoring from one-to-one to 15 minute checks (may include camera monitoring and then no camera monitoring) to 30 minute checks
        - Stepwise increase in belongings from smock and soft tray with progressive additions of clothing, utensils, and other items (this can be done with a formal series of steps but some flexibility is necessary as each case will represent different kinds of risk)
        - Reductions in monitoring only occur after face-to-face evaluation by a mental health professional
        - A follow-up plan for when monitoring ends that provides, at a minimum, for follow-up the next working day and 3-7 days after
- A system of care that provides several levels of care with non-medication treatments focused on the residential settings
    - A restrictive housing level of care
        - For the dangerous mentally ill
        - Progression through levels or steps as a measure for readiness for step-down
        - 10 hours of out of cell unstructured time each week
            - Solo progressing to group
        - 10 hours of out of cell structured activities
            - With staff

- Treatment (individual and/or group), structured recreation, rehabilitation (e.g., psycho-education, supervised ADLs and cell cleaning), education, work, programs
- May necessitate development of the ability to hold groups with restrained participants on these units only

o A step-down level of care (should be a larger number of beds than the restrictive settings)
  ▪ For those who do not need restrictive housing and those who progress from restrictive housing
  ▪ Expanded out of cell time
    - The added time can be primarily unstructured but additional structured time with an emphasis on correctional programming, education, and work is beneficial
    - Structured treatment designed to maintain stability and develop self-management skills rather than to explore or address long-standing psychological problems

o Develop special housing units or at least differentiate residential settings by pod to separate, as much as possible, those with:
  ▪ Major mental illness
  ▪ Personality disorder
  ▪ Cognitive impairment

o Outpatient (general population) services
  ▪ Emphasize primarily medication management
  ▪ Other brief treatment focused on self-management skills and support rather than exploring or addressing long-standing psychological problems
  ▪ Limit mental health staff involvement in correctional programming
    - Their involvement should primarily be to assist in training custody and/or program staff to deliver the content themselves

o Placement
  ▪ Develop a system for placement
    - No placement in residential mental health without mental health assent
    - No transfer out of a residential setting without mental health assent (absent an emergency)
    - Mental health recommendation for placement in residential mental health housing is implemented directly unless a determination is made that safety and security demands preclude such placement
      o Adequate treatment must still be provided
  ▪ Ready access to licensed level of care
  ▪ Mechanisms to divert the seriously mentally ill from maximum custody settings whenever possible

o Medication management
  ▪ Provide for emergency involuntary medication in the jails
    - Since this can be done and may be directly and imminently associated with safety, it must be done

- Consider providing long-term, non-emergent involuntary medication
  - This can remain at only the licensed level of care but allowing this to occur in jails introduces efficiencies into the system
- o Restraint
  - Consider providing behavioral restraint ordered by qualified licensed staff in the jails
    - This can remain at only the licensed level of care but allowing this to occur in jails introduces efficiencies into the system
    - There must at least be provision for behavioral restraint while awaiting transport and during transport to a licensed facility
- o Re-entry services
  - Focused on those in residential mental health settings (in a tiered manner as detailed above)
    - Medications provided until care can be resumed or initiated in the community
    - Community follow-up appointments
    - Housing to the extent possible
    - Assistance in securing medical insurance and money benefits
  - General population
    - Provide information about community resources
- o Training
  - Mental health staff
    - Correctional mental health system
    - Correctional mental health policies
    - Suicide assessment and intervention
    - Treatment modalities to be offered in the jails
  - Correctional staff
    - Mental health policies
    - Critical incident response
    - Recognizing different types of mental illness
    - Interacting with the mentally ill
    - Suicide and self-harm detection and prevention
- o Quality Improvement processes sufficient to support the above
- o Policies and procedures to support the above plus other important medico-legal issues
  - Competence and consent
  - Right to refuse
  - Confidentiality and release of information
    - Including provisions for information exchange for the purposes of continuity of care

**System Capacity**

<u>Prevalence of Mental Illness</u>

While there are varying ways establishing the prevalence of mental illness in correctional settings, it is beyond the scope of this report to detail the extensive literature on this topic.  The numbers I cite are generally accepted and, if anything, conservative (in the sense of reliably detecting true cases but minimizing the detection of false cases and emphasizing serious illness over the mere presence of a diagnosable disorder, which is present in the vast majority of the incarcerated population).

Those with serious mental illness that are likely to need some level of service is 15-25% of the jail population.  Those with illness so severe that they require residential or licensed level of service are 2-4%.  Most developed systems treat about 25% of the male population and 30-50% of the female population.

Using these figures and a jail census rounded to 3800, this gives the following:

- 570-950 with illness needing some level of service
- 76-152 requiring residential or licensed level of care

These are consistent with figures provided by DMH who finds that 18% (684) of the population have a serious mental illness (schizophrenia, depression, bipolar disorder) and 42% (1586) have an open case, that is, are officially recognized as requiring at least monthly check-ins.

The percentage of inmates reported by DMH to be on psychotropic medications is 26.8.  At each facility, the percentages are:

- RPDC:  41%
- SWDC:  22%
- SCF:  25%
- Indio:  29%
- Blythe:  6%

These medication figures are also in line with data reported from other systems, which are typically on the order of 25%.

<u>Residential Beds</u>

There are many in residential settings who do not suffer from serious mental illness but from personality disorders and cognitive disorders.  The County may choose to provide residential services to those with personality disorders but this would necessitate provision of beds in addition to the needs enumerated in this section.

Those with cognitive disorders are often housed in residential mental health settings when more than mild deficits are present.  But they have very different needs, typically requiring special housing, separated from general population inmates, with services primarily directed at activities and skill development (self-care and self-management) rather than intensive mental health treatment.  The data provided do not allow a reliable estimate of these numbers; while DMH reports less than 1% "organic" disorders, usually consisting primarily of dementia and traumatic brain injury (TBI), there is no data for

intellectual disabilities.  In the community, the prevalence of dementia is very low under age 65 but is about 14% for those aged 71 and above.  The prevalence is higher in correctional settings but it does not represent a substantial number in the jails as there are few inmates over 70.  But the prevalence of intellectual disability in corrections is 4-10%, again higher than in the community.  Prevalence estimates of TBI vary widely and have been found to be as high as 60% in correctional populations.  In 2010, about 1% of the US population had a disability following hospitalization for a traumatic brain injury, providing a conservative estimate.  In short, it is virtually certain that a good deal of cognitive disorder is going undetected in the Riverside jail system.  Using a lower estimate, 4% + 1% = 5% (190) of the population can be expected to have intellectual disability or disability due to TBI.  A substantial portion of these are expected to need residential or special housing, conservatively about half or about 100.

Taken together with the mental health residential needs from above (76-152), a conservative estimate is that around 200 residential beds are needed.  The jails currently have up to 188 beds officially designated as residential but usually cannot use them all because of the need to provide single cells for many of the more seriously ill.  The additional beds at SWDC and those planned at SCF are more than sufficient.

Thus, the current number of residential and licensed beds is likely sufficient to manage the mentally ill population, assuming general population services are sufficient to maintain the stability of those seriously mentally ill residing in general population.  While the number of beds may be sufficient, they are not properly arrayed.  As mentioned previously, it is important to have residential beds at both high and low levels of custody.  And the above-mentioned problem of mixing diverse populations needs to be addressed as well.  The plan for a step down unit outlined in the June 18, 2015 memo from Ms. Johnson to Mr. O'Harra includes the kinds of services needed for such a unit.  However, if it is run with the kind of security limitations currently present in the residential mental health units, it will not be able to serve this function.  In addition, it is likely that (at some point) those with cognitive disorders may require a separate housing unit or at least differentiated program opportunities designed more for the habilitative and rehabilitative needs resulting from the functional limitations of this population which, to reiterate, are quite different from the needs of the mentally ill.

<u>Medical Records</u>

While it is possible to provide good quality care with a poor record system (assuming full access to all information by all clinical staff), poor records systems are a significant barrier to care and to efficiency.  The dual record system that currently exists, and will still exist with the electronic record system for medical, creates intrinsic barriers to the exchange of information that increases the likelihood of complications and lack of information.  It also introduces substantial inefficiencies, further taxing the already stretched staff, thereby inducing them to take shortcuts that create risk.  While I did not mark this is a formal "deficiency" (because it can be overcome), it is a barrier that can only create inefficiency and/or risk.  The county would be wise to take measures to consolidate records or at least provide open access to all clinicians, regardless of agencies.  It is unreasonable to deny either medical or mental health staff access to the important clinical information available in both sets of records.

Staffing

Staffing needs to be sufficient to provide the services described above.  It is beyond the scope of this report to generate a staffing model but some general comments and an example may assist in estimating staffing needs.

It is reasonable for a psychiatrist to manage 50 residential patients in an acute correctional setting and 100 in a chronic setting.  At this point, the jails have almost entirely acute settings but long-term, with AB109 populations likely to grow, more chronic settings will be necessary.  Thus, it can be estimated that 4 FTE psychiatrists are needed just for residential services.

But to look at overall psychiatric need, it is important to assess the relevant functions psychiatrists must serve.  Intake or initial psychiatric evaluations take a minimum of one hour and 30 minutes is reasonable for medication follow-up.  Thus, if we assume that 25% of the jail population will receive psychotropic medications and remove the approximately 50% of 58,000 bookings that stay a day or less, we can estimate that there will be 0.25 X 29,000 = 8410 intakes at the high end.  Limiting the number to just those staying more than 5 days (30%), the figure is 4350.  This amounts to approximately 2-4 FTE.  This is a very conservative estimate as it assumes that 100% of 2000 hours of annual working time is dedicated to patient care.  Attaining 70% clinical productivity would be outstanding in a correctional setting, yielding FTE estimates of 3-6.  In addition, follow-up will be necessary.  Given that we do not know the average length of stay of those in jail 5 days or longer, it is difficult to make a sound estimate of how much follow-up time is needed for those taking psychotropic medication.  Making a conservative estimate that each patient will need a monthly visit (note that the actual figure is 1.5 psychiatric encounters/patient-month but this includes assessment and other encounters such as safety cell assessments) for 5 months, this adds another 2.5 X 8410 = 21,025 or 2.5 X 4350 = 10,875 hours, amounting to 8-15 FTE. This excludes any assessment of those in safety cells (which psychiatrists need not do but currently are) and any other clinical services.  Thus, conservatively, 11-21 psychiatrists are needed to provide basic services.  Right now the jails have about 7 FTE of fragmented psychiatric time.  It is entirely reasonable for the county to use the lower end estimate as a starting point, especially if steps are taken to improve efficiency.  Psychiatric efficiency can be improved by reducing idle time (psychiatrists report that when patients do not show or there is no deputy runner available that they often do not have patients to see), limiting psychiatric involvement in safety cell management to medication management and challenging release decisions requiring consultation (which could also be provided by psychologists if available as recommended below), providing administrative support, and limiting the mental health benefit to those prisoners with serious mental health needs.

While similar calculations can be made for Clinical Therapists, this is much more difficult as they serve a wide range of functions that would be difficult to enumerate and estimate the time each takes.  The needs represented by treatment requirements of residential settings can be estimated as can approximate general population caseloads for on-going services.  As these functions are not being served effectively at this time, these can be considered as a starting conservative estimate of additional staff requirements.  This is predicated on the assumption that some functions are removed, such as the requirement to see all those submitting requests for service and the requirement to see every patient coming out of a safety cell daily for 7 days and to see every inmate that sends a request for services.  If these functions are trimmed down and limited discretion added, it is likely that these functions, crisis response, and initial assessments will be able to be met by existing staffing.

Structured residential programming for a minimum of 10 hours per week for 200 patients begins by establishing group size. While up to 15 is reasonable in community and hospital settings, it is very difficult to run groups of this size in corrections. Most systems find that on average 10 is achievable. We can also assume that up to 25% will refuse groups, leaving 150. We can further assume that at least 4 of the 10 hours can be achieved by education and other correctional programs, though it is important to note that this is not occurring at all at the present time and may require additional resources. Another hour per week of individual contact brings the group treatment load to 5 hours per week. 150 patients in groups of 10 for five hours per group amounts to 75 hours per week. Each hour of group requires an hour of preparation and documentation, bringing the total to 150 hours per week or 7800 hours/year, amounting to 5.5 FTE (at 70% efficiency). In addition, an hour a week of individual contact for each of the 200 residential patients is another 200 hours or 10,400/year or 7.5 FTE (at 70% efficiency).

For general population settings, I make the following assumptions. Mental health rarely has contact with those staying less than a day; it is estimated as zero. This leaves about 30,000 bookings per year, of which mental health has contact with about 7777 or about 26%, quite similar to the 25% who are estimated to be prescribed psychotropic medication. DMH states that about 42% are identified as being open cases. This provides outer estimates of numbers being served, that is, between 0.26 X 3800 = 988 (rounded to 1000) and .42 X 3800 = 1596 (rounded to 1600). Subtracting the 200 residential beds, this leaves about 800-1400 being served in general population. Each of these requires at least a monthly check-in, estimated at 30 minutes including charting. This amounts to 12 X 0.5 X 800 = 4800 to 12 X 0.5 X 1600 = 9600 hours per year of clinical time. At 70% clinical efficiency, this amounts to about 3.5 to 7 FTE. This excludes the provision of any groups, individual treatment, or the addition of the intended correctional programming groups such as MRT and Thinking for a Change.

Lastly, to provide transitional services will require the addition of two FTE in order to serve the 200 in residential settings.

Thus, in order to provide minimally adequate mental health services (assuming a reduction in existing Clinical Therapist duties and requirements as described above), an additional 11-16.5 FTE of Clinical Therapist time are required. While there are some minor discrepancies in staffing reports, the general situation is that there remain about 12.6 FTE Clinical Therapist positions unfilled. Thus, after filling these positions, adding the needed psychiatrists noted above, and making the system changes detailed above, it should be possible (perhaps with a few additional positions) for the County to meet its minimally adequate requirement for mental health services. As mentioned previously, the county also plans to add an additional 8 FTE Clinical Therapists at SCF, reportedly to provide correctional programming. If properly arrayed, this should be attainable, though I again offer that it may be in the county's interest to consider having non-clinical program staff run these groups or at least to use mental health staff only to develop programs and train custody and/or program staff to deliver these services.

But I must emphasize that the only important outcome is not staffing numbers but the provision of services. If the Riverside County jail system can provide the needed services through different staffing approaches, that is entirely reasonable. Again, these staffing numbers are offered as a way to quantitatively estimate needs.

In closing my recommendations, I note that it would be beneficial to consider hiring other job classes such as Recreational Therapists (for residential groups) and Social Workers (for transition services).

There is currently only one licensed psychologist working in the jails.  Another strong recommendation is that DMH should hire at least one doctoral level, licensed psychologist at each of the three major facilities (and the new Indio jail when completed) in order to oversee the system of care and to provide more robust clinical oversight to frontline clinicians such as Clinical Therapists.  These need not be additional positions but conversion of existing positions.

**NCCHC ACCREDITATION**

Mr. Cunningham asked that I comment on whether NCCHC accreditation would address some or all of the concerns expressed above.  In my opinion, realizing the NCCHC standards, rather than accreditation itself, would address the majority of my concerns.  As with most accreditation there is, understandably, and to some degree necessarily, an emphasis on paperwork which is why realizing the standards is more important than the accreditation itself.  It is also important to recognize that correctional standards, including NCCHC, are evolving and expanding both as the field matures and as correctional systems face greater burdens of mentally ill and cognitively impaired.  One area that standards do not well address is systems, that is, the overarching structure of the system.  This is reasonable as they focus on care delivery at the point of patient contact and the content of policies, rather than how a system is arrayed to achieve results.  The standards also lack specificity in some areas.  Most importantly, they do not address the adequacy of treatment in the sense of whether or not the services rendered are actually the right services for the patient, whether they are delivered in sufficient dosage (a concept that applies to treatments besides medication), or whether the services achieve fidelity to the treatment model.

This concludes my report.


Respectfully submitted,


Bruce C. Gage, M.D.